# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE
COMMISSION,

                              Plaintiff,

          vs.

LOUIS SCHOOLER and FIRST
FINANCIAL PLANNING CORPORATION
d/b/a WESTERN FINANCIAL PLANNING
CORPORATION,

                              Defendant.

CASE NO. 12-CV-2164-LAB-JMA

**PRELIMINARY INJUNCTION
ORDER**

          The SEC filed a complaint against Schooler and Western Financial on September 4, and on September 6 it applied for a temporary restraining order.  The Court entered a TRO that same day.  After denying Defendants' motion to dissolve the TRO and hearing oral argument—after which the parties attempted to reach a settlement and failed—the Court must now decide whether to convert the TRO into a preliminary injunction.

          As the Court explains in some detail below, it will grant the SEC's motion for a preliminary injunction, but on a more limited basis than it tentatively offered at the preliminary injunction hearing.

## I.    Legal Standard

          In the typical case, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  This is the standard the Defendants would have the Court apply.  Not only that, but Defendants

1  urge the Court to, in essence, stack standards.  Because the SEC would have to make its

2  case at trial by "clear and convincing evidence," Defendants argue that the SEC must now

3  establish not only that it is likely to succeed on the merits, but that it is likely to do so *by clear*

4  *and convincing evidence.*[1]

5      The SEC is of a very different mind.  It isn't, after all, the typical private litigant, but a

6  "statutory guardian charged with safeguarding the public interest in enforcing the securities

7  laws." *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975).  Indeed, the Second

8  Circuit in *Mgmt. Dynamics* called it a "crucial error" to "assum[e] that SEC enforcement

9  actions seeking  injunctions are governed by criteria identical to those which apply in private

10  injunction suits." *Id.* at 808.  It explained that while injunctive relief in private actions is

11  "rooted wholly in the equity jurisdiction of the federal court," SEC suits for injunctive relief are

12  "creatures of statute." *Id.*  That's true.  *See* 15 U.S.C. §§ 77t(b), 78u(d).  The statutes,

13  however, don't provide the exact standard to be applied; they merely authorize district courts

14  to grant injunctive relief "upon a proper showing."

15      What is the standard, then, if not the *Winter* standard?  According to the SEC, it need

16  only establish: (1) a prima facie case that Defendants have violated the securities laws; and

17  (2) a reasonable likelihood that their violations will be repeated.  There is some authority for

18  this. *See SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 n.2 (11th Cir. 1999)

19  ("Under 20(b) of the Securities Act of 1933, and Section 21(d) of the Securities Exchange Act

20  of 1934, the SEC is entitled to a preliminary injunction when it establishes the following: (1)

21  a prima facie case of previous violations of federal securities laws, and (2) a reasonable

22  likelihood that the wrong will be repealed."); *SEC v. Bravata*, 763 F.Supp.2d 891, 918 (E.D.

23  Mich. 2011) (applying *Unique Fin. Concepts* standard); *SEC v. Homestead Props., L.P.*,

24

_____

25      [1] The Court isn't sure where Defendants get this "clear and convincing" language.  In
   fact, "[i]n a civil enforcement proceeding, the SEC must prove a violation of the relevant
26  statute or rule by a preponderance of the evidence." *SEC v. Colonial Inv. Mgmt. LLC*, 381
   Fed.Appx. 27, 28 (2d Cir. 2010).  So, even assuming the Court were inclined to stack
27  standards, it would ask whether the SEC is likely to succeed on the merits *by a*
   *preponderance of the evidence.*  Perhaps the explanation is that, according to Defendants,
28  clear and convincing evidence is required to establish the scienter element of securities
   fraud.  (*See* Tr. at 29:6–10.)

1    2009 WL 5173685 at *2 (C.D. Cal. Dec. 18, 2009) (same); *SEC v. Shiner*, 268 F.Supp.2d

2    1333, 1340 (S.D. Fla. 2003) (same); *SEC v. Phoenix Telecom, LLC*, 239 F.Supp.2d 1292,

3    1296 (N.D. Ga. 2000) (same).  The Court will follow this precedent.[2]

4    **II.   Discussion**

5         The big issue in this case is whether interests in the general partnerships organized

6    by Defendants are securities, which they must be in order to trigger the SEC's enforcement

7    authority.  If they are, Defendants are certainly on the hook for the unregistered offer and

8    sale of securities, and, depending on the facts, they may be on the hook for securities fraud

9    as well.  At the preliminary injunction hearing, the Court indicated a willingness to: (1) make

10   a preliminary finding that the general partnership interests are securities; and (2) grant

11   _____

12   [2] The Court acknowledges there is not clear uniformity on the standard to be applied.
     For example, the Ninth Circuit has held that "[i]n statutory enforcement cases where the
13   government has met the 'probability of success' prong of the preliminary injunction test, we
     presume it has met the 'possibility of irreparable injury' prong because the passage of the
     statute is itself an implied finding by Congress that violations will harm the public." *United*
14   *States v. Nutri-cology, Inc.*, 982 F.2d 394, 398 (9th Cir. 1992).  Here, the implication is that
     a modified *Winter* standard applies, the difference being that the second prong drops out.
15   This presumably leaves the party seeking injunctive relief to establish a likelihood of success
     on the merits, that the balance of equities tips in its favor, and that an injunction is in the
16   public interest.  But this seems odd.  If irreparable harm may be presumed because the
     statute itself is an implied finding that it's present, then it seems the public interest prong
17   should also be presumed.
          Moreover, district courts in California have deviated from the two-part *Unique Fin.*
18   *Concepts* standard.  *See, e.g.*, *SEC v. Small Bus. Capital Corp.*, Case No. 12-CV-3237, Doc.
     No. 34 (N.D. Cal. July 10, 2012) (granting injunctive where good cause existed to believe
19   defendants violated the securities laws and the SEC demonstrated a probability of success
     on the merits); *SEC v. Private Equity Mgmt.*, Case No. 9-CV-2901, Doc. No. 246 (C.D. Cal.
20   Aug. 4, 2009) (granting injunctive relief where good cause existed to believe defendants
     violated the securities laws, SEC demonstrated a probability of success on the merits, and
21   good cause existed to believe defendants would continue to violate the securities laws "to
     the immediate and irreparable loss and damage to investors and to the general public"); SEC
22   *v. Learn Waterhouse*, Case No. 4-CV-2037, Doc. No. 29 (S.D. Cal. Nov. 1, 2004) (same).
     The problem is that the courts in these cases simply entered proposed orders with boilerplate
23   language that were submitted by the SEC, and in at least one case the preliminary injunction
     was not contested.  These cases are therefore not useful guides here.
24        A different standard from the one the Court will apply prevails in the Second Circuit.
     There, "injunctions sought by the SEC do not require a showing of irreparable harm or the
25   unavailability of remedies at law.  Rather, the SEC need only make a substantial showing of
     likelihood of success as to both a current violation and the risk of repetition." *Smith v. SEC*,
26   653 F.3d 121, 127–28 (2d Cir. 2011) (internal quotations omitted).
          While Defendants urge the Court to apply the *Winter* standard, they haven't identified
27   a single SEC enforcement action seeking injunctive relief that imported it.  In fact, they cite
     *Mgmt. Dynamics*, which the court in *Unique Fin. Concepts* relied on in coming up with the
28   two-part standard for injunctive relief that the Court will follow here.  *See Unique Fin.*
     *Concepts*, 196 F.3d at 1199 n.2 (citing *Mgmt. Dynamics*, 515 F.2d at 806–07).

