1
2
3
4
5
6
7
8            UNITED STATES DISTRICT COURT
9            SOUTHERN DISTRICT OF CALIFORNIA
10

11   SECURITIES AND EXCHANGE        )   Case No. 3:12-cv-2164-GPC-JMA
     COMMISSION,                    )
12                                  )   **ORDER**
                                    )
13                                  )   **(1) GRANTING IN PART AND**
                    Plaintiff,      )   **DENYING IN PART**
14                                  )   **DEFENDANTS' MOTION TO**
     v.                             )   **MODIFY PRELIMINARY**
15                                  )   **INJUNCTION ORDER;**
                                    )
16                                  )   **(2) DECLINING TO APPROVE**
                                    )   **RECEIVER'S REPORT AND**
17   LOUIS V. SCHOOLER and FIRST    )   **RECOMMENDATIONS**
     FINANCIAL PLANNING             )   **REGARDING VALUATION OF**
18   CORPORATION, dba Western       )   **REAL ESTATE ASSETS OF**
     Financial Planning Corporation,)   **RECEIVERSHIP ENTITIES;**
19                                  )
                                    )   **(3) GRANTING RECEIVER'S**
20                                  )   **MOTION FOR AUTHORITY TO**
                    Defendants.     )   **PURSUE CLAIMS AGAINST**
21                                  )   **LINMAR BORROWERS**
                                    )
22   ─────────────────────────────

23                    **INTRODUCTION**

24        This is a civil enforcement action initiated by the Securities and Exchange

25   Commission ("SEC"), in which the SEC alleges defendants Louis V. Schooler

26   ("Schooler") and First Financial Planning Corporation d/b/a Western Financial

27   Planning Corporation ("Western") defrauded investors through the sale of unregistered

28   securities tied to interests in real property.

More specifically, the SEC alleges that, since 2007, Defendants have defrauded thousands of investors by offering and selling approximately $50 million worth of general partnership units ("GP units")—i.e., interests in general partnerships organized by Defendants—without disclosing material facts regarding the true value of the underlying land, the mortgages encumbering the properties, and when ownership of the underlying land was actually transferred from Defendants to the general partnerships ("GPs").

The Court has entered a preliminary injunction and appointed Thomas C. Hebrank ("Receiver") as permanent receiver to operate and manage the affairs of Western, its subsidiaries, and the several general partnerships that Western formed in connection with the sale of the aforementioned interests in real property.

Before the Court is Defendants' Motion for Modification of the [March 13, 2013] Preliminary Injunction Order to Remove the Real Estate General Partnerships from the Receivership ("Motion to Modify"). (ECF No. 195.) Both the Receiver and the SEC have filed responses in opposition to the Motion to Modify. (ECF Nos. 206, 207.) Defendants have filed a reply in support of their Motion to Modify.[1] (ECF No. 407.) The Receiver has filed a sur-reply in opposition to the Motion to Modify. (ECF No. 455.)[2] In addition, the Court has received more than 220 letters from investors in support of Defendants' Motion to Modify and approximately five letters expressing dissatisfaction with Defendants.

Also before the Court is the Receiver's Report and Recommendations Regarding Valuation of Real Estate Assets of Receivership Entities ("Valuation Report"). (ECF No. 203.) Defendants have filed a response to the Valuation Report. (ECF No. 210.)

---

[1] The Court **GRANTS** Defendants' motion for leave to file excess pages as to their reply in support of their motion to modify the preliminary injunctions, (ECF No. 406). Though, the Court notes future requests to exceed any page limits should be filed *in advance* of the filing that will exceed a page limit.

[2] The Court **GRANTS** the Receiver's Ex Parte Application for Leave to File Sur-Reply, (ECF No. 455). The Clerk of Court is directed to file the document attached as Exhibit A to the Receiver's Ex Parte Application on the docket in this matter.

The Receiver has filed a reply in support of the Valuation Report. (ECF No. 457.)

Lastly before the Court is the Receiver's Motion for Authority to Pursue Claims Against LinMar Borrowers ("Motion for Authority"). (ECF No. 192.) The LinMar Borrowers are entities controlled by Schooler that owe money to Western. Defendants have filed an opposition to the Receiver's Motion for Authority, (ECF No. 205), and the Receiver has filed a reply in support thereof, (ECF No. 359).

On July 26, 2013, the Court held a hearing on the above matters, at which counsel for Defendants, the Receiver, and the SEC appeared. Having considered the parties' submissions, the Receiver's submissions, the letters from investors, and the applicable law, and for the reasons that follow, the Court will **GRANT IN PART** and **DENY IN PART** Defendants' Motion to Modify, **DECLINE TO APPROVE** the Valuation Report, and **GRANT** the Receiver's Motion for Authority.

## DISCUSSION

### I. Legal Standards

#### A. Supervisory Power

"The Power of a district court to impose a receivership or grant other forms of ancillary relief . . . derives from the inherent power of a court of equity to fashion effective relief." *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980). The "primary purpose of equity receiverships is to promote orderly and efficient administration of the estate by the district court of the benefit of creditors." *SEC v. Hardy*, 803. F.2d 1034, 1038 (9th Cir. 1986). The court may therefore employ "reasonable procedures" to serve this purpose. *Id.*

"A district court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad." *SEC v. Capital Consultants, LLC*, 397 F.3d 733, 738 (9th Cir. 2005). A district court's supervisory decisions are reviewed for an abuse of discretion. *Id.*

#### B. Notice to Non-parties

"It is well settled that property cannot be subjected to a court's judgment unless

reasonable and appropriate efforts have been made to give the property owners actual notice of the action." *In re San Vincente Med. Partners Ltd.*, 962 F.2d 1402, 1407 (9th Cir. 1992) (internal quotation omitted). "The Constitution requires that property owners receive procedural due process in the form of notice and opportunity for a hearing." *Id.* "Whether the opportunity for a hearing must be afforded before any preliminary deprivation of property interest depends on a balancing of interests." *Id.* A court need not "dwell on the timing of the hearing" where there is an opportunity for a hearing before any material deprivation of a property interest occurs. *Id.*

Further, where a general partner represents and receives notice for a limited partner, the entire enterprise is deemed to have received notice of a proceeding. *Id.* Indeed, where a limited partner receives notice at all stages of the receivership proceedings and has every opportunity to participate in the proceedings (by, for example, submitting objections and appearing at a hearing), the fact that the limited partner is not a named part in the proceedings does not violate due process. *Id.* at 1408.

