1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>LOUIS V. SCHOOLER and FIRST FINANCIAL PLANNING CORPORATION, dba Western Financial Planning Corporation,<br><br>Defendants. | Case No. 3:12-cv-2164-GPC-JMA<br><br>**ORDER:**<br><br>**(1) GRANTING IN PART RECEIVER'S THIRD FEE APPLICATION, (ECF NO. 197);**<br><br>**(2) GRANTING IN PART ALLEN MATKINS' THIRD FEE APPLICATION, (ECF NO. 198);**<br><br>**(3) GRANTING DUFFY'S FIRST FEE APPLICATION, (ECF NO. 202);**<br><br>**(4) GRANTING MOTION FOR ORDER APPROVING SETTLEMENT, (ECF NO. 256);**<br><br>**(5) GRANTING COTTON DRIGGS' FINAL FEE APPLICATION, (ECF NO. 472);**<br><br>**(6) GRANTING IN PART RECEIVER'S FOURTH FEE APPLICATION, (ECF NO. 477);**<br><br>**(7) GRANTING IN PART ALLEN MATKINS' FOURTH FEE APPLICATION, (ECF NO. 478);**<br><br>**(8) APPROVING RECEIVER'S FIFTH INTERIM REPORT, (ECF NO. 481)** |

# INTRODUCTION

This is a civil enforcement action initiated by the Securities and Exchange Commission ("Commission"), in which the Commission alleges defendants Louis V. Schooler ("Schooler") and First Financial Planning Corporation d/b/a Western Financial Planning Corporation ("Western") defrauded investors through the sale of unregistered securities tied to interests in real property. The Court has entered a preliminary injunction and appointed Thomas C. Hebrank ("Receiver") as permanent receiver to operate and manage the affairs of Western, its subsidiaries, and the several general partnerships that Defendants formed in connection with the sale of the aforementioned interests in real property. Several items are before the Court for disposition:

1. Third Interim Application for Approval and Payment of Fees and Costs to Thomas C. Hebrank, as Receiver ("Receiver's Third Fee Application"), (ECF No. 197);
    a. Schooler has filed a response in opposition to the Receiver's Third Fee Application, (ECF No. 464);
    b. The Receiver has filed a reply in support of his Third Fee Application, (ECF No. 467);
    c. The Commission has filed a statement of non-opposition to the Receiver's Third Fee Application, (ECF No. 464);
2. Third Interim Fee Application of Allen Matkins Leck Gamble Mallory & Natsis LLP, Counsel to Receiver ("Allen Matkins' Third Fee Application"), (ECF No. 198);
    a. Schooler has filed a response in opposition to Allen Matkins' Third Fee Application, (ECF No. 464);
    b. The Receiver has filed a reply in support of Allen Matkins' Third Fee Application, (ECF No. 467);
    c. The Commission has filed a statement of non-opposition to Allen

1    Matkins' Third Fee Application, (ECF No. 464);

2    3.   First Interim Application for Approval and Payment of Fees and Costs to Duffy, Kruspodin & Company, LLP, as Tax Accountants for Receiver ("Duffy's First Fee Application"), (ECF No. 202);

   a.   The Commission has filed a statement of non-opposition to Duffy's First Fee Application, (ECF No. 464);

4.   Motion to Approve Settlement with Sierra Pacific Power Company, (ECF No. 256);

5.   Final Fee Application of Cotton, Driggs, Walch, Holley Woloson & Thompson, Special Counsel to Receiver, ("Cotton Driggs' Final Fee Application"), (ECF No. 472);

6.   Fourth Interim Application for Approval and Payment of Fees and Costs to Thomas C. Hebrank, as Receiver ("Receiver's Fourth Fee Application"), (ECF No. 477);

   a.   Schooler has filed a response in opposition to the Receiver's Fourth Fee Application, (ECF No. 505);

   b.   The Receiver has filed a reply in support of his Fourth Fee Application, (ECF No. 508);

7.   Fourth Interim Fee Application of Allen Matkins Leck Gamble Mallory & Natsis LLP, Counsel to Receiver ("Allen Matkins' Fourth Fee Application), (ECF No. 478);

   a.   Schooler has filed a response in opposition to Allen Matkins' Fourth Fee Application, (ECF No. 505);

   b.   The Receiver has filed a reply in support of Allen Matkins' Fourth Fee Application, (ECF No. 508);

8.   The Receiver's Fifth Interim Report, (ECF No. 481).

The Court has considered the foregoing items and all related briefing. The Court finds the foregoing items suitable for disposition without oral argument. <u>See</u> CivLR

7.1.d.1.

