UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 3:12-cv-2164-GPC-JMA |
| | **ORDER:** |
| Plaintiff, | **(1) DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT, (ECF NO. 542);** |
| v. | **(2) DENYING PLAINTIFF'S MOTION TO DEFER CONSIDERATION OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT, (ECF NO. 553);** |
| LOUIS V. SCHOOLER and FIRST FINANCIAL PLANNING CORPORATION, dba Western Financial Planning Corporation, | |
| Defendants. | **(2) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, (ECF NO. 563)** |

## INTRODUCTION

This is a civil enforcement action initiated by the Securities and Exchange Commission ("SEC"), in which the SEC alleges defendants Louis V. Schooler ("Schooler") and First Financial Planning Corporation d/b/a Western Financial Planning Corporation ("Western") defrauded investors through the sale of unregistered securities tied to interests in real property.

The Court has entered a preliminary injunction and appointed Thomas C. Hebrank ("Receiver") as permanent receiver to operate and manage the affairs of Western, its subsidiaries, and the several general partnerships that Western formed in connection with the sale of the aforementioned interests in real property.

On August 16, 2013, the Court entered an order to remove the GPs from the receivership once certain conditions were satisfied.  (ECF No. 470.)  Among those conditions, Defendants disagreed with the condition that Western's interests in the GPs be liquidated so that Western would have no further ties to the GPs.  (ECF No. 474.) The Court rejected Defendants' argument that this was an inappropriate condition, (ECF No. 494), and Defendants appealed to the Ninth Circuit, (ECF No. 499). Thereafter, Defendants asked the Court to release the GPs from the receivership, but to put a hold on the condition that Western's interests in the GPs be liquidated.  (ECF No. 495.)  On November 14, 2013, the Court decided to put a hold on releasing the GPs from the receivership until the Ninth Circuit has a chance to decide whether this Court's conditions for releasing the GPs from the receivership are appropriate.  (ECF No. 513.)

On November 15, 2013, the SEC filed its own appeal of this Court's order that the GPs should be released upon satisfaction of certain conditions.  (ECF No. 514.)

Now before the Court are the following three motions:  **(1)** Defendants' Motion for Partial Summary Judgment ("Defendants' MSJ"), (ECF No. 542), which has been fully briefed, (ECF Nos. 552, 556[1]); **(2)** the SEC's Motion to Defer Consideration of Defendant's MSJ ("SEC's Motion to Defer"), (ECF No. 553), which has been fully briefed, (ECF Nos. 557, 564); and **(3)** the SEC's cross Motion for Partial Summary Judgment ("SEC's MSJ"), (ECF No. 563), which has been fully briefed, (ECF Nos.

---

[1] Having considered it, the Court will **GRANT** Defendants' Request for Leave to Exceed Page Limit, (ECF No. 556-3).  Defendants are advised, however, that leave to exceed a page limit must be granted before a document that exceeds the page limit is filed.  See CivLR 7.1.h.  In that vein, it is not well taken that Defendants submitted their request as an attachment to their over-length reply brief in lieu of filing the request as a separate motion as is the practice in this district and as Defendants themselves have done in the past.  (See ECF No. 406.)

571, 575).  The Court finds the foregoing motions suitable for disposition without oral argument.  See CivLR 7.1.d.1.

Having considered the parties' submissions, the record in this matter, and the applicable law, and for the reasons that follow, the Court will **DENY** the SEC's Motion to Defer,[2] **DENY** Defendants' MSJ, and **GRANT IN PART** and **DENY IN PART** the SEC's MSJ.

## BACKGROUND[3]

### I.   Solicitation

When offering to sell GP units, Defendants solicited investors throughout the country without regard to the investors' level of sophistication in business affairs or real estate investments.  Defendants, for example, engaged in cold-calling programs to market the GP units to investors.  Defendants also hosted real estate investing workshops, which they advertised through mass mailings sent to targeted zip codes, and they participated in benefits fairs to solicit new investors.  Defendants also met prospective investors through networking groups and other contacts.  Many Western salespeople also acted as financial advisors, in which role they encouraged their clients to not only invest in GP units, but to also invest in real estate investment trusts ("REITs"), which interests are generally categorized as securities.  When acting as financial advisors, these salespeople were technically working for non-party WFP Securities, Inc.—a company in which Schooler owns an interest, but in which Schooler asserts he is otherwise uninvolved.

