**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | CASE NO. 3:12-cv-2164-GPC-JMA |
| Plaintiff, | **ORDER KEEPING GENERAL PARTNERSHIPS UNDER RECEIVERSHIP** |
| v. | |
| LOUIS V. SCHOOLER and FIRST FINANCIAL PLANNING CORPORATION, dba Western Financial Planning Corporation, | |
| Defendants. | |

## I. INTRODUCTION

Before the Court is the issue of whether all, some, or none of the approximately 86 general partnerships ("GPs") currently under receivership in this case should be released from the receivership and under what conditions, if any. Receiver Thomas C. Hebrank (the "Receiver") has filed a Receiver's Report and Recommendations Regarding General Partnerships (the "Report and Recommendation") on this issue. (ECF No. 852.) The parties, (ECF Nos. 874, 880), and the investors, (*see, e.g.*, ECF Nos. 854, 869, 871, 882, 884, 886, 888, 890, 892, 894, 896, 900, 902, 904, 906, 908, 911, 913, 915, 917, 919, 921, 929, 931, 933, 937, 939, 941, 943, 945, 951, 953), have responded to the Receiver's Report and Recommendation, and included both critiques and counterproposals. A hearing on the Receiver's Report and Recommendation was

held on January 23, 2015. (ECF No. 947.)

Upon review of the Receiver's Report and Recommendation, the responses thereto by the parties and investors, and all submissions and arguments to the Court regarding this issue that have been put forth throughout the entirety of this case, the Court concludes that maintaining the receivership over the GPs through the conclusion of the case is necessary in order to preserve, to the extent possible, assets owned by Western and its affiliates that will be available as investor restitution in the event that Defendants are held liable for securities fraud. This is the only practical result given the extent to which Western's assets are intertwined with investor assets, and the lack of alternative viable means to preserve Western's GP interests.[1]

## II. BACKGROUND

### A. Receivership

This is an enforcement action brought by Plaintiff Securities and Exchange Commission (the "SEC"). (*See* ECF No. 1.) The SEC alleges that Defendants Louis V. Schooler ("Schooler") and First Financial Planning Corporation d/b/a Western Financial Planning Corporation ("Western") (collectively, "Defendants") defrauded investors in the sale of general partnership units which were, as a matter of law, unregistered securities. (*Id.*) Because the SEC had demonstrated a probability of success on the merits of this case and the possibility that Defendants would dissipate assets, on September 6, 2012, Judge Larry A. Burns ordered that Western and the GPs be placed under a temporary receivership (the "Temporary Restraining Order"). (ECF No. 10, at 1.) The Temporary Restraining Order, among other things, directed the Receiver to oversee Western and entities that it controlled, including the GPs. (ECF No. 10.) On October 5, 2012, following further briefing by the parties, Judge Burns concluded that the SEC had made out a prima facie case that the GPs were securities

---

[1] At oral argument, Defendants objected to the Court's use of the term "commingling." (ECF No. 949, at 8:13–17.) While the Court recognizes that commingling can have various meanings, (*see, e.g.*, 34 C.F.R. § 303.123), the Court simply uses the term here to assess the extent to which Western's assets are intertwined with investor assets.

and ordered that the receivership be permanent (the "Preliminary Injunction Order"). (ECF No. 44, at 21–22.)

On October 22, 2012, the case was transferred to the Honorable Gonzalo P. Curiel. (ECF No. 52.) On May 29, 2013, Defendants moved to remove the GPs from the Receivership in a motion to modify preliminary injunction. (ECF No. 195.) The Defendants asserted thirteen grounds for removing the GPs from the receivership, including the arguments that: (1) the imposition of costs on investors before the SEC carried the burden of proving its case at trial was unwarranted; (2) removal of the GPs from the receivership would not hinder the SEC's ability to fully litigate all pending claims; and (3) there was no danger or risk to the GPs that necessitated a receivership over the GPs. (ECF. 195-1 at 6-7.) On August 16, 2013, this Court issued its Order Granting in Part and Denying in Part Defendants' Motion to Modify Preliminary Injunction Order (the "Modification Order"). (ECF No. 470.) Based upon the status of the case at the time, the Court concluded that the GPs should be released from the receivership upon the satisfaction of certain conditions. (*Id.* at 25–27.) The Modification Order was thereafter appealed by the Defendants and the SEC filed a cross appeal. (ECF Nos. 499, 514.) While the appeals were pending, on April 25, 2014, the Court issued its Order Granting in Part and Denying in Part Plaintiff's Motion for Partial Summary Judgment (the "Partial Summary Judgment Order"). (ECF No. 583.) The Partial Summary Judgment Order concluded that the SEC had proven that the GPs, as a matter of law, were securities. (*Id.*) Based upon these legal developments, the Court, sua sponte, found good cause to reconsider the Modification Order. (*Id.* at 16, 20.)

