# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>LOUIS V. SCHOOLER and FIRST FINANCIAL PLANNING CORPORATION, dba Western Financial Planning Corporation,<br><br>    Defendants. | CASE NO. 3:12-cv-2164-GPC-JMA<br><br>**ORDER DENYING THE SEC'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS FOURTH CLAIM FOR RELIEF**<br><br>[ECF No. 685] |

## I. INTRODUCTION

Before the Court is Plaintiff Securities and Exchange Commission's (the "SEC") Motion for Partial Summary Judgment on its Fourth Claim for Relief. (ECF No. 685.) Defendants Louis V. Schooler ("Schooler") and First Financial Planning Corporation d/b/a Western Financial Planning Corporation ("Western") (collectively, "Defendants") oppose. (ECF No. 980.)

The parties have fully briefed the motion. (ECF Nos. 685, 980, 1019.) The Court finds the motion suitable for disposition without oral argument pursuant to Civil Local Rule 7.1(d)(1). Upon review of the moving papers, admissible evidence, and applicable law, the Court DENIES the SEC's motion for partial summary judgment.

/ /

## II. BACKGROUND

This is an enforcement action brought by the SEC. (*See* ECF No. 1.) The SEC alleges that Defendants defrauded investors in the sale of general partnership ("GP") units which were, as a matter of law, unregistered securities. (*Id.*) On September 4, 2012, the SEC filed its complaint. (*Id.*) On October 22, 2012, this case was transferred to the Honorable Gonzalo P. Curiel. (ECF No. 52.) On July 15, 2013, Defendants filed an answer to the SEC's complaint. (ECF No. 255.) On March 28, 2014, the SEC filed a motion for partial summary judgment with regards to whether the GP units were securities. (ECF No. 563.) On April 25, 2014, the Court granted the SEC's motion for partial summary judgment and found that the GP units at issue in this case were, as a matter of law, securities (the "Securities Order"). (ECF No. 583.) The facts of this case are set forth in detail in the Securities Order. (*Id.* at 1–11.)

On September 9, 2014, the SEC filed the present motion for partial summary judgment on its fourth claim for relief. (ECF No. 685.) On February 13, 2015, Defendants filed an opposition to the SEC's motion. (ECF No. 980.) On March 6, 2015, the SEC filed a response to Defendants' opposition. (ECF Nos. 1011, 1019.) The SEC moves for summary judgment on its fourth claim for relief: that Defendants violated Sections 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C. §§ 77e(a), 77e(c). (ECF No. 1 ¶¶ 79–82; ECF No. 685.) The SEC further moves for disgorgement pursuant to its Section 5 cause of action. (ECF No. 685-1, at 1.)

## IV. LEGAL STANDARD

**A. Summary Judgment**

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986); FED. R. CIV. P. 56. Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material when it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial. *Id.* at 322–23. If the moving party fails to bear the initial burden, summary judgment must be denied and the Court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citing FED. R. CIV. P. 56 (1963)). If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Id.* at 325. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing FED. R. CIV. P. 56 (1963)). In making this determination, the Court must "view [] the evidence in the light most favorable to the nonmoving party." *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001). The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. *Anderson*, 477 U.S. at 255.

In an SEC enforcement action, once the SEC has made out a prima facie case of the sale of unregistered securities, it is the defendant's burden to raise an exemption as a defense. *See Sec. and Exch. Comm'n v. Murphy*, 626 F.2d 633, 641 (9th Cir. 1980)

(citations omitted). Though it would be the defendant's burden at trial to prove that it satisfied the requirements of the exemption, when the SEC is moving for summary judgment, the SEC carries the burden of proving that the exemption does not apply. *Id.*[1]

**B. Disgorgement**

When moving for disgorgement, the SEC bears "the ultimate burden of persuasion that its disgorgement figure" is "a reasonable approximation of profits causally connected to the violation." *Sec. and Exch. Comm'n v. First Pac. Bancorp*, 142 F.3d 1186, 1192 n.6 (9th Cir. 1998) (quoting *Sec. and Exch. Comm'n v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996)); *Sec. and Exch. Comm'n v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1232 (D.C.C. 1989). Once the SEC has met this burden, the burden shifts to the defendant to "demonstrate that the disgorgement figure was not a reasonable approximation." *First City*, 890 F.2d at 1232.

## V. DISCUSSION

**A. Sale of Unregistered Securities**

There are three elements to a prima facie case of a Section 5 violation: (1) the offer or sale, (2) of an unregistered security, (3) through interstate commerce. 15 U.S.C. §§ 77e(a), 77e(c). Regulation D provides four exemptions to Section 5: Rule 504, Rule 505, Rule 506(b), and Rule 506(c). 17 C.F.R. §§ 230.504, 230.505, 203.506(b), 203.506(c). This Court, in the Securities Order, has already determined that the GP units at issue in this case were securities in the form of investment contracts. (ECF No. 583.)

Defendants do not appear to dispute that the SEC has made out a prima facie case of the sale of unregistered securities under Section 5, instead they argue that there

---

[1] The Court notes that some post-*Murphy* Ninth Circuit cases have implied that on an SEC motion for summary judgment, the defendant bears the burden on any registration exemption defenses. *See, e.g., Sec. and Exch. Comm'n v. Platforms Wireless Intern. Corp.*, 617 F.3d 1072, 1083, 1086 (9th Cir. 2010) (stating that "the defendant . . . has the burden of proof in showing entitlement to an exemption" in ruling on an appeal from an SEC motion for summary judgment on a Section 5 cause of action) (quoting *Murphy*, 626 F.2d at 641). However, there is no indication that *Murphy* has been overruled and thus the Court will apply *Murphy*'s standard in this case.

is a dispute of material fact as to whether those sales qualify for the private offering exemption under Rule 506(b). (*See* ECF No. 980, at 6.) Defendants have admitted that the GP units were not registered with the SEC. (ECF No. 255 ¶ 81.) Defendants also do not dispute the SEC's evidence that the GP units were offered or sold through interstate commerce, including mail and email. (*See, e.g.*, ECF No. 8 ¶ 11; ECF No. 4-25.) Accordingly, the Court finds that the SEC has made out a prima facie Section 5 violation. The Court now addresses whether an exemption applies.

**B. Rule 506(b)**

Though the SEC argues that Defendants cannot meet the requirements of any of the exemptions, (ECF No. 685-1, at 11–12), Defendants only contend that there is a dispute of material fact as to whether their sales of GP units qualifies for an exemption under Rule 506(b), (ECF No. 980, at 6), and do not raise any of the other exemptions in either their answer or opposition. (*See* ECF Nos. 255, 980.) To qualify for an exemption under Rule 506(b), an offering must meet the general conditions set forth in 17 C.F.R. §§ 230.501–.502, including providing information to purchasers and refraining from general solicitation or advertising, *see* 17 C.F.R. §§ 230.502(b)–(c), 230.506(b)(1), and two specific conditions: (1) there must be, or the issuer must reasonably believe there are, fewer than 35 non-accredited investors of securities in the offering, and (2) each non-accredited investor must have, or the issuer reasonably believes he or she has, "such knowledge and experience in financial and business matters that he [or she] is capable of evaluating the merits and risks of the prospective investment," 17 C.F.R. § 230.506(b)(2); *see also* 17 C.F.R. § 230.501(e)(1)(iv) (excluding "accredited investor[s]" when calculating the number of "purchaser[s]").

**1. Integration**

The first issue under Rule 506(b) is to determine the number of offerings. Defendants argue that each GP was a separate offering. (ECF No. 980, at 7.) The SEC argues that either there was one continuous offering or there were approximately 23 offerings, one for each property. (ECF No. 1019, at 6.) 17 C.F.R. § 230.502(a) sets

forth the five factors that apply to whether sales are integrated:

>(a) Whether the sales are part of a single plan of financing;
>
>(b) Whether the sales involve issuance of the same class of securities;
>
>(c) Whether the sales have been made at or about the same time;
>
>(d) Whether the same type of consideration is being received; and
>
>(e) Whether the sales are made for the same general purpose.

17 C.F.R. § 230.502(a) Note; Securities Act Release No. 4552 (Nov. 6, 1962), 27 Fed. Reg. 11316; *see Murphy*, 626 F.2d at 645 ("These factors guide our evaluation.") (citations omitted).

*Murphy* provides a useful analogue to this case. In *Murphy*, the defendant company, Intertie, created approximately 30 limited partnerships over the course of several years. 626 F.2d at 637. "Intertie would buy a cable television system, making a cash down payment and financing the remainder, and then sell it to a partnership for a cash down payment and non-recourse promissory notes in favor of Intertie and lease it back from the partnership." *Id.* Intertie raised approximately "$7.5 million from 400 investors." *Id.* The Ninth Circuit found that "[a]ll but the third factor militate in favor of finding integration" because, though "[t]he separation in time from one system offering to the next suggests that the offerings were not integrated, . . . that factor is heavily outweighed by the remaining considerations." *Id.* at 646. First, "the offerings were all made for the same general purpose" and part of a single financing plan to finance Intertie's operations. *Id.* Second, the securities were all of the same class because they were all limited partnership interests. *Id.* Third, "the consideration for all partnership shares was the same, cash and notes secured by the particular cable systems purchased." *Id.* Based on this, the Ninth Circuit concluded that "the trial court on summary judgment was bound to conclude that the offerings were integrated." *Id.*

Like Intertie in *Murphy*, Western would buy undeveloped real estate through a combination of cash and selling financing. (ECF No. 182, at 5.) Western would similarly go on to form one or more GPs, sell GP units to investors, and then sell the

undeveloped real estate to the GP or GPs. (*Id.* at 2–5) Through this investment scheme, Western raised approximately $153 million from approximately 3,400 investors. (ECF No. 27, at 6; ECF No. 203, at 8.)

Just as in *Murphy*, all but the third factor strongly support finding that there was a single offering in this case. The sales of GP units were part of a single plan to finance Western's operations. (*See* ECF No. 182, at 7 ("Approximately 93% of the actual cash collect by the GPs was transferred to Western.").) The sales of GP units were of the same class because they were all general partnership interests for GPs that owned the same type of property, undeveloped real estate. (ECF No. 980-2 ¶ 8 ("the GPs were established for the sole purpose of owning raw land in fractional interests for eventual resale to developers."); ECF No. 14-1, Ex. 1 (sample partnership agreement).) All investors bought GP units using the same type of consideration: cash and notes. (ECF No. 182, at 6.) The sales of GP units were all made for the same purpose: financing Western's operations through creating GPs to buy and hold undeveloped real estate. (ECF No. 980-2 ¶ 8); *cf. Donohoe v. Consolidated Operating & Prod. Corp.*, 982 F.2d 1130, 1140 (7th Cir. 1992) ("The term 'same general purpose' suggests a level of generality to the integration analysis that may be satisfied by the observation that the purpose of each partnership was to drill for oil.") (citation omitted).

With regards to the third factor, the operative time period is the "separation in time from one [GP] offering to the next." *Murphy*, 626 F.2d at 646. Although the GPs were formed over the course of 31 years, a GP was formed in 26 of the 31 years and the longest gap between GP formations was between 1982 and 1987; no other gap was larger than approximately two years. (ECF No. 203, at 3–8.[2]) Courts have found that separate sales made over the course of a number of years can be integrated. *See, e.g.*, *Murphy*, 626 F.2d at 645–46, *Sec. and Exch. Comm'n v. Alt. Energy Holdings, Inc.*, No. 1:10-cv-0621-EJL-REB, 2014 WL 2515710, at *7 (D. Id. May 13, 2014), Moreover,

---

[2] At least one GP was formed in each of the following years: 1981, 1982, 1987, 1988, 1989, 1990, 1991, 1992, 1993, 1994, 1996, 1997, 1998, 1999, 2000, 2001, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, and 2012. (ECF No. 203, at 3–8.)

the sale of GP units for a given GP would often last a year or more, (*see, e.g.*, ECF No. 1 ¶ 51; ECF No. 255 ¶ 50), meaning that, in many instances, the time between sales was smaller than the GP formation date indicates. In *Murphy*, 30 limited partnerships were formed to purchase 30 different cable television systems yet this was considered a single offering. 626 F.2d at 637, 646. Similarly, though Western sold 23 different properties, and created approximately 86 GPs, the Court finds that the "time factor is heavily outweighed by the remaining factors" and thus the 17 C.F.R. § 230.502(a) factors, as a whole, warrant considering Western's sales of GP units for all the GPs to be a single, integrated offering. *Currie v. Cayman Res. Corp.*, 595 F. Supp. 1364, 1377 (N.D. Ga. 1984).

### 2. Conditions

The SEC argues that Western's sales of GP units do not satisfy Rule 506(b)'s conditions for three reasons: (1) Western failed to provide required information to non-accredited investors, (2) Western engaged in general solicitation, and (3) Western exceeded the limit on purchasers. (ECF No. 1019, at 7–16.)

#### a. Purchaser Limit

Rule 506(b) requires that there be no more than 35 purchasers, excluding accredited investors, in the offering. 17 C.F.R. §§ 230.501(e)(1)(iv), 230.506(b)(2). Included within the definition of "accredited investor" is "[a]ny natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000." *Id.* § 230.501(a)(5). The SEC argues that, because there were "3,400 investors in the defendants' single, integrated offering of GP securities," "the registration exemption cannot be invoked." (ECF No. 1019, at 16.) However, the SEC has failed to carry its burden to show that more than 35 of the 3,400 investors count against Rule 506(b)'s purchaser limit. The SEC provides no evidence relating to the net worth of any of the investors. Accordingly, the Court finds that there is a dispute of material fact as to whether there were more than 35 purchasers in the single integrated offering of GP units.

### b. Information Requirement

Rule 506(b) further requires that an issuer must provide certain kinds of information to any non-accredited investor purchaser. 17 C.F.R. § 230.502(b). The SEC argues that, because Schooler stated that "Western did not provide any financial statements to prospective investors," "it is undisputed that the [information requirement] has not been met." (ECF No. 1019, at 8 (quoting ECF No. 980-2 ¶ 8).) Again, the SEC has failed to carry its burden because the information requirement does not apply to accredited investors and the SEC has not provided any evidence relating to the net worth of any of the investors. Accordingly, the Court finds that there is a dispute of material fact as to whether Defendants complied with the information requirement.

### c. General Solicitation

Rule 506(b) also prohibits an issuer or "any person acting on its behalf" from selling or offering to sell securities "by any form of general solicitation or general advertising." 17 C.F.R. § 230.502(c). The SEC cites eleven sources of evidence to support its contention that Western engaged in general solicitation or advertising of GP units, primarily relying upon Schooler's statements with regards to cold calls. (ECF No. 685-2, at 1; ECF No. 1019, at 9–15.)

Contrary to the SEC's arguments, the evidence it cites does not necessarily indicate that GP units were generally solicited or advertised by Western. First, Rule 506(b) prohibits offering or selling securities through general solicitation or advertising, but does not prohibit obtaining clients through such methods. *See* 17 C.F.R. § 230.502(c). Indeed, the SEC has issued a no action letter recognizing that offers to clients obtained through general solicitation do not constitute general solicitation so long as "sufficient time" passes "between establishment of the relationship and [the] offer." *Sec. and Exch. Comm'n v. Credit First Fund LP*, No. 05-cv-8741-DSF-PJWx, 2006 WL 4729240, at *12 (C.D. Cal. Feb. 13, 2006) (quoting E.F. Hutton & Co., No-Action Letter, 1985 SEC No-Act. LEXIS 2917 (Dec. 3, 1985)).

1  Second, the SEC has failed to cite any case which interprets the phrase "any person
2  acting on its behalf." 17 C.F.R. § 230.502(c). Instead the SEC merely argues that the
3  sales agents being compensated by Western for the sale of GP units qualifies, without
4  providing any reason why such compensation satisfies the "acting on its behalf"
5  standard. Third, an unknown number of cold calls or mailings to a geographic area of
6  unknown size may not necessarily qualify as general solicitation or advertising. *Cf. Sec.*
7  *and Exch. Comm'n v. Tecumseh Holdings Corp.*, No. 03-cv-5490-SAS, 2009 WL
8  4975263, at *4 (S.D.N.Y. Dec. 22, 2009) (noting that a "*nationwide* cold-calling
9  campaign has many of the same characteristics as the examples listed in 502(c)"
10 because of three factors: "(1) it has the potential to reach a large number of people; (2)
11 it has the potential to reach people throughout a large geographic area; and, perhaps
12 most importantly, (3) it generally targets people with whom the issuer does not have
13 a prior relationship and who are unlikely to have any special knowledge about the
14 offered security") (emphasis added). With these three issues in mind, the Court now
15 turns to the evidence proffered by the SEC.

### i. Cold Calls

17 First, the SEC relies heavily on several pieces of evidence that reference cold
18 calls and call lists, including: (1) statements from Schooler's May 3, 2012, deposition,
19 (ECF No. 4-1, Ex. 1, at 159:9–15); (2) statements from Schooler's February 27, 2015,
20 deposition. (ECF No. 1013, Ex. 3, at 72–73); and (3) Schooler's statements in
21 requesting advice from his counsel prior to this litigation, (ECF No. 980-3, Ex. 1, at 48,
22 58). Yet, in the referenced statements, Schooler does not say that Western offered or
23 sold GP units through cold calls or lead lists, rather he says that Western obtained
24 *clients* through such methods. As the SEC's E.F. Hutton & Co. No-Action Letter makes
25 clear, obtaining clients through general solicitation or advertising and then offering
26 those clients securities does not necessarily violate Rule 506(b)'s general solicitation
27 and advertising prohibition. 1985 SEC No-Act. LEXIS 2917. Schooler's comments,
28 without more, are insufficient to carry the SEC's burden on summary judgment as it is

possible that Western did not generally solicit or advertise the GP units even though Western obtained clients in that way.

Additionally, Defendants contend that these cold calls should not be considered general solicitations for two reasons: (1) Western, through its agents, instructed sales personnel not to cold call, and (2) any cold calls were "done by persons in their capacity as agents of WFP Securities, Inc., which is an entity legally separate from Western." (ECF No. 980, at 7–10.) The SEC argues that these sales personnel were "acting on [Western's] behalf." (ECF No. 1019, at 13.) As the Court has noted above, the SEC has failed to carry its burden to show that the people making cold calls were acting on behalf of Western. That said, Defendants' argument regarding Western's instructions is unavailing for two reasons. One, merely because Western instructed its sales personnel not to cold call does not necessarily mean that they were not acting on Western's behalf. And two, even if that were sufficient, instructions given after previous cold calling, (*see, e.g.*, ECF No. 980-15, Ex. 5, at 62–66), would not remedy those prior cold calls when all of the GPs are considered a single, integrated offering.

### ii. Counsel Admissions

Second, the SEC relies on Defendants' response to the SEC's statement of facts in support of the SEC's March 28, 2014, Motion for Partial Summary Judgment, (ECF No. 563). (ECF No. 571-1, at 4.) The SEC's statement of facts stated that "Schooler then conducted an offering of GP interests to the general public." (ECF No. 563-2, at 2.) At the time, Defendants' responded that this was "[u]ndisputed, but immaterial and irrelevant." (ECF No. 571-1, at 4.) However, Defendants dispute this fact now. (*See* 980-1, at 1. ) It is within a district court's discretion whether to treat representations by counsel as judicial admissions. *Am. Title Ins. Co. v. Lacelaw Corp.*, 862 F.2d 224, 226–27 (9th Cir. 1988) ("We . . . hold that statements of fact contained in a brief may be considered admissions of the party in the discretion of the district court.").

As an initial matter, the language from the SEC's statement of facts relies on the same statements from Schooler's May 3, 2012, deposition, (ECF No. 4-1, Ex. 1, at

159:9–15), that the Court has already noted do not necessarily show a violation of the prohibition on general solicitation. Regulation D exemptions to Section 5 were also not at issue in the SEC's March 28, 2014, Motion for Partial Summary Judgment, (ECF No. 563). Most importantly, Defendants now dispute this fact. Thus, the Court exercises its discretion and declines to consider Defendants' response to the SEC's statement of facts as a judicial admission. *See Am. Title Ins.*, 862 F.2d at 227.

The SEC relatedly relies on statements from this Court's Securities Order. (ECF No. 583, at 3.) Though the Securities Order states that "Defendants solicited investors throughout the country" "[w]hen offering to sell GP units," (*id.*), that language appears to have been borrowed from the SEC's statement of facts. (*See* ECF No. 571-1, at 4.) As the Court has already noted, the language from the SEC's statement of facts misinterprets the statements from Schooler's May 3, 2012, deposition, (ECF No. 4-1, Ex. 1, at 159:9–15). In any event, the Court's language in the Securities Order with regard to a fact that was immaterial at the time is not evidence.

### iii. Preliminary Injunction Order

Third, the SEC points to statements from Judge Burns's October 5, 2012, Preliminary Injunction Order. (ECF No. 44, at 10–11.) This evidence does not support the SEC's argument for numerous reasons. First, the standard for a preliminary injunction differs from the standard for summary judgment. *Compare Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) *with* FED. R. CIV. P. 56(c). Second, Judge Burns merely stated that Western had "purchased lead lists and made cold calls," not that Western had offered or sold securities through such methods. (ECF No. 44, at 10.) Third, Judge Burns relied on the on the same statements from Schooler's May 3, 2012, deposition, (ECF No. 4-1, Ex. 1, at 159:9–15), that the Court has already noted do not necessarily show a violation of the prohibition on general solicitation.

### iv. Mailings

Fourth, the SEC cites several pieces of evidence referencing mailings and subsequent followup meetings between Western and potential investors, including: (1)

1  statements from the April 24, 2012, deposition of Roger de Bock, (ECF No. 4-4, at 102:8–105:25), (2) the Declaration of Robert Centanni where Mr. Centanni states that he met with Western, (ECF No. 552-1 ¶ 3), and  (3) the Declaration of Roy Honig where Mr. Honig states that he received a flyer from Western, met with a Western representative Courtland Young, and then was advised to invest in GP units, (ECF No. 552-3 ¶¶ 3–4). Mr. de Bock stated that Western would send out fliers to "target ZIP codes" advertising a "workshop to discuss Western Financial Planning and real estate investments." (ECF No. 4-4, at 103:16–24.) However, Mr. de Bock's statements are ambiguous as to whether "real estate investments" means the GP units at issue in this case, as well as ambiguous as to the scope of the geographic area, and thus are insufficient to carry the SEC's burden on summary judgment. *See Tecumseh*, 2009 WL 4975263, at *4.

Mr. Honig's statements are similarly insufficient. (*See* ECF No. 552-3 ¶¶ 3–4.) While it does appear that an insufficient amount of time may have passed between the receipt of the flyer and the offer to sell GP units, *see* 1985 SEC No-Act. LEXIS 2917, there is no indication as to the geographic or numerical reach of the flyer that Mr. Honig received. *See Tecumseh*, 2009 WL 4975263, at *4. Mr. Centanni's declaration is also insufficient as he states that he learned about Western from his brother and that Mr. Centanni himself reached out to Western. (ECF No. 552-1 ¶ 3.) This is clearly not solicitation or advertising by Western since Western is being contacted by the investor rather than the other way around.

### v. Networking Groups

Fifth, the SEC cites to evidence of networking groups included within statements from the June 27, 2012, deposition of Rhea Olson. (ECF No. 498, Ex. 8, at 25:14–27:24; ECF No. 980-15, Ex. 3, at 13:2–20:24.) Ms. Olson stated that she learned about Western through a "business networking group" known as "BNI" and that one of Western's agents, John Naviaux, discussed with her the possibility of investing in GP units. (ECF No. 498, Ex. 8, at 25:14–27:24) However, Ms. Olson's statements are

1  ambiguous as to how many people Mr. Naviaux actually discussed the GP units with
2  and what prior relationship, if any, they had with Western. (*See id.* (stating that "it was
3  a good investment for *us*") (emphasis added).) Without more, this is insufficient to
4  carry the SEC's burden and show that Western engaged in general advertising or
5  solicitation when it appears that one of Western's agents may have merely discussed
6  the GP units with a few people that he appears to have had a preexisting relationship
7  with.

8       Additionally, Ms. Olson's statements do not necessarily indicate that Western,
9  through Mr. Naviaux, sold or offered to sell GP units through general solicitation.
10 Rather, Ms. Olson states that Mr. Naviaux used his presentation "as a way to really
11 advocate for the company," not to sell or offer to sell GP units. (ECF No. 980-15, Ex.
12 3, at 13:2–20:24 at 20:21.) Even if Mr. Naviaux did offer to sell Ms. Olson GP units,
13 it has not been shown that it was a *general* solicitation. (*See id.* at 13:22–23 ("the only
14 one he told *me* about was this Nevada piece of land") (emphasis added).)

### vi. Benefits Fairs

16      Sixth, the SEC cites evidence relating to benefits fairs included in the
17 Declaration of Eleonore Gorwin. (ECF No. 552-2.) Ms. Gorwin declares that she
18 learned about Western at "an annual benefits fair" and then engaged Western for
19 financial planning services which included Western's representative, Simon Chung,
20 advising her to invest in GP units. (*Id.* ¶¶ 3–4.) However, there is no indication as to
21 the timing of the offer or sale of GP units to Ms. Gorwin and thus may not count as
22 general solicitation or advertising if sufficient time had passed. *See* 1985 SEC No-Act.
23 LEXIS 2917. Accordingly, Ms. Gorwin's declaration does not carry the SEC's burden
24 to show that Western engaged in general advertising or solicitation.

25      As none of the evidence cited by the SEC undisputedly shows that Western did
26 not meet the requirements of Rule 506(b), the SEC has failed to carry its burden on
27 summary judgment. Accordingly, the Court finds that, on the evidence currently before
28 it, there is a dispute of material fact as to whether Defendants complied with Rule

506(b)'s conditions and DENIES the SEC's motion for partial summary judgment with regards to its Section 5 cause of action.

**B. Prejudice**

The Court is cognizant that Defendants did not raise Rule 506(b) as a defense to the SEC's Section 5 cause of action until Defendants' opposition to the SEC's present motion. (*See* ECF No. 980.) Nowhere in their answer do Defendants raise any Regulation D exemption as an affirmative defense. (*See* ECF No. 255.) Defendants' Rule 506(b) argument is an affirmative defense as it does not allege that the SEC has failed to meet any of the elements of a prima facie Section 5 violation. A defendant may raise an affirmative defense in response to a motion for summary judgment "only if the delay does not prejudice the plaintiff." *Magana v. Commonwealth of the N. Mar. I.*, 107 F.3d 1436, 1446 (9th Cir. 1997) (citation omitted). Defendants first raised their Rule 506(b) affirmative defense approximately five months after the SEC filed the present motion and approximately nineteen months after Defendants filed their answer. (*See* ECF Nos. 255, 685, 980.) The SEC filed its reply addressing Defendants' Rule 506(b) affirmative defense less than a month after Defendants first raised the issue. (*See* ECF Nos. 980, 1011.) While the Court finds it appropriate to consider Defendants Rule 506(b) affirmative defense as the SEC had predicted it in the SEC's initial moving papers, (*see* ECF No. 685-1, at 11–12), the Court acknowledges that the short amount of time in which the SEC has had the opportunity to respond to Defendants' arguments may have led to the deficiencies in the SEC's supporting evidence. Accordingly, the Court finds it appropriate to deny the SEC's motion without prejudice so that it may have the opportunity to have sufficient time to gather evidence. The SEC may file an amended version of the present motion, addressing the deficiencies noted by the Court, on or before April 24, 2015.[3]

//

---

[3] This constitutes a minor amendment to the scheduling order. (*See* ECF No. 850.)

**C. Disgorgement**

As the SEC's claim for disgorgement hinges on it obtaining summary judgment on its Section 5 cause of action, which the Court has denied, the Court also DENIES the SEC's motion for partial summary judgment with regards to disgorgement.

## VI. CONCLUSION AND ORDER

For the reasons stated above, **IT IS HEREBY ORDERED** that:

1. The SEC's Motion for Partial Summary Judgment on its Fourth Claim for Relief, (ECF No. 685), is **DENIED** without prejudice; and
2. The SEC may refile its motion, addressing the deficiencies noted by the Court, on or before **April 24, 2015**.

DATED: April 3, 2015

HON. GONZALO P. CURIEL
United States District Judge