1
2
3
4
5
6
7

8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | CASE NO. 3:12-cv-2164-GPC-JMA |
| Plaintiff, | **NOTICE OF TENTATIVE AMENDMENT TO THE COURT'S ORDER ON THE SEC'S INITIAL MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| LOUIS V. SCHOOLER and FIRST FINANCIAL PLANNING CORPORATION, dba Western Financial Planning Corporation, | **[ECF No. 1029]** |
| Defendants. | |

11
12
13
14
15
16
17
18

19

## I. INTRODUCTION

20

Pursuant to Federal Rule of Civil Procedure 54(b), the Court finds it appropriate

21

to amend its April 3, 2015, Order Denying the SEC's Motion for Partial Summary

22

Judgment on its Fourth Claim for Relief. (ECF No. 1029.) The Court's prior order

23

incorrectly set forth the law regarding which party bears the burden of proving an

24

affirmative defense on summary judgment under Federal Rule of Civil Procedure 56.

25

(*See* ECF No. 1029, at 3–4.) With a correct interpretation of the law, the Court finds

26

that SEC's initial motion, (ECF No. 685), must be granted in part and denied in part,

27

reversing the Court's initial determination in the April 3, 2015, Order. Citing *Sec. and*

28

*Exch. Comm'n v. Murphy*, 626 F.2d 633, 641 (9th Cir. 1980), Defendants had argued

that, on summary judgment, the evidentiary burden is on the SEC to disprove an

affirmative defense to a registration violation. (ECF No. 980, at 4.) However, this aspect of *Murphy* was overturned by *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (Rule 56 does not require the moving party to "negate[] the opponent's claim.") (emphasis omitted). Thus the Court finds it appropriate to amend the April 3, 2015, order's sections regarding Rule 506(b) and disgorgement. The Court now provides notice of its tentative ruling on these issues.

## II. DISCUSSION

### A. Rule 506(b)

The SEC argue that Western's sales of GP units do not satisfy Rule 506(b)'s conditions for three reasons: (1) Western failed to provide required information to non-accredited investors, (2) Western engaged in general solicitation, and (3) Western exceeded the limit on purchasers. (ECF No. 1019, at 7–16.)

### 1. Purchaser Limit

Rule 506(b) requires that there be no more than 35 purchasers, excluding accredited investors, in the offering. 17 C.F.R. §§ 230.501(e)(1)(iv), 230.506(b)(2). Included within the definition of "accredited investor" is "[a]ny natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000." *Id.* § 230.501(a)(5). The SEC argues that, because there were "3,400 investors in the defendants' single, integrated offering of GP securities," "the registration exemption cannot be invoked." (ECF No. 1019, at 16.) Defendants attempt to rebut this argument by pointing to the fact that two GPs have less than 35 investors. (ECF No. 980, at 7.) However, the Court has already concluded that all the GPs constitute a single, integrated offering and thus the fact that two GPs have less than 35 investors does not show that the entire offering has less than 35 non-accredited investors. Accordingly, the Court finds that Defendants have failed to carry their burden on Western's Rule 506(b) affirmative defense. The Court will, however, address the remaining disputes concerning Rule 506(b).

/ /

### 2. Information Requirement

Rule 506(b) further requires that an issuer must provide certain kinds of information to any non-accredited investor purchaser. 17 C.F.R. § 230.502(b). The SEC argues that, because Schooler stated that "Western did not provide any financial statements to prospective investors," "it is undisputed that the [information requirement] has not been met." (ECF No. 1019, at 8 (quoting ECF No. 980-2 ¶ 8).) Defendants argue that "Western reasonably believed that non-accredited investors, either alone or with a purchaser representative, possessed the 'knowledge and experience in financial and business matters' to fairly evaluate 'the merits and risks of the prospective investment.'" (ECF No. 980, at 10 (citations omitted).) But Rule 506(b) does not exempt non-accredited investors from the information requirement based on Western's beliefs about the investors' financial expertise; only accredited investors are exempted from the information requirement. 17 C.F.R. § 230.502(b)(1). Accordingly, the Court finds that Defendants have failed to carry their burden to show that the required information was provided to non-accredited investors.

### 3. General Solicitation

Rule 506(b) also prohibits an issuer or "any person acting on its behalf" from selling or offering to sell securities "by any form of general solicitation or general advertising." 17 C.F.R. § 230.502(c). The SEC cites eleven sources of evidence to support its contention that Western engaged in general solicitation or advertising of GP units, primarily relying upon Schooler's statements with regards to cold calls. (ECF No. 685-2, at 1; ECF No. 1019, at 9–15.)

Contrary to the SEC's arguments, the Court finds that the evidence cited by the parties indicates a dispute of material fact as to whether the GP units were generally solicited or advertised by Western. First, Rule 506(b) prohibits offering or selling securities through general solicitation or advertising, but does not prohibit obtaining clients through such methods. *See* 17 C.F.R. § 230.502(c). Indeed, the SEC has issued a no action letter recognizing that offers to clients obtained through general solicitation

may not constitute general solicitation if "sufficient time" passes "between establishment of the relationship and [the] offer." *Sec. and Exch. Comm'n v. Credit First Fund LP*, No. 05-cv-8741-DSF-PJWx, 2006 WL 4729240, at *12 (C.D. Cal. Feb. 13, 2006) (quoting E.F. Hutton & Co., No-Action Letter, 1985 SEC No-Act. LEXIS 2917 (Dec. 3, 1985)). Second, Western argues that its sales agents were selling the GP units on behalf of a third party, not Western. (ECF No. 980, at 7–10.) Third, an unknown number of cold calls or mailings to a geographic area of unknown size may not necessarily qualify as general solicitation or advertising. *Cf. Sec. and Exch. Comm'n v. Tecumseh Holdings Corp.*, No. 03-cv-5490-SAS, 2009 WL 4975263, at *4 (S.D.N.Y. Dec. 22, 2009) (noting that a "*nationwide* cold-calling campaign has many of the same characteristics as the examples listed in 502(c)" because of three factors: "(1) it has the potential to reach a large number of people; (2) it has the potential to reach people throughout a large geographic area; and, perhaps most importantly, (3) it generally targets people with whom the issuer does not have a prior relationship and who are unlikely to have any special knowledge about the offered security") (emphasis added).

**B. Disgorgement**

The SEC argues that the amount of money raised from investors, $152,982,250, is the proper amount of disgorgement. (ECF No. 685-1, at 12–15.) Defendants do not dispute that this was the actual amount raised from investors, but instead argue that the "profits" in this case should be that amount minus certain expenses and costs. (ECF No. 980, at 11–13.) The Court finds that, the total amount raised from the investors in the GPs that underlie the SEC's Section 5 cause of action, $152,982,250, is a "reasonable approximation of profits causally connected to the violation" because it does not appear that Western actually paid anything to buy or produce the securities themselves and thus any income would be pure profit. *First Pac. Bancorp*, 142 F.3d at 1192 n.6 (citation and internal quotation marks omitted); *see Platforms Wireless*, 617 F.3d at 1096–97 ("There is no evidence in the record, and the defendants do not contend, that

they paid cash value for the newly-issued shares."). The SEC also requests prejudgment interest. (ECF No. 685-1, at 14.) The Court finds that an award of prejudgment interest appropriate in this case. *See Sec. and Exch. Comm'n v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996) ("Requiring payment of interest prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity.") Prejudgment interest shall be calculated through the date of the final order on the SEC's motion, in accordance with the tax underpayment rate. 26 U.S.C. § 6621; *Platforms Wireless*, 617 F.3d at 1099. However, the Court rejects the prejudgment interest calculated by the SEC because, as discussed below, the Court finds it appropriate to reduce the disgorgement total requested by the SEC.

As the SEC has carried its initial burden, the Court turns to the five arguments raised by Defendants why either disgorgement is unwarranted or the total proposed by the SEC should be reduced: (1) that Defendants have not yet been found liable for fraud, (2) that investors have received consideration for their investment, (3) that legitimate business expenses are deductible, (4) that Defendants' cost to acquire the GP units are deductible, and (5) that the disgorgement total is punitive and inequitable. (ECF No. 980, at 12–21.)

First, with regards to fraud, Defendants cite no authority for this proposition other than to distinguish the facts of this case from those of *Platforms Wireless* and *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109 (9th Cir. 2006). (ECF No. 980, at 14.) Courts have also awarded disgorgement in the absence of fraud. *See, e.g., Sec. and Exch. Comm'n v. Parkersburg Wireless Ltd. Liability Co.*, 991 F. Supp. 6, 9 (D.D.C. 1997) (ordering disgorgement even if the defendant "had no idea that the units he was selling were securities").

Second, the Court does find that the investors received consideration for their securities, namely the property interest that each of their GPs hold. However, the Court rejects Defendants' argument that each property's value can only be fixed through sale. It is clear to the Court that appraisals have routinely been used to value property and

there is no indication that an appraisal would be insufficient in this case. The Court thus finds it appropriate to reduce the disgorgement amount by $16,328,000, the appraised value of the land obtained by the Receiver. (ECF No. 203, at 2)

Third, the Court believes that it is at least arguable that direct transaction costs could be deducted, but Defendants have not satisfied their burden in this regard. The Ninth Circuit in *JT Wallenbrock* specifically refused to allow "offset[s] for *entirely illegitimate* expenses incurred to perpetrate an *entirely fraudulent* operation*," 440 F.3d at 1115 (emphasis in original), which leaves open the question of whether legitimate expenses can be deducted from a disgorgement total and what kinds of expenses are considered legitimate. It is true that the vast majority of courts have found that business expenses cannot be deducted in any case. *See, e.g.*, *Sec. and Exch. Comm'n v. Brown*, 658 F.3d 858, 861 (8th Cir. 2011). That said, a significant number of courts, primarily in the Second Circuit, have found certain business expenses deductible. *See, e.g.*, *Sec. and Exch. Comm'n v. Universal Exp., Inc.*, 646 F. Supp. 2d 552, 564 (S.D.N.Y. 2009); *Thomas James*, 738 F. Supp. at 95. However, contrary to Defendants' argument, it is not "general business expenses, such as overhead expenses," that these courts find deductible, but rather "direct transaction costs . . . that plainly reduce the wrongdoer's actual profit." *Universal Exp.*, 646 F. Supp. 2d at 564 (citations and internal quotation marks omitted); *see also Thomas James*, 738 F. Supp. at 94 ("In determining the proper amount of restitution, a Court may consider as an offset the sums which a defendant paid *to effect* a fraudulent transaction.") (emphasis added). Thus Defendants submission of Western's general tax documents for the years 1984 through 1986 and 1988 through 2012, (ECF Nos. 980-2–980-12, Exs. 3–30), would not satisfy their burden to show direct transaction costs even if the Court were to consider such costs deductible.

Fourth, acquisition costs should not be deducted in this case for two reasons. First, the Court is already deducting for the value of the property transferred to the GPs and thus deducting for acquisition costs would be double dipping. Second, Defendants

peeled off valuable portions of several of the properties before selling them to the GPs and thus it would be inequitable to deduct the costs of these properties when they were not entirely transferred to the GPs.

Fifth, the Court does not find the disgorgement amount to be punitive. The purpose of disgorgement is to account for the profits gained in violation of the securities laws; the focus is on the Defendants' current violations, not the investors. *Wyly*, 2014 WL 3739415, at *2 (citation omitted). Defendants' citation to *Rind* regarding remoteness in time is unavailing because the two cases that *Rind* cites, *SEC v. Willis*, 777 F. Supp. 1165 (S.D.N.Y. 1991), and *SEC v. Glick*, No. cv-LV-78-11, 1980 WL 1414 (D. Nev. June 12, 1980), found remoteness in time relevant when deciding whether to issue injunctive relief, not disgorgement. *See Willis*, 777 F. Supp. at 1174; *Glick*, 1980 WL 1414, at *2. This makes sense because the standard for injunctive relief explicitly considers the likelihood that the violations will be repeated. (ECF No. 44, at 22 ("A preliminary injunction is appropriate if there is a prima facie case that Defendants have violated the securities laws and a reasonable likelihood that their violations will be repeated.").)

In sum, the Court finds that the SEC has carried its burden with regards to the initial figure of $152,982,250, and that Defendants have carried their burden as to a reduction for the consideration transferred to investors, which the Court values at the 23 properties' $16,328,000 appraised value. Thus the Court determines the appropriate disgorgement amount to be $136,654,250 plus prejudgment interest calculated to the date of the final order on the SEC's motion.

DATED:  May 14, 2015

HON. GONZALO P. CURIEL
United States District Judge