1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

LOUIS V. SCHOOLER and FIRST
FINANCIAL PLANNING
CORPORATION, dba Western
Financial Planning Corporation,

Defendants.

CASE NO. 3:12-cv-2164-GPC-JMA

**ORDER:**

**(1) AMENDING THE COURT'S
APRIL 3, 2015, ORDER;**

**[ECF No. 1029]**

**(2) GRANTING IN PART AND
DENYING IN PART THE SEC'S
MOTION FOR PARTIAL
SUMMARY JUDGMENT ON ITS
FOURTH CLAIM FOR RELIEF;**

**[ECF No. 685]**

**(3) DENYING AS MOOT THE
SEC'S AMENDED MOTION;**

**[ECF No. 1064]**

**(4) DENYING AS MOOT THE
PARTIES' JOINT MOTION FOR
RESCHEDULING OF HEARING
DATES AND MODIFICATION OF
BRIEFING SCHEDULE;**

**[ECF No. 1066]**

**(5) VACATING HEARING DATE**

Pursuant to Federal Rule of Civil Procedure 54(b), the Court finds it appropriate to amend its April 3, 2015, Order Denying the SEC's Motion for Partial Summary Judgment on its Fourth Claim for Relief. (ECF No. 1029.) The Court's prior order incorrectly set forth the law regarding which party bears the burden of proving an affirmative defense on summary judgment under Federal Rule of Civil Procedure 56. (*See* ECF No. 1029, at 3–4.) With a correct interpretation of the law, the Court finds that SEC's initial motion, (ECF No. 685), must be granted in part and denied in part, reversing the Court's initial determination in the April 3, 2015, Order. The Court further finds that based on its changed ruling, the SEC's amended motion, (ECF No. 1064), and the parties' joint motion, (ECF No. 1066), are now moot.

At the May 15, 2015, hearing, Defendants objected to this Court's sua sponte reconsideration of its April 3, 2015, Order. (ECF No. 1037.) Rule 54(b), however, expressly provides that orders may be amended at any time before the entry of final judgment. FED. R. CIV. P. 54(b) (An order "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."). Ultimately, failure to correct the Court's initial order would permit the SEC's fourth claim for relief to proceed to trial. This result would greatly increase litigation costs and unreasonably delay disgorgement of profits illegally obtained by Defendants.

Accordingly **IT IS HEREBY ORDERED** that:

1.   The Court's April 3, 2015, Order, (ECF No. 1029), is **AMENDED** and the Court has attached the amended version of that order below;

2.   The SEC's Motion for Partial Summary Judgment on its Fourth Claim for Relief, (ECF No. 685), is **GRANTED IN PART AND DENIED IN PART**;

3.   The parties' Joint Motion for Rescheduling of Hearing Dates and Modification of Briefing Schedule, (ECF No. 1066), is **DENIED** as moot;

4.   The SEC's Amended Motion for Partial Summary Judgment on its Fourth Claim for Relief, (ECF No. 1064), is **DENIED** as moot; and

1    5.    The hearing on the SEC's amended motion, (ECF No. 1064), currently set

2          for May 29, 2015, is **VACATED**.[1]

3    DATED:  May 19, 2015

4

5                                        HON. GONZALO P. CURIEL
                                         United States District Judge
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
_____

[1] The hearing on the SEC's other pending motion for summary judgment, (ECF No. 1015), also set for May 29, 2015, remains on calendar. (*See* ECF No. 1016.)

**AMENDED ORDER**

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | CASE NO. 3:12-cv-2164-GPC-JMA |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART THE SEC'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS FOURTH CLAIM FOR RELIEF** |
| v. | |
| LOUIS V. SCHOOLER and FIRST FINANCIAL PLANNING CORPORATION, dba Western Financial Planning Corporation, | **[ECF No. 685]** |
| Defendants. | |

## I. INTRODUCTION

Before the Court is Plaintiff Securities and Exchange Commission's (the "SEC") Motion for Partial Summary Judgment on its Fourth Claim for Relief. (ECF No. 685.) Defendants Louis V. Schooler ("Schooler") and First Financial Planning Corporation d/b/a Western Financial Planning Corporation ("Western") (collectively, "Defendants") oppose. (ECF No. 980.)

The parties have fully briefed the motion. (ECF Nos. 685, 980, 1019.) A hearing on the SEC's motion was held on May 15, 2015. (ECF No. 1073.) Upon review of the moving papers, admissible evidence, oral argument, and applicable law, the Court GRANTS IN PART AND DENIES IN PART the SEC's motion for partial summary judgment.

## II. BACKGROUND

This is an enforcement action brought by the SEC. (*See* ECF No. 1.) The SEC alleges that Defendants defrauded investors in the sale of general partnership ("GP") units which were, as a matter of law, unregistered securities. (*Id.*) On September 4, 2012, the SEC filed its complaint. (*Id.*) On October 22, 2012, this case was transferred to the undersigned judge. (ECF No. 52.) On July 15, 2013, Defendants filed an answer to the SEC's complaint. (ECF No. 255.) On March 28, 2014, the SEC filed a motion for partial summary judgment with regards to whether the GP units were securities. (ECF No. 563.) On April 25, 2014, the Court granted the SEC's motion for partial summary judgment and found that the GP units at issue in this case were, as a matter of law, securities (the "Securities Order"). (ECF No. 583.) The facts of this case are set forth in detail in the Securities Order. (*Id.* at 1–11.)

On September 9, 2014, the SEC filed the present motion for partial summary judgment on its fourth claim for relief. (ECF No. 685.) On February 13, 2015, Defendants filed an opposition to the SEC's motion. (ECF No. 980.) On March 6, 2015, the SEC filed a response to Defendants' opposition. (ECF Nos. 1011, 1019.) The SEC moves for summary judgment on its fourth claim for relief: that Defendants violated Sections 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C. §§ 77e(a), 77e(c). (ECF No. 1 ¶¶ 79–82; ECF No. 685.) The SEC further moves for disgorgement pursuant to its Section 5 cause of action. (ECF No. 685-1, at 1.)

## III. LEGAL STANDARD

### A. Summary Judgment

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986); FED. R. CIV. P. 56. Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material when it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial. *Id.* at 322–23. If the moving party fails to bear the initial burden, summary judgment must be denied and the Court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citing FED. R. CIV. P. 56 (1963)). If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Id.* at 325. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing FED. R. CIV. P. 56 (1963)). In making this determination, the Court must "view [] the evidence in the light most favorable to the nonmoving party." *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001). The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. *Anderson*, 477 U.S. at 255.

In an SEC enforcement action, once the SEC has made out a prima facie case of the sale of unregistered securities, the burden shifts to the defendant to introduce evidence supporting its affirmative defense. *Celotex*, 477 U.S. at 324; *Sec. and Exch.*

1   *Comm'n v. Murphy*, 626 F.2d 633, 641 (9th Cir. 1980) (citations omitted).[1]

2   **B. Disgorgement**

3       When moving for disgorgement, the SEC bears "the ultimate burden of

4   persuasion that its disgorgement figure" is "a reasonable approximation of profits

5   causally connected to the violation." *Sec. and Exch. Comm'n v. First Pac. Bancorp*,

6   142 F.3d 1186, 1192 n.6 (9th Cir. 1998) (quoting *Sec. and Exch. Comm'n v. First*

7   *Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996)); *Sec. and Exch. Comm'n v. First*

8   *City Fin. Corp., Ltd.*, 890 F.2d 1215, 1232 (D.C.C. 1989). The amount of disrogement

9   "should include all gains flowing from the illegal activities," "includ[ing] prejudgment

10  intrest." *Sec. and Exch. Comm'n v. Cross Fin. Servs., Inc.*, 908 F. Supp. 718, 734 (C.D.

11  Cal. 1995) (citations omitted). Once the SEC has met this burden, the burden shifts to

12  the defendant to "demonstrate that the disgorgement figure was not a reasonable

13  approximation." *First City*, 890 F.2d at 1232.

14                          **IV. DISCUSSION**

15  **A. Sale of Unregistered Securities**

16      There are three elements to a prima facie case of a Section 5 violation: (1) the

17

18      [1] Citing *Murphy*, Defendants argue that, on summary judgment, the evidentiary burden is on the SEC to disprove an affirmative defense. (ECF No. 980, at 4); 626 F.2d

19  at 641 ("On a motion for summary judgment, however, 'it is the moving party who carries the burden of proof; he must show that no genuine issue of material fact exists

20  . . . even though at trial his opponent would have the burden of proving the facts alleged.'") (citations omitted). This aspect of *Murphy* was overturned by *Celotex*. 477

21  U.S. at 323 (Rule 56 does not require the moving party to "negate[] the opponent's claim.") (emphasis omitted).

22      In spite of *Celotex*, Defendants argued at oral argument that *Murphy* is still good law because no case has explicitly overturned *Murphy*. (ECF No. 1073.) However,

23  *Celotex*, a Supreme Court case, directly contradicts *Murphy*, making this aspect of *Murphy* no longer good law. Moreover, the Ninth Circuit's decision in *Platforms*

24  *Wireless* also makes clear that this language from *Murphy* has been overturned. In *Platforms Wireless*, the district court granted summary judgment for the SEC based on

25  a Section 5 cause of action. 617 F.3d at 1083. The defendants appealed the summary judgment ruling, arguing that two registration exemptions applied. *Id.* at 1084, 1086.

26  In ruling on the defendants' exemption defenses in the context of summary judgment, the Ninth Circuit unequivocally stated: "Once the SEC introduces evidence that a

27  defendant has violated the registration provisions, the defendant then has the burden of proof in showing entitlement to an exemption." *Id.* at 1086 (citations and internal

28  quotation marks omitted). Accordingly, the Court rejects Defendants argument that the burden is on the SEC to disprove Defendants' registration exemption defense.

offer or sale, (2) of an unregistered security, (3) through interstate commerce. 15 U.S.C. §§ 77e(a), 77e(c). Regulation D provides four exemptions to Section 5: Rule 504, Rule 505, Rule 506(b), and Rule 506(c). 17 C.F.R. §§ 230.504, 230.505, 203.506(b), 203.506(c). This Court, in the Securities Order, has already determined that the GP units at issue in this case were securities in the form of investment contracts. (ECF No. 583.) Registration exemptions are construed narrowly "in order to further the purpose of the Act: To provide full and fair disclosure of the character of the securities, and to prevent frauds in the sale thereof." *Platforms Wireless*, 617 F.3d at 1086 (citations omitted).

Defendants do not appear to dispute that the SEC has made out a prima facie case of the sale of unregistered securities under Section 5, instead they argue that there is a dispute of material fact as to whether those sales qualify for the private offering exemption under Rule 506(b). (*See* ECF No. 980, at 6.) Defendants have admitted that the GP units were not registered with the SEC. (ECF No. 255 ¶ 81.) Defendants also do not dispute the SEC's evidence that the GP units were offered or sold through interstate commerce, including mail and email. (*See, e.g.*, ECF No. 8 ¶ 11; ECF No. 4-25.) Accordingly, the Court finds that the SEC has made out a prima facie Section 5 violation. The Court now addresses whether an exemption applies.

**B. Rule 506(b)**

Though the SEC argues that Defendants cannot meet the requirements of any of the exemptions, (ECF No. 685-1, at 11–12), Defendants only contend that there is a dispute of material fact as to whether their sales of GP units qualifies for an exemption under Rule 506(b), (ECF No. 980, at 6), and do not raise any of the other exemptions in either their answer or opposition. (*See* ECF Nos. 255, 980.) To qualify for an exemption under Rule 506(b), an offering must meet the general conditions set forth in 17 C.F.R. §§ 230.501–.502, including providing information to purchasers and refraining from general solicitation or advertising, *see* 17 C.F.R. §§ 230.502(b)–(c), 230.506(b)(1), and two specific conditions: (1) there must be, or the issuer must

reasonably believe there are, fewer than 35 non-accredited investors of securities in the offering, and (2) each non-accredited investor must have, or the issuer reasonably believes he or she has, "such knowledge and experience in financial and business matters that he [or she] is capable of evaluating the merits and risks of the prospective investment," 17 C.F.R. § 230.506(b)(2); *see also* 17 C.F.R. § 230.501(e)(1)(iv) (excluding "accredited investor[s]" when calculating the number of "purchaser[s]").

### 1. Integration

The first issue under Rule 506(b) is to determine the number of offerings. Defendants argue that each GP was a separate offering. (ECF No. 980, at 7.) The SEC argues that either there was one continuous offering or there were approximately 23 offerings, one for each property. (ECF No. 1019, at 6.) 17 C.F.R. § 230.502(a) sets forth the five factors that apply to whether sales are integrated:

(a) Whether the sales are part of a single plan of financing;

(b) Whether the sales involve issuance of the same class of securities;

(c) Whether the sales have been made at or about the same time;

(d) Whether the same type of consideration is being received; and

(e) Whether the sales are made for the same general purpose.

17 C.F.R. § 230.502(a) Note; Securities Act Release No. 4552 (Nov. 6, 1962), 27 Fed. Reg. 11316; *see Murphy*, 626 F.2d at 645 ("These factors guide our evaluation.") (citations omitted).

*Murphy* provides a useful analogue to this case. In *Murphy*, the defendant company, Intertie, created approximately 30 limited partnerships over the course of several years. 626 F.2d at 637. "Intertie would buy a cable television system, making a cash down payment and financing the remainder, and then sell it to a partnership for a cash down payment and non-recourse promissory notes in favor of Intertie and lease it back from the partnership." *Id.* Intertie raised approximately "$7.5 million from 400 investors." *Id.* The Ninth Circuit found that "[a]ll but the third factor militate in favor of finding integration" because, though "[t]he separation in time from one system

offering to the next suggests that the offerings were not integrated, . . . that factor is heavily outweighed by the remaining considerations." *Id.* at 646. Those considerations were: (1) "the offerings were all made for the same general purpose" and part of a single financing plan to finance Intertie's operations; (2) the securities were all of the same class because they were all limited partnership interests; and (3) "the consideration for all partnership shares was the same, cash and notes secured by the particular cable systems purchased." *Id.* Based on this, the Ninth Circuit concluded that "the trial court on summary judgment was bound to conclude that the offerings were integrated." *Id.*

Like Intertie did with cable television systems, Western would buy undeveloped real estate through a combination of cash and selling financing. (ECF No. 182, at 5.) Western would similarly go on to form one or more GPs, sell GP units to investors, and then sell the undeveloped real estate to the GP or GPs. (*Id.* at 2–5) Through this investment scheme, Western raised approximately $153 million from approximately 3,400 investors. (ECF No. 27, at 6; ECF No. 203, at 8.)

Just as in *Murphy*, all but the third factor strongly support finding that there was a single offering in this case. The sales of GP units were part of a single plan to finance Western's operations. (*See* ECF No. 182, at 7 ("Approximately 93% of the actual cash collected by the GPs was transferred to Western.").) The sales of GP units were of the same class because they were all general partnership interests for GPs that owned the same type of property, undeveloped real estate. (ECF No. 980-2 ¶ 8 ("the GPs were established for the sole purpose of owning raw land in fractional interests for eventual resale to developers."); ECF No. 14-1, Ex. 1 (sample partnership agreement).) All investors bought GP units using the same type of consideration: cash and notes. (ECF No. 182, at 6.) The sales of GP units were all made for the same purpose: financing Western's operations through creating GPs to buy and hold undeveloped real estate. (ECF No. 980-2 ¶ 8); *cf. Donohoe v. Consolidated Operating & Prod. Corp.*, 982 F.2d 1130, 1140 (7th Cir. 1992) ("The term 'same general purpose' suggests a level of

1   generality to the integration analysis that may be satisfied by the observation that the

2   purpose of each partnership was to drill for oil.") (citation omitted).

3        With regards to the third factor, the operative time period is the "separation in

4   time from one [GP] offering to the next." *Murphy*, 626 F.2d at 646. Although the GPs

5   were formed over the course of 31 years, a GP was formed in 26 of the 31 years at issue

6   in this case, and the longest gap between GP formations was between 1982 and 1987;

7   no other gap was longer than approximately two years. (ECF No. 203, at 3–8.[2]) Courts

8   have found that separate sales made over the course of a number of years can be

9   integrated. *See, e.g.*, *Murphy*, 626 F.2d at 645–46; *Sec. and Exch. Comm'n v. Alt.*

10  *Energy Holdings, Inc.*, No. 1:10-cv-0621-EJL-REB, 2014 WL 2515710, at *7 (D. Id.

11  May 13, 2014). Moreover, the sale of GP units for a given GP would often last a year

12  or more, (*see, e.g.*, ECF No. 1 ¶ 51; ECF No. 255 ¶ 50), meaning that, in many

13  instances, the time between sales was smaller than the GP formation date indicates. In

14  *Murphy*, 30 limited partnerships were formed to purchase 30 different cable television

15  systems yet this was considered a single offering. 626 F.2d at 637, 646. Similarly,

16  though Western sold 23 different properties, and created approximately 86 GPs, the

17  Court finds that the "time factor is heavily outweighed by the remaining factors" and

18  thus the 17 C.F.R. § 230.502(a) factors, as a whole, warrant considering Western's

19  sales of GP units for all the GPs to be a single, integrated offering. *Currie v. Cayman*

20  *Res. Corp.*, 595 F. Supp. 1364, 1377 (N.D. Ga. 1984).[3]

21

---

22      [2] At least one GP was formed in each of the following years: 1981, 1982, 1987,
23  1988, 1989, 1990, 1991, 1992, 1993, 1994, 1996, 1997, 1998, 1999, 2000, 2001, 2003,
    2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, and 2012. (ECF No. 203, at 3–8.)

24      [3] Even if the Court were to consider the sale of GP units for each GP to be a
    separate offering, Defendants would still fail to carry their burden of proving their Rule
25  506(b) affirmative defense. *See Platforms Wireless*, 617 F.3d at 1086. Defendants only
    indicate that two GPs have less than 35 investors, and use this to argue that "the
26  presence of at least two qualifying GPs illustrates a genuine issue for trial because
    several other GP's [sic] may in fact contain less than 35 non-accredited purchasers."
27  (ECF No. 980, at 7.)
        First, if each GP were considered a separate offering, it would be Defendants'
28  burden to show entitlement to an exemption for each of those offerings. Merely
    because Defendants may be able to show that two GPs have fewer than 35 purchasers

**2. Conditions**

The SEC argues that Western's sales of GP units do not satisfy Rule 506(b)'s conditions for three reasons: (1) Western failed to provide required information to non-accredited investors, (2) Western engaged in general solicitation, and (3) Western exceeded the limit on purchasers. (ECF No. 1019, at 7–16.)

**a. Purchaser Limit**

Rule 506(b) requires that there be no more than 35 purchasers, excluding accredited investors, in the offering. 17 C.F.R. §§ 230.501(e)(1)(iv), 230.506(b)(2). Included within the definition of "accredited investor" is "[a]ny natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000." *Id.* § 230.501(a)(5). The SEC argues that, because there were "3,400 investors in the defendants' single, integrated offering of GP securities," "the registration exemption cannot be invoked." (ECF No. 1019, at 16.) Defendants attempt to rebut this argument by pointing to the fact that two GPs have less than 35 investors. (ECF No. 980, at 7.) However, the Court has already concluded that all the GPs constitute a single, integrated offering and thus the fact that two GPs have less than 35 investors does not show that the entire offering has less than 35 non-accredited investors. Accordingly, the Court finds that Defendants have failed to carry their burden on Western's Rule 506(b) affirmative defense. The Court will, however, address the remaining disputes concerning Rule 506(b).

**b. Information Requirement**

Rule 506(b) further requires that an issuer must provide certain kinds of information to any non-accredited investor purchaser. 17 C.F.R. § 230.502(b). The

---

is not evidence that other GPs have fewer than 35 purchasers. Second, and more importantly, even if some GPs have fewer than 35 purchasers, there is no evidence that Western provided the required information to investors in *any* GP. *See* 17 C.F.R. § 230.502(b). Thus, even if each GP were considered a separate offering, and even if Western could show that some GPs had fewer than 35 non-accredited investor purchasers, Western would still fail to carry its burden on its Rule 506(b) affirmative defense with regards to those GPs because there is no evidence that Western provided the required financial statements to the purchasers in those GPs.

SEC argues that, because Schooler stated that "Western did not provide any financial statements to prospective investors," "it is undisputed that the [information requirement] has not been met." (ECF No. 1019, at 8 (quoting ECF No. 980-2 ¶ 8).) Defendants argue that "Western reasonably believed that non-accredited investors, either alone or with a purchaser representative, possessed the 'knowledge and experience in financial and business matters' to fairly evaluate 'the merits and risks of the prospective investment.'" (ECF No. 980, at 10 (citations omitted).) But Rule 506(b) does not exempt non-accredited investors from the information requirement based on Western's beliefs about the investors' financial expertise; only accredited investors are exempted from the information requirement. 17 C.F.R. § 230.502(b)(1). Accordingly, the Court finds that Defendants have failed to carry their burden to show that the required information was provided to non-accredited investors.

### d. General Solicitation

Rule 506(b) also prohibits an issuer or "any person acting on its behalf" from selling or offering to sell securities "by any form of general solicitation or general advertising." 17 C.F.R. § 230.502(c). The SEC cites eleven sources of evidence to support its contention that Western engaged in general solicitation or advertising of GP units, primarily relying upon Schooler's statements with regards to cold calls. (ECF No. 685-2, at 1; ECF No. 1019, at 9–15.)

Contrary to the SEC's arguments, the Court finds that the evidence cited by the parties indicates a dispute of material fact as to whether the GP units were generally solicited or advertised by Western. First, Rule 506(b) prohibits offering or selling securities through general solicitation or advertising, but does not prohibit obtaining clients through such methods. *See* 17 C.F.R. § 230.502(c). Indeed, the SEC has issued a no action letter recognizing that offers to clients obtained through general solicitation may not constitute general solicitation if "sufficient time" passes "between establishment of the relationship and [the] offer." *Sec. and Exch. Comm'n v. Credit First Fund LP*, No. 05-cv-8741-DSF-PJWx, 2006 WL 4729240, at *12 (C.D. Cal. Feb.

13, 2006) (quoting *E.F. Hutton & Co.*, No-Action Letter, 1985 SEC No-Act. LEXIS 2917 (Dec. 3, 1985)). Second, Western argues that its sales agents were selling the GP units on behalf of a third party, not Western. (ECF No. 980, at 7–10.) Third, an unknown number of cold calls or mailings to a geographic area of unknown size may not necessarily qualify as general solicitation or advertising. *Cf. Sec. and Exch. Comm'n v. Tecumseh Holdings Corp.*, No. 03-cv-5490-SAS, 2009 WL 4975263, at *4 (S.D.N.Y. Dec. 22, 2009) (noting that a "*nationwide* cold-calling campaign has many of the same characteristics as the examples listed in 502(c)" because of three factors: "(1) it has the potential to reach a large number of people; (2) it has the potential to reach people throughout a large geographic area; and, perhaps most importantly, (3) it generally targets people with whom the issuer does not have a prior relationship and who are unlikely to have any special knowledge about the offered security") (emphasis added). With these issues in mind, the Court now turns to the evidence proffered by the parties.

### i. Cold Calls

First, the SEC points to several pieces of evidence that reference cold calls and call lists, including: (1) statements from Schooler's May 3, 2012, deposition, (ECF No. 4-1, Ex. 1, at 159:9–15); (2) statements from Schooler's February 27, 2015, deposition. (ECF No. 1013, Ex. 3, at 72–73); and (3) Schooler's statements in requesting advice from his counsel prior to this litigation, (ECF No. 980-3, Ex. 1, at 48, 58). Yet, in the referenced statements, Schooler does not say that Western offered or sold GP units through cold calls or lead lists, rather he says that Western obtained *clients* through such methods. As the SEC's *E.F. Hutton & Co.* No-Action Letter indicates, obtaining clients through general solicitation or advertising and then offering those clients securities does not necessarily violate Rule 506(b)'s general solicitation and advertising prohibition. 1985 SEC No-Act. LEXIS 2917.

That said, Defendants' other arguments are unavailing: (1) Western, through its agents, instructed sales personnel not to cold call, and (2) any cold calls were "done by

persons in their capacity as agents of WFP Securities, Inc., which is an entity legally separate from Western." (ECF No. 980, at 7–10.) The SEC argues that these sales personnel were "acting on [Western's] behalf." (ECF No. 1019, at 13.) One, merely because Western instructed its sales personnel not to cold call does not necessarily mean that they were not acting on Western's behalf. And two, even if that were sufficient, instructions given after previous cold calling, (*see, e.g.*, ECF No. 980-15, Ex. 5, at 62–66), would not remedy those prior cold calls when all of the GPs are considered a single, integrated offering.

### ii. Counsel Admissions

Second, the SEC points to Defendants' response to the SEC's statement of facts in support of the SEC's March 28, 2014, Motion for Partial Summary Judgment, (ECF No. 563). (ECF No. 571-1, at 4.) The SEC's statement of facts stated that "Schooler then conducted an offering of GP interests to the general public." (ECF No. 563-2, at 2.) At the time, Defendants' responded that this was "[u]ndisputed, but immaterial and irrelevant." (ECF No. 571-1, at 4.) However, Defendants dispute this fact now. (*See* 980-1, at 1. ) It is within a district court's discretion whether to treat representations by counsel as judicial admissions. *Am. Title Ins. Co. v. Lacelaw Corp.*, 862 F.2d 224, 226–27 (9th Cir. 1988) ("We . . . hold that statements of fact contained in a brief may be considered admissions of the party in the discretion of the district court.").

As an initial matter, the language from the SEC's statement of facts relies on the same statements from Schooler's May 3, 2012, deposition, (ECF No. 4-1, Ex. 1, at 159:9–15), that the Court has already noted do not necessarily show a violation of the prohibition on general solicitation. Regulation D exemptions to Section 5 were also not at issue in the SEC's March 28, 2014, Motion for Partial Summary Judgment, (ECF No. 563). Most importantly, Defendants now dispute this fact. Thus, the Court exercises its discretion and declines to consider Defendants' response to the SEC's statement of facts as a judicial admission. *See Am. Title Ins.*, 862 F.2d at 227.

The SEC relatedly points to statements from this Court's Securities Order. (ECF

No. 583, at 3.) Though the Securities Order states that "Defendants solicited investors throughout the country" "[w]hen offering to sell GP units," (*id.*), that language appears to have been borrowed from the SEC's statement of facts. (*See* ECF No. 571-1, at 4.) As the Court has already noted, the language from the SEC's statement of facts misinterprets the statements from Schooler's May 3, 2012, deposition, (ECF No. 4-1, Ex. 1, at 159:9–15). In any event, the Court's language in the Securities Order with regard to a fact that was immaterial at the time is not evidence.

### iii. Preliminary Injunction Order

Third, the SEC points to statements from Judge Burns's October 5, 2012, Preliminary Injunction Order. (ECF No. 44, at 10–11.) This evidence does not support the SEC's argument for numerous reasons. First, the standard for a preliminary injunction differs from the standard for summary judgment. *Compare Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) *with* FED. R. CIV. P. 56(c). Second, Judge Burns merely stated that Western had "purchased lead lists and made cold calls," not that Western had offered or sold securities through such methods. (ECF No. 44, at 10.) Third, Judge Burns relied on the on the same statements from Schooler's May 3, 2012, deposition, (ECF No. 4-1, Ex. 1, at 159:9–15), that the Court has already noted do not necessarily show a violation of the prohibition on general solicitation.

### iv. Mailings

Fourth, the SEC cites several pieces of evidence referencing mailings and subsequent followup meetings between Western and potential investors, including: (1) statements from the April 24, 2012, deposition of Roger de Bock, (ECF No. 4-4, at 102:8–105:25), (2) the Declaration of Robert Centanni where Mr. Centanni states that he met with Western, (ECF No. 552-1 ¶ 3), and  (3) the Declaration of Roy Honig where Mr. Honig states that he received a flyer from Western, met with a Western representative Courtland Young, and then was advised to invest in GP units, (ECF No. 552-3 ¶¶ 3–4). Mr. de Bock stated that Western would send out fliers to "target ZIP codes" advertising a "workshop to discuss Western Financial Planning and real estate

investments." (ECF No. 4-4, at 103:16–24.) However, Mr. de Bock's statements are ambiguous as to whether "real estate investments" means the GP units at issue in this case, as well as ambiguous as to the scope of the geographic area. *See Tecumseh*, 2009 WL 4975263, at *4.

Mr. Honig's statements are similarly unclear. (*See* ECF No. 552-3 ¶¶ 3–4.) While an insufficient amount of time may have passed between the receipt of the flyer and the offer to sell GP units, *see* 1985 SEC No-Act. LEXIS 2917, there is no indication as to the geographic or numerical reach of the flyer that Mr. Honig received. *See Tecumseh*, 2009 WL 4975263, at *4. Mr. Centanni's declaration is also insufficient as he states that he learned about Western from his brother and that Mr. Centanni himself reached out to Western. (ECF No. 552-1 ¶ 3.) This is clearly not solicitation or advertising by Western since Western is being contacted by the investor rather than the other way around.

### v. Networking Groups

Fifth, the SEC cites to evidence of networking groups included within statements from the June 27, 2012, deposition of Rhea Olson. (ECF No. 498, Ex. 8, at 25:14–27:24; ECF No. 980-15, Ex. 3, at 13:2–20:24.) Ms. Olson stated that she learned about Western through a "business networking group" known as "BNI" and that one of Western's agents, John Naviaux, discussed with her the possibility of investing in GP units. (ECF No. 498, Ex. 8, at 25:14–27:24) However, Ms. Olson's statements are ambiguous as to how many people Mr. Naviaux actually discussed the GP units with and what prior relationship, if any, they had with Western. (*See id.* (stating that "it was a good investment for *us*") (emphasis added).)

Additionally, Ms. Olson's statements do not necessarily indicate that Western, through Mr. Naviaux, sold or offered to sell GP units through general solicitation. Rather, Ms. Olson states that Mr. Naviaux used his presentation "as a way to really advocate for the company," not to sell or offer to sell GP units. (ECF No. 980-15, Ex. 3, at 13:2–20:24 at 20:21.) Even if Mr. Naviaux did offer to sell Ms. Olson GP units,

it unclear whether it was a *general* solicitation. (*See id.* at 13:22–23 ("the only one he told *me* about was this Nevada piece of land") (emphasis added).)

### vi. Benefits Fairs

Sixth, the SEC cites evidence relating to benefits fairs included in the Declaration of Eleonore Gorwin. (ECF No. 552-2.) Ms. Gorwin declares that she learned about Western at "an annual benefits fair" and then engaged Western for financial planning services which included Western's representative, Simon Chung, advising her to invest in GP units. (*Id.* ¶¶ 3–4.) However, there is no indication as to the timing of the offer or sale of GP units to Ms. Gorwin and thus may not count as general solicitation or advertising if sufficient time had passed. *See* 1985 SEC No-Act. LEXIS 2917. Accordingly, the Court finds that there is a dispute of material fact as to whether Western engaged in general solicitation.

As Western has failed to carry its burden on its Rule 506(b) affirmative defense with regards to the number of non-accredited investors and the information requirement, and the SEC has carried its burden on its prima facie case, the Court GRANTS the SEC's motion for partial summary judgment with regards to its Section 5 cause of action. The Court now turns to the issue of disgorgement.

### B. Disgorgement

The SEC argues that the amount of money raised from investors, $152,982,250,[4] is the proper amount of disgorgement. (ECF No. 685-1, at 12–15.) Defendants do not dispute that this was the actual amount raised from investors, but instead argue that the "profits" in this case should be that amount minus certain expenses and costs. (ECF No. 980, at 11–13.) The Court finds that the total amount raised from the investors in the GPs that underlie the SEC's Section 5 cause of action, $152,982,250, is a "reasonable approximation of profits causally connected to the violation" because it does not appear

---

[4] This number was produced by Receiver Thomas C. Hebrank (the "Receiver"), who currently acts as federal equity receiver over Western, the GPs, and other Western-related entities, after a forensic accounting of Western and the GPs' records. (*See* ECF No. 203, at 8.)

that Western actually paid anything to buy or produce the securities themselves and thus any income would be pure profit. *See First Pac. Bancorp*, 142 F.3d at 1192 n.6 (citation and internal quotation marks omitted); *see also Platforms Wireless*, 617 F.3d at 1096–97 ("There is no evidence in the record, and the defendants do not contend, that they paid cash value for the newly-issued shares."). The SEC also requests prejudgment interest. (ECF No. 685-1, at 14.) The Court finds that an award of prejudgment interest appropriate in this case. *See Sec. and Exch. Comm'n v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996) ("Requiring payment of interest prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity."). Prejudgment interest shall be calculated through May 19, 2015, the date of this amended order, in accordance with the tax underpayment rate. 26 U.S.C. § 6621; *Platforms Wireless*, 617 F.3d at 1099. However, the Court rejects the prejudgment interest calculated by the SEC because, as discussed below, the Court finds it appropriate to reduce the disgorgement total requested by the SEC.

As the SEC has carried its initial burden, the Court turns to the five arguments raised by Defendants why either disgorgement is unwarranted or the total proposed by the SEC should be reduced: (1) that Defendants have not yet been found liable for fraud, (2) that investors have received consideration for their investment, (3) that legitimate business expenses are deductible, (4) that Defendants' cost to acquire the GP units are deductible, and (5) that the disgorgement total is punitive and inequitable. (ECF No. 980, at 12–21.)

**1. Fraud**

Defendants argue that disgorgement is unwarranted in the absence of fraud. (ECF No. 980, at 14–15.) Defendants cite no authority for this proposition other than to distinguish the facts of this case from those of *Platforms Wireless* and *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109 (9th Cir. 2006). (*Id.* at 14.) The purpose of disgorgement is "to effectuate the deterrence objectives of the securities laws." *Sec. and Exch. Comm'n v. Wang*, 944 F.2d 80, 85 (2d. Cir 1991) (citation omitted). Indeed,

courts have awarded disgorgement even in the absence of fraud. *See, e.g., Sec. and Exch. Comm'n v. Parkersburg Wireless Ltd. Liability Co.*, 991 F. Supp. 6, 9 (D.D.C. 1997) (ordering disgorgement even if the defendant "had no idea that the units he was selling were securities"). Accordingly, the Court finds that disgorgement is still an appropriate remedy in this case even in the absence of fraud.

## 2. Consideration

Defendants argue that disgorgement is premature because the investors received consideration for their investment, in the form of undeveloped real property, whose value cannot be calculated until the property has sold. (ECF No. 980, at 15–17.) Purely because a GP has not sold its property does not mean that that GP's investors' losses or gains cannot be calculated. Contrary to Defendants' assertion, the value of the land need not be "fixed through its sale to third parties"; that value can be determined through other methods such as appraisals. Accordingly, the Court finds that there is no need to wait until a GP has sold its property to determine the appropriate amount of disgorgement.

Though the Court need not wait until the properties have sold, the SEC does not offer any reason why the value of the properties that Western sold to the GPs and their investors should not be offset against the proceeds that Western raised from those GPs and investors. Though it may not have been cash, as was paid to the investors in *JT Wallenbrock*, 440 F.3d at 1113, Western still returned something of value to investors, namely undeveloped real property, when it sold the GP units at issue in this case. Accordingly, the Court finds it equitable to offset the value of the property sold to investors against the entire proceeds raised by Western. *See JT Wallenbrock*, 440 F.3d at 1113. However, neither the SEC nor Defendants have proposed a valuation for the interests in real property that the GPs and their investors received from Western.[5] Thus it is incumbent upon the Court to determine the appropriate valuation to be used for

---

[5] This is likely because the SEC failed to respond to Defendants' argument that the value should be offset and Defendants argue that the value cannot be determined until the properties are sold.

disgorgement.

Based on the record in this case, there are two possible valuations for the properties: (1) $21,168,464, the amount paid by Western to purchase the properties, (ECF No. 182, at 2); or (2) $16,328,000, the appraised value of the land obtained by the Receiver, (ECF No. 203, at 2). However, the amount that Western paid for properties would be an inappropriate valuation in this case because Western sometimes sold only part of a property to investors, preferring to strip off and retain portions of those properties for itself, Schooler, or Schooler-related entities. (ECF No. 182, at 9 ("in some situations, parcels of land were also stripped off prior to their resale to the GPs" and, for the Dayton Valley IV property, "1 parcel totaling 81 acres was sold to LVS IV LLC (a Louis Schooler related entity), and another parcel totaling 440 acres was retained by Western").) Finding that the Receiver's appraised value is a reasonable approximation of the value of the land transferred to the GPs, the Court finds that $16,328,000 to be the appropriate valuation to deduct from the $152,982,250 figure.

**3. Business Expenses**

Defendants argue that business expenses should be deducted from the disgorgement total. (ECF No. 980, at 17–18.) The SEC argues that "Defendants are not entitled to any offset for business expenses." (ECF No. 1019, at 19.) As an initial matter, the Court notes that different courts have taken different positions with regards to the deduction of business expenses from disgorgement totals and the Ninth Circuit's decision in *JT Wallenbrock* provides insufficient guidance on this issue.

Though the SEC contends that the Ninth Circuit in *JT Wallenbrock* "rejected the reasoning" of *SEC v. Thomas James Assocs., Inc.*, 738 F. Supp. 88 (W.D.N.Y. 1990) and *Litton Indus., Inc. v. Lehman Bros.*, 734 F. Supp. 1071 (S.D.N.Y. 1990), this is incorrect. (ECF No. 1019, at 19.) The Ninth Circuit did not criticize the reasoning of those cases, rather it distinguished the facts in *JT Wallenbrock* from those in *Thomas James* and *Litton*, noting that "[a]pplying *Thomas James*' analysis does not help the defendants here." *JT Wallenbrock*, 440 F.3d at 1115. Though the Ninth Circuit quoted

the broad language of *SEC v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1087 (D.N.J. 1996), *aff'd* 124 F.3d 449 (3d Cir.1997) ("overwhelming weight of authority holds that securities law violators may not offset their disgorgement liability with business expenses"), in an explanatory parenthetical, that quotation was part of a sentence where the Ninth Circuit explicitly referenced the defendants' fraud. *JT Wallenbrock*, 440 F.3d at 1115 ("Neither the deterrent purpose of disgorgement nor the goal of depriving a wrongdoer of unjust enrichment would be served were we to allow these defendants-who *defrauded* investors of $253.2 million-to 'escape disgorgement by asserting that expenses associated with this *fraud* were legitimate.'") (emphasis added) (quoting *Sec. and Exch. Comm'n v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 16 (D.D.C. 1998)). Moreover, the Ninth Circuit in *JT Wallenbrock* specifically refused to allow "offset[s] for *entirely illegitimate* expenses incurred to perpetrate an *entirely fraudulent* operation." 440 F.3d at 1115 (emphasis in original). *JT Wallenbrock* leaves open the question of whether legitimate expenses can be deducted from a disgorgement total and what kinds of expenses are considered legitimate.

It is true that the vast majority of courts have found that business expenses cannot be deducted in any case. *See, e.g.*, *Sec. and Exch. Comm'n v. Brown*, 658 F.3d 858, 861 (8th Cir. 2011); *Sec. and Exch. Comm'n v. United Energy Partners, Inc.*, 88 Fed. App'x. 744, 746–47 (5th Cir. 2004); *Sec. and Exch. Comm'n v. Orr*, No. 11-cv-2251-SAC, 2012 WL 1327786, at *8 (D. Kan. Apr. 17, 2012); *Sec. and Exch. Comm'n v. Aerokinetic Energy Corp.*, No. 8:08-cv-1409, 2010 WL 5174509, at *4 (M.D. Fla. Dec. 15, 2010); *Sec. and Exch. Comm'n v. TLC Invs. And Trade Co.*, 179 F. Supp. 2d 1149, 1157 (C.D. Cal. 2001); *Sec. and Exch. Comm'n v. Kenton Capital, Ltd.*, 69 F. Supp.2d 1, 16 (D.D.C. 1998); *Hughes Capital*, 917 F. Supp. at 1087 ("Furthermore, the overwhelming weight of authority holds that securities law violators may not offset their disgorgement liability with business expenses."); *Sec. and Exch. Comm'n v. Great Lakes Equities Co.*, 775 F. Supp. 211, 214 (E.D. Mich. 1991) ("The manner in which defendants . . . chose to spend their misappropriation is irrelevant as to their objection

1  to disgorgement."); *Sec. and Exch. Comm'n v. Benson*, 657 F. Supp. 1122, 1134
2  (S.D.N.Y. 1987) ("The manner in which [the defendant] chose to spend his
3  misappropriations is irrelevant as to his objection to disgorge.")

4       That said, a significant number of courts, primarily in the Second Circuit, have
5  found certain business expenses deductible. *See, e.g.*, *Sec. and Exch. Comm'n v. Kapur*,
6  No. 11-cv-8094-PAE, 2012 WL 5964389, at *3 (S.D.N.Y. Nov. 29, 2012); *Sec. and
7  Exch. Comm'n v. Universal Exp., Inc.*, 646 F. Supp. 2d 552, 564 (S.D.N.Y. 2009); *Sec.
8  and Exch. Comm'n v. Bocchino*, No. 98-cv-7525-JGK-RLE, 2002 WL 31528472, at
9  *2 (S.D.N.Y. Nov. 8, 2002) (Magistrate Judge's Report and Recommendation); *Sec.
10  and Exch. Comm'n v. McCaskey*, No. 98-cv-6153-SWK-AFP, 2002 WL 850001, at *4
11  (S.D.N.Y. Mar. 26, 2002) (Magistrate Judge's Report and Recommendation); *Thomas
12  James*, 738 F. Supp. at 95. However, contrary to Defendants' argument, it is not
13  "general business expenses, such as overhead expenses," that these courts find
14  deductible, but rather "direct transaction costs . . . that plainly reduce the wrongdoer's
15  actual profit." *Universal Exp.*, 646 F. Supp. 2d at 564 (citations and internal quotation
16  marks omitted); *see also Thomas James*, 738 F. Supp. at 94 ("In determining the proper
17  amount of restitution, a Court may consider as an offset the sums which a defendant
18  paid *to effect* a fraudulent transaction.") (emphasis added).

19       The evidence presented by Defendants, (ECF No. 980, at 17), consists purely of
20  Western's general tax documents for the years 1984 through 1986 and 1988 through
21  2012. (ECF Nos. 980-2–980-12, Exs. 3–30.) Even if the Court were to find that certain
22  business expenses could be deducted, Defendants have not carried their burden to show
23  that the expenses listed in their tax documents were "direct transaction costs" and not
24  "general business expenses." *Universal Exp.*, 646 F. Supp. 2d at 564 (citations and
25  internal quotation marks omitted). As Defendants have failed to carry their burden, the
26  Court does not find it equitable to deduct the business costs listed in Western's tax
27  returns.
28  / /

### 4. Acquisition Costs

Defendants argue that the costs to acquire GP interests should be deducted from the disgorgement total. (ECF No. 980, at 18–19.) Defendants appear to argue that they should be able to deduct both the amount Western paid to acquire the undeveloped real property and the amount that Defendants themselves invested in the GPs to buy GP units that they did not resell. (*See id.*) However, Defendants reliance on *Platforms Wireless* is misplaced. In that case, the Ninth Circuit specifically noted that there was no evidence that "the defendants . . . paid cash value for the *newly-issued shares*." 617. F.3d at 1096–97 (emphasis added).

The first flaw in Defendants argument is that the cost that arguably could have been deducted in *Platforms Wireless* was the amount that the defendants in that case paid for the shares that were then resold to investors. *See id.* Defendants production of evidence showing the amount of GP units that Western paid for and owns is immaterial because those GP units have not been sold to investors. (*See* ECF No. 980-17 ¶ 24; ECF No. 980-26, Ex. 17, at 129–37; *cf.* ECF No. 1019, at 20.) Had Western paid valuable consideration to obtain the GP units that it sold to investors, it may be equitable to deduct that value from the disgorgement total. *See Platforms Wireless*, 617 F.3d at 1096–97 ("Assuming that the securities were paid as compensation for services rendered, we do not see evidence of substantial value . . .")

To the extent that Defendants argue that the property it transferred to the GPs constituted consideration paid to acquire GP units that were then sold to investors, such an argument is attempting to double-dip by deducting once for the value of the properties that were transferred to the GPs and investors, (ECF No. 980, at 15–17), and again for the amount paid by Western for those properties, (ECF No. 980, at 18–19). Deducting twice for property values would amount to a sort of double recovery for Defendants and would clearly be inequitable. As the Court has already deducted the value of the consideration that was transferred from Western to investors, it would be redundant to deduct the amount that Western paid to acquire the undeveloped real

1  property.[6]

2  **5. Punitive**

3  Defendants argue that the requested disgorgement total "is both highly

4  inequitable and punitive under the circumstances of this case." (ECF No. 980, at

5  19–21.) The SEC's proposed disgorgement total is clearly not punitive because it does

6  not request more than the amount that Western gained through violating Section 5. *Sec.*

7  *and Exch. Comm'n v. Wyly*, — F. Supp. 3d —, 2014 WL 3739415, at *2 (S.D.N.Y. July

8  29, 2014) (citation omitted).

9  Defendants offer seven reasons why disgorgement is inequitable in this case: (1)

10 investors received consideration, (2) there has been no finding of fraud, (3) Section 5

11 imposes strict liability, (4) the SEC has not produced evidence showing that the GPs

12 have lost money, (5) other GPs have made a profit, (6) the majority of the GPs were

13 formed outside of 5 year statute of limitations for civil penalties, and (7) Defendants

14 have not previously been subject to legal action because of Western's investment

15 scheme. (ECF No. 980, at 19–20.) First, the Court has already reduced the initial

16 disgorgement total by the amount of consideration received by the investors. Second,

17 the Court has already noted that disgorgement is appropriate even in the absence of

18 fraud and purely for Section 5 violations. *See Sec. and Exch. Comm'n v. Olins*, 762 F.

19 Supp. 2d 1193, 1197–98 (N.D. Cal. 2011). Third, whether current investors have made

20 or lost money, whether former investors have made or lost money, and whether

21 Defendants have previously been subject to legal action is immaterial. The purpose of

22 disgorgement is to account for the profits gained in violation of the securities laws; the

23 focus is on the Defendants' current violations, not the investors. *Wyly*, 2014 WL

24 3739415, at *2 (citation omitted).

25 Fourth, Defendants have failed to carry their burden showing that disgorgement

26 for 31 years of violations is inappropriate. Defendants rely on *SEC. v. Rind* which

27

28 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
      [6] The Court also discussed above why such a figure would be inappropriate due
    to Western stripping off parts of the land before selling to investors.

states that courts "can and should consider the remoteness of the defendant's past violations in deciding whether to grant the requested equitable relief." 991 F.2d 1486, 1492 (9th Cir. 1993); (ECF No. 980, at 20). The SEC contends that the aforementioned language from *Rind* "concerns application of a statute of limitations" and "not an evaluation of disgorgement." (ECF No. 1019, at 21 n.4.) On its face, the SEC's argument appears to be incorrect as Part II.B of *Rind*, where the quoted language resides, specifically notes that "[d]isgorgement plays a central role in the enforcement of the securities laws" and includes an entire paragraph that discusses disgorgement. 991 F.2d at 1491–92. However, the two cases that *Rind* cites for this proposition, *SEC v. Willis*, 777 F. Supp. 1165 (S.D.N.Y. 1991), and *SEC v. Glick*, No. cv-LV-78-11, 1980 WL 1414 (D. Nev. June 12, 1980), found remoteness in time relevant when deciding whether to issue injunctive relief, not disgorgement. *See Willis*, 777 F. Supp. at 1174; *Glick*, 1980 WL 1414, at *2. This makes sense because the standard for injunctive relief explicitly considers the likelihood that the violations will be repeated. (ECF No. 44, at 22 ("A preliminary injunction is appropriate if there is a prima facie case that Defendants have violated the securities laws and a reasonable likelihood that their violations will be repeated.").) Disgorgement on the other hand merely considers the profits that have flowed from the securities laws violations; the likelihood of future violations is immaterial. *See First City*, 890 F.2d at 1232. Thus the Court finds remoteness in time irrelevant to disgorgement. Even if it were relevant, the Court does not find that it would reduce the disgorgement total because this case involves a single, integrated offering and the Court previously found that there was a reasonable likelihood that the alleged securities violations would be repeated. (*See* ECF No. 44, at 22.)

Finally, the Court notes that the evidence indicates that Defendants were on notice since at least 1994 that they may be in violation of California's securities laws. (*See* ECF No. 980-1, Ex. 1 (two letters sent to Western from the California Department of Corporations state that "it appears that the investment you are offering may fall

- 23 -

within the definition of a security").) The evidence further indicates that Defendants were concerned, since at least 1995, that their sales of GP units may violate federal securities laws. (*See id.* (opinions of counsel sent to Western regarding the legality of the sale of GP units dated July 18, 1995, April 22, 1999, and June 17, 2010).) In 1995, Western's counsel opined that, while it was "more probable than not" that the GP units would not be considered securities, "there is some chance the Ninth Circuit could decide" that the GP units are securities. (*Id.*) Though Western has had these concerns for at least 17 years prior to the filing of this case, there is no indication that Western ever sought a no-action letter from the SEC. *See No-Action Letters*, U.S. SECURITIES AND EXCHANGE COMMISSION, http://www.sec.gov/answers/noaction.htm. By continuing to sell GP units, Western has essentially gambled that either those units would not be considered securities or that the SEC would not take notice. Based on the fact that Western has been aware for a significant amount of time that its actions may violate Section 5, the Court does not doubt that disgorgement is an appropriate remedy for the sale of all the GP units at issue in this case. Accordingly, the Court finds that the reasons cited by Defendants do not warrant finding that the SEC's proposed disgorgement total is punitive or inequitable.

In sum, the Court finds that the SEC has carried its burden with regards to the initial figure of $152,982,250, and that Defendants have carried their burden as to a reduction for the consideration transferred to investors, which the Court values at the 23 properties' $16,328,000 appraised value. Thus the Court determines the appropriate disgorgement amount to be $136,654,250 plus prejudgment interest calculated to May 19, 2015, the date of this amended order.[7]

## V. CONCLUSION AND ORDER

For the reasons stated above, **IT IS HEREBY ORDERED** that:

1.     The SEC's Motion for Partial Summary Judgment on its Fourth Claim for

---

[7] As the SEC has not moved for civil penalties, this order does not consider that issue. (*See* ECF No. 685-1, at 14–15.)

Relief, (ECF No. 685), is **GRANTED** as to the SEC's Section 5 cause of action, **GRANTED** as to disgorgement, and **DENIED** as to the SEC's requested disgorgement total; and

2.   The Court finds that the appropriate amount of disgorgement is the amount raised from investors, $152,982,250, minus the appraised value of the land transferred to investors, $16,328,000, resulting in a disgorgement total of **$136,654,250 plus prejudgment interest calculated to May 19, 2015**, the date of this amended order.

DATED:  May 19, 2015

HON. GONZALO P. CURIEL
United States District Judge