1   injunctive relief on that limited basis.  This way, the SEC could get its injunctive relief (and
2   accompanying asset freeze), while the Defendants would be spared the embarrassment of
3   a judicial finding, albeit a preliminary one, that they'd possibly engaged in fraud.

4         The basis for the Court's Order is divided into two parts.  First, the Court summarizes
5   the law on when general partnership interests qualify as securities.  Here, the seminal case
6   is *Williamson v. Tucker*, 645 F.2d 404, 418 (5th Cir. 1981), which articulated a three-factor
7   test for making this determination.  Second, the Court applies the *Williamson* test to the facts
8   of this case and determines whether the SEC has made out a prima facie case that the
9   general partnership interests sold by Western are securities.

10        **A.     Legal Background**

11        From the beginning, the Defendants have taken the firm position that the general
12  partnership interests are not securities.  Most recently, Defendants argued that "the case law
13  over many decades has consistently held that there is a presumption that (1) interests in
14  general partnerships are not securities, and (2) interests in raw land held solely for market
15  appreciation are not securities."  (Doc. No. 34 at 2–3.)  That's true.  *See SEC v. Merchant*
16  *Capital, LLC*, 483 F.3d 747, 755 (11th Cir. 2007) ("A general partnership interest is presumed
17  not to be an investment contract because a general partner typically takes an active part in
18  managing the business and therefore does not rely solely on the efforts of others."); *Shiner*,
19  268 F.Supp.2d at 1340 ("The general rule is that units in general partnerships are not
20  investment contracts and therefore not securities under federal law."); *McConnell v. Frank*
21  *Howard Allen & Co.*, 574 F.Supp. 781, 784 (N.D. Cal. 1983) ("There is persuasive authority
22  for the position that if an investor in a real estate syndicate expects profits to come solely
23  from the general appreciation of property values, then the investment is not a security.").

24        But like any presumption, the presumption that general partnership interests aren't
25  securities can be overcome, and therefore has limited independent force.  Here's why.  The
26  securities laws define "security" to include an "investment contract."  The Supreme Court, in
27  1946, defined an investment contract as "a contract, transaction or scheme whereby a
28  person invests his money in a common enterprise and is led to expect profits solely from the

efforts of the promoter or a third party." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99 (1946).   This requirement—that profits be expected "solely" from the efforts of the promoter—"has been given a liberal reading." *McConnell*, 574 F.Supp at 784.   Emphasizing this point, the Ninth Circuit has even dropped the term "solely" from the investment contract test.   *See Burnett v. Rowzee*, 2007 WL 2809769 at *4 (C.D. Cal. Sept. 26, 2007) (citing *Hocking v. Dubois*, 885 F.2d 1449, 1455 (9th Cir. 1989)).   The question is "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which effect the failure or success of the enterprise." *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973).   And most importantly, "[t]he Supreme Court has repeatedly emphasized that economic reality is to govern over form and that the definitions of the various types of securities should not hinge on exact and literal tests."   *Williamson*, 645 F.2d at 418; *see also Howey*, 328 U.S. at 1102 ("Form was disregarded for substance and emphasis was placed on economic reality.").

Indeed, "[a] scheme which sells investments to inexperienced and unknowledgeable members of the general public cannot escape the reach of the securities laws merely by labeling itself a general partnership or joint venture." *Williamson*, 645 F.2d at 423.   *See also Holden v. Hagopian*, 978 F.2d 1115, 1119 n.3 (9th Cir. 1992) ("In determining whether interests are investment contracts, we focus on the economic realities of the underlying transaction and not the name it carries.").   The definition of an investment contact must therefore be "flexible rather than . . . static" and "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of other on the promise of profits." *Howey*, 328 U.S. at 299.

The Fifth Circuit in *Williamson* devised an operational test for an investment contract that's since been widely followed.

> A general partnership or joint venture interest can be designated a security if the investor can establish, for example, that (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is

> so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.

*Williamson*, 645 F.2d at 424.  The Ninth Circuit has expressly adopted the *Williamson* test. *See Koch v. Hawkins*, 928 F.2d 1471, 1476–78 (9th Cir. 1991).  Under this test, it's important to recognize, the focus is on investors' expectations when they originally invest, not "what actually transpires after the investment is made, i.e., whether the investor later decides to be passive or to delegate all powers and duties to a promoter or managing partner."  *Id.* at 1477; *Holden*, 978 F.2d at 1119 n.6; *Merchant Capital*, 483 F.3d at 756 ("We analyze the expectations of control at the time the investment is sold, rather than at some later time after the expectations of control have developed or evolved.").  This principle descends from the statement in *Williamson* that "[a]n investor who is offered an interest in a general partnership or joint venture should be on notice . . . that his ownership rights are significant, and that the federal securities acts will not protect him from a mere failure to exercise his rights." *Williamson*, 645 F.2d at 422.

In applying the *Williamson* test, the Court must look beyond the general partnership agreements themselves, "to other documents structuring the investment, to promotional materials, to oral representations made by the promoters at the time of the investment, and to the practical possibility of the investors exercising the powers they possessed pursuant to the partnership agreement."  *Koch*, 928 F.2d at 1478; *Merchant Capital*, 483 F.3d at 756 ("Consistent with *Howey*'s focus on substance over form, we look at all the representations made by the promoter in marketing the interests, not just at the legal agreements underlying the sale of the interest.").

### B.   The *Williamson* Test

The presence of any *one Williamson* factor renders an investment contract a security. *Merchant Capital*, 483 F.3d at 755.  And while technically the factors aren't exhaustive, courts have certainly treated them as such in making the determination with which this Court is now faced.  *See, e.g.*, *Merchant Capital*, 483 F.3d at 757–66 (considering each *Williamson* factor in sequence before concluding that partnership interest was a security); *Koch*, 928

1   F.2d at 1478 (We therefore . . . apply all three *Williamson* factors in evaluating whether the
2   investors expected profits produced by the efforts of others so as to satisfy the third element
3   of *Howey*.").

4                    1.    **"An agreement among the parties leaves so little power in the**
                          **hands of the partner or venturer that the arrangement in fact**
5                          **distributes power as would a limited partnership."**

6          This first *Williamson* factor "is addressed to the legal powers afforded the investor by
7   the formal documents without regard to the practical impossibility of the investors invoking
8   them." *Koch*, 928 F.2d at 1478.  If investors' powers are merely theoretical, even, their
9   general partnership interest may still not qualify as a security on this factor. *See Holden*, 978
10  F.2d at 1119–20 ("Under the first prong of the *Williamson* test our inquiry is limited to an
11  examination of the legal powers afforded the investor by the partnership agreement and
12  other formal documents that comprised the partnership agreement or arrangement.").

13         In the Court's judgment the SEC's analysis of this factor misses the mark.  Rather
14  than focus on the formal documents of the general partnerships and assess the investors'
15  power vis-a-vis that of Defendants, the SEC highlights how little control the so-called
16  "Signatory Partners" exercised in reality, and their relative lack of sophistication.  It also
17  highlights how little the general partnerships required of the investors, which is obviously a
18  separate question from what their formal powers were under the general partnership
19  agreements.

20         The SEC's best argument here is that the mere size of the general partnerships cuts
21  against any claim on the part of Defendants that the investors maintained meaningful control
22  over their investments.  The court in *Williamson* did recognize that "one would not expect
23  partnership interests sold to large numbers of the general public to provide any real
24  partnership control; at some point there would be so many partners that a partnership vote
25  would be more like a corporate vote, each partner's role having been diluted to the level of
26  a single shareholder in a corporation." *Williamson*, 645 F.2d at 423.  There are still a couple
27  of problems.  First, the number of investors in a general partnership has little to do with the
28  formal powers that are given to the investors in the partnership documents.  Second,

1    *Williamson* also recognized that a large number of general partnership interests "might well"

2    be evidence of an investment contract, meaning there is rigid rule with respect to partnership

3    numbers.  For example, the Ninth Circuit in *Koch* faced 35 general partnerships comprising

4    a total of 160 investors, collectively operating a jojoba plantation, and it found that "[e]ven

5    though each investor's absolute control is reduced by the voting structure, the general

6    partners as a legal matter do have the sort of influence [within] the partnership] which

7    generally provides them with access to important information and protection against a

8    dependence on others."  *Koch*, 928 F.2d at 1479 n.12 (internal quotations omitted).

9         Defendants emphasize that they are non-voting members of any general partnership

10   in which they hold an interest, and that "any and all voting members have the ability to

11   engage and direct the partnership in whatever direction they desire."  (Doc. No. 21 at 11.)

12   For example:

13           Partnerships are provided all contact information for one another
             to facilitate communication.  And any partner may initiate a ballot
14           for a partnership vote on any matter by simply submitting a
             request to the partnership secretary.  The secretary has no
15           discretion regarding any ballot request—she simply serves as a
             messenger coordinating the efficient distribution of a ballot to all
16           members on any matter any partner desires to be addressed by
             the partnership.

17

18           The partnerships like any general partnerships can take any
             action they want with a proper vote of the partners and cannot
             take any action not duly authorized by a vote of the partners of
19           set forth in the terms of the partnership agreement.

20   (*Id.*)  The Court doesn't have good cause to doubt this—even if in practice the investors'

21   powers are illusory.  It is clear in the caselaw that, with respect to the first *Williamson* factor,

22   what courts look for is a partnership agreement that plainly gives the promoter or manager

23   a power advantage over the investors.  *See, e.g.*, *Burnett*, 2007 WL 2809769 at *5 (finding

24   that an LLC membership interest was a security where operating agreement installed

25   defendant-promoter as sole manager and gave him full authority and discretion to manage

26   the LLC, sign documents, recommend investments, solicit money, and so forth).  By contrast,

27   where partnership acts may only be taken upon a majority vote of the partners, where the

28   manager's role is ministerial, and where the partnership retains the power to dismiss its

1  manager, the first *Williamson* factor may not be present.  *See, e.g.*, *Holden*, 978 F.2d at

2  1120.  The Court in *Holden* reached precisely this conclusion because:

> A substantial number of partnership acts may be taken only after a majority vote of the partners to wit: all decisions respecting partnership business; the transfer, sale, or encumbrance of partnership interests; compensation of a partner for work on behalf of the partnership; and the empowerment and direction of one or more partners or an agent to negotiate and conclude sales of property.  Furthermore, any amendment of the articles of partnership requires approval of sixty percent of the partners, while seventy-five percent of the partnership has the power to close the partnership once it has retained a certain amount of capital.  Finally, partners retained reasonable access to the partnership books maintained at KTA's office . . . .
>
> Partners also retain substantial authority under the terms of Hagopian's employment contract.  The contract itself limits Hagopian's functions to clerical and ministerial tasks, and his authority to enter into contracts or to make promises on behalf of the partnership is circumscribed by requiring KTA's express, written authority.

13  *Id.*  The Court finds the facts of this case are closer to those of *Holden* than *Burnett*.

14       Defendants submitted a sample, representative partnership agreement with their

15  emergency motion to dissolve the TRO.  (*See* Doc. No. 14-1.)  The agreement gives general

16  partners the right to access the partnership's books.[3]  (*Id.* at ¶ 2.6.)  It provides that a majority

17  in interest may vote to remove the Signatory Partners.  (*Id.* at ¶ 4.2.3.)  A majority in interest

18  must also vote to admit new partners to the partnership.  (*Id.* at ¶ 4.5.)  All partnership

19  decisions must be made by a majority in interest vote.  (*Id.* at ¶ 5.1.2.)  "Any Partner,

20  including Non-Voting Partners, may request a vote of the Partnership on any matter relevant

21  to the business and operation of the Partnership."  (*Id.* at ¶ 5.2.2.)  Partners' contact

22  information, under the agreement, is circulated to all members.  (*Id.* at ¶ 5.4.)  While

23  Defendants are appointed partnership administrators under the agreement, they may be

24  terminated, with or without cause, by a majority vote.  (*Id.* at 7.1.4.)  A majority in interest

---

[3] While the court in *Holden* made something out of the fact that general partners had a right to access the partnership's books, the Court in *Merchant Capital* found this fact to have no "independent salience."  *Merchant Capital*, 483 F.3d at 761.  This doesn't undermine the Court's reliance on *Holden*, however, because what the court in *Merchant Capital* was truly concerned about was general partners having access to information but, at the same time, having no recourse under a partnership agreement to do anything with that information.  *Id.*

1  may decide to terminate the partnership itself.  (*Id.* at ¶ 9.1.)  The agreement may be

2  amended upon the consent of a majority in interest of those members entitled to vote.  (*Id.*

3  at ¶ 11.17.)  To be clear, the Court isn't finding that the reality of the general partnerships

4  bears out the above.  It is merely finding that under the formal documents the partnership

5  members don't necessarily have "so little power" that they are effectively limited partners.

6  Accordingly, it doesn't find that the SEC has made out a prima facie case that the general

7  partnership interests are securities under the first *Williamson* factor.

8         **2.    "The partner or venturer is so inexperienced and unknowledgeable**
              **in business affairs that he is incapable of intelligently exercising**
9             **his partnership or venture powers"**

10         With this second *Williamson* factor, "[t]he proper inquiry is whether the partners are

11  inexperienced or unknowledgeable 'in business affairs' generally, not whether they are

12  experienced and sophisticated in the particular industry or area in which the partnership

13  engages they have invested."  *Holden*, 978 F.2d at 1121; *Koch*, 928 F.2d at 1479.[4]

14         The SEC argues that Defendants' investors are inexperienced and unknowledgeable

15  because, among other reasons, they are members of the general public who were solicited

16  by Defendants.  There is no dispute that Defendants have a sales force, comprised of

17  registered securities brokers and financial advisers, that pitch the general partnerships to

18  investors.  A former securities broker and financial advisor has testified that Western's

19  securities and real estate arms operated as one, and that as a broker-advisor he was

20  encouraged (and trained) to sell the general partnership investments to clients.  (Torres Decl.

21  ¶¶ 3, 5.)  Schooler conceded in his deposition that Western gets its clients through its sales

22  force, which in turn relies on referrals.  (Kalin Decl., Ex. 1, Schooler Dep. at 159:9–12.)  He

23  admitted that Western had, in the past, purchased lead lists and made cold calls.  (*Id.* at

24  159:13–160:14.)  Today, he explained, the sales force uses a promotional brochure and a

25

26         [4] The Eleventh Circuit has gone the other way on this point: "A focus on experience
    in the particular business is also more consistent with the *Howey* test.  The ultimate question
27  is whether the investors were led to expect profits solely from the efforts of others.
    Regardless of investors' general business experience, where they are inexperienced in the
28  particular business, they are likely to be relying solely on the efforts of promoters to obtain
    their profits."  *Merchant Capital*, 483 F.3d at 762.

1   sales script that Defendants developed.  (*Id.* at 160:12–161:20.)

2          The SEC has also submitted the declaration of an investor who claims he didn't know,

3   at the time of his investment, that he was becoming a partner in a venture—nor did he

4   appreciate the technical details of the investment. (Levoy Decl. ¶¶ 8, 11, 13, 14.)  The Court

5   questions whether Levoy is the best declarant here for the SEC's purposes.  He is the

6   Director of Human Resources at the Stanford Business School, which is a high-level position

7   at a high-level institution.  One would think someone of his professional experience is at least

8   mildly sophisticated in business affairs, even if his role at Stanford is a purely administrative

9   one.  Another investor, Rhea Olson, testified in a deposition that she was very confused as

10  to whether her investment was in a general partnership." (Kalin Decl., Ex. 8, Olson Dep. at

11  52:11–16.)

12         While the Court certainly understands where the SEC is going here, it shares

13  Defendants' concern that its evidence is both anecdotal and thin.  The SEC points out that

14  Defendants have organized more than 100 general partnerships, some of which are made

15  up of hundreds of investors.  That it has tracked down *two* who are shaky on the nature of

16  this particular investment isn't immensely persuasive.[5]  It would be different if there were

17  some categorical rule that members of the general public are presumed to be

18  unsophisticated in business affairs, or investments that are the result of a mass sales pitch

19  are presumptively securities, but the SEC doesn't point to one.  As a result, the Court is left

20  guessing, really, as to the actual sophistication of the large body of Defendants' investors.

21  The SEC has certainly shown that it's possible Levoy and Olson are in the majority, but this

22  doesn't necessarily it has made out a prima facie case.  The Court therefore can't find, for

23  preliminary injunction purposes, that the second *Williamson* factor is present in this case.

24  *See Koch*, 928 F.2d at 1479 (finding that where record wasn't fully developed it "simply [had]

25

26         [5] The SEC identified a third confused investor in its opposition to Defendants' motion
    to dissolve the TRO.  (*See* Kalin Decl. II, Ex. 5, Lawrence Dep. at 57:3–58:5; 64:6–65:19.)
27  This investor said, "I didn't even, I mean, still to this day I'm not necessarily sure the
    particulars of what a partnership is as opposed to a group of people buying the same piece
28  of land all together."  Going from two investors to three does not change the Court's view of
    the anecdotal, thin nature of the SEC's showing on this point.

no basis for evaluating the sophistication of many of the investors").

> **3.   "The partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers."**

This last *Williamson* factor is the SEC's only hope of establishing a prima facie case that the general partnership interests sold by Defendants are in fact securities.  Defendants' argument on this issue has consistently been, in essence, that there's no possibility for dependency because all the general partners do is invest in raw land and wait for it to appreciate in value.  The Defendants' duties are purely ministerial:

> The raw land investment is pretty straightforward.   The partnership has to pay property taxes and insurance.  It has to pay an accountant to file K-1's every year.  If other issues arise, the partnerships have the authority to take steps to address them.   But that is largely the list of events.   The partnership makes its payments and waits for an opportunity to sell at some future date.  So there are not complicated day-to-day, hour-by-hour management decisions or other steps that need to be taken.

(Doc. No. 21 at 13–14; *see also* Tr. at 11:11–14.)  "The return on the investment is solely a function of market appreciation," Defendants argue.  (Doc. No. 21 at 15.)  "There is no management or entrepreneurial skill that could ever have an impact on the return of investment for the GPs." (*Id.*)  This is not a frivolous argument.  Above all else, Defendants manage the general partnerships, and *Williamson* itself recognized that "a reliance on others does not exist merely because the partners have chosen to hire another party to manage their investment." *Williamson*, 645 F.2d at 423.  *See also Holden*, 978 F.2d at 1120 (finding that, under the first *Williamson* factor, general partners retained substantial authority when agreement limited manager's functions to "clerical and ministerial tasks").  That the manager of the investment in this case is also the vendor doesn't make a difference. *Williamson*, 645 F.2d at 423.

Indeed, the easier case is one in which investors contribute to a general partnership and then a manager, at his or her discretion and with his or her expertise, does something

1    with their money.[6]   In *Merchant Capital*, for example, investors bought interests in an LLP

2    that, in turn, bought shares in debt pools, but it was the manager-defendant of the LLP who

3    decided (on information he didn't share) whether and when to buy those shares.  *Merchant*

4    *Capital*, 483 F.3d at 753.   The SEC argues that the facts of this case fall right into

5    *Williamson*'s holding that a genuine dependence on others might exist, hypothetically, where

6    investors are "induced to enter a real estate partnership on the promise that the partnership's

7    manager has some unique understanding of the real estate market in the area in which the

8    partnership is to invest."  *Williamson*, 645 F.2d at 423.  This is because "the partners may

9    have the legal right to replace the manager, but they could do so only by forfeiting the

10   management ability on which the success of the venture is dependent."  *Id.*  The difference,

11   though, is that in both *Merchant Capital* and the *Williamson* hypothetical, the investment was

12   *prospective*.  Here, by contrast, the general partnership has technically already invested at

13   the time the investors join.  As the SEC explains it, "Defendants buy raw, undeveloped land

14   in the southwest United States, they organize multiple general partnerships to hold the land,

15   and then they use Western's sales force to offer interests in the GPs to investors." (Doc. No.

16   3-1 at 1.).   The SEC must therefore identify some work that Defendants do, once the

17   investors are financially committed and going forward, that makes them so dependant on

18   Defendants that they can't exercise meaningful powers within the partnership.[7]

19        One thing the SEC seizes on is Defendants' role in selling the properties in which the

20   general partnerships are invested.  A former broker, for example, said in a declaration that

21   he was trained to tell investors that Schooler "had great expertise" in "making decisions about

22

23        [6] Similarly, it is an easier case when investors put money toward a tangible asset and
     then rely on a promoter-manager to be the stewards of it.  *See, e.g.*, *Shiner*, 268 F.Supp. at
24   1341) (investors bought units in LLPs formed to operate local telephone companies);
     *Phoenix Telecom*, 239 F.Supp.2d at 1298 (LLC sold investments in coin-operated
25   telephones); *Albanese v. Florida Nat. Bank of Orlando*, 823 F.2d 408, 412 (11th Cir. 1987)
     (investors purchased ice machines and relied on seller to maintain them).

26        [7] The Court put this question to the SEC at the preliminary injunction hearing when
     it said, "Your position would be more compelling if it was, 'He's going to acquire these things
27   and he hasn't yet, and we're putting all of this money in and we're getting a fractional interest
     in something yet to be determined.' Here they know what their fractional interest is.  It's
28   fractional interest in a general partnership that has some assets, and the assets are
     identified."  (Tr. at 45:21–46:10.)

the best time to buy and sell land." (Torres Decl. ¶¶ 5–6.)  He also said "Western would decide when to sell the land, find a buyer, and negotiate a sales price." (*Id.* at ¶ 8.)  An investor—the Stanford Business School employee—said that when he spoke with Defendants' representative, he was told that "when Western believed the time was right to sell the land, it would approach potential buyers and negotiate a sales price, then come back to its investors for final approval." (Levoy Decl. ¶ 9.)  The SEC asserted in its opposition to Defendants' motion to dissolve the TRO that "the evidence in this case shows that Schooler only presents offers that will provide a positive return on the investment, as opposed to **all** offers." (Doc. No. 18 at 4.)  The deposition testimony it cites to, however, does some but not all of the work the SEC enlists it to do.  For example, in his own deposition the SEC tried to pin Schooler down on this point and didn't fully succeed:

> Q:  Did you share every single offer that came in with the — so, if there was an offer on  a particular piece of land and it was way below what you thought was appropriate for the property, would you share that offer with the partnership?
>
> A:  If it's a written offer, I have to.  If it's a letter of intent, I might indicate to Mr. Schaeffer that I will send that to the partnership, gladly, but I don't believe that it's going to be accepted because it's too low.  And so, sometimes the person making the offer would raise the price a little bit, but, if that's not the case, then I send it to the partnership.
>
> Q:  You send the letter of intent to the partnership?
>
> A:  Mm-hmm.
>
> Q:  For a vote, do you mean?
>
> A:  For a vote, yes.  Or, there's a ballot created that explains the terms of the letter of intent.
>
> Q:  Did you ever get any verbal offers on any of these pieces of land?
>
> A:  Verbal offers?
>
> Q:  Like, brokers talking to each other.  You know, hey, maybe I could buy the land for a certain amount of money but it's not a letter of intent.
>
> A:  I don't remember.
>
> Q:  Did you engage in some negotiation with the potential

1          buyers?

2     A:   Directly?

3     Q:   Directly or through Mr. Schaeffer.

4     A:   Not really.  I mean, when it's a real offer, it has to go to
           the partnership.
5
      Q:   I think you just mentioned that if you got a letter of intent
6          that seemed low to you, you'd tell Mr. Schaeffer to go
           back to the -
7
      A:   Well, usually, there's a question that comes along with
8          that, "Do you think the partnership will take this?"  And I'll
           say, "I don't know.  I don't believe so."  You know, just
9          based on what they paid for it, everybody's real cognizant
           of their time, so, you know, most buyers want to send in
10         an offer that has a chance of being accepted, but if it's a
           formal offer, you know, a real offer, I have to give it to the
11         partnership.

12   (Kalin Decl. II, Ex. 1, Schooler Dep. at 219:11–221:5.)  The Court doesn't think this testimony

13   completely clears Schooler, but neither does it completely accept the SEC's view that it

14   shows he doesn't present all offers to the partnership.  Likewise, the deposition testimony

15   of Roger de Bock is suggestive, but not conclusive.

16    Q:   Who would decide when to sell the land?

17    A:   Since   I've   never   had   any   property   sell,   my
           understanding—what I was told by the sales manager is
18         if an offer is presented, say, to Louis, that he would then
           disseminate that offer to all investors and they would have
19         the ability to vote whether to accept or decline that offer.

20    Q:   Okay.  And did Mr. Schooler disseminate every offer he
           received to investors?
21
      A:   I've never seen an offer during my time with Western ever
22         come out.  So –

23    Q:   Okay.   And during your time with Western, did Mr.
           Schooler ever talk about receiving offers?
24
      A:   In – a couple of times he said people came knocking on
25         his door, but the offerings were — were unreasonable,
           you know.
26
      Q:   Okay.
27
      A:   And this — I think he was — and the reference of that
28         time was the real estate market was getting beat up pretty
           bad, and he implied that they were — what's the word? —

1                      trying to find some fire sale deal, you know, something like that.

2

3    Q:   And do you know if he passed that offer along to all investors?

4    A:   I don't know that.

5    Q:   Do you know who would go try to find buyers for the land?

6    A:   No.

7    Q:   If there was an offer, who would negotiate the deal?

8    A:   My understanding is Louis Schooler was going to represent the investors as — as a commercial — or broker.

9

10   (Kalin Decl. II, Ex. 4, de Bock Dep. at 199:21–201:3.).   Again, this testimony certainly

11   suggests that Schooler played an active and discretionary role in selling the general

12   partnerships' properties, but it's not absolutely conclusive.   More telling, from the Court's

13   perspective, is a PowerPoint slide used in seminars to solicit investors in which Defendants

14   represented "We Make Sure You Get The Best Value For Your Investment."   (Kalin Decl.,

15   Ex. 11 at 159.)   It's hard to reconcile this with Defendants' position now that "it is simply

16   impossible for any one person to have any impact at all on the GP's return on the investment,

17   even if they wanted to."   (Doc. No. 21 at 15.)   The assurance that general partners will get

18   "the best value" for their investment imputes to Defendants some kind of expertise on which

19   the general partners will depend going forward.

20         The SEC also calls attention to investors being told that Schooler is involved with

21   various Chambers of Commerce, the implication being that he could influence development.

22   One former broker said in a declaration that his sales managers, in encouraging him to sell

23   the general partnership interests, told him that Schooler "helped to promote the land by being

24   involved in local politics regarding economic growth and development in the areas of

25   investment."   (Torres Decl. ¶ 8.)   The Court is inclined to agree with Defendants that mere

26   involvement with the Chambers of Commerce isn't nearly the kind of "unique entrepreneurial

27   or managerial ability" on the part of a promoter-manager that can make investors in a general

28   partnership dependent on him.   Beyond this, the SEC presents no evidence that Schooler

1   actually is cozy with local politicians and able to steer economic growth in the direction of the

2   properties in which the general partnerships are invested.

3        The SEC also argues forcefully that "investors were wholly reliant on the Defendants

4   to generate returns from their investment" and that "[o]nce the investors invested their

5   money, it was solely the efforts of Schooler and Western that affected the failure or success

6   of the enterprise." (Doc. No. 14.)  The Defendants' response to this is that their duties are

7   purely administrative, their only purpose being to keep the partnerships in existence.  Their

8   counsel put it this way at the preliminary injunction hearing:

> The General Partnership is structured so that property taxes can
> be paid, insurance can be  maintained to protect the members,
> K-1's have to be filed with the IRS.  The General Partnership
> agreement has provisions in it that everyone signs when they
> enter into the investment.  That spells out that those are merely
> administrative functions . . . . So the fact that the structure sets
> up this ability to keep it in existence is it . . . . It's really a
> bookkeeping administrative function and that is it.

(Tr. at 15:24–16:16.)    Indeed, the Partnership Agreement does spell out a list of

responsibilities—eleven of them, to be precise—to be assumed by Schooler and his

management company EBS Land Co., "[f]or the purpose of facilitating the efficient and

orderly administration of the Partnership's various clerical, administrative, and organizational

needs." (Doc. No. 14-1 at ¶ 7–7.1.1.)  These range from maintaining mailing addresses and

general partnership records to "[m]aintenance and administration of the Partnership and LLC

bank accounts" to "[p]reparing and distributing correspondences to Partners."  The SEC

argues that "everything from creating the GPs, to opening the GP's bank accounts, to

operating the GPs, is ultimately controlled by Western." (Doc. No. 3-1 at 4.)  And the SEC

goes into considerable detail in describing this structure: Defendants identify Signatory

Partners whose only real responsibility is to sign documents on behalf of the partnerships;

Defendants' own employees act as secretaries for the partnerships; Defendants file all

paperwork with the states; Defendants set up and maintain bank accounts; and Defendants

handle all of the operations. (*See id.* at 4–7.)  Of course, Defendants don't deny any of this,

but rather argue that these responsibilities are of a bookkeeping nature and

don't create dependency on the part of investors or render Defendants irreplaceable.

This is a close call.  On the one hand, *Williamson* recognizes that  a dependency relationship may exist where investors are reliant "on the managing partner's unusual experience and ability in running this particular business," and there can't be any doubt that Schooler and Western are uniquely experienced in the area of real estate syndication and partnerships.  Their own promotional materials say so.  (*See* Kalin Decl., Ex. 11 at 134; Torres Decl., Ex. A at 1–2; Torres Decl., Ex. D at 28; .)  Their own sales staff were trained to say so.  (*See* Torres Decl. ¶¶ 6–8.)  Investors were told as much.  (*See* Levoy Decl. ¶¶ 6–9.)  On the other hand, *Williamson* is equally clear that "[t]he delegation of rights and duties—standing alone—does not give rise to the sort of dependence on others which underlies the third prong of the *Howey* test."  *Williamson*, 645 F.2d at 423.  It continues, "It is not enough, therefore, that partners in fact rely on others for the management of their investment; a partnership can be an investment contract only when the partners are so dependent on a particular manager that they cannot replace him or otherwise exercise ultimate control."  *Id.* at 424.  In fact, the manager in *Williamson* assumed far more responsibilities over the land investment than Defendants are alleged to have assumed in this case, and the court still did not find a dependency relationship:

> The closest that the plaintiffs come to the third factor consists of the generalized argument that they were dependent on Godwin Investments' promise "to plan uses for the property, obtain zoning changes, refinance, manage condemnation proceedings, and develop, lease, or sell the property to return a profit."  It is true that the property would have to be developed or sold, and in the interim managed, before a profit could be returned on it; and it is true that Godwin Investments promised to perform these tasks.  But this alone does not establish a dependence on Godwin Investments so great as to deprive the plaintiffs of their partnership powers.

*Id.* at 425.  That is an important holding, and it cuts strongly against the SEC's argument here that Defendants' mere handling of the operational side of the general partnerships made investors so dependent on them that they couldn't find a replacement or exercise meaningful partnership powers themselves.  This is all to say that the SEC's claim that "Western would take care of everything related to the land," even if true, doesn't on its own constitute a prima facie case that the third *Williamson* factor is met.  (*See* Doc. No. 3-1 at 15.)

The SEC has one other argument that it failed to develop explicitly.   It is a straightforward application of *Koch*.   In that case, as the Court briefly explained above, 35 general partnerships purchased 80 acres each of a jojoba plantation that was approximately 2,700 acres.   Critical to the Ninth Circuit's holding that the general partnership interests were potentially securities[8] was that the 80-acre plots seemed to carry no independent value.   The 2,700 acres had to be farmed cooperatively by all of the general partnerships for the enterprise to make any economic sense, and yet each general partnership had no influence beyond its own 80-acre plot.   As the Ninth Circuit put it, "'[t]he partnership agreement . . . only provides for the exercise of general partner control and decisionmaking *within* each partnership, and as to land controlled by each partnership, not as to issues concerning the entire plantation."   *Koch*, 928 F.2d at 1480.   Because the general partnerships only had a fractional interest, then, in the underlying investment, "it would be difficult if not impossible for an investor to affect the management of the plantation as a whole."   *Id.*   Indeed, "even if a general partner vigorously exercised his or her rights under the partnership agreement, he or she arguably could have no impact on the investment (other than to ensure its failure by withdrawing from the larger plantation)."   *Id.* at 1481.   This arrangement would, quite obviously, make all investors dependent on the manager-promoter.   Meaningful change could only happen with the consent of *all* partnerships, and yet there was "not even a formalized mechanism in the partnership agreements for attempting to effect change on behalf of all thirty-five partnerships."   *Id.* at 1480.[9]

That's basically the situation in this case.   The general partnerships don't own a

---

[8] The holding in *Koch* reversed a district court's grant of summary judgment to the defendant-manager.   As such, the holding wasn't that the general partnership interest at issue was in fact a security, but rather that *that* question presented a triable question of fact.

[9] The Ninth Circuit in *Holden* reiterated this problem with general partnerships owning a fractional interest in a single investment: "In *Hocking* and *Koch* when investors withdrew from the larger scheme or the current management arrangement changed, individual investors were left with an investment—a single condominium unit in a hotel-like resort or a general partnership in a small jojoba farm—which, absent the larger management scheme of the pooling arrangement or plantation, was incapable of producing the profit investors expected originally."   *Holden*, 978 F.2d at 1122.   *See also Merchant Capital*, 483 F.3d at 764 ("Thus, even if an individual partnership managed to replace [the manager], it would find that its major assets were tied up in fractional share form in [the debt pool investment].").

1   discrete parcel of land all to themselves.  They, along with separate general partnerships,

2   own a fractional share of one.  Schooler gave unambiguous deposition testimony on this

3   point:

> Q:   Do you generally sell the land to one partnership or multiple partnerships or how does that work?
>
> A:   Depends on the size of the property.  In the ones that are very large then I have to sell them to multiple partnerships . . . .
>
> Q:   Do they own the entire property?
>
> A:   No, one-quarter of it.
>
> Q:   And how do you determine how many partnerships to offer a piece of land to?
>
> A:   Depends on the size of the land.  You know, some properties are just not as big as others, and so maybe two partnerships is enough or three partnerships is enough.  You want the partnerships not to exceed the unwieldy, I think 5 million is the biggest one we've ever done.  Does that answer your question?
>
> Q:   I'm trying to figure out how you determine how many partnerships to offer it to.
>
> A:   Right.  It's between two and four just depending on the size of the property.

(Kalin Decl., Ex. 1, Schooler Dep. at 134:12–136:21.)  This seems to fall right into the lap of

*Koch*, as a general partnership arrangement in which the general partnership is truly

powerless with respect to the disposition of the asset in which it is invested.  A majority in

interest within the general partnership may, for example, vote to sell, but that vote would be

meaningless absent a similar vote within the other general partnerships.

There is, of course, another side here.  The Ninth Circuit in *Koch* was bothered by the

fact that there was no "formalized mechanism in the partnership agreements for attempting

to effect change on behalf of all thirty-five partnerships."  *Koch*, 928 F.2d at 1480.  The

partnership agreement here, however, specifies that each general partnership will hold its

interest as a co-tenant, and that while any disposition of the "master parcel" will require the

mutual agreement of all co-tenants, any partner of any general partnership can contact a co-

tenant general partnership "to distribute information and/or initiate a ballot vote on matters

1  regarding the Master Parcel that are of consequence or importance to all Co-Tenants." (Doc.
2  No. 14-1 at ¶¶ 6–6.3.2.)  That, presumably, is precisely the kind of "formalized mechanism
3  . . . for attempting to effect change on behalf of all . . . partnerships" that the Ninth Circuit
4  found absent in *Koch*.  Moreover, co-tenant general partnerships are expected to honor
5  communications from other co-tenant general partnerships as if they came from within their
6  own. (*Id.* at ¶ 6.3.3.)  The Court is still dubious that the co-tenancy relationship between the
7  general partnerships invested in a single parcel of land saves Defendants here, especially
8  if it returns to the first principle that substance matters more than form, and that the emphasis
9  must be placed on economic realities.  All signs are that with respect to the core
10  investment—the piece of land or so-called "master parcel"—the general partners truly are
11  dependant on Schooler and Western's managerial abilities and unable to replace him or
12  exercise meaningful powers—at least with respect to the inter-partnership dealings that are
13  central to the ultimate disposition of their asset.  So, this is one argument the Court believes
14  the SEC should have made more forcefully.[10]

15      Where does all of this leave the Court?  The question is whether the SEC has made
16  out a prima facie case, on the third *Williamson* factor, that the general partnership interests
17  at issue are securities.  The Court finds it has.  Defendants' likely involvement in selling the
18  parcel of land in which the general partnerships are invested, its pivotal operational role with
19  respect to the general partnerships, the fractional nature of the general partnerships' interest
20  in the land, and the apparent use of investors IRA funds, *taken as whole*, satisfy the Court

21  _____

22  [10] There is also another, which the Court hesitates to raise because neither party has
   addressed it.  The court in *Merchant Capital* noted that "investors invested through their IRA
23  accounts" and that "Merchant had represented to the IRA administrator that the interests
   were limited liability partnership interests."  *Merchant Capital*, 483 F.3d at 752, 752 n.4.  It
24  then recognized, "IRA funds may not be self-directed into general partnership interests." *Id.*
   But Defendants appear to be doing  that.  One promotional material represented, "We Make
25  it Possible to Use *IRA Funds.*"  (Kalin Decl., Ex. 11 at 159.)  An investor said in a declaration,
   "I spoke with [Defendants' sales person] over the phone and explained to him that I had
26  recently changed jobs and was looking to roll the approximately $185,000 I had held in my
   previous employer's retirement fund, into an IRA." (Levoy Decl. ¶ 4.)  Defendants may have
27  a ready response to this, grounded in some technical understanding of the accounting or tax
   rules that is more developed than the Court's, but this is certainly something worth
28  considering further.  There is cause for suspicion if Defendants are characterizing the general
   partnership interests as something else in order to recruit investors' IRA funds, but then
   calling the investments just that to avoid the securities laws.

1    that the SEC has made a prima facie case that the general partnership interests at stake are

2    securities.  The Court is especially persuaded by the fractional nature of the interests.  Of the

3    four factors just mentioned, that one is doing the most work in the Court's conclusion,

4    considering the clear holding in *Koch.*

5    **III.    Conclusion**

6          A preliminary injunction is appropriate if there is a prima facie case that Defendants

7    have violated the securities laws and a reasonable likelihood that their violations will be

8    repeated.  The Court has just concluded that a prima facie case has been made.  That's the

9    SEC's biggest hurdle.  From there, almost everything else falls into place.  There is little

10   doubt that, as of this case being filed, Defendants' activities were ongoing—and indeed,

11   substantial funds remain in many general partnerships.  (*See* Kalin Decl. ¶ 28; Hebrank Decl.

12   ¶¶ 4–5.)  The Court therefore converts the pending TRO into a preliminary injunction.

13         The SEC must meet and confer with Defendants' counsel and submit a proposed

14   preliminary injunction order to chambers within five days of the date this Order is entered.

15   (Obviously, it will be very similar if not virtually identical to the TRO now in place.)  If there

16   are disagreements among the parties as to the contents of the order, the SEC should submit

17   a proposed order to chambers while filing in the case docket a joint statement in which the

18   parties' respective positions on disputed contents are explained.[11]

19   **IV.    Asset Freeze**

20         Defendants have independently challenged the legitimacy of an asset freeze in this

21   case, and the Court must address that issue.

22         The SEC originally argued that it "need only establish the mere possibility that assets

23   may be dissipated" and that "[i]t is unnecessary for the Court to find that dissipation of funds

24   is likely."  (Doc. No. 3-1 at 21.)  It relied on *FSLIC v. Sahni*, in which the Ninth Circuit did hold

25   that where a plaintiff seeks a preliminary injunction and has shown a likelihood of success

26

27         [11] With respect to notifying the general partners of this action, which has been a
     substantial concern of Defendants from the beginning, the Court is willing to approve the
28   receiver notifying them that the general partnerships have been placed into a court-ordered
     receivership on a preliminary finding that their interests are unregistered securities.

1  on the merits, "a possibility of dissipation of assets" is enough to support a freeze.  868 F.2d

2  1096.  The Ninth Circuit overruled itself, however, in the wake of *Winter*, holding that "[a]

3  party seeking an asset freeze must show a likelihood of dissipation of the claimed assets,

4  or other inability to recover monetary damages, if relief is not granted." *Johnson v. Couturier*,

5  572 F.3d 1067, 1085 (9th Cir. 2009).  It explained that while *Sahni* rejected that standard,

6  "because *Winter* requires a likelihood of irreparable harm, this aspect of the *Sahni* decision

7  is overruled."

8      The SEC's fallback position is that *Sahni* has only been overruled to the extent it

9  applies to private parties.  (Doc. No. 23.)  Indeed, the Court has determined that the *Winter*

10 standard doesn't apply to preliminary injunctions sought by the SEC, so it may follow that

11 neither does *Winter* inform the standard for an asset freeze sought by the SEC.  There are

12 two problems with the SEC's argument.  First, the party seeking relief in *Sahni* was the

13 Federal Savings and Loan Insurance Corporation, a predecessor to the Federal Deposit

14 Insurance Corporation.  If the Ninth Circuit in *Johnson*, which involved private parties,

15 intended for there to be two asset freeze standards, it needn't have overruled *Sahni* at all.

16 But it did overrule *Sahni*, and that means it overruled a "possibility of dissipation" standard

17 in a case in which the party seeking the freeze was a servant of the public interest.  Second,

18 at least two district courts, following *Winter*, have applied the *Johnson* asset freeze standard

19 to the Federal Trade Commission, a statutory guardian of the public interest analogous to

20 the SEC.  *See FTC v. Millennium Telecard Inc.*, 2011 WL 2745963 at *11 (D.N.J. 2011); FTC

21 *v. John Beck Amazing Profits, LLC*, 2009 WL 7844076 at *15 (C.D. Cal. 2009).  The Court

22 therefore can't accept the SEC's argument that it need only demonstrate a possibility that

23 Defendants will dissipate assets in order to justify an asset freeze.  *Johnson* controls.

24      Has the SEC shown, then, that Defendants are likely to dissipate their own assets,

25 along with those of the general partnerships?  In its original brief, it doesn't try to make that

26 showing.  (*See* Doc. No. 3-1 at 21–22.)  It did file a supplemental pleading, though, in which

27 it argued that the evidence it has submitted does satisfy a "likelihood" standard.  (Doc. No.

28 23.)  But here is what that evidence reduces to: Beverly Schuler and Alice Jacobson, both

1   Western employees, are secretaries for the general partnerships and have signature

2   authority for their bank accounts, and Schooler has been using Western's funds "to pay hush

3   money to complaining investors." (*Id.* at 2.)   As Defendants' counsel suggested at the

4   preliminary injunction hearing, this is some spin in this.   That "hush money" went to an

5   investor who wasn't satisfied with his investment.   (*See* Kalin Decl., Ex. 4, de Bock Dep. at

6   88:23–92:4.)  There is a "hush" subtext to the partial reimbursement—the request came with

7   a  threat  to  disclose  and  the  partial  reimbursement  came  with  a  nondisclosure

8   agreement—but the less cynical interpretation is simply that Defendants gave an unsatisfied

9   customer some of his money back.   And it certainly doesn't make great sense to freeze

10  Defendants' assets so they can't do that.

11        The point of an asset freeze is to prevent their dissipation and waste so they will be

12  available for disgorgement.  *SEC v. Hickey*, 322 F.3d 1123, 1132 (9th Cir. 2003); *Rafkind v.*

13  *Chase Manhattan Bank*, 1992 WL 380291 at *1 (S.D.N.Y. Dec. 7, 1992).   The Court is

14  hesitant to find that threat in this case for several reasons.   First, the Court has explicitly

15  avoided staking its preliminary injunction on the SEC's allegations of fraud, and it is really

16  where fraud is found that an asset freeze has the most traction.  *See, e.g.*, *Fidelity Nat. Title*

17  *Ins. Co. v. Castle*, 2011 WL 5882878 at *6 (N.D. Cal. Nov. 23, 2011).  All the Court has found

18  here, by contrast, is that the SEC has made out a prima facie case that the general

19  partnership interests Western sells are securities.  Second, the SEC has offered no evidence

20  that Defendants are sheltering or hiding money, or shuffling it around nefariously, and the

21  SEC has been openly monitoring them for over a year.   *See John Beck Amazing Profits*,

22  2009 WL 7844076 at *15 (denying an asset freeze for lack of evidence that defendants "have

23  ever previously attempted to intentionally dissipate, hide or otherwise shelter corporate or

24  personal assets from an effort to collect a debt or judgment").   Third, the SEC's best

25  evidence is a single example of Defendants returning money to a dissatisfied investor.[12]

26  _____

27        [12] The SEC has since argued that Schooler delayed in filing an accounting of his
    assets, as ordered by the TRO, by September 11, 2012.  (Doc. No. 40 at 3.)  While true that
28  courts may freeze assets where a defendant has "refused to disclose asset information in
    defiance of a court order," the asset information has now been filed with the Court—and the
    SEC hasn't identified any plain inadequacies in the information.  *See Millennium Telecard*,

1    (*See* Doc. No. 23 at 2; Doc. No. 40 at 3.)  Even if this was "hush money" as alleged, it still

2    went to a recipient with a rightful claim to it.  *See Millennium Telecard*, 2011 WL 2745963 at

3    *13 (finding that proofs of financial impropriety "do not, as a general matter, rise to the level

4    of those instances where courts have found a likelihood of dissipation of assets").  Fourth,

5    the SEC's request for an asset freeze hangs too heavily on the mere fact that Western

6    employees control the general partnerships' bank accounts.  (*Id.*)  It is close to complete

7    speculation that, contrary to the interests of the general partnerships and unbeknownst to

8    them,  they will receive and obey a command from Schooler to put their money out of reach.

9    And fifth, Defendants have already suffered a TRO and the public scrutiny and

10   embarrassment that come with an SEC lawsuit.  The Court can't imagine that this isn't an

11   additional deterrent to the dissipation of investors' money.

12         In spite of the above, Defendants are willing to stipulate to a continued freeze of the

13   assets of the general partnerships, overseen by the appointed receiver.  They are also willing

14   to consent to Schooler's and Western's own assets, which are now frozen, being monitored

15   to address the SEC's concerns about money that has passed straight from the general

16   partnerships to Western.  This seems reasonable to the Court, especially in light of its

17   conclusion that the SEC's argument for any kind of asset freeze is tenuous to begin with.

18   The Court will take guidance from *Millennium Telecard*, and direct the receiver to meet and

19   confer with the parties and submit a proposal by which he will remain receiver of the general

20   partnerships but transition into a monitor role with respect to Defendants' assets.  The freeze

21   and receivership of Defendants' assets will not be lifted until the Court approves the

22   //

23   //

24   //

25   //

26

27   2011 WL 2745963 at *11; Doc. Nos. 36–37.  Also, at the risk of being too charitable to
Defendants, at the preliminary injunction hearing the Court encouraged the parties to see a

28   Magistrate Judge and attempt to reach a settlement, and this may have given Defendants
the impression—albeit mistaken—that the Court's TRO was not to be taken seriously in its
entirety, or immediately.

receiver's proposal.  The Court would ask that the receiver submit this proposal within two weeks of the date this Order is entered.

**IT IS SO ORDERED**.

DATED:  October 5, 2012

**HONORABLE LARRY ALAN BURNS**
United States District Judge