In short, "a district court has the power to include the property of a non-party limited partnership in an SEC receivership order as long as the party meets the minimum contacts standard set out in *International Shoe* and receives actual notice and an opportunity for a hearing." *Id.* Due process is satisfied where a non-party is "sufficiently involved in the receivership action." *Id.*

## II.    Motion to Modify

### A.    Defendants' Arguments

Defendants argue the GPs "have been wrongfully pulled into the receivership imposed on Western." Defendants assert the GPs should be immediately removed from the receivership for thirteen reasons: (1) the GPs are wholly independent, free-standing, third-party entities; (2) to the extent Western owns any units in the GPs, those units are non-voting units; (3) the GPs have never been provided with the due process requirements of notice and an opportunity to be heard; (4) the receivership has taken away control and imposed unnecessary costs on investors; (5) there is no threat, danger,

or risk to the GPs or to the GPs' land investments for which a receiver is necessary to protect the GPs; (6) neither the SEC nor the Receiver have identified any evidence of misappropriation of funds, commingling, or other financial mismanagement; (7) any speculative concern regarding potential mismanagement of the GPs relied on by the SEC in its TRO application has now been demonstrated to not exist; (8) the GPs merely hold raw land, and their operational needs are minimal; (9) the GPs have, through "partnership administrators," successfully carried out their operational needs at the nominal cost of $100 to $400 per month, compared to the Receiver's fees of $250 per hour; (10) the Receiver has implicitly endorsed the ability of Western personnel to handle the GPs' operational affairs, as the Receiver has kept such personnel in place; (11) the Court's original goal of "locking down" all bank accounts and taking inventory of Western's financial affairs has been accomplished; (12) the Receiver has gone far beyond the Court's stated purpose for the receivership, which was to "clarify Western's financial affairs"; and (13) removal of the GPs from the receivership will not hinder or prejudice the SEC's ability to litigate its pending claims against Defendants.

Defendants argue any risk of foreclosure or other creditor actions against the GPs could be staved off because Western would still be able to make mortgage payments on behalf of the GPs by setting up an "automatic payment plan" whereby the GPs could repay money to Western that GPs borrowed from Western to finance the GPs' original purchase of property from Western.

**B.    Receiver's Response**

In response, the Receiver first asserts that Defendants' Motion to Modify is based on several factual misstatements and provides no basis to modify the Preliminary Injunction Order. The Receiver asserts that, "[d]ue to Western's inability to make payments on loans secured by GP properties, the receivership and accompanying litigation injunction provide much needed protection to the GPs." The Receiver further notes that, because the GPs are under the sole management and control of the GPs, Defendants' basis for seeking relief on behalf of the GPs is unclear.

Regarding the factual misstatements, the Receiver first asserts that, contrary to Defendants' assertions, the Receiver has never suggested that the GPs be dissolved. Rather, as stated in the Valuation Report, the Receiver suggests that investors vote on selling or retaining properties. The Receiver further corrects Defendants' assertion that the Receiver unilaterally ordered appraisals of the GP properties, noting this Court approved such a course of action in approving the Receiver's Second Report. The Receiver further corrects Defendants' assertion that Western's financial health has no impact on the GPs, noting that Western is the borrower on loans secured by GP properties and that a failure by Western to make payments on these loans could result in foreclosure of GP properties.

Regarding the protection the receivership provides to the GPs, the Receiver asserts Western has run out of cash and is thus no longer able to keep all loans secured by GP properties current. The Receiver thus asserts that, "[w]ithout the protection of the receivership, these mortgage defaults would expose GPs to the risk of losing properties via foreclosure and other adverse actions by creditors."

The Receiver asserts that Western has historically played a significant role in the operation and financing of the GPs. Western has (1) financed investor purchases of ownership units and collected note payments on behalf of the GPs, (2) made payments on loans secured by GP properties, (3) made loans to the GPs to cover shortfalls when bills were sent to investors to cover GP operating expenses, and (4) repurchased ownership units from investors who demanded a return of their capital.

The Receiver asserts that, as set forth in the Valuation Report, investors should remain in the receivership while they are permitted to vote on (1) staying in the receivership, selling their property interests, and retaining any right to recover from the receivership estate or (2) separating from the receivership estate, relinquishing their claims against the receivership estate, and taking sole responsibility for all mortgages and expenses associated with retaining their property interests. The Receiver notes that, while the litigation injunction contained in the Preliminary Injunction Order

currently protects the GPs from actions by creditors, decisions should be made as soon as possible to preserve whatever equity exists in the properties for the benefit of investors.

Regarding Defendants' argument that an automatic payment plan could be set up to ensure Western has enough capital to pay mortgages on GP properties, the Receiver asserts such a thing would not be possible. The Receiver asserts that, prior to his appointment, Western was actively collecting loan payments from investors and was *still* unable to make mortgage payments and pay its operating expenses without constant cash infusions from Schooler. The Receiver further notes that some investors now refuse to repay amounts they borrowed from Western to purchase GP units, given the SEC's pending fraud allegations. The Receiver further notes that some of the GP accounts already had a zero balance at the time he was appointed. The Receiver thus asserts that, if remaining balances in other GP accounts are used to make loan payments to Western, investors will be directly harmed because no funds would remain to pay taxes, insurance, and other GP expenses.[3]

The Receiver asserts Western's cash shortage is a direct result of Schooler draining Western's cash reserves prior to the receivership, refusing to put cash back into Western, and failing to repay loans Western made to entities he controls (namely, the LinMar Borrowers). As an example, the Receiver notes that Western raised approximately $80 million from investors in the forty-six GPs that purchased interests in Western's final thirteen land transactions, but that Western had virtually no cash when the Receiver was appointed. Of that $80 million, the Receiver asserts large sums were paid to Schooler and more than $1.26 million was loaned to the LinMar Borrowers. The Receiver thus asserts that, contrary to Defendants' assertions that the receivership has depleted Western's cash, it was Schooler who starved Western of cash thereby necessitating a reduction of Western's equity interests in the GPs. The

---

[3] This argument for investor protection extends to the Receiver's desire to have the GPs purchase Western's equity units to ensure sufficient money for payment of receivership fees, as such a repurchase of Western's units would cause a cash shortage in the GP accounts.

Receiver asserts he has paid for receivership fees by reducing Western's equity interests (dollar for dollar) in various GPs in the total amount of $51,001.[4]

## C. SEC's Response

The SEC also responds to Defendants' Motion to Modify. The SEC argues "the receivership remains necessary because the GPs have depended on, and continue to depend on, Western to manage the GPs, including the payment of mortgages and property taxes." The SEC asserts Western, under the control of Schooler, effectively functioned as the GPs' manager while the GPs were little more than limited partners. The SEC asserts that Schooler ensured Western paid the mortgages on the GP properties each month, that Schooler's employees conducted administrative tasks and acted as contact points for investors seeking information regarding their particular GPs, and that Schooler was expected to ultimately find purchasers for the GP properties and to negotiate any terms of sale.[5]

The SEC asserts that, in addition to managing the GPs, Western used investor funds to pay its own expenses for months, and sometimes years, prior to deeding any land to the GPs. The SEC further asserts that, contrary to Defendants' claims that the GPs are not defendants' alter egos, that "[t]here is no allegation that corporate forms have been disregarded," and that "there is no overlap in management or control between Western and the GPs," the SEC did in fact allege that corporate forms were disregarded.[6] The SEC asserts the Receiver's Initial and Second Reports have proven

---

[4] A breakdown of this figure is provided by Defendants, as set forth in note 9, *infra*.

[5] The SEC cites a letter to the Court from Mr. Loguidice, in which Mr. Loguidice asks "how does taking Louis Schooler away from the management of the partnerships during the interim help the partners?" (ECF No. 162.)

[6] The SEC cites paragraphs 5 and 20 of its Complaint, in which it alleges:

. . . the GPs held not interest in the land until the end of each GP offering, which was months, and sometimes years, after the first investment. Defendants did not disclose that during this interim period and before the properties were transferred to the GPs, Western used investor funds to pay its general operating expenses, including mortgages on properties held by older GPs, Schooler's salary, and large tax penalties. Also during the interim, Western had no mechanism in place to ensure the safety of investor funds

the SEC's allegations as correct. As an example, the SEC specifically notes that the investors in F-86 Partners (the GP offering ongoing at the time the SEC filed its Complaint), have been left with next to nothing in their GP account and have never been deeded the interest in land that Western promised them. The SEC argues that, "[d]espite defendants' desperate attempts to paint the GPs as wholly independent entities that were not controlled or managed by Western, the facts clearly show otherwise." The SEC asserts that, "[i]f the GPs were truly 'self-operating entities,' then they would not need defendants to file [the Motion to Modify] on their behalf."

The SEC asserts that the GPs continue to rely on Western since the Receiver's appointment. The SEC notes that the Receiver has overseen administrative tasks on behalf of the GPs, such as filing their taxes and acting as a point of contact for investors seeking information regarding their investments. The SEC further asserts that the Receiver has made mortgage payments owed by Western to protect the GP properties and that, contrary to Defendants' assertion that the GPs owe Western more than a dollar for every dollar Western owes on underlying mortgages, Western actually took out $14.2 million in loans to purchase the GP properties, and GP investors took out only $12.5 million in loans from Western. Thus, even if Western collected on its loans to investors, it still would not have enough money to pay off the mortgages secured by the GP properties.

The SEC further argues "[D]efendants' complaints about purported due process violations suffered by the GPs and their investors ring hollow," noting "[t]he GPs are on notice of this action, of the receivership, and have been participating in this action." The SEC asserts "it is remarkable that [D]efendants even make this argument about due process now," having argued earlier that investors should not be notified of the September 2012 preliminary injunction hearing because "[a]lerting all Western investors and partners . . . would likely permanently damage, and likely end, Defendants' business." The SEC notes that Judge Burns stayed the portion of the TRO

in the even they needed to be returned.

that required the Receiver to provide investors with notice of the TRO and that the SEC later renewed its request to provide notice of the TRO in its opposition to Defendants' Motion to Dissolve the TRO, but that Judge Burns ultimately left the stay in place. The SEC similarly notes that Defendants stipulated to the receivership over the GPs and did not subsequently challenge the Court's appointment of a receiver over the GPs for eight months. The SEC thus argues that Defendants' motion is merely an untimely motion for reconsideration. The SEC further asserts that the GPs have, at a minimum, been notified of these proceedings and that the Court has considered their input in the form of letters submitted to the Court.

Lastly, the SEC asserts the Receiver has not yet fully clarified the structure and relationship between Western and the GPs. Indeed, the Receiver has yet to determine what happened to the money investors paid into Western for their interests in the GP properties.

## D. Defendants' Reply

In reply, Defendants argue that, despite their prior position that investors should not be given notice of the TRO and receivership, the investors were, and are, entitled to a hearing as to whether their assets should have been placed under receivership in the first place. Defendants assert that the SEC and the Receiver distort Defendants' prior arguments regarding notice to investors because, at that time, no permanent receiver was being appointed. Defendants further assert that the Court's consideration of investor letters is insufficient due process because, as non-defendant third-parties, investors are entitled to notice and a hearing.

Defendants reiterate that the GPs are independent entities that do not depend on Western and that do not need the Receiver's protection. Defendants assert that none of the tasks cited by the SEC or the Receiver rise to the level of discretion, authority, or control over the GPs necessary to justify the continuation of the receivership over the GPs. Defendants note that the Receiver agrees that "GPs may be able to hire somebody to perform some of these functions performed by Western (and possible

survive without others)." Defendants emphasize the GPs' ability to carry out the tasks that Western carried out on their behalf and that now the Receiver carries out on their behalf. Defendants note that the GP agreements allow the GPs, by a simple majority vote, to terminate Western's role as administrator.

Defendants further argue that the SEC's allegation that corporate form was disregarded and investor funds used to pay Western's operating expenses is without merit because only the portion of investor funds that belonged to Western (i.e., the portion allocated for the purchase of the land–approximately 93%) actually passed to Western. Defendants assert the remaining portion of investor funds (i.e., the portion retained in GP accounts for operating expenses–approximately 7%) remained in GP accounts. Defendants assert that, in Western's history, "title has in every instance passed from Western to the GPs as soon as each GP was fully formed," and that the lack of an escrow account does not necessarily create an alter ego relationship—especially where, as in this instance, the structure of these transactions, including the immediate payment of purchase funds to Western, was fully disclosed to investors ahead of their investment.

Defendants assert their motion is properly before the Court, as the Court has discretion to modify the Preliminary Injunction Order at any time. Defendants thus assert that, given the Court's duty to monitor the receivership, Defendants' Motion to Modify is not a motion for reconsideration.

Defendants reiterate that the GPs need only do the following to exist: (1) pay property taxes twice a year; (2) pay insurance once a year; (3) engage an accountant once a year to prepare Form K-1s; and (4) to the extent a GP still has a noted owed to Western, make the monthly scheduled payments; and (5) collect amounts owed to the GPs from individual investors. Defendants argue that the SEC and the Receiver's attempt to make the GPs' needs seem more complicated is without merit.

Regarding the SEC and the Receiver's assertion that the Receiver is needed to continue making payments on mortgages secured by GP properties, Defendants assert

that only Western is obligated to make note payments and that, if Western ceases to make mortgage payments, the GPs could step in and make mortgage payments directly to the original lenders/sellers of the GP properties.  Defendants further assert it is disingenuous for the Receiver to argue he is needed to make mortgage payments when, in fact, the Receiver has stopped making mortgage payments on some GP properties. Defendants repeatedly assert that, if removed from the receivership, the GPs will "have all of their basic operational needs met by the partnership administrators."  At oral argument, counsel for Defendants stated that Schooler has offered to cover the current shortfall that exists between Western's outstanding mortgages and the money the GPs owe Western for payment of those mortgages—approximately $1,300 per month. Counsel for Schooler further stated that Schooler "has made it clear to the SEC that [he is] absolutely committed to that $1,300 cost coming in."

Defendants further argue that the Receiver has mischaracterized Western's financial state, as "Western's receivables exceed its payables by more than $1.5 million and also owns real assets."  Defendants assert that "[s]imply collecting amounts due and paying amounts owed, will cause $1.5 million of cash to accumulate in Western's bank account."

Defendants go on to argue that the Receiver is, in fact harming, rather than protecting, investors.  Defendants assert that much of this is due to the Receiver's conflict of interest between his role as receiver over Western and his role as receiver over the GPs.  As an example, Defendants assert that, as receiver over Western, the Receiver has demanded that the GPs "repay unsecured, non-recourse debt owed to Western," while, as receiver over the GPs, he should have rejected such a demand because payment of such "unsecured, non-recourse debt" has left many of the GPs with insufficient cash to pay property taxes and insurance premiums.

Defendants elaborate that the Receiver has taken the following actions, which have harmed, and will continue to harm, investors.  First, Defendants argue the Receiver has failed to make numerous payments on Western mortgages secured by GP

properties.[7]   Defendants assert the Receiver has failed to make these mortgage payments despite the fact that some investors continue to repay money they borrowed from Western for their initial investment.  Defendants assert this creates a surplus in Western's accounts and that Western currently has over $115,000 in cash.  Defendants assert, however, that the Receiver is safeguarding this money in anticipation of this Court's ruling on his third set of fee applications (currently set to be heard by the Court on August 16, 2013).  Defendants assert that, as receiver over Western, the Receiver has an obligation to make these mortgage payments and that, as receiver over the GPs, the Receiver has an obligation to alert investors that their payments are not being used as expected (i.e., for making mortgage payments), but are instead being reserved for payment of the Receiver's fees.[8]

Defendants assert the Receiver has further harmed investors by prioritizing payment of "unsecured, non-recourse debts" owed by the GPs to Western so that the Receiver could pay himself fees out of Western accounts.  Defendants assert this has

---

[7]   Defendants provide that the Receiver has failed to make the following payments due on Western mortgages secured by GP properties:

- $21,570.84 due June 15, 2013, to the Borda Family Trust for the Dayton II property (very last payment due on this 120 installment note);
- $11,843.06 due June 25, 2013, to Northern Nevada Title Co. for the Dayton 4 property;
- $2,843.25 due June 25, 2013, to Northern Nevada Title Co. for the Dayton 4 property;
- $12,539.72 due June 25, 2103, to Northern Nevada Title Co. for the Dayton 4 property;
- $2,972.38 due June 25, 2013, to Schafer Pacific Prop. for the Dayton 4 property;
- $8,167.07 due July 3, 2013, to the Nell J. Redfield Foundation on a loan for which Defendants do not provide details;
- $6,504.67 due July 15, 2013, to American Equities Mortgage on loans for which Defendants do not provide details;
- $3,676.23 due July 3, 2013, to Schafer Pacific Prop. for the  Silver Springs property;
- $8,331 due July 3, 2013, to BCB Ventures for the Silver Springs property;
- $11,772.54 due July 3, 2013, to the Julius & Rose Bunkowski Trust for the Silver Springs property.

[8]   This argument again ignores the fact that investors have already paid for their purchase of land (either through payment of cash in-full or by executing a note in favor of the GP or Western). Investors never had the expectation that their properties were subject to foreclosure because Schooler and Western did not actually use the funds raised to purchase the properties outright, but instead put down cash and financed the rest of the initial purchase.  Thus, Defendants' position is particularly perplexing because Western raised funds in an amount many times greater than Western's purchase price for the GP properties.

13

left a balance in some GP accounts that is insufficient to meet upcoming obligations.[9] Defendants therefore assert that investors will have to contribute additional cash to their GP accounts to cover their upcoming operational expenses.[10] Defendants assert, on a related note, that the Receiver is harming investors by ceasing operational billing. Defendants assert there are currently twenty-eight GPs with balances of less than $5,000 in their accounts, "meaning each of them needs to engage in operational billing," so they can meet their next payment obligations. Defendants assert these GPs are therefore at risk for missing their next property tax payment, which means the GPs are at risk for substantial late fees and penalties.

Defendants assert the Receiver has further harmed investors by using GP assets to purchase Western's equity units at $1 per unit because "[n]ot a single investor was asked if this was how they wanted *their* funds used," which is "[i]n direct violation of the GPs' respective charters." (Emphasis in original.)

**E.    Investor Letters**

As mentioned above, the Court has received over 220 letters from investors. Approximately half of the letters were a form letter. In the form letter, investors indicate their support for Defendants' Motion to Modify, stating the GPs should never have been included in the Receivership because they have no legal or administrative

---

[9]    As examples, Defendants assert the Receiver made the following withdrawals from GP accounts:

- $11,731 paid from BLA Partners to Western, leaving $899.76;
- $7,799 paid from Borderland Partners to Western, leaving $183.67;
- $6,399 paid from Honey Springs Partners to Western, leaving $86.41;
- $4,516 paid from Horizon Partners to Western, leaving $183.04;
- $7,478 paid from Production Partners to Western, leaving $127.70;
- $7,690 paid from Rainbow Partners to Western, leaving $155.55;
- $4,320 paid from Suntec Partners to Western, leaving $150.59;
- $7,210 paid from Victory Lap Partners to Western, leaving $127.65;
- $4,320 paid from Valley Vista Partners to Western, leaving $416.95.

[10]    It appears the earliest obligations the GPs will have are property taxes sometime this fall.

14

connection to Western.[11]  (*See, e.g.*, ECF No. 219, 229, 230-233, 235-238, 342-346, 415-420.)

In the same form letter, investors state they were aware in the beginning that their investment could be a long term proposition, and that it would be a "tragedy to sell these properties in this down market."  Apparently unaware that the Receiver has in fact proposed that investors vote on the disposition of their properties, investors state it is a violation of their due process rights for the Receiver to sell GP properties without a vote from the partnership investors.

In the same form letter, Investors also take issue with the fact that the Receiver has used GP funds to purchase Western's equity units from the GPs rather than leaving money in GP accounts to pay GP operational expenses.  Investors further take issue with the fact that the Receiver has caused the GPs to repurchase Western's equity units at face value ($1/unit) when the appraised value of some properties is 12-13 cents per unit on the dollar and when the GP agreements require the sale of GP units at market or appraised value.

With regard to operational funds, investors object to the fact that the Receiver has stopped collecting operational funds based on the fact that the GP properties have been appraised at such a low value because such an action requires a majority vote of the partners.

The form letter concludes, stating the Receiver's "primary goal seems to be getting paid for his services rather than protecting the value in the partnership properties," and that the Receiver has declined all requests for a face-to-face meeting, stating he posts all litigation related documents on his website.  Investors assert, however, that he "rarely posts litigation from the defendants."

Most of the remaining letters reiterate the investors' support for Defendants' Motion to Modify, restating the points made in the form letter described above.  (*See,*

---

[11]  This of course ignores the fact that Western is an equity interest holder in many of the GPs and the fact that Western's personnel acted as partnership administrators for the GPs.

*e.g.*, 214-215, 370-374, 408-412.)

On the other hand, at least five letters provide support for the Receiver's and the SEC's responses in opposition to Defendants' Motion to Modify. John P. Elder and Connie J. Elder, for example, state they invested in a GP over twenty-five years ago with the initial promise that their investment property would be sold within five years. (ECF No. 375.) Mr. and Mrs. Elder state that the "very scant communication" they received from Western in the first twenty-four years was comprised mostly of annual bills. Mr. and Mrs. Elder state that, in the past ten months, they have received "extensive correspondence from Schooler bemoaning the legal fate of [Western] *and encouraging investors somehow to become active*, and at least implicitly, to complain to the courts and SEC about the treatment of [Western]." (Emphasis added.) Mr. and Mrs. Elder state that, for the first time in twenty-four years, Schooler refers to them as "voting members." Mr. and Mrs. Elder state they "had never seen this term used nor in any way addressed as though [they] had some decision-making authority in this matter." Mr. and Mrs. Elder state they "*never once in this period of time were asked for [their] opinions as 'partners', nor certainly, asked to meet with other partners nor to vote.*" (Emphasis in original.) Mr. and Mrs. Elder state they are anxious to see their property liquidated as soon as possible; "[t]hus, the more quickly the Court and the SEC can accelerate the forensic accounting process, end the receivership and sell the property, the better."

In a similar letter, Roy Honig, in a paragraph headed with the word "FRAUD," states Western told him and his wife they "were buying land at a fair price and it would gain value over time," but that Western "charged the partnership 5 times FAIR MARKET VALUE!" (ECF No. 290.) Mr. Honig states he and his wife have "written-off" these investments and "only hope the courts will see justice served."

Another investor, Gene Fantaro, who sent a form letter of the type described above included a post-script, stating: "My wife & I have waited too long for these properties to realize their potential. (ECF No. 414.) We do not need the bureaucracy

to siphon off our funds.  I have always understood that Schooler & [Western] were minor partners & consultants.  *I have faith that Schooler will eventually advise us to sell the properties at a good price*."  (Emphasis added.)

Another investor, Ty Ponder, states that he and his wife feel ill informed by the level of communication they have thus far received.  (ECF No. 330.)  Mr. Ponder further states "*[w]ithout further detailed information [he] does not feel that investors necessarily know how to care for the partnership by themselves* unless they have specific expertise related to such matters."  (Emphasis added.)  Mr. Ponder states that, on the other hand, he is "not confident that the [R]eceiver is spending what little is left [of investor funds] wisely if the investors are not cared for and informed."  Mr. Ponder states: "While I must assume that my investments are virtually worthless at this point, I have been provided no information as to what my investments may be worth."  Mr. Ponder concludes, "I hope those who are looking out for us will make further efforts to keep us well informed."

## F.    Receiver's Sur-reply

In his Sur-reply, the Receiver asserts "investors have been misled into believing the receivership is costing them huge amounts of money and the Receiver is unilaterally taking actions for the GPs."  The Receiver notes that Schooler has established a website that makes these misrepresentations.  The Receiver asserts there is confusion and unrest among investors, as demonstrated by the "flood of letters the Court has recently received," many of which quote the misinformation provided on Schooler's website.

The Receiver further asserts that "[m]any other investors . . . have expressed chock and dismay to learn (a) what Mr. Schooler paid for the land in relation to what he sold it to the GPs, (b) the amount of money Western obtained from the GPs, and (c) the properties' current appraised values."  The Receiver asserts that, "[a]lthough these investors may not have written letters to the Court, their interests should be protected, and, as recommended in [the Valuation Report], they should have the right to vote" on

the disposition of their property interests.

Regarding mortgage payments, the Receiver explains that he will continue making as many mortgage payments as possible without putting Western in a position of having insufficient cash to pay its remaining employees and establish a new work place once the building they currently occupy is sold.  The Receiver asserts Western does not have sufficient cash to make all mortgage payments and pay its basic operating expenses but would have sufficient cash if Schooler were willing to return some of the more than $20 million in salaries he took from Western or repay some of the loans Western made to the LinMar Borrowers.

Regarding Western's receivables, the Receiver asserts the matter is not as simple as "collecting amounts due," noting the fact that Schooler has objected to the Receiver pursuing claims against the LinMar Borrowers.  The Receiver reiterates that, the amount collected from GPs each month, either because investors cannot or are unwilling to pay their notes, is insufficient to make all mortgage payments.  And, even if all GPs paid on their notes, there would still be a shortfall between the amount collected and the amount Western owes on its outstanding mortgages.

Regarding the inability of GPs to pay property taxes, the Receiver asserts Defendants are again incorrect.  The Receiver asserts that before causing any GP to make a loan payment to Western, he analyzed the GP's upcoming expense to ensure the payment would not jeopardize the GP's ability to meet its financial obligations.  The Receiver states he will ensure that no GP property tax payments due in August 2013 will go unpaid because of loan payments made to Western or because Western's equity interests in those GPs were converted to cash.

As to a conflict of interest, the Receiver asserts that courts routinely appoint a single receiver over multiple entities where those entities had pre-receivership transactions between themselves and are part of a large scheme or enterprise operated by the individual defendants.  The Receiver asserts he is role is to do what is best for the receivership estate as a whole, not to advocate for the interests of one entity or

group of investors. The Receiver asserts his objective is to preserve and protect all receivership assets, maximize the recovery for all investors, and if authorized by the Court, distribute assets in a fair and equitable manner.

With regard to releasing the GPs from the receivership, the Receiver asserts the GPs would face a significant change in becoming a truly independent general partnership. The Receiver notes that Western has financed investor purchases of GP ownership units, made payments on loans secured by GP properties, covered GP cash shortfalls, and purchased GP ownership units from investors who demanded a return of their capital. The Receiver reiterates that Western personnel have also paid mortgages on the properties, taxes, and other expenses on behalf of the GPs. GPs therefore had relatively few issues to resolve. The Receiver notes that, if released from the receivership, GPs will need to establish new procedures and contingency plans to handle these issues and, most importantly, establish a capital base to support operation of the subject property.

**G.    Analysis**

**1.    Due Process**

The Court first addresses Defendants' due process argument. It is undisputed that GP investors have been apprised of this litigation and that they have had the chance to participate in the action by way of submitting letters to the Court, which the Court has considered and will continue to consider. It is further undisputed that, from the time this litigation commenced up until the time this Court appointed a receiver over the GPs, the extent to which the GPs were intertwined with and dependent on Western was unclear.

That said, the Court recognizes that investors have not been afforded a hearing in this matter. Notwithstanding, the Court finds investors have not yet been denied due process because the Receiver's actions in relation to the GPs have not deprived the GPs of any material property interest. While the Receiver has commissioned appraisals of the GP properties and caused some GPs to buy back some of Western's equity units,

investors have not been deprived of their primary investment: the property interests they acquired from Western.  The Court agrees, however, that if Western's cash shortage continues to jeopardize Western's ability to keep mortgages on the properties current, then investors will face the risk of losing their primary investment.  Related to this issue is the Valuation Report, in which the Receiver discusses his plan for disposition of the GP properties.  (ECF No. 203.)

The Receiver proposes in the Valuation Report that investors be permitted an opportunity to vote on  (1) staying in the receivership, selling their property interests, and retaining any right to recover from the receivership estate or (2) separating from the receivership estate, relinquishing their claims against the receivership estate, and taking sole responsibility for all mortgages and expenses associated with retaining their property interests.  "The Receiver sees no reason why a group of GPs that collectively own a property, if all GPs with an ownership interest in the property vote to retain their interests, should not be able to retain the property and take sole responsibility for all mortgages and expenses associated with the property."

Regarding the voting process, the Receiver notes that each property is owned by multiple GPs, the majority of which each own an undivided interest in the property as co-tenants.  The Receiver thus notes it is not possible to sell a portion of a property then pay the net proceeds to the GPs who vote to sell their interests.  The Receiver asserts the co-tenancy agreements (i.e., the agreements among the several GPs owning a single property as co-tenants) requires a unanimous vote of all co-tenants to dispose of a GP property.  The Receiver thus proposes that investors vote pursuant to their respective GP agreements (which generally require only a majority of votes to make a decision) to decide how to cast that individual GP's (i.e., individual co-tenant's) vote in deciding whether the entire GP property should be sold or retained.[12]

_____

[12] Defendants assert that, like the GP agreements, the co-tenancy agreements only require a majority vote to take action.  Defendants attach an example of a co-tenancy agreement, but without reviewing the co-tenancy agreements for each property, it is unknown whether unanimous or majority consent is required.  At oral argument, it was clarified that a majority of the co-tenancy agreements

The Receiver proposes that, if GPs decide to separate from the receivership and retain their property, that all money borrowed from Western (including amounts that Western loaned to the GPs to cover operating expenses) must first be repaid and that the GPs would be solely responsible for any mortgage obligations or other expenses associated with the property. The Receiver further proposes that, if a GP decides to separate from the receivership, the GPs may not recover anything further from the receivership estate, and that any equity interest owned by Western in the GPs will be liquidated so that Western will have no further obligation to contribute to mortgage payments, taxes, insurance, or any other expenses of the separating GPs.

The Receiver further notes that investors should be advised that, if they separate from the receivership, they may need to hire a new administrator to fulfill the responsibilities traditionally carried out by Western.

In the meantime, the Receiver has, based on the appraisals of the properties, suspended operational billings and collection of payments on loans made by GPs or Western to investors to finance their initial purchase of the properties. The Receiver asserts he has done this to save investors from having to put even more money into an investment that is currently underwater or worth pennies for every dollar initially invested.

Defendants assert in their opposition to the Valuation Report that the Receiver's proposed voting options are a choice between bad and worse outcomes. Defendants further note that the Receiver's proposal violates both the individual GP agreements and the co-tenancy agreements. While Defendants agree that investors should have a choice, Defendants assert the choice should be whether to be in the receivership at all. Defendants assert that, before any vote happens, investors should be afforded an opportunity for a hearing.

Defendants further take issue with the Receiver's decision to cease operational billing and loan collection efforts because the appraisals commissioned by the Receiver

do require unanimous consent before action is taken with regard to the property as a whole.

are unreliable and highly variable.

The Court agrees with Defendants that investors have not had a fully opportunity to be heard regarding the inclusion of the GPs in the receivership estate. The Court further agrees with Defendants that the conditions attached to the Receiver's proposed voting options would materially affect investors' interests in the GP properties without ever having had a chance to be directly heard by the Court regarding the GPs' inclusion in the receivership estate. Because the Court finds it appropriate to release the GPs from the receivership, as set forth in the next section, the Court finds investors' due process rights have not been infringed to the extent that the Court is releasing the GPs from the receivership before their primary investment is significantly affected. Accordingly, the Court declines to approve the voting scheme set forth in the Valuation Report.

That said, the Court has concerns about investors' ability to immediately resume control over their GPs. While the Court recognizes that the day-to-day operations of managing the GPs' affairs are minimal, the Court finds that Western has always held the primary role of administering the GPs' operations. Whether such a role was managerial and to the exclusion of participation by investors remains to be determined. Still, given the misstatements of fact and confusion in the letters the Court has received from investors, it is clear to the Court that–while investors may have the legal authority to manage their GPs' affairs–investors do not fully understand that authority. Accordingly, the Court finds it appropriate to provide investors with a comprehensive informational packet before the Court releases the GPs from the receivership.

The Court thus approves the Valuation Report to the extent it recommends investors be fully informed. Accordingly, the Receiver shall prepare a comprehensive informational packet that includes—in lay terms—the following:

- • the SEC's allegations;
- • the Receiver's findings to date, including the original purchase prices of the GP properties, the funds raised by Western from the GPs, how the

difference between the purchase prices and the money raised was spent by Western, and the results of the appraisals on the GP properties;

- a general explanation of what a general partnership is, including the requirements for making a decision on behalf of a general partnership;

- the legal relationship between Western and the GPs, including the significance of Western's equity shares in the GPs and an explanation of any debts owed by the GPs to Western;

- the legal relationship amongst the GPs themselves within the co-tenancy agreements, including the requirements for making decisions on behalf of an entire co-tenancy;

- the tasks and operations Western personnel have carried out on behalf of the GPs;

- the operations and responsibilities the investors will undertake once the GPs are released from the receivership, including the responsibility to monitor the mortgages on their respective properties and to pay such mortgages to the extent Western has insufficient cash to make such payments;

- the option of retaining or terminating the GPs' current partnership administrators, including the need to be in direct contact with the administrators if investors continue to utilize their services on an independent contractor basis, the cost of retaining the administrators, and the necessary steps for terminating the administrators;

- the legal effect of being released from the receivership, including the lifting of the litigation injunction, the ability to pursue individual claims for damages on behalf of the GPs, the possibility that Western will engage in collection efforts against the GPs for the payment of any outstanding debts, and the effect of investors' rights to recover from the receivership estate;

- • the Court's conditions for release of the GPs from the receivership as set forth below;
- • a recommendation to seek out the advice of independent counsel to the extent investors do not understand the legal effect of being released from the receivership; and
- • any other information the Receiver finds necessary to include.

The Receiver shall file a proposed informational packet as soon as is practicable, but no later than **September 6, 2013**. Defendants will then have seven calendar days following the filing of the proposed packet to file any objections to the proposed packet (any such objections shall be limited to fifteen pages in length). The Court will thereafter make any modifications the Court deems fit before approving the packet for publication. Twenty-one calendar days after publication of the informational packet, the Court will issue an order releasing the GPs from the receivership.

Given the presumably large cost of mailing an entire informational packet to all investors, the Court will direct the Receiver to publish the informational packet on his website. To be sure investors are alerted to the packet's presence on the Receiver's website, the Court will direct the Receiver to mail postcards to each investor, alerting investors to the fact that the GPs will be released from the receivership on a date specific and alerting investors to the informational packet's presence on the Receiver's website. The Receiver shall mail the postcards to investors on the same day the informational packet is published.

The Court further finds that investors should be permitted to freely communicate with one another as soon as possible. The Court thus directs the Receiver to permit Western personnel to provide investors with the contact information of other investors in their respective GPs and co-tenancies to the extent such information has not already been provided. This information should be provided in the most economical way possible.

/ / /

## 2. Release of GPs from the Receivership

The Court first notes that, at the time the receivership was implemented, the extent to which the GPs and Western were intertwined was unclear. The Court thus ordered the receivership to clarify, among other things, the relationship between the GPs and Western. From the Court's perspective, this relationship has been clarified.[13] In short, while the GPs are, on paper, legally free-standing entities, they have always relied on Western to administer their operations.[14] The question thus becomes whether a continuation of the receivership over the GPs is necessary to protect investors' interests given that investors have never directly administered the operations of their respective GPs.

The Court finds that, given the minimal operations needed to run the GPs, a continuation of the extraordinary remedy of a receivership is no longer warranted. As the Court noted at the hearing on this matter, average citizens pay their mortgages, property taxes, and insurance premiums every day. And some even hire professionals, such as accountants and lawyers, to help them manage their affairs. There is thus no reason to believe that investors could not do the same on behalf of the GPs, provided that investors are fully aware of what those responsibilities are as set forth above. There are, however, certain conditions the Court finds equitable to impose in connection with releasing the GPs from the receivership.

First, the Court first orders a pro rata reduction of Western's equity interests in the GPs according to the properties' current fair market value as set forth in the

---

[13] While the Receiver notes that the forensic accounting has not been fully completed, all that remains is to determine how Western spent the money raised by investors. The Court finds that an understanding of how Western spent the money raised by investors does not justify a continuation of the receivership over the GPs.

[14] As Mr. and Mrs. Elder stated in their letter to the Court, they have never understood that they had any decision making authority and that, up until recently, Western (through Schooler) has managed their investments. And, in supporting Defendants' Motion to Modify, Mr. Fantaro ironically stated he is confident that Schooler will eventually tell him and his wife when to sell their investment property. Mr. Fantaro's reliance on Schooler is indicative of the fact that Western has, through its personnel, actually managed these investments. Further, Mr. Ponder expressed concern that many investors would not know what to do if released from the receivership at this time.

appraisals obtained by the Receiver. To the extent a GP account has a zero balance or insufficient funds to meet an obligation due within ninety days from the date of the reduction of Western's interests, such interests shall nonetheless be formally liquidated with no payment to Western. Before the GPs are released from the receivership, all of Western's equity interests in the GPs shall be liquidated to ensure that Western will have no future responsibility for any liability incurred by the GPs. Additionally, given the enormous disparity between the purchase prices of the GP properties and the funds Western raised from the GPs, the Court finds it equitable to preclude Western from receiving a share of any proceeds received from any future sale of the GP properties.

Second, once the GPs are released from the receivership, the Court will direct the Receiver to cease any payment by Western to the partnership administrators for work done in connection with administering the GPs' operations. To the extent investors choose to retain the services of the current partnership administrators, such relationship will be arranged solely between the administrators and the GPs.

Third, to the extent Western has sufficient cash to make payments on loans secured by GP properties, the Court directs the Receiver to continue making such payments. The Court further directs the Receiver to continue the collection of payments on the loans Western made to the GPs to finance the purchase of GP units and to cover shortfalls in operational funds. Once released from the receivership, the Court will direct the Receiver to continue such collections.[15]

Lastly, the Court directs the Receiver to permit the current partnership administrators to continue operational billing to the extent necessary to prevent late fees and other penalties from accruing until the GPs are released from the receivership and the investors have decided whether to retain the services of the partnership

---

[15] Once the Receiver begins collection efforts against the LinMar Borrowers, as the Court authorizes the Receiver to do in the next section, the Court expects Western will accumulate sufficient cash to cover the approximately $1,300 per month shortfall between the amounts Western owes to lenders and the amount GPs owe to Western. Also, to the extent Schooler is prepared to cover that difference in the interim as a forfeiture of the salaries he previously caused Western to pay him, the Court authorizes the Receiver to accept such payments on behalf of Western.

26

1 | administrators.

2 | **II.    Motion for Authority to Pursue Claims Against LinMar Borrrowers**

3 | The Receiver provides that the LinMar Borrowers are controlled by Schooler,

4 | and that Western (through Schooler) loaned approximately $1.26 million to the LinMar

5 | Borrowers that has not been repaid to Western. The Receiver states he has subpoenaed

6 | a significant number of financial documents from the LinMar Borrowers, but that the

7 | LinMar Borrowers have only partially complied with the subpoenas. The Receiver

8 | further states that he attempted to settle with the LinMar Borrowers but did not receive

9 | a response to his last counteroffer. The Receiver thus seeks authority to pursue claims

10 | against the LinMar Borrowers. The Receiver asserts it would cost anywhere from

11 | $7,500 to $100,000 in legal fees to pursue claims against the LinMar Borrowers.

12 | In response, Defendant emphasize that Western's loans to the LinMar Borrowers

13 | are "non-recourse loans." Defendants further assert a suit against the LinMar

14 | Borrowers would incur needless expenses for little to no benefit to Western due to the

15 | lack of equity in the LinMar properties and the lack of assets for most of the LinMar

16 | Borrowers. Defendants lastly assert that the LinMar Borrowers did not respond to the

17 | Receiver's last settlement counteroffer because it contained unworkable terms.

18 | The Receiver argues in reply that the term "non-recourse" has no application to

19 | unsecured loans, and that the fact that many of Western's loans to the LinMar

20 | Borrowers are unsecured is of little consequence because the LinMar Borrower and

21 | Schooler have the ability to pay the money owed to Western. The Receiver further

22 | notes that the fact that the LinMar Borrowers' offer to repay the loans (albeit with

23 | unacceptable conditions) further indicates their ability to pay the money borrowed from

24 | Western. The Receiver notes lastly that he will continue to re-evaluate the collection

25 | actions at each juncture of the litigation and will advise the court if he believes (a) the

26 | costs will vary substantially from those projected, (b) the likelihood of success in the

27 | litigation is materially lower than expected, or (c) the prospects of collection do not

28 |

justify continuing the litigation.

Based on the foregoing, the Court finds it appropriate to grant the Receiver authority to initiate collection efforts against the LinMar Borrowers on behalf of Western. There is no dispute that the debt is owed. The core dispute is over the Receiver's ability to collect the debt from the LinMar Borrowers. Based on the information currently before the Court, including defense counsel's representation that the LinMar Borrowers are currently offering Western $12,000 per month (for an unknown number of months) as a settlement, it appears likely the Receiver will prevail in a suit against the LinMar Borrowers and that the amount likely to be collected would exceed the estimated cost of litigation. Accordingly, the Court will grant the Receiver's Motion for Authority. The Court notes, however, that the Receiver should still consider and report to the Court for approval any reasonable settlement offers by the LinMar Defendants.

## CONCLUSION

Based on the foregoing, **IT IS HEREBY ORDERED** that:

1.   Defendants' Motion to Modify the Preliminary Injunction Order to Remove the GPs from the Receivership is **GRANTED IN PART** and **DENIED IN PART**;

2.   The Court **DECLINES TO APPROVE** the Receiver's recommendations contained in the Report and Recommendations Regarding Valuation of Real Estate Assets of Receivership Entities; and

3.   The Receiver's Motion for Authority to Pursue Claims Against LinMar Borrowers is **GRANTED**.

DATED:  August 16, 2013

HON. GONZALO P. CURIEL
United States District Judge