## BACKGROUND

In his Third and Fourth Fee Applications, the Receiver asserts he has incurred a total of $239,053.95 in fees for work done in the following categories:

| Category | 3rd App. | 4th App. | Total |
| --- | --- | --- | --- |
| General Receivership | $20,342.25 | $32,496.75 | $52,839.00 |
| Asset Investigation & Recovery | $50,141.70 | $82,823.85 | $132,965.55 |
| Reporting | $21,938.40 | $4,290.75 | $26,229.15 |
| Operations & Asset Sales | $9,033.75 | $12,987.00 | $22,020.75 |
| Claims & Distributions | $0.00 | $0.00 | $0.00 |
| Legal Matters & Pending Litigation | $1,237.50 | $3,762.00 | $4,999.50 |

While the Receiver incurred $239,053.95 in fees, he now seeks only 90% of those fees, i.e., $215,148.56. The Receiver's Third Fee Application covers the period January 1, 2013, through March 31, 2013. The Receiver's Fourth Fee Application covers the period April 1, 2013, through June 30, 2013. The Receiver does not waive the right to later seek the remaining fees incurred in his final fee application. The Receiver also seeks costs in the total amount of $1,589.76 ($790.37 in Third Fee Application plus $799.39 in Fourth Fee Application), which includes costs for parking, website additions, copies, fuel, PACER charges, and postage.

Allen Matkins asserts it incurred $95,395.50 in fees for work done in the following categories:

| Category | 3rd App. | 4th App. | Total |
| --- | --- | --- | --- |
| General Receivership | $8,337.15 | $9,520.65 | $17,857.80 |
| Asset Investigation | $2,134.35 | $13,524.30 | $15,658.65 |
| Reporting | $21,546.00 | $9,516.15 | $31,062.15 |
| Operations & Asset Sales | $970.65 | $7,690.50 | $8,661.15 |
| Claims & Distributions | $1,624.05 | $3,173.85 | $4,797.90 |
| Third Party Recoveries | $4,568.85 | $0.00 | $4,568.85 |

| Pending Litigation | $1,213.65 | $3,013.20 | $4,226.85 |
| Employment/Fees | $4,101.30 | $4,460.85 | $8,562.15 |

While Allen Matkins incurred $95,395.50, it now seeks only 80% of those fees, i.e., $76,316.40. Allen Matkins' Third and Fourth Fee Applications cover the same periods noted above. Allen Matkins' reserves the right to later seek the remaining fees incurred in its final fee application. Allen Matkins also seeks costs in the total amount of $5,534.97 ($1,033.04 in Third Fee Application plus $4,501.93 in Fourth Fee Application), which includes expenses for document editing and copying, filing fees, service fees, recording fees, shipping, and postage.

Duffy, the tax accounting firm retained by the Receiver, seeks $78,050.12 in fees for General Engagement Services ($1,807.65), IT Consulting ($2,650.37), and Preparation of 2012 Form 1096 and 1099 Informational Returns and 2012 Income Tax Returns ($73,592.10). Duffy further seeks $7,016.89 in costs.

Cotton Driggs, the special counsel retained by the Receiver to represent certain GPs involved in ongoing litigation in Nevada, seeks $1,619.50 in fees and $.80 in costs for work done in settling a complicated condemnation action in Nevada.

## DISCUSSION

**I.  Legal Standard**

"[I]f a receiver reasonably and diligently discharges his duties, he is entitled to fair compensation for his efforts." SEC v. Elliott, 953 F.2d 1560, 1577 (11th Cir.1992). "The court appointing [a] receiver has full power to fix the compensation of such receiver and the compensation of the receiver's attorney or attorneys." Drilling & Exploration Corp. v. Webster, 69 F.2d 416, 418 (9th Cir. 1934). A receiver's fees must be reasonable. See In re San Vicente Med. Partners Ltd., 962 F.2d 1402, 1409 (9th Cir. 1992).

As set forth in this Court's Order Granting in Part First Interim Fee Applications, (ECF No. 169), the Court will assess the reasonableness of the requested fees using the

factors enumerated in SEC v. Fifth Avenue Coach Lines, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973), and In re Alpha Telcom, Inc., 2006 WL 3085616, at *2-3 (D. Or. Oct. 27, 2006). Those factors include: (1) the complexity of the receiver's tasks; (2) the fair value of the receiver's time, labor, and skill measured by conservative business standards; (3) the quality of the work performed, including the results obtained and the benefit to the receivership estate; (4) the burden the receivership estate may safely be able to bear; and (5) the Commission's opposition or acquiescence.

A district court's award of receivership fees is reviewed for abuse of discretion. San Vicente, 962 F.2d at 1409.

## II. Analysis

In his oppositions to the Receiver's and Allen Matkins' Third and Fourth Fee Applications, Schooler makes two arguments unrelated to the reasonableness of the amount of fees requested. First, Schooler argues the Receiver's and Allen Matkins' fee applications "must not be approved unless and until the Receiver certifies that he has applied all funds received from the GPs to the corresponding underlying notes owed by Western to the original sellers" of the GP properties, which notes are secured by the GP properties. In its August 16, 2013 Order Granting in Part and Denying in Part Defendants' Motion to Modify Preliminary Injunction Order, this Court directed the Receiver to continue making payments on the notes owed by Western. Thus, Schooler's argument is moot.

Even if it were not moot, the Court finds Schooler's argument unpersuasive. While Schooler alludes to an "all-inclusive trust deed" that contains an "express understanding" that funds paid to Western by the GPs will be applied to the underlying notes, Schooler does not provide this "all-inclusive trust deed" or any other authority that would prevent the Receiver from applying Western's receivables in a way that fairly meets Western's obligations. The Court thus finds no support for Schooler's assertion that the Receiver must "certify" that he has applied all funds to the underlying notes before paying any receivership costs.

Moreover, the Court notes that, according to spreadsheets provided by the Receiver, Western's underlying note obligations currently exceed Western's income from GPs by approximately $10,360 per month—not $1,300 per month as previously asserted. (See ECF No. 508-1 at 6-9.) In the past, Schooler likely would have infused Western with cash to cover this shortfall. Indeed, Schooler voluntarily made two such cash infusions to ensure the underlying notes were paid toward the beginning of this case. Because Western's cash flow is largely dependent on GPs repaying the loans they acquired from Western, Western may not be able to meet all of its obligations—including payments on the underlying notes.[1]

Second, Schooler argues the fee applications "should be denied in light of the actual harm that has been caused to date to the receivership entities by the Receiver's actions." Schooler asserts "there are nine GPs that today would have enough money to make their next property tax payment except for the fact that the Receiver used limited available cash to" buy Western's equity interests in the GPs. Schooler, however, provides no information as to when these GPs' next tax payments are due, whether these GPs have incurred late fees or other penalties, or why the GPs could not, if necessary, raise additional operational funds (as they have in the past) to meet their obligations. This is far from a demonstration of "actual harm." Further, given the percentage of investor funds that Schooler paid himself in salary or paid other entities that he controls from January 1, 2005, through September 6, 2012, (approximately 25%), the court is reluctant to give any weight to Schooler's apparent concern that the Receiver not reduce Western's equity interests in the GPs in order to meet Western's

---

[1] If Western is ultimately unable to pay the underlying notes, the obligation to pay the notes may—if what Schooler has asserted is true—fall on the GPs themselves in order to avoid foreclosure on their properties. Thus, in some instances, GPs may be obligated to make payments on the underlying notes, in addition to making payments on the loans from Western that the GPs acquired to finance their GP interests in the first place, which loans will not, to the Court's knowledge, be extinguished by Western's failure to pay the underlying notes. Because Defendants did not use investor funds to purchase the GP properties outright (but instead financed the purchases and used investor proceeds to pay Schooler's salary, commissions, operating expenses, etc.), any inability by Western to pay the underlying notes may result in investors paying more for their investments than they originally bargained for.

legitimate expenses, which now include the costs of the receivership.

Further, while the Court has, in the past tolerated Schooler making arguments on behalf of the GPs, the Court is no longer willing to consider arguments made by Schooler or his counsel on behalf of the GPs. Counsel for Defendants has a clear conflict of interest in representing the interests of both Defendants and the GPs because the GPs are comprised of investors alleged to have been defrauded by Defendants.

In addition, Schooler has insisted from the get-go that the GPs are fully capable of managing their own affairs. But Schooler's frequent intervention on behalf of the GPs and the misinformed letters the Court has received from investors who have apparently relied on information from a website established by Schooler demonstrate that, to the contrary, the GPs actually do rely on Defendants to manage more of their affairs than mere administration of their partnerships.[2]

Notwithstanding Schooler's contradictory tactics, the Court recently concluded that the GPs are capable of managing their own affairs if they are fully informed. By all indications, investors are far from being fully informed as to the state of their business interests or ties to Defendants. The Court has thus set forth a process by which the GPs may be released from the receivership so they may proceed however they wish with the interests they acquired from Defendants.[3]

In short, the Court finds it is no longer appropriate to consider arguments made by Schooler on behalf of the GPs. To the extent that the GPs would like to participate in this case, they may take the appropriate steps to do so. It is anticipated, however, that the GPs will, in the near future, be released from the receivership after it is

---

[2] The Receiver asserts the current partnership administrators have taken up office with Schooler and have, thus far, failed to resume operational billing of the GPs as previously ordered by this Court. If the current partnership administrators do not resume operational billing on or before **November 22, 2013**, the Court will, while the GPs remain in the receivership, entertain from the Receiver an ex parte application for authorization to terminate the partnership administrators and replace them with individuals who will comply with the Court's orders.

[3] The removal of the GPs has, of course, been delayed by Schooler's appealing to the Ninth Circuit this Court's condition that Western's legal ties to the GPs be severed before releasing the GPs from the receivership.

determined which conditions may apply to their release.

Having disposed of Schooler's objections, the Court will consider the reasonableness of the instant fee requests.

### A. Complexity of Tasks

Schooler maintains "the problems faced [in this case] were not truly complex at the beginning of the receivership and have not grown more complex since." Schooler asserts that, while "there are over 100 entities each with its own bank account, 22 properties, and over 3,300 investors, the accounts are all with one bank, the entities have a common office in San Diego with common storage, and the entities hold only raw land with no day-to-day management required." Defendants assert the GPs have been able to meet all of their obligations for years at the nominal cost of between $100 and $400 per month, and these obligations and needs did not suddenly increase upon the appointment of a receiver."

The Court finds the tasks the Receiver performed during the Third and Fourth Fee Application periods were somewhat complex. After organizing the many entities and accounts that comprise the receivership estate, the Receiver was left with overseeing the day-to-day operations of the receivership entities, communicating with investors, completing a two-part forensic accounting report, overseeing the preparation of necessary tax forms and filings for the receivership entities, obtaining an appraisal of the GP properties, recovering Western's receivables and assets, participating in this litigation (including the preparation of reports to the Court and responding to Defendants' motions and opposition briefs), overseeing unrelated litigation involving specific receivership entities, and other tasks.

The Court finds the tasks that Allen Matkins performed during the Third and Fourth Fee Application periods to be moderately complex. In addition to working with the Receiver on matters arising from this litigation (including briefs in response to Defendants' motions and opposition briefs), Allen Matkins assisted the Receiver with matters related to taxes, the Receiver's forensic accounting, and the Receiver's

reporting requirements. Allen Matkins also assisted the Receiver in recovering debts owed to Western by investigating, for example, loans made to the LinMar Borrowers. Allen Matkins was also required to confer with counsel or parties in litigation involving one or more of the receivership entities. Allen Matkins also spent a notable amount of time responding to investor inquiries.

As to the complexity of the tasks performed by the Receiver's accountant, Duffy, the Court finds its tasks were moderately complex. Duffy was required to prepare tax and informational returns for 98 GPs, which preparation required Duffy to accurately reflect the ownership structure of each GP as set forth by the partnership agreements. The volume of data required to prepare these documents was vast. While individually not all that complex, the preparation of over 8,000 returns and accompanying K-1s was labor intensive.

Regarding the complexity of the tasks performed by the Receiver's special counsel, Cotton Driggs, the Court finds its tasks were minimally complex, as they involved only the completion of settlement talks and the preparation of settlement documents.

Lastly, the Court considers the fact that Schooler has not identified any unnecessary or over-billed tasks in the time sheets submitted in support of the fee applications. Indeed, the Court has reviewed the time sheets and finds that, at this time, the tasks were necessary and not over-billed.

**B.     Fair Value of Time, Labor, & Skill**

The Receiver billed his time at $247.50 per hour and the time of those working for him at $157.50 - $211.50 per hour. Allen Matkins billed its time at $211.50 - $585.00 per hour, with most of the work being billed at $418.50 per hour. The Receiver's accounting firm, Duffy, billed its time at $36.00 - $337.50 per hour, with most of the work being billed at $112.50 per hour. These rates reflect a ten percent discount from the Receiver's, Allen Matkins', and Duffy's ordinary rates. Cotton Driggs billed its time at $285 - $400 per hour.

The Court continues to find, as it has in orders granting previous fee applications, that the rates charged by the Receiver and Allen Matkins are comparable to rates charged in this geographic area.  The Court also continues to find that the rates charged by Cotton Driggs are comparable to the rates attorneys charge in Nevada.

Finally, the Court notes that no evidence was submitted with regard to Duffy's rates for accounting work.  Though, because Duffy discounted its rates by 10%, and because the majority of Duffy's work was billed at $112.50, the Court is able to find Duffy's rates represent the fair value of its work.  See, e.g., In re Pahl, 2013 WL 1385676, at *5 (Bankr. D. Or. Apr. 4, 2013) (approving accountant's rate of $215 to $230 per hour).

### C.    Quality of Work Performed

Schooler asserts that, "[s]ince there has been no indication as to the results obtained through the Receiver's labors to date, the Receiver's work merits an incomplete grade and therefore the fee application should be denied in its entirety or else the award should be reduced significantly."

The Court finds the quality of work performed by the Receiver and his counsel to be above average.  The Receiver and his professionals have, to the best of their ability, kept afloat the tangled web of business entities built by Schooler—all without have been paid for nearly a year's worth of work and all while facing a constant stream of opposition by Schooler.  The Receiver and his counsel have complied with the Court's orders and have made every effort to protect investors from further financial harm during the pendency of this litigation.

The Court finds the quality of work performed by Duffy and Cotton Driggs to be satisfactory.  As for Duffy, the Court has received no complaint that Duffy's tax preparation activities for the receivership entities was deficient in anyway.  Regarding, Cotton Driggs, the Court finds its work in settling the Nevada litigation achieved a fair

and equitable result for all involved.[4]

**D.     Receivership Estate's Ability to Bear Burden of Fees**

As noted in the Receiver's and Allen Matkins' Fourth Fee Applications, "Western can certainly afford to pay approved receivership fees and costs without putting it at any risk of being unable to make payments on loans secured by GP properties." This is due in large part to Court's authorization to sell Western's office furniture and equipment, the Court's instruction to the Receiver to continue collecting payments on loans Western made to the GPs to cover shortfalls in operational funds, and the Court's authorization to commence collection actions against the LinMar Borrowers. Accordingly, the Court finds Western has, or will have, the ability to bear the Receiver's and Allen Matkins' fee and cost requests.

In the Court's prior fee orders, the Court found that the GPs had more than $6 million in cash in their accounts. Based on the most current information available to the Court, that amount has not changed significantly. Accordingly, the Court finds the GPs have the ability to bear Duffy's accounting fees and costs, which were largely incurred for the benefit of the GPs.

The Court finds the four GPs involved in the Nevada litigation (Gold Ridge Partners, Grand View Partners, Rolling Hills Partners, Sky View Partners) have sufficient ability to bear the burden of Cotton Driggs' fees and costs. Based on the most current information available to the Court, these four GPs have an aggregate

---

[4] The Nevada litigation involved the condemnation of a portion of the property belonging to four GPs (Gold Ridge Partners, Grand View Partners, Rolling Hills Partners, and Sky View Partners). A jury awarded these GPs $4.4 million for the taking of 480 acres of their property. The case went up on appeal and, at some point, the condemner sought to abandon the action by giving back the 480 acres of property and seeking a return of the $4.4 million. The GPs opposed the abandonment, and the matter was eventually resolved by the Nevada Supreme Court, which said it would be up to the Nevada trial court to determine whether the condemner could abandon the taking action. Shortly thereafter, the Nevada litigation was stayed due to this Court's preliminary injunction order, which included a stay of litigation involving the receivership entities. Then, with the assistance of Cotton Driggs, the GPs settled with the condemner in a deal that allowed the condemner to keep the 480 acres and the GPs to keep the $4.4 million. Given the uncertainty of what would have happened in the Nevada case once the litigation stay issued in this case was lifted, this Court finds the settlement is a fair and equitable result for both the GPs and the condemner in the action. Thus, as set forth in the Court's Conclusion and Order, the Court will approve this settlement.

amount of about $850,000 in their bank accounts, and Cotton Driggs' fees and costs are less than $1,500.

### E. Commission's Opposition or Acquiescence

While the Commission does not expressly approve of the requested fees and costs as reasonable, the Commission has filed a notice of non-opposition to the Receiver's and Allen Matkins' Third Fee Applications and to Duffy's First Fee Application. Further, the Court accepts the Receiver's representations that the Commission does not oppose Cotton Driggs' Final Fee Application or the Receiver's and Allen Matkins' Fourth Fee Applications.

Considering the above five factors together, and considering that "[i]nterim fees are generally allowed at less than the full amount," Alpha Telcom, 2006 WL 3085616, at *2-3, the Court awards fees and costs as set forth in the following table.[5]

| Applicant | Fees Allowed | % of Fees Incurred[6] | Costs Allowed | % of Costs Incurred |
|---|---|---|---|---|
| Receiver | $191,243.16 | 80% | $1,589.76 | 100 % |
| Allen Matkins | $66,776.85 | 70 % | $5,534.97 | 100 % |
| Duffy | $78,050.12 | 100% | $7,016.89 | 100% |
| Cotton Driggs | $1,619.50 | 100 % | $0.80 | 100% |

### CONCLUSION AND ORDER

After a review of the parties' submissions, the record in this matter, and the applicable law, and for the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. The Receiver's Third Fee Application, (ECF No. 197), is **GRANTED IN**

---

[5] The Court directs the Receiver to: (1) pay his and Allen Matkins' fees and costs from Western's accounts; (2) pay Duffy's fees and costs first from Western's accounts and then, to the extent that is not possible, from the GP accounts in a fair and reasonable way; and (3) pay Cotton Driggs' fees and costs from the accounts of Gold Ridge Partners, Grand View Partners, Rolling Hills Partners, and Sky View Partners in a fair and reasonable way.

[6] The Court includes the percentage of fees incurred rather than a percentage of the fees requested, given that the Receiver and Allen Matkins request only a percentage of their actual fees.

      **PART**;

2. Allen Matkins' Third Fee Application, (ECF No. 198), is **GRANTED IN PART**;

3. Duffy's First Fee Application, (ECF No. 202), is **GRANTED**;

4. The Receiver's Motion to Approve Settlement, (ECF No. 256), is **GRANTED**;

5. Cotton Driggs' Final Fee Application, (ECF No. 472), is **GRANTED**;

6. The Receiver's Fourth Fee Application, (ECF No. 477), is **GRANTED IN PART**;

7. Allen Matkins' Fourth Fee Application, (ECF No. 478), is **GRANTED IN PART**;

8. Having reviewed the Receiver's Fifth Interim Report, (ECF No. 481), is **APPROVED**;

9. The hearing on the Receiver's and Allen Matkins' Fourth Fee Applications, currently set for November 8, 2013, is **VACATED**.

DATED: November 5, 2013

HON. GONZALO P. CURIEL
United States District Judge