These broad solicitation efforts attracted investors throughout the United States.  And, given the scope of these solicitation efforts, many investors did not meet with or even know other investors in their GPs.  Their only contact, at least initially, was with Defendants and their representatives.

---

[2] Given the SEC's statement that it "seeks to defer only to the extent that the Court is inclined to grant the defendants' motion," the Court finds denial of the SEC's Motion to Defer appropriate.

[3] The following facts are undisputed unless otherwise indicated.

Western and its salespeople gave investors and prospective investors marketing materials that highlighted Western's and Schooler's expertise in real estate investment. One slide show prepared by a Western salesperson explained that Western's role in the GPs was to "Find the Right Investments," "Bring Investors Together," "Take Care of All Paperwork Details," and "Make Sure You Get the Best Value for Your Investment" and that Western performed "Rigorous Due Diligence Process" and delivered "Impressive, Consistent Returns."  While Defendants do not dispute that a Western salesperson prepared and presented this information to investors, Schooler asserts he neither saw nor approved the information for dissemination to investors.  Further, Western salespeople were trained to tell investors Schooler "had great expertise in . . . making decisions about the best times to buy and sell land," and "Western would decide when to sell the land, find a buyer, and negotiate a sales price" before sending ballots to investors."  At least one individual invested his IRA account with Western based on representations by Western salespeople "that when Western believed the time was right to sell the land, it would approach potential buyers and negotiate a sales price, then come back to its investors for final approval."[4]

## II.    GP Formation

Upon investing—i.e., at the time investors gave Western cash or a promissory note for their GP units—investors were generally required to sign, among others, two key documents.  Defendants created both documents.  Investors did not negotiate the terms of the documents.

The first document is entitled, "Statement and Agreement of Partnership" ("Partnership Agreement").  Once effective, the document provides that: (1) investors have the right to access, inspect, and copy GP records; (2) investors have the right to

---

[4] Defendants assert these statements are inadmissible hearsay.  The Court disagrees.  These statements are excluded from the definition of hearsay as statements offered against an opposing party.  See Fed. R. Evid. 801(d)(2).

select and remove signatory partners and partnership administrators;[5] (3) investors "shall participate in the control, management, and direction of the business"; (4) investors shall make decisions affecting the GP in accordance with a vote of the partners holding a majority of the capital contributed to the GP who are entitled to vote; (5) Schooler, Western, and others are non-voting members; and (6) any investor, whether voting or non-voting, may initiate a matter for a vote by submitting a written request to the partnership administrator, who "will" prepare and distribute ballots to other investors.

The second document is entitled, "Partner Representations."  Among other representations, it includes a statement that investors "have sufficient experience, knowledge, and understanding of real estate and financial matters such that [they are] capable of evaluating the merits and risks of [their] investment."

At least two, but typically four, GPs would end up owning the undeveloped real estate that Defendants selected and bought.  In one instance, eleven GPs owned various parcels of one large stretch of real estate.[6]  Generally, each GP held an undivided fractional interest in a parcel.  Schooler determined the number of GPs that would co-own a parcel, the price each GP would pay for its interest, and the price of GP units offered to the public.

Once Schooler decided the structure and terms of the offerings, Western conducted the GP offerings serially–i.e., one at a time–at prices that increased from one GP offering to the next, so investors had an incentive to invest early.  Many GPs had 100 or more investors each, and some had as many as 275 investors.  Once a GP was, in essence, filled with investors, the offering for that GP would be "closed," the GP

---

[5]   Signatory partners were authorized to sign documents, write checks, hire employees/contractors, and take other necessary actions on behalf of the GPs.  Signatory partners could also delegate an agent to undertake these tasks on the signatory partner's behalf.  Partnership administrators were authorized to maintain the books and records of the GP, collect from investors who borrowed money from Western to buy their GP units, administer the GP bank accounts, coordinate action among GPs, and retain third-party services providers on behalf of the GPs.

[6] Unlike most parcels that were divided up between two or four GPs, two of these parcels were each owned by only one GP.

would be formally organized, and Western would transfer an interest in land to the GP. It was only at that time that investors were provided with a list of names and contact information for the other investors in their GP.   And while investors bore some responsibility for keeping their partnership administrators updated with their current contact information, these lists were sometimes incomplete and outdated.

Returning to the Partnership Agreement that investors signed at the time they invested, the SEC notes each agreement states in the first paragraph that, "The General Partnership Agreement is effective as of _____," and each signature page stated that the agreement was "executed as of the day and year first above written."  The effective date was only filled in once a GP offering closed.  For example, the Night Hawk Partners offering began in May 2008, and Western continued to receive investor money through August 2009 for that GP.   The final Partnership Agreement for this GP provides an effective date of September 9, 2009.  Thus, more than a year and three months passed between the initial offering and the date that this Partnership Agreement, by its terms, became effective.  This is one to two-year period between initial offering and GP closing was typical.

Further, because of the above scheme, at the time most investors paid for their interests, the GPs in which they were investing did not formally exist.  This is because a GP offering would be closed before required formation paperwork was filed with the State of California.   Nonetheless, bank accounts were opened in the names of prospective GPs upon an initial investment.  Investors did not control these bank accounts until the Partnership Agreements, which provided for the appointment of signatory partners, became effective.   Generally, 93% of investor funds were transferred from the GPs to Western during this period.  7% of investor funds would remain in the GP accounts to cover operational expenses.

## III.   Investor Dependance

One of Western's selling points was that it would take care of everything, and many investors purchased GP units, in part, because they expected Western to manage

all partnership business for them and advise them when to sell their land.

While the Partnership Agreement provided that investors should make decisions by majority vote, no votes were taken to decide who would act as signatory partners. Neither were any votes taken as to who would act as partnership administrators. Rather, two individuals who worked under or with Schooler in Western's offices— Beverly Schuler ("Schuler") and Alice Jacobson ("Jacobson") (together, "Partnership Administrators")—selected the signatory partners and appointed themselves partnership administrators for each GP. The extent of Schooler's oversight and direction of Schuler and Jacobson is disputed.

Until a GP offering closed, Schuler and Jacobson were generally the only individuals with signatory authority on the bank accounts opened in the name of prospective GPs. And, while a signatory partner was added to the account after a GP offering closed, signatory partners never exercised their right to sign checks. Rather, Schuler and Jacobson—without express authorization by any signatory partner—continued to sign checks on behalf of the GPs. Schuler and Jacobson also ensured that formation documents for each GP were filed with the State of California and coordinated the transfer of real estate from Western to the GPs—again, all without express authorization by any signatory partner.

Some investors believed they were "silent partners," and thus relied on Schooler to manage the partnership, decide when to sell, and negotiate sales prices. Defendants' representations at the time of investment led some investors to believe they could sit back and wait for a check to come in. The SEC asserts Schooler retained control over any sales of real estate GPs, in that he was responsible for receiving offers to purchase GP properties and for transmitting such offers to the GPs for consideration. Defendants, on the other hand, provide evidence indicating that, while written offers were mailed to the same office in which Western was located, the offers were typically addressed to the GPs and opened by the Partnership Administrators. Defendants assert that, thereafter, the Partnership Administrators would communicate with Schooler

about the offers because of his expertise in real estate matters.  Schooler might then respond to the offer directly (e.g., when the offeror asked whether a GP might consider a certain offer) or prepare a letter to investors explaining the offer.  When an offer was accepted, Western often acted as the real estate broker between the GP and the buyer, taking a commission on the sale.

Some investors assert were not aware of actions they could have taken in connection with their GP.  Some investors assert they were not even aware they had invested in a general partnership.  Some signatory partners who had signed several GP-related documents assert they did not understand what they had signed or what their powers were.  And at least on signatory partner does not even know the name of the GP for which he is the signatory partner.  One investor asserts he attempted to contact between forty and fifty other investors in his GP, but was only able to reach one person because the contact list provided to him by one of the Partnership Administrators included incorrect or outdated information.  This investor does not, however, state whether he informed the Partnership Administrators of his inability to contact other investors and, if so, what action was taken, if any.

Defendants in this action have argued strenuously on behalf of the GPs despite Defendants' insistence that they are completely separate entities from the GPs. Defendants did so until this Court ordered Defendants to stop.  Schooler has sent letters to investors explaining this litigation and advising them as to what action they might take.  Hundreds of investors have sent the Court letters in support of Defendants' arguments.   Most of these letters are of the same form and include the same misinformation (e.g., an implication that the Receiver has acted unilaterally without court approval).  Some letters, however, support the SEC's position that investors do in fact rely on Defendants to manage their partnership affairs. One letter states, "I have faith that Schooler will eventually advise us to sell the properties at a good price." Another letter asks

> . . . could you actually believe that the best interests of the partners are being served by removing the <u>only individual</u> who had such a lifetime of

1  experience and expertise and replacing them with a 'court appointed
2  receiver,' who has undoubtedly nowhere near the same level of expertise
   in working with these types of investments?

3  (Emphasis added.)

4       When all the offerings related to a master parcel were closed, the GPs were

5  organized into co-tenancies under an agreement signed by the signatory partner of each

6  GP.  Defendants set up this co-tenancy structure.  Indeed, the Partnership Agreements

7  that Defendants drafted provide that each GP will hold an undivided fraction of the

8  master parcel pursuant to a co-tenancy agreement that the GPs "will enter into" to

9  "facilitate the orderly maintenance of the Master Parcel and any future disposition

10 thereof."

11      Most co-tenancy agreements required that all decisions about a property be made

12 by unanimous consent of all co-tenant GPs.  This structure made it effectively

13 impossible for any single investor or GP to exercise any power over the GP's main

14 asset—land.  Investors were limited to requesting that a ballot be sent to other investors

15 in their GP as to whether some action should be taken with regard to the co-tenancy as

16 a whole (e.g., voting to sell the land).[7]  Even if a single investor could contact the 100-

17 275 other investors in his or her GP, a majority vote would be required before any

18 action was taken on behalf of that GP with regard to the co-tenancy as a whole.  If a GP

19 voted to take action with regard to the co-tenancy as a whole, a ballot would be sent to

20 the other GP co-tenants.   Defendants have acknowledged that the unanimity

21 requirement under the co-tenancy agreements is "potentially unworkable" and would

22 produce a "liberum veto" effect.

23

24      [7] Section 6.3.2 of the Partnership Agreement provides:  "A Partner Member of one Co-Tenant
    can submit a written request to its Partnership Administrator for a formal Co-Tenancy Communication
25  requesting the other Co-Tenants to distribute information and/or initiate a ballot vote on matters
    regarding the Master Parcel that are of consequence or importance to all Co-Tenants."   There are
26  several problems with this provision.  First, the effect of a "Partner Member" "submitting a written
    request to its Partnership Administrator for a formal Co-Tenancy Communication" is unclear.  Section
27  5.1.2 provides that all partnership decisions must be made by majority vote.  It seems the decision
    whether to submit a ballot to other co-tenants would be a partnership decision.  The Court thus reads
28  Section 6.3.2 as permitting an investor to submit a request to his or her partnership administrator for
    a vote to be taken as to whether that investor's GP wants to initiate some action among the other GP
    co-tenants.

Further, because anywhere from two to eleven GPs would eventually own any given master parcel, the length of time between the closing of the first GP and the closing of the last GP (and therefore the formation of the co-tenancy) could be years. While Western would transfer an undivided fractional interest of a master parcel to each GP as they closed, none of the GPs could take any action with regard to their properties until the co-tenancy agreement was in place. Western held the unsold interests in the master parcel until each GP closed. For example, the Borda master parcel was sold to four different GPs. The first investor in the first GP formed to own a parcel of that property (Eagle View Partners) invested in March 2007, and the Eagle View Partners GP was closed in October 2008. The fourth GP to own part of the Borda master parcel, however, did not close until November 2010. Thus, until the master parcel was completely sold off and the co-tenancy agreement formed, the first three GPs depended on Western to, not only sell the remaining undivided interests in their land, but to also coordinate any action required as to the master parcel.

Several facts illustrate the GPs are financially intertwined with Western. First, Western borrowed roughly $14.2 million to buy certain properties that it later transferred to GPs. These loans are secured by mortgages on these properties. Thus, a default by Western could result in the foreclosure of these properties.

Second, many investors borrowed money from Western to buy GP units. Defendants structured this debt so the GPs, rather than individual investors, owed Western money. That is, Defendants would lend money to the GPs to cover individual investor shortfalls in exchange for promissory notes from the GPs. Some GPs also owed Western additional money for loans Western made to GPs to cover operational expenses. Despite the existence of these loans, Western rarely collected on them until a GP's property was sold.

Third, investors in Western's third GP offering have no property interest, even indirectly, because the offering never closed, their prospective GP (F-86 Partners) was never formed, and thus title was never transferred to the GP. The halting of this

offering was due in large part to the SEC filing the instant suit. Nonetheless, under the structure set up by Defendants, these investors paid Western $780,000. None of this money was used to purchase the interest in land the investors were promised. Instead, $711,000 of the funds were transferred to Western, which amount Western spent before the SEC filed this action. Only $69,000 remained in the bank account set up for the prospective GP at the beginning of this action.

Fourth, on several occasions—including twice since this action was filed—Schooler has covered shortfalls in Western's or the GPs' expenses.

Fifth, Western bought and retained an equity, albeit non-voting, interest in every GP. In the aggregate, these interests had a purported value of $10 million (based on the prices Defendants charged investors for their interests), but the current fair market value of these interests has been estimated to be about $1 million. While the Receiver has obtained an appraisal of the GP properties, the current fair market value of the GP properties remains disputed.

## LEGAL STANDARD

Summary judgment is appropriate where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. See Celotex, 477 U.S. at 323. The moving party may satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case, or (2) by demonstrating that the nonmoving party failed to make a sufficient showing on an

essential element of its case.  Id. at 322-23.

Where the moving party does not bear the burden of proof at trial, it may show that no genuine issue of material fact exists by demonstrating "there is an absence of evidence to support the non-moving party's case."  Id. at 325.  The moving party is not required to produce evidence showing the absence of a genuine issue of material fact, nor is it required to offer evidence negating the moving party's claim.  Lujan v. National Wildlife Fed'n, 497 U.S. 871, 885 (1990); United Steelworkers v. Phelps Dodge Corp., 865 F.2d 1539, 1542 (9th Cir. 1989).  "Rather, the motion may, and should, be granted so long as whatever is before the District Court demonstrates that the standard for the entry of judgment, as set forth in Rule 56(c), is satisfied."  Lujan, 497 U.S. at 885 (quoting Celotex, 477 U.S. at 323).  If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60 (1970).

If the moving party meets the initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Anderson, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (internal quotations omitted).

"Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  "The district court may limit its review to the documents submitted for purpose of summary judgment and those parts of the record specifically referenced therein." Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1030

(9th Cir. 2001). Therefore, the court need not "scour the record in search of a genuine issue of triable fact." <u>Keenan v. Allen</u>, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing <u>Richards v. Combined Ins. Co.</u>, 55 F.3d 247, 251 (7th Cir. 1995)).

The court may not make credibility determinations, and inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion. <u>Masson v. New Yorker Magazine</u>, 501 U.S. 496, 520 (1991); <u>see</u> <u>Anderson</u>, 477 U.S. at 255; <u>Matsushita</u>, 475 U.S. at 587.

"The mere fact that the parties make cross-motions for summary judgment does not necessarily mean that there are no disputed issues of material fact and does not necessarily permit the judge to render judgment in favor of one side or the other." <u>Starsky v. Williams</u>, 512 F.2d 109, 112 (9th Cir. 1975). Rather, courts must consider each motion separately "on its own merits" to determine whether any genuine issue of material fact exists. <u>Fair Housing Council of Riverside County, Inc. v. Riverside Two</u>, 249 F.3d 1132, 1136 (9th Cir. 2001); <u>Starsky</u>, 512 F.2d at 112. When evaluating cross-motions for summary judgment, the court must analyze whether the record demonstrates the existence of genuine issues of material fact, both in cases where the parties assert no material factual issues exist, as well as where the parties dispute the facts. <u>See</u> <u>Fair Housing Council of Riverside County</u>, 249 F.3d at 1136 (citing <u>Chevron USA, Inc. v. Cayetano</u>, 224 F.3d 1030, 1037 & n.5 (9th Cir. 2000)).

## DISCUSSION

Defendants move for summary judgment on the issue of whether the GP units at issue in this case are securities under the first two factors announced in <u>Williamson v. Tucker</u>, 645 F.2d 404, 424 (1981), for determining whether a transaction is an investment contract (and thus a security) for purposes of federal securities laws. Defendants assert the GP units are not securities under either of the first two <u>Williamson</u> factors. Defendants argue the rights and powers enumerated in the Partnership Agreements demonstrate the first <u>Williamson</u> factor is unmet here. Defendants then argue the representations made under penalty of perjury in the

Partnership Representations demonstrate the second <u>Williamson</u> factor is also unsatisfied here.

The SEC opposes Defendants' MSJ as to the first two <u>Williamson</u> factors and independently moves for summary judgment on all three <u>Williamson</u> factors. The SEC argues that, notwithstanding the rights and powers enumerated in the Partnership Agreements, the Partnership Agreements were ineffective until each GP closed. The SEC thus argues that, at the time they invested, individuals actually had no rights and powers under the Partnership Agreements. With regard to the second <u>Williamson</u> factor, the SEC argues it is entitled to summary judgment based solely on the fact that Defendants engaged in a broad, indiscriminate program of solicitation. The SEC asserts that, to the extent this Court requires more than broad solicitation to satisfy this factor, that there is at least a dispute of material fact with regard to the level of sophistication of investors. The SEC further asserts that, even if this Court were to rely on the Partnership Representations, investors did not represent that they are experienced in general business matters; investors merely signed a form stating they are able to evaluate "the merits and risk of the investment."

## I.    Investment Contracts

Sections 2(a)(1) of the Securities Act and 3(a)(10) of the Exchange Act include investment contracts in their definitions of a "security." 15 U.S.C. §§ 77b(a)(1) & 78c(a)(10). An investment contract is "a contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." <u>SEC v. W.J. Howey Co.</u>, 328 U.S. 293, 298-99 (1946). The three elements of the <u>Howey</u> test are thus: (1) an investment of money, (2) a common enterprise, and (3) the expectation of profits to be derived solely from the efforts of others. <u>See</u> <u>Koch v. Hankins</u>, 928 F.2d 1471, 1476 (9th Cir. 1991); <u>Alluni v. Dev. Res. Group, LLC</u>, 445 Fed. Appx. 288, 295 (11th Cir. 2011).

Generally, the <u>Howey</u> test revolves around the third, "control," element of the test. <u>Koch</u> 928 F.2d at 1476. In <u>Koch</u>, the Ninth Circuit made clear that the Fifth

Circuit's three-factor test for analyzing the third <u>Howey</u> element applies in the Ninth Circuit. 928 F.2d at 1478. The Fifth Circuit's three-factor test, articulated in <u>Williamson v. Tucker</u>, provides that the third <u>Howey</u> element will be satisfied if one of the following three factors is present:

> (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.

<u>Williamson</u>, 645 F.2d 404, 424 (1981). These factors are not exhaustive. <u>Id.</u> at 424 n.15.

"The focus under <u>Williamson</u> is on the investor's expectations <u>at the time of the original investment</u>, and is not directed at what actually transpires after the investment was made . . . ." <u>Holden v. Hagopian</u>, 978 F.2d 1115, 1119 n.6 (9th Cir. 1992).

The Supreme Court has emphasized that "form should be disregarded for substance," and that courts should focus on the "economic reality underlying a transaction, and not on the name appended thereto." <u>United Housing Found., Inc. v. Forman</u>, 421 U.S. 837, 848-49 (1975); <u>Tcherepnin v. Knight</u>, 389 U.S. 332, 336 (1967); <u>Williamson</u>, 645 F.2d at 418.

## II.   Written Agreements & Other Formal Documents

The first factor under the <u>Williamson</u> test is "limited to an examination of the legal powers afforded the investor by the partnership agreement and other formal documents that comprised the partnership agreement or arrangement." <u>Holden</u>, 978 F.2d at 1119-20. To be considered, the documents must "establish how the legal powers and duties in the partnership are divided" or "alter the powers to control the partnership business." <u>See id.</u> at 1120 n.7.

Here, it is undisputed that, "at the time of the original investment," <u>see id.</u> at 1119 n.6, a large majority of the investors had no powers under the Partnership

Agreements. This is because, by their very terms, the Partnership Agreements were not effective until months or years after the first investment was made. In other words, at the time investors sent money to Western, the GPs in which they were investing did not formally exist. And, under California law, a GP could not have existed informally until—at a minimum—the GP was closed because, "where the parties purport to establish a partnership to engage in a business at a future time or upon the happening of a contingency, the partnership does not come into being until the time specified or until the contingency is removed." Solomont v. Polk Dev. Co., 245 Cal. App. 2d 488, 496 (1966). Thus, regardless of whether the rights and powers enumerated in the Partnership Agreements eventually accrued, it is clear that, at the time of investing, most investors had no formal rights and powers under the Partnership Agreements.

Moreover, Defendants largely ignore the Co-Tenancy Agreements in their MSJ, focusing almost entirely on the Partnership Agreements for purposes of the first Williamson factor. Based on the record before it, however, the Court concludes the Co-Tenancy Agreements "alter the powers to control the partnership," Holden, 978 F.2d at 1120 n.7, and should thus be considered under the first Williamson factor. Considering the Co-Tenancy Agreements, the Court finds they are subject to the same delayed effectiveness as the Partnership Agreements. Whereas the Partnership Agreements would become effective upon a GP's closing, however, the Co-Tenancy Agreements were not generally executed until an entire master parcel sold off to various GPs. The Court thus finds the Co-Tenancy Agreements did not confer any rights or powers on investors at the time of investing.

Based on the foregoing, the Court will **DENY** Defendants' MSJ and **GRANT** the SEC's MSJ as to the first Williamson factor.[8] Because the presence of only one Williamson factor is necessary to establish that the GP units are securities, the Court

---

[8] While this Court has in the past determined that the Partnership Agreements provide significant rights and powers to investors (ECF No. 212 at 6), this is the first time the Court has considered whether the Partnership Agreements were actually effective at the time of investing. Moreover, the Court's prior determination was made at the pleading stage, not the summary judgment stage as is the case here.

1  concludes, as a matter of law, that the GP units are securities. The Court nonetheless

2  proceeds to analyzing the remaining two Williamson factors.

3  **III.  Investor Knowledge of Business Matters**

4      The second Williamson factor examines "whether the partners are inexperienced

5  or unknowledgeable 'in business affairs' generally, not whether they are experienced

6  and sophisticated in the particular industry or area in which the partnership engaged

7  and they have invested." Holden, 978 F.2d at 1121; but see SEC v. Shields, 744 F.3d

8  633, 647 (10th Cir. 2014) (observing that, in the Tenth Circuit, the second Williamson

9  factor "focus[es] on the experience of investors in the particular business, not the

10  general business experience of the partners").

11      The SEC relies on Reves v. Ernst & Young, 494 U.S. 56, 66-68 (1990), to

12  support its argument that a broad solicitation of investors, by itself, satisfies the second

13  Williamson prong. In Reves, however, the Supreme Court articulated the "family

14  resemblance" test for determining whether a promissory note is a security and

15  specifically rejected the Howey test for use in this situation. Reves, 494 U.S. at 64.

16  It thus appears the Supreme Court intended the Howey test (and thus the Williamson

17  test, which is the progeny of Howey) to be separate and distinct from the "family

18  resemblance" test. See Fox v. Dream Trust, 743 F. Supp. 2d 389, 398 n.7 (D.N.J.

19  2010) ("Notes and investment contracts are analyzed differently."). Nonetheless, the

20  Court finds it appropriate to consider Defendants' broad solicitation of investors in

21  determining whether the second Williamson factor is present. Though, rather than

22  being decisive, as such a solicitation would likely be under the "family resemblance

23  test," see Reves, 494 U.S. at 68, the Court concludes Defendants' broad solicitation is

24  merely an additional fact to consider when determining, under the second Williamson

25  factor, whether investors lacked the level of sophistication necessary to intelligently

26  exercise their partnership powers.

27      The Court turns next to Defendants' assertion that the Partnership

28  Representations require a finding that the second Williamson factor is unmet. It is

undisputed that investors were generally required to sign the Partnership Representations upon investing and that the Partnership Representations include the following statement: "I have sufficient experience, knowledge, and understanding of real estate and financial matters such that I am capable of evaluating the merits and risks of my investment in the Partnership." Based on these facts, Defendants assert investors are bound by this representation and that any contrary statement regarding their knowledge of business affairs is impeached by their having signed the Partnership Representations. In support of this argument, Defendants rely on Holden.

There, the Ninth Circuit observed that an agreement in which investors indicated "they considered themselves experienced in general business matters" was "the only evidence in the record regarding investors' general business experience and sophistication." 978 F.2d at 1121. Here, however, the SEC has offered additional evidence indicating many investors do not own or manage businesses and had never invested in real estate partnerships. Some investors include a pharmaceutical salesman, a retired software programmer, and a casino employee. While the fact that investors are employed in these professions is not dispositive under the second Williamson factor, the Court finds it is relevant to assessing the general business knowledge of investors. And, as set forth above, the Court has concluded that Defendants' broad program of solicitation is an additional relevant fact under the second Williamson factor.

While it may be in some instances that "[a] party who signs a written agreement is bound by its terms, even though the party neither reads the agreement nor considers the legal consequences of signing it," Employee Painters' Trust v. J & B Finishes, 77 F.3d 1188, 1192 (9th Cir. 1996), the Court finds this rule is overridden in the context of the Williamson analysis because of the Supreme Court's emphasis that "form should be disregarded for substance," and that courts should focus on the "economic reality underlying a transaction," Forman, 421 U.S. at 848-49. In other words, the Court finds that, under the second Williamson factor, the proper consideration of the Partnership

Representations, along with the circumstances surrounding investors' execution of these documents, lies not in the formal legal effect of these documents, but rather in the context of determining whether, at the time of investing, investors <u>actually</u> had sufficient knowledge in general business matters to intelligently exercise their partnership powers.[9]

The Court further notes that, even if it were to rely exclusively on the Partnership Representations, these documents alone do not conclusively establish that the second <u>Williamson</u> factor is unmet. This is because the Partnership Representations state that the signer has sufficient knowledge "such that [he or she] is capable of evaluating the merits and risks of [his or her] investment." The Court reads this qualification as limiting the signer's purported knowledge to whether he or she understands the risks of this particular investment. The Partnership Representations are silent as to investors' actual knowledge of general business matters. And, as the SEC notes, "[u]nderstanding that one might lose money from land depreciation is not the same has having enough business experience to manage a large partnership."

Based on the foregoing, the Court will **DENY** both the SEC's and the Defendants' MSJs as to the second <u>Williamson</u> factor.

## IV. Investor Dependance

The third and final <u>Williamson</u> factor focuses on whether an investor "is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers." 645 F.2d at 424. For purposes of summary judgment, the Court finds the analysis of this factor more straightforward than the previous two factors.

On one hand, the SEC asserts the co-tenancy structure is unworkable without a

---

[9] Given the Court's conclusion that investors had no formal partnership powers at the time of investing, the Court questions the utility of the second <u>Williamson</u> factor in this case. This is because the second <u>Williamson</u> factor focuses on whether, at the time of investing, investors had sufficient knowledge to "intelligently exercis[e] his partnership or venture <u>powers</u>." <u>Williamson</u>, 645 F.2d at 424 (emphasis added).

manager and that investors depended on Defendants to manage the GPs and generate a return. On the other hand, Defendants assert the co-tenancy structure's information-sharing and balloting procedures make the co-tenancy structure workable without a manager and that any operational activities undertaken by the Defendants (or the Partnership Administrators, who Defendants assert are not Western employees) fell within the powers provided to them under the Partnership Agreements. Having considered the parties' arguments and submission regarding this factor, the Court is not prepared to conclude, as a matter of law, that Defendants' GP scheme satisfies the third Williamson factor. Rather, the Court finds the balancing of the parties' positions on this factor is best left to the trier of fact. As such, the Court will **DENY** the SEC's MSJ as to the third Williamson factor.

## **CONCLUSION & ORDER**

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Defendants' MSJ, (ECF No. 553), is **DENIED**;

2. The SEC's MSJ, (ECF No. 563), is **GRANTED** with respect to the first Williamson factor and **DENIED** as to the second and third Williamson factors;

3. It is established that the GP units at issue in this case are "securities" for purposes of federal securities laws;

4. Given the Court's conclusion that the GP units are securities, the Court finds good cause to sua sponte reconsider its August 16, 2013 order removing the GPs from the receivership.[10] The Court sets this issue for consideration at a hearing on **July 18, 2014, at 1:30 p.m.** The parties are directed to file briefs on whether, given the Court's conclusion that the GP units are securities, the Court should reconsider its order removing the GPs from the receivership. The parties should address how the parties'

---

[10] Under Federal Rule of Civil Procedure 54(b), district courts have the inherent authority to reconsider interlocutory rulings until a final judgment is entered. Level 3 Communs., LLC v. Lidco Imperial Valley, Inc., 2013 WL 394059, at *2 (S.D. Cal. Jan. 20, 2013).

cross-appeals to the Ninth Circuit affect the Court's desire to reconsider its August 16, 2013 order.  The parties should also address the need to provide investors with an opportunity to file briefs and appear at the July 18, 2014 hearing.  The parties shall each file an opening brief on or before **May 9, 2014**, and may file a responsive brief on or before **May 23, 2014**. No reply briefs will be permitted.  Opening and responsive briefs shall be limited to twenty-five pages each.

DATED:  April 25, 2014

HON. GONZALO P. CURIEL
United States District Judge