On July 22, 2014, the Court issued its Order on Sua Sponte Reconsideration of August 16, 2013 Order to Release General Partnerships from Receivership (the "Reconsideration Order"). (ECF No. 629.) Because the Reconsideration Order maintained the GPs in the receivership, the Court concluded that the GPs' due process rights were implicated and the GPs were entitled to a hearing. (*Id.* at 7–8.) On October

10 and 15, 2014, an investor hearing was held and the GPs were afforded the opportunity to speak (the "Investor Hearing").[2] (ECF Nos. 790, 794.) On October 17, 2014, the Court issued its Order Regarding Investor Hearing (the "Investor Hearing Order") and ordered the Receiver to file a report and recommendation addressing the question whether it was appropriate to treat all GPs the same in light of their varying financial conditions. (*Id.* at 3–6.) . (ECF No. 808.)

**B. Alleged Investment Scheme**

Defendants' investment plan generally involved: (1) purchasing an undeveloped property, (2) forming between two and four general partnerships to take undivided fractional interests in the property, and (3) raising money from investors to become general partners in those GPs. (*See* ECF No. 182, at 1–2.) For the 46 GPs that the Receiver has performed a forensic accounting, Western paid approximately $21 million to purchase the 13 underlying properties and raised approximately $101 million from investors. (*Id.* at 15.) Western retained the approximately $80 million difference. (*Id.*)

The Dayton Valley II property serves as an illustrative example. (*See id.* at 5–7.) Western purchased the Dayton Valley II property from a third party for approximately $1,989,393 in 2003. (*Id.* at 5.) The $1,989,393 was divided as follows: (1) approximately $309,393 was paid in cash; (2) $1,500,000 was owed to the seller in the form of a note (i.e., a mortgage); and (3) $180,000 as commission was owed to Schafer Pacific Properties in the form of a note (*Id.* at 5–6; ECF No. 504, at 3.)

Western then created four GPs—Storey County Partners, Comstock Partners, Silver City Partners, and Nevada View Partners—that would take title to the Dayton Valley II property as cotenants. (ECF No. 182, at 6.) Western raised approximately $8,994,800 from the investors in these four GPs. (*Id.*) The $8,994,800 was divided as follows: (1) approximately $7,554,550 in cash paid by investors; (2) $92,368 in "Western Notes" representing funds advanced by Western to GPs for the investor down

---

[2] The Court additionally gave all investors who wanted to speak an opportunity to do so, even if another investor who represented their GP had already spoken. (*See* ECF No. 790.)

payment; and (3) $1,347,882 in "Partnership Notes" payable from investors to the four GPs (the four GPs, in turn, had notes payable in the same amount to Western). (*Id.* at 6–7.) Any interest in each GP that Western had was nominally as a nonvoting partner, (*see* ECF No. 195-3, Ex. 1), but Western collected loan payments from investors directly on behalf of the GPs. (ECF No. 504, at 4.)

Though Western raised significantly more cash than the price it had paid for the Dayton Valley II property, the mortgage that Western took out on the property was not immediately paid off and a balance was still owed on the mortgage as of October 1, 2014. (*See* ECF No. 852-1, Ex. A.) Additionally, several investors have indicated that they were not informed that the property they were investing in was encumbered by a mortgage. (*See, e.g.*, ECF No. 7 ¶ 8; ECF No. 8 ¶ 9.)

## III. LEGAL STANDARD

### A. Authority of the District Court

District courts have extremely broad authority to supervise and determine the appropriate action to be taken in a federal equity receivership. *Sec. and Exch. Comm'n v. Capital Consultants, LLC*, 397 F.3d 733, 738 (9th Cir. 2005). Though the GPs are legally separate entities from Western, the Ninth Circuit has made it clear that the Court has authority to place a nonparty's property under a receivership even where the nonparty is not accused of any wrongdoing. *See In re San Vicente Med. Partners Ltd.*, 962 F.2d 1402, 1408 (9th Cir. 1992). To include the properties of third parties in receivership, three requirements must be met: (1) the third party must meet *International Shoe*'s minimum contacts standard, (2) the third party must receive actual notice, and (3) the third party must be given an opportunity for a hearing. *Id.*

First, for legal entities such as general partnerships, *International Shoe*'s minimum contacts standard is satisfied in the state under whose laws the entity is formed or in the state where the entity has its principal place of business. *Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014). The GPs in this case were formed under the laws of California and list their principal place of business as "5186 Carroll Canyon

Road, San Diego, California, 92121." (*See, e.g.*, ECF No. 195-3, Ex. 1.) Second, under California law, where one general partner receives notice, the entire general partnership is deemed to have received notice. *In re San Vicente*, 962 F.2d at 1407 n.3 (citations omitted). The Receiver, per this Court's order, gave notice of the Investor Hearing to the GPs by: (1) posting the Reconsideration Order to the Receiver's website, (2) emailing the Reconsideration Order to individual investors, and (3) mailing the Reconsideration Order to the address of record for each GP. (ECF No. 629, at 9.) Third, a hearing was held on the inclusion of the GPs within the receivership at which all GPs who wished to speak were given the opportunity to do so. (ECF No. 790.) Thus the Court has authority to include third party property, such as the GPs, within the receivership and has respected the due process rights of the GPs. *See In re San Vicente*, 962 F.2d at 1407.

**B. Authority of the Receiver**

Some investors have argued that the Receiver has exercised more authority than Western did prior to the receivership, (*see, e.g.*, ECF No. 869), and that the Receiver has operated beyond the scope of the GPs' partnership agreements. (*See id.*) Contrary to the investors' assertions, the Receiver's authority to manage the GPs does not stem from the GPs' partnership agreements, rather it stems from the Receiver's authority as an officer of the Court tasked with managing the property under the Court's control. *See In re San Vicente*, 962 F.3d at 1409–10. As such, the Receiver has the legal authority to take actions beyond the scope of the GPs' partnership agreements and ones that could not have been taken by Western in order to protect the status quo. *See id.*; *see also Sec. and Exch. Comm'n v. Am. Capital Invs., Inc.*, 98 F.3d 1133, 1143–45 (9th Cir. 1996) abrogated on other grounds by *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998).

Ultimately, the Receiver may only take action pursuant to this Court's orders and the Receiver is tasked with preserving receivership assets, administering receivership property suitably, and assisting in any equitable distribution of those assets if

appropriate. *See Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006) (citation omitted). Additionally, the preliminary injunction in this case protects the investors by preventing litigation against the GPs or concerning GP properties, such as for the recovery of debts or for foreclosure. (ECF No. 10, at 15–16; ECF No. 44.)

## IV. DISCUSSION

### A. Clarification

Before turning to the Receiver's Report and Recommendation, the Court finds it appropriate to clarify several issues as well as to address concerns that have been brought up by investors through their letters and briefs.

#### 1. Paying Receivership Fees

Some investors have claimed that they are paying for the Receiver's fees and that such fees are unreasonable. (S*ee, e.g.*, ECF No. 906.) This is an argument that Defendants have previously made. (*See, e.g.*, ECF No. 869; *see also* ECF No. 790.) These investors argue that, because the investors are paying their debts to the GPs, the GPs are paying their debts to Western, and Western is paying receivership fees, the investors are therefore paying receivership fees. (*See id.* at 1–3.) What this argument ignores is that the investors would be paying the debts they owed the GPs and the GPs would paying the debts they owe Western, even if the receivership were not in place. Here, the Receiver is billing GPs so that those GPs' operational funds, such as property taxes, mortgage payments, and other expenses, can be met. The Receiver is not billing the GPs to pay receivership fees and this Court's orders specifically require that any fees paid by Western are not paid out of money needed to make mortgage payments on GP properties. (*See* ECF No. 470, at 26–27; ECF No. 922, at 12.) Moreover, the Receiver is required to submit his fees to this Court for approval before he can collect them and this Court has reviewed all fees requested by the Receiver and ensured that the Receiver only collects reasonable amounts. (*See, e.g.*, ECF Nos. 511, 637, 922.)

#### 2. Increased Operational Bills

Several investors have indicated incredulity at the fact that the operational bills

sent by the Receiver have been significantly higher than those sent by Western. (*See, e.g.*, ECF No. 969.) For example, Investor David Butler states that "[s]omething smells fishy" because he is now being billed $109.44 per month for SunTec Partners whereas his previous bills averaged $19.25 per month. (*Id.*) However, the Receiver's report makes clear that the Receiver is not doing anything "fishy." Rather it is the failure of investors to pay their bills that is resulting in higher overall bills to all investors. (*See* ECF No. 852-1, Ex. C.) Because only a certain percentage of investors pay their bills, the Receiver has increased the amount billed to ensure that he can recover sufficient funds to pay for GP expenses and prevent any potential default on mortgages or taxes relating to GP properties. (*See id.*)

Turning to SunTec Partners specifically, SunTec will have a total of $27,314 in expenses for 2014–2015. (ECF No. 852-1, Ex. A.) This comes out to approximately $1,138 per month. Multiplied by Mr. Butler's 2.356793% share in SunTec, his share of expenses is approximately $26.82 per month, which is close to his previous monthly average. (*See* ECF No. 969.) The problem lies in the fact that SunTec's general partner investors are, collectively, only paying 7% of their operational bills. (ECF No. 852-1, Ex. C.) Thus Mr. Butler's bill is higher not because of the receivership but because his fellow investors in SunTec are not paying their share of SunTec's expenses.

Moreover, if such nonpayment had occurred in the past, the investors would likely not have seen an increase in their bills. This is because any shortfalls due to investor nonpayment that occurred prior to the receivership were often covered by Western loaning money to the GPs without investor knowledge. (ECF No. 852, at 26.) Prior to the receivership, Schooler himself put funds back into Western to cover shortfalls that Western itself incurred. (*See* ECF No. 519, at 2.) Because Western has had minimal capital since before the receivership was put in place, Western, through the Receiver, is unable to cover any shortfalls as it had in the past. (*See* ECF Nos. 519, 524.)

/ /

**B. Receiver's Report and Recommendation**

    **1. Receiver's Recommendation**

       The Receiver's overall recommendation is that the receivership be continued as to all GPs pending a determination of whether Defendants defrauded investors. (ECF No. 852, at 6.) The SEC agrees with this recommendation. (ECF No. 880, at 9.)

    **2. Receiver's First Proposal**

       The Receiver's First Proposal categorizes the GPs into three categories, A, B, and C, from most to least financially stable, based on their cotenancy's ability to pay its operating expenses through the end of 2015. (ECF No. 852, at 12–19.) Because most cotenancies include multiple GPs in varying financial condition, each cotenancy is categorized according to the least financially healthy GP in the cotenancy. (*Id.* at 14.) There are seven Category A cotenancies, fifteen Category B cotenancies, and three Category C cotenancies. (*Id.* at 13.) Under the Receiver's First Proposal, a renewed appraisal on each GP property and an informational packet would be sent to all investors. (*Id.* at 17.) Cotenancies in three groups would then be liquidated and any proceeds distributed to their investors: (1) Category A and B cotenancies where a majority of each GP votes to sell; (2) Category B cotenancies that do not raise sufficient capital to pay their 2015 operating expenses; and (3) all Category C cotenancies. (*Id.* at 18–19.) Cotenancies in two categories would then be released from the receivership: (1) Category A cotenancies without majority votes of all GPs to sell; and (2) Category B cotenancies without majority votes of all GPs to sell that raise sufficient capital to pay their 2015 operating expenses. (*Id.* at 18.)[3] GPs that exit receivership would be required to meet additional requirements such as assuming their respective mortgages and liquidating Western's interest. (*Id.* at 14–15, 18.) This proposal allows each cotenancy that is financially able to cover its 2015 operating

---

[3] Essentially the default presumption is that Category B cotenancies that raise sufficient capital and Category A cotenancies will be released from the receivership. Though opposed to the Receiver's First Proposal, the SEC argues that if the Receiver's First Proposal is adopted, the default presumption should be that cotenancies stay in the receivership. (ECF No. 880, at 12 n.6.)

expenses to achieve the outcome that a majority of its investors want.

### 3. Receiver's Second Proposal

The Receiver's Second Proposal divides investors between those who wish to remain in their GP and those who wish to exit their GP. (ECF No. 852, at 20–22.) Investors who wished to remain in their GP would be asked to raise sufficient capital to buyout their co-investors who do not wish to remain in the their GP. (*Id.*) If the buyout amount is raised, the capital is transferred and the cotenancy exits the receivership in the hands of the investors who wish to retain control. (*Id.*) If the buyout amount is not raised, the cotenancy's property is liquidated. (*Id.*) This proposal attempts to allow investors with differing desires but who are in the same cotenancy to get what they want. However, it is not clear what the Buyout Amount for each GP would be until a ballot was sent to investors and it is also unclear whether it would be feasible for some investors to raise enough capital to buyout dissatisfied investors.

### 4. Post Proposal

Investor Gregory M. Post makes an alternate proposal where each GP would seek out volunteers to serve on a committee to manage the GP. (ECF No. 869, at 8–11.)

### 4. Defendants' Proposal

Defendants simply propose that the receivership over all the GPs be "dissolved." (ECF No. 874, at 15.)

## C. Objections

### 1. Receiver

The Receiver argues that all GPs should be treated similarly because "investors' losses cannot be determined until the GP has sold its property interest and investors have received their distribution." (ECF No. 852, at 7.) Thus, the Receiver states, allowing GPs to hold on to their properties would delay the recovery of those GPs' investors. (*Id.*)

### 2. SEC

The SEC argues that treating GPs differently would be inequitable. (ECF No.

880, at 9–10.) The SEC also argues that releasing the GPs would prohibit those GPs' investors from recovering from any distribution plan that may be instituted in this case. (*Id.* at 12.) While the investment scheme was, at least in part, "factually similar" for each investor, the investors were investing in different pieces of property which does distinguish them from each other and may merit different treatment in a distribution plan. *Capital Consultants*, 397 F.3d at 738–39; (*see also* ECF Nos. 8-2, 8-3, 8-4). The Court must do what is the most equitable, even if that equitable relief treats victims differently and thus results in some investors being treated more favorably than others. *See Sec. and Exch. Comm'n v. Credit Bancorp, Ltd.*, No. 99-cv-11395-RWS, 2000 WL 1752979, at *29 (S.D.N.Y. Nov. 29, 2000). As discussed above, the Court has broad authority in fashioning equitable relief and does not see why releasing a GP from the receivership requires that the GP's investors therefore forfeit any claim towards any distribution plan that may be instituted. While the Court acknowledges that a distribution plan, if ordered, may give investors a choice of either retaining their interest or receiving proceeds from Western's assets, it is too early to assess whether such a binary choice is appropriate.

The SEC also reiterates the bases that this Court previously found for permanently including the GPs in the receivership. (ECF No. 880, at 13–18.) The SEC requests that the Court vacates the portion of its order releasing the GPs from the receivership, (ECF No. 470), and formally deny in full Defendants' initial motion to remove the GPs from the receivership, (ECF No. 195). (ECF No. 880, at 6.)

### 3. Investors

Investor Curt Johnson, speaking on behalf of hundreds of fellow investors, states that a certain number of his fellow investors have declined to pay their operational bills because of the receivership. (ECF No. 917.) He further states that these same investors indicate that they would resume payment if the receivership was ended. (*Id.*) While Mr. Johnson interprets this as justification for ending the receivership, (*see id.*), the Court does not see it the same way. The debts that investors owe to their GP are valid and

owed whether or not the property is in receivership. The fact that some investors believe it appropriate to ignore their legal obligations when something happens to their investment that they do not wish for is troubling. This does not lend any confidence that such investors would be able to adequately guide their GP going forward.

Mr. Johnson also makes several requests: (1) stop the Receiver from making the GPs pay Western beyond any valid and outstanding debts that the GPs owe to Western; (2) compel the Receiver to sign the listing agreement presented by Rainbow and Horizon Partners; (3) require the Receiver to pay Western's share of operational expenses before he takes any fees; (4) do not require a repurchase of Western's ownership interest in the GPs; and (5) release all GPs from the receivership. (*Id.*)

As the Court discussed above, the Court is only ordering increased payment by the GPs to Western so that expenses can be paid. (*See* ECF No. 524.) While this may mean that the GPs are paying more than they owe on their notes, the Court authorized these increased payments to ensure that the mortgages for those GPs' properties were paid. (*See id.*) As the Court discussed in its prior order, the Court believes this to be the most equitable way to ensure that those GPs do not lose their properties to foreclosure even though the investors may not have agreed to or even known about their property securing a mortgage paid by Western. (*See id.*)

The Court has already reviewed the proposed listing agreement from Investor Nancy Kemper that Mr. Johnson is referring to. (*See* ECF No. 629, at 6–7.) As the Court previously discussed, there are significant flaws with the listing price and thus the Court does not find it appropriate to use that listing agreement at this time. Listing the property owned by Rainbow and Horizon Partners at a price that would almost assuredly not sell would be a waste of the receivership estate's resources as the Receiver would be required to oversee and manage the listing agent.

With regards to Western's share of operational expenses, the Court notes that Western has been covering shortfalls that occurred due to GP expenses exceeding GP payments to Western. (*See* ECF No. 519, at 2.) The Court is cognizant that Western is

an investor in most of the GPs, and thus has required that any fees paid to the Receiver by Western are not paid out of money needed to make mortgage payments on GP properties. (*See* ECF No. 922, at 12.) Finally, the Court, as discussed below, does not find it equitable to release the GPs from receivership or to consider a buyout of Western's interest prior to the conclusion of this case.

### 4. Defendants

Defendants object that the Receiver is attempting to engage in a "fire sale" of GP properties. (ECF No. 874, at 7.) Specifically Defendants object that the Receiver's proposals prevent investors from choosing what to do with their investment. (*Id.* at 8.) While the proposals may temporarily remove some control from investors, the Court must do what is equitable. Moreover, Defendants' argument stands on questionable footing as at least some investors have claimed that Defendants or their agents stated that the investment would be passive and managed by Defendants. (*See* ECF No. 8 ¶ 9.) The Court must ensure that the investors, as a whole, are treated as fairly as possible. Such action may mean that some investors are prevented from taking certain actions so that the investors as a whole may benefit.

Defendants object to the GP property appraisals, arguing that they are unsupported and dated. (ECF No. 874, at 4–5.) However, the Receiver has already addressed this contention, in part, by proposing a new appraisal for every GP property. (ECF No. 852, at 12.) Additionally, Defendants' objection to the Receiver's appraisals is mostly attorney argument and contains scant evidence. The only evidence that Defendants point to is a single appraisal for a single property. (*See* ECF No. 874, at 5.) Merely because Defendants' attorneys argue that this is a "historically low market" and imply that "development" will "reach[]" the GPs' properties does not make such arguments true. (*See id.*) A single appraisal does not suffice to counter the dozens of appraisals already obtained by the Receiver and that would be obtained if further

1    appraisals are ordered by the Court.[4]

2        Next, citing a Western brochure, (ECF No. 12-1), Defendants argue that there

3 is a "track record[]" showing success by prior GPs in obtaining "a 239% profit" on

4 their investment that counsels against liquidating any GP properties. (ECF No. 874, at

5 6–7.) Ignoring the fact that the brochure lacks support and is marketing material

6 published by Western, it is unclear whether the brochure actually supports Defendants'

7 argument. The brochure simply refers to "Purchase Price" and "Sold Price." (ECF No.

8 12-1, at 2–3.) First, it is not clear whether the "Purchase Price" refers to the amount of

9 money actually invested by GP investors or whether it refers to the amount that the GP

10 or GPs paid for the land itself. As the Receiver's forensic accounting reports have made

11 clear, in many instances, the amount paid for a property was significantly less than the

12 amount invested. (*See* ECF No. 852-1, Ex. A.) Second, it is not clear whether either of

13 these prices includes the amount paid by GP investors in operational expenses each

14 year or includes any amount that would not go to investors, such as to pay Western's

15 interest in the GP or to pay closing costs. In light of the information regarding the

16 investment process revealed by the Receiver's forensic accounting reports and the

17 limited information supplied by the brochure, the brochure does not support

18 Defendant's proposition that these investments have proven to be successful.

19        In addition, Defendants object to the acceleration and payment of the GPs' debt

20 obligations to Western. (ECF No. 874, at 10-11.) Defendants further object that the

21 Receiver has a conflict of interest as receiver over both Western and the GPs. (*Id.* at

22 11.) The Court's duty is to treat the investors as a group equitably, even if, in some

23 instances, the most equitable course of action overall is less favorable to some

24 individual investors. The Receiver's goal is to maximize the receivership estate so that

25 its funds may be available for possible investor restitution. *See Liberte Capital*, 462

26 F.3d at 551. While both Western and the GPs are under the receivership, the Receiver

27

28      [4] Overall it appears that Defendants seek to perpetuate the investment scheme that Defendants were engaged in prior to the SEC filing suit and not what is equitable to all the investors. (*See* ECF No. 874, at 5–6.)

can ensure that any obligations are met. However, any GPs that leave the receivership may not meet their obligations to Western and would no longer be protected by the preliminary injunction's litigation hold. Such action would harm the investors who may lose their properties to foreclosure. Moreover, Defendants have repeatedly advanced the argument that the loans the GPs owe to Western constitute unsecured, subordinated debt and that, if the Receiver were acting in the best interests of the GPs, the GPs would object to paying this debt to Western. (*See, e.g.*, ECF No. 470, at 12.) As the Court has previously discussed, these payments are made to ensure that expenses, such as mortgages, are paid. If the GPs did not make these payments to Western, they would risk foreclosure and loss of their property. As should be obvious, such a result would be problematic and would harm the investors in this case.

Defendants also make several additional objections that do not relate to whether it is appropriate to release the GPs from the receivership such as that the Receiver has been biased by his interactions with the SEC and that Western's investments have a "track record[]" of success. (ECF No. 874, at 6–7, 12–14.) As these objections are irrelevant to whether it is appropriate to keep the GPs in the receivership and do not address the issue of Western's assets being intertwined with the investors' assets, the Court does not address them.

Finally, at oral argument, Defendants argued that receivership over the GPs on the basis of Western's intertwined assets was improper because the GPs were legally separate entities. (ECF No. 790.) Defendants analogized that if Western owned shares of a completely separate company, e.g., IBM, it would be inequitable to place IBM under receivership merely to create district court oversight of the actions of IBM executives to ensure that the value of those shares would be maximized. (*Id.*) Defendants' IBM analogy overlooks several key factors regarding this case. First, there are no allegations that Western ever managed IBM whereas there are allegations that Western managed the GPs. (*See* ECF No. 1.) Second, there are no allegations that Western defrauded investors during the formation of IBM whereas there are allegations

1  that Western defrauded investors during the formation of the GPs. (*See id.*) These

2  allegations distinguish the GPs from other third party entities and make receivership

3  over them appropriate even where receivership over other third party entities may not

4  be.

5  **D. Analysis**

6      **1. Alleged Fraud**

7         The first issue is that, though the GPs have been found to be securities, (ECF No.

8  583), the SEC has not yet moved on any other element of its securities fraud causes of

9  action. Whether or not Defendants are liable for securities fraud, independent of any

10  15 U.S.C. §§ 77e(a)–(c) violations, may bear significantly on whether investor

11  restitution is appropriate. *See Sec. and Exch. Comm'n v. Fischbach Corp.*, 133 F.3d

12  170, 175 (2d Cir. 1997) (noting that disgorged funds "may often go to compensate

13  securities fraud victims for their losses"). The Court will not know whether Defendants

14  defrauded investors until after summary judgment or trial. Even though the SEC

15  represents that it will seek to return any disgorgement from the SEC's sale of

16  unregistered securities cause of action to investors, (*see* ECF No. 880, at 9), the SEC's

17  motion for disgorgement, (ECF No. 685), is still pending and has not yet been reviewed

18  by the Court.[5]

19      **2. Investor Preferences**

20         The second issue is that there is a split between investors. Some investors desire

21  to either continue the receivership or at least liquidate the property of their GP so that

22  they can be done with the investment. (*See, e.g.*, ECF Nos. 884, 888, 896, 900, 904,

23  953.) Other investors desire that their GP's property be released from the receivership

24  so that they can manage their investment themselves, pursuant to the partnership

25  agreement they signed when they invested. (*See, e.g.*, ECF No. 917.) Additionally, a

26

27       [5] The SEC believes that Defendants will only be opposing the amount of

28  disgorgement, not the liability. (ECF No. 880, at 9.) However, the Court has not reviewed the briefs on the SEC's motion for disgorgement and finds it inappropriate to reach the merits of those briefs until the Court actually considers the SEC's motion.

certain number of investors have changed their mind as this litigation has gone on. (*See, e.g.*, ECF No. 888; *compare* ECF No. 352 *with* ECF No. 884.) As a factual matter, conflicting information from investors makes it unclear whether the investors were led to believe that they would actively manage the investment or led to believe that the investment would passive. (*Compare* ECF No. 8 ¶ 9 (stating that "Western took care of everything related to land investment") *with* ECF No. 917 (stating that "[o]ur intent was to have the control necessary to make the decision").) It is entirely possible that, despite investing in the same venture, different investors were told different things.

Unlike cases where the investments were in actual securities, *see, e.g.*, *Credit Bancorp, Ltd.*, 2000 WL 1752979, honoring the differing desires of investors would be difficult if not impossible in this case. If a GP contains investors who wish to be done with the investment and those who wish to continue managing it, the Court cannot easily fashion relief that allows both groups to get what they want. Had the investment been in actual securities traceable to each investor, the Receiver may have been able to transfer those securities to investors who wished to keep them while simultaneously liquidating the securities of investors who wished to walk away. Here, each GP is made up of nearly a hundred investors and many GP properties are held by up to four GPs. Even if the Court were to make a property by property determination as to whether to continue the receivership, this would still leave hundreds, if not thousands, of investors unsatisfied with the outcome.

While the Receiver's Second Proposal presents a compromise, the Court is skeptical about its feasibility. Such a compromise may also create an inequitable result between investors or groups of investors who have significant funds and can afford to buy out dissatisfied investors and those who lack funds and thus cannot buy out dissatisfied investors.

### 3. Perpetuating the Scheme

Allowing GPs to exit the receivership also risks further perpetuating the scheme created by Defendants; a scheme that may have been fraudulent. (*See* ECF No. 1.)

Many GP properties are under mortgages that pre-receivership were paid by Defendants and post-receivership have been paid by the Receiver. (*See* ECF No. 852-1, Ex. A.) Moreover, due to the general partnership structure of the GPs, the general partner investors are personally liable for *all* debts of their partnership under California law. *Mariani v. Price Waterhouse*, 70 Cal. Rptr. 2d 671,684 (Cal. Ct. App. 1999) (citation omitted). Indeed several investors have expressed concern that they may face personal liability. (*See, e.g.*, ECF No. 871; ECF No. 880, Ex. 5.) As it stands, the GPs collectively owe approximately $3.6 million to Western. (ECF No. 852-1, Ex. A.) An additional approximately $1 million is owed on mortgages secured by GP properties. (*Id.*) While Western, not the GPs, is the debtor on the mortgages, the approximately half of GPs whose properties are mortgaged risk losing their land to foreclosure if Western were to fail to make timely mortgage payments. (*See* ECF No. 852, at 14–15.)

Currently, the receivership protects GP properties from foreclosure because the preliminary injunction in this case prevents such action against receivership entities without leave of this Court. (*See* ECF No. 174, at 6–7.) Releasing a GP risks that mortgage payments may not be made by the GP, ultimately resulting in foreclosure and the GP's loss of its property. Additionally, if a GP is released from the receivership estate, the Receiver would no longer be under a fiduciary duty towards that GP. At that time, it may be appropriate for the Receiver to attempt to collect what is owed by the GP to Western, for which investors would be personally liable pursuant to their status as general partners.

## D. Keeping the GPs in Receivership

The Court understands that no matter the decision it makes, a certain number of investors will not get the outcome they desire. While releasing all or some of the GPs from the receivership is an appealing option, the Court does not believe such a course to be the most equitable. The Court finds that, consistent with "the public interest in maintaining the receivership estate's assets while the SEC pursues charges against the Defendants," the most equitable decision is to keep all the GPs within the receivership

1  until the conclusion of this case. *Sec. and Exch. Comm'n v. Small Bus. Capital Corp.*,

2  No. 5:12-cv-3237-EJD, 2013 WL 6701928, at *4 (N.D. Cal. Dec. 19, 2013).

3       Generally, during the pendency of an SEC enforcement action, property related

4  to the allegedly fraudulent investment scheme is held in receivership. *See Small Bus.*

5  *Capital Corp.*, 2013 WL 6701928, at *4; *see also In re San Vicente Med. Partners Ltd.*,

6  962 F.2d at 1404–05. While Defendants and some investors argue that the general rule

7  should be departed from in this case, the Court disagrees.

8       In SEC enforcement actions, defendants may be ordered to disgorge their ill-

9  gotten gains. *Sec. and Exch. Comm'n v. First Jersey Sec.*, 101 F.3d 1450, 1474 (2d Cir.

10  1996). These funds can then be then be distributed *pro rata* back to investors, which

11  the SEC has indicated it intends to seek. (*See* ECF No. 880.) In this case, the SEC has

12  moved for disgorgement, (ECF No. 685), but the hearing on the SEC's motion will not

13  be held for several months. (ECF No. 849.) Outside of moving to establish that the GPs

14  are securities, the SEC has not yet moved on its fraud causes of action. (*See* ECF No.

15  1.) Whether disgorgement is granted and whether investors were defrauded bear

16  significantly on whether distribution to investors is appropriate. *See Fischbach Corp.*,

17  133 F.3d at 175 (noting that disgorged funds "may often go to compensate securities

18  fraud victims for their losses"). An order on either disgorgement or fraud will take

19  months if decided on summary judgment, and potentially upwards of a year if decided

20  at trial. (*See* ECF No. 850.)

21       Western's assets include an interest in at least one GP that holds each GP

22  property except one—Washoe I—and notes from nearly two-thirds of GPs, including

23  two of the GPs that own Washoe I. (*See* ECF No. 852-1, Ex. A.) The value of

24  Western's interest in GP properties and the debt owed to Western by the GPs is

25  approximately $4.6 million. (*Id.*) If Western is ordered to disgorge its ill-gotten gains,

26  that disgorgement may include its share of each GP property and the GP notes. Though

27  the investors own the vast majority of the GPs and thus the GP properties, Western has

28  essentially intertwined its assets with those of investors by taking an interest in at least

one GP that owns almost every GP property and holding notes from nearly two-thirds of GPs. If restitution to investors of Western's disgorged funds is appropriate, every Western investor would arguably have an interest in every GP property. Were the Court to release the GPs, a GP property would be subject to the control of its several hundred general partner investors who would have no obligation to consider the interests of the thousands of investors who may be able to lay claim to Western's interest through investor restitution. Continuation of the receivership ensures that the Receiver and the Court maintain oversight of these properties and that any action taken in relation to the GPs or GP properties is the most equitable overall. *See Credit Bancorp, Ltd.*, 2000 WL 1752979, at *13, 43.

Though the Court could order Western to divest its interest and the GPs to pay the notes, and thus release the GPs without the aforementioned issue, this too is problematic. Western may not be liable for disgorgement or fraud and altering the structure of the GPs at this stage may be prejudging Western's liability. As the appropriate course of action is significantly influenced by Western's liability, the Court finds it appropriate to wait until these issues are resolved before removing the GPs from the receivership or altering their structure.

### E. Administration of the Receivership

#### 1. Information

While the Court finds that continuation of the receivership over all the GPs is appropriate, the Court does have some concerns regarding their current financial status as well as the information available to their investors. As the Receiver has indicated, some investors are not paying their share of costs and these costs are shifted onto other investors who are paying more than their share of costs. (*See* ECF No. 852-1, Ex. C.) Due to comments at the investor hearing, it appears that the operational bills sent to investors lack detail. Thus the Court finds it appropriate to order that additional information be provided to investors so that they can make a choice as to whether to pay the higher operational bill or not. Though choosing not to cover their delinquent

co-investors may result in the sale of a property if insufficient funds are raised to pay operating expenses, the investors should be informed and knowledgeable as to exactly why they are paying an outsized share of costs before they are asked to do so. To that end, the Court orders the Receiver to take three actions to help inform investors: (1) include a detailed list of expenses in any future bills sent to investors, (2) obtain updated appraisals of all GP properties, and (3) prepare an informational packet to be sent to investors.

### 2. Liquidation

At this juncture, it is unclear whether liquidation of some GP properties is appropriate. However, the Receiver's Report and Recommendation appears to indicate that liquidation of GPs that will be unable to pay their bills may be warranted. It may also be the case that billing investors to maintain GP properties is not the wisest course of action based on the valuation of their GP and its property. Thus the Court orders the Receiver to provide a report and recommendation whether liquidation is warranted for any GP that is unable to meet its payment obligations.

### 3. Property Company

Finally, based on issues with the partnership administrators as well as the savings that could be provided by a professional management company, the Court grants the Receiver's request to transition administration of the GPs to the Lincoln Property Company.

### V. CONCLUSION AND ORDER

Based on the reasons stated above, **IT IS HEREBY ORDERED** that:

1. The portion of the Modification Order, (ECF No. 470), granting in part Defendants' Modification Motion, (ECF No. 195), and releasing the GPs from the receivership is **VACATED**;

2. Defendants' Modification Motion, (ECF No. 195), is therefore **DENIED** and the GPs shall be kept in the receivership through the conclusion of this case;

3.   The Receiver's request to transition administration of the GPs to the Lincoln Property Company is **GRANTED**;

4.   The Receiver shall include a detailed list of expenses in any future bills sent to investors;

5.   The Receiver shall obtain updated appraisals of all GP properties as soon as is practicable;

6.   On or before **March 27, 2015**, the Receiver shall file a proposed comprehensive informational packet that includes—in lay terms—the following:

    a.   the SEC's allegations;

    b.   the Receiver's findings to date, including the original purchase prices of the GP properties, the funds raised by Western from the GPs, how the difference between the purchase prices and the money raised was spent by Western, and the results of the appraisals on the GP properties;

    c.   the current and projected financial status of the GPs and their properties;

    d.   the amount and purpose of the expenses being billed to investors, the amount of billed expenses that are actually paid, and what may occur if insufficient funds are raised from investors to pay operational expenses; and

    e.   any other information the Receiver finds necessary to include;

7.   On or before **April 17, 2015**, the Receiver shall file a report and recommendation regarding the appropriate course of action with regards to each GP in light of the Court keeping the GPs in receivership.

DATED:  March 4, 2015

HON. GONZALO P. CURIEL

United States District Judge

3:12-cv-2164-GPC-JMA