1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

SECURITIES AND EXCHANGE
COMMISSION,

CASE NO. 3:12-cv-2164-GPC-JMA

11

**ORDER GRANTING IN PART AND
DENYING IN PART THE SEC'S
MOTION FOR PARTIAL
SUMMARY JUDGMENT ON ITS
FIRST AND SECOND CLAIMS
FOR RELIEF**

Plaintiff,

12

v.

13
14
15

LOUIS V. SCHOOLER and FIRST
FINANCIAL PLANNING
CORPORATION, dba Western
Financial Planning Corporation,

**[ECF No. 1015]**

16
17

Defendants.

18
19

## I. INTRODUCTION

20

    Before the Court is Plaintiff Securities and Exchange Commission's (the "SEC")

21

Motion for Partial Summary Judgment on its First and Second Claims for Relief. (ECF

22

No. 1015.) Defendants Louis V. Schooler ("Schooler") and First Financial Planning

23

Corporation d/b/a Western Financial Planning Corporation ("Western") (collectively,

24

"Defendants") oppose. (ECF No. 1063.)

25

    The parties have fully briefed the motion. (ECF Nos. 1015, 1063, 1067.) A

26

hearing on the SEC's motion was held on May 19, 2015. (ECF No. 1073.) Upon review

27

of the moving papers, admissible evidence, oral argument, and applicable law, the

28

Court GRANTS IN PART AND DENIES IN PART the SEC's motion for partial

summary judgment.

## II. BACKGROUND

This is an enforcement action brought by the SEC. (*See* ECF No. 1.) The SEC alleges that Defendants defrauded investors in the sale of general partnership ("GP") units which were, as a matter of law, unregistered securities. (*Id.*) On September 4, 2012, the SEC filed its complaint. (*Id.*) On October 22, 2012, this case was transferred to the undersigned judge. (ECF No. 52.) On July 15, 2013, Defendants filed an answer to the SEC's complaint. (ECF No. 255.) On March 28, 2014, the SEC filed a motion for partial summary judgment with regards to whether the GP units were securities. (ECF No. 563.) On April 25, 2014, the Court granted the SEC's motion for partial summary judgment and found that the GP units at issue in this case were securities as a matter of law (the "Securities Order"). (ECF No. 583.) The facts of this case are set forth in further detail in the Securities Order. (*Id.* at 1–11.)

On March 13, 2015, the SEC filed the present motion for partial summary judgment on its first and second claims for relief. (ECF No. 1015.) On April 24, 2015 Defendants filed an opposition to the SEC's motion. (ECF No. 1063.) On May 8, 2015, the SEC filed a response to Defendants' opposition. (ECF Nos. 1067.) The SEC moves for summary judgment on its first and second claims for relief: that Defendants violated Section 17(a) of the Securities Act of 1933 ("Section 17(a)"), 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act of 1934 ("Section 10(b)"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated under the Exchange Act of 1934 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5. (ECF No. 1 ¶¶ 67–74; ECF No. 1015.)

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986); FED. R. CIV. P. 56. Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material when it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial. *Id.* at 322–23. If the moving party fails to bear the initial burden, summary judgment must be denied and the Court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his or hear pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citing FED. R. CIV. P. 56 (1963)). If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Id.* at 325. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing FED. R. CIV. P. 56 (1963)). In making this determination, the Court must "view [] the evidence in the light most favorable to the nonmoving party." *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001). The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. *Anderson*, 477 U.S. at 255.

/ /

## IV. DISCUSSION

**A. Evidentiary Disputes**

### 1. Judicial Admissions

First, the statements made by Defendants, (ECF No. 571-1 ¶¶ 9–10), are not, as the SEC argues, "conclusively binding." (*See* ECF No. 1067, at 2–3 (citation omitted).) Federal Rule of Civil Procedure 7 generally allows for two types of filings by the parties: (1) "pleadings," and (2) "motions and other papers." FED. R. CIV. P. 7. Rule 7 further specifies that there are exactly seven types of pleadings, primarily complaints, answers to complaints, and replies to answers to complaints. *Id.* Ignoring this distinction, the SEC misinterprets *American Title Insurance Co. v. Lacelaw Corp.*, 861 F.2d 224 (9th Cir. 1988), and *Ferguson v. Neighborhood Housing Services*, 780 F.2d 549 (6th Cir. 1986). With regards to *pleadings*, those cases do hold that "stipulations and admissions in the pleadings are generally binding on the parties and the Court." *Am. Title*, 861 F.2d at 224 (citation and quotation marks omitted); *Ferguson*, 780 F.2d at 551. But Defendants' statements at issue are not contained in the pleadings, they are contained within a response to a statement of facts submitted in conjunction with an opposition to a motion. (*See* ECF No. 571-1 ¶¶ 9–10.) This is, of course, not a "pleading" but an "other paper[]," FED. R. CIV. P. 7, and thus not governed by *Ferguson*. 780 F.2d at 550 ("The primary issue presented by this appeal is the significance and effect of NHS' admission in its *answer* . . . .") (emphasis added). Statements contained in non-pleadings, such as briefs, are governed by the Ninth Circuit's holding in *American Title*: "statements of fact contained in a brief *may* be considered admissions of the party in the discretion of the district court." 861 F.2d at 226–27 (emphasis in original). To the extent that Defendants now dispute a statement contained in an earlier non-pleading filing, (*compare* ECF No. 1063-1 ¶¶ 8–9 *with* ECF No. 571-1 ¶¶ 9–10 ), the Court exercises its discretion and does not consider the earlier statement to be a judicial admission. (*Cf.* ECF No. 1029, at 11.)

/ /

### 2. Schooler's 2015 Deposition

Second, Defendants argue that statements from Schooler's 2015 deposition are inadmissible because Schooler was unable to review the transcript pursuant to Federal Rule of Civil Procedure 30(e). (ECF No. 1063-1 ¶ 13.) Though one of Schooler's attorneys, Philip Dyson, declares that Mr. Dyson was not "notified by the certified court reporter that Mr. Schooler's transcript was ready for review," (ECF No. 1063-2 ¶ 13), the SEC has submitted a letter indicating that another of Schooler's attorneys, Eric Hougen, was notified that Schooler's transcript was available for review, (ECF No. 1067-2, Ex. 4). Ultimately, Rule 30(e) permits introduction of Schooler's original deposition testimony. *See Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 103 (2d Cir. 1997) (original answer admissible even when deponent amends deposition transcript). Furthermore, to the extent that Schooler believed his deposition statements were in error, he could have stated so in his declaration, which he did not directly do. (*See* ECF No. 1063-3.) Though he alleges that he never obtained a copy from the court reporter pursuant to Rule 30(e), (*id.* ¶ 17), his counsel was in possession of at least the portions of the transcript that the SEC submitted in support of its present motion and his counsel could have shared those portions with him. (*See* ECF Nos. 1015-5, 1015-6.) Accordingly, the Court finds that the statements contained in Schooler's 2015 deposition can be considered by the Court for purposes of the present motion.

## B. Fraud

The SEC alleges that Defendants violated three antifraud provisions: (1) Section 17(a), (2) Section 10(b), and (3) Rule 10b-5. (ECF No. 1 ¶¶ 67–74.) There are four elements to violations of all three provisions: "[1] a material misstatement or omission [2] in connection with the offer or sale of security [3] by means of interstate commerce" [4] made with the requisite intent. *Sec. and Exch. Comm'n v. Phan*, 500 F.3d 895, 907–08 (9th Cir. 2007) (citation omitted). For "[v]iolations of Section 17(a)(1), Section 10(b), and Rule 10b-5," scienter is satisfied by a showing of recklessness. *Sec. and Exch. Comm'n v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001) (emphasis

1    and citation omitted). For "[v]iolations of Sections 17(a)(2) and (3)," intent is satisfied

2    by a showing of negligence. *Id.* (citation omitted).[1]

3         As the Court previously found that the GP units at issue in this case are securities

4    and that Defendants advertised or sold the GP units through telephone and mail, (ECF

5    No. 583, at 3, 20; *see also* ECF No. 4-25), the Court finds that the SEC has satisfied

6    its burden with regards to the security and interstate commerce elements and thus

7    GRANTS the SEC summary judgment on these elements. *See Sec. and Exch. Comm'n*

8    *v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993) ("We have said that the 'in

9    connection with' requirement is met if the fraud alleged 'somehow touches upon' or

10   has 'some nexus' with 'any securities transaction.'") (quoting *Sec. and Exch. Comm'n*

11   *v. Clark*, 915 F.2d 439, 449 (9th Cir. 1990)). The Court now turns to whether the

12   statements or omissions were material and whether Defendants acted with the requisite

13   intent.

14       **1. Materiality**

15       Materiality is defined as "a substantial likelihood that the disclosure of the

16   omitted fact would have been viewed by the reasonable investor as having significantly

17   altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway,*

18   *Inc.*, 426 U.S. 438, 449 (1976). The Ninth Circuit has cautioned that "[d]etermining

19   materiality in securities fraud cases 'should ordinarily be left to the trier of fact.'"

20   *Phan*, 500 F.3d at 908 (quoting *In re Apple Computer Secs. Litig.*, 886 F.2d 1109, 1113

21   (9th Cir. 1989)). "[E]ven when there is no dispute as to the facts, it usually is for the

22   jury to decide whether the conduct in question meets the reasonable-person standard."

23   *Phan*, 500 F.3d at 908 (citations and emphasis omitted). Thus a misstatement or

24   omission must be "so obviously important to an investor, that reasonable minds cannot

25

26       [1] The SEC notes that "[t]he Supreme Court has never addressed whether
27   negligence is necessary to prove a violation of Sections 17(a)(2) and (a)(3)," and
     argues that negligence may not be required to prove a violation of Sections 17(a)(2) or
28   (3). (ECF No. 1015-1, at 12, 24–25.) However, the Ninth Circuit has unequivocally
     stated that negligence is an element of Section 17(a)(2) and (a)(3) violations. *Phan*, 500
     F.3d at 907; *Dain Rauscher*, 254 F.3d at 856.

differ on the question of materiality," for the Court to decide the issue of materiality on summary judgment. *TSC Indus.*, 426 U.S. at 450 (quoting *Johns Hopkins Univ. v. Hutton*, 422 F.2d 1124, 1129 (4th Cir. 1970)).

The SEC argues three bases for materiality: (1) failure to disclose the price that Western's initial purchase price on the properties it resold to the GPs at nearly 500% that initial price, (2) the inclusion of purportedly comparable properties that were not actually comparable, and (3) failure to disclose that the GPs' properties were subject to mortgages. (ECF No. 1015-1, at 14–22.)

### a. Land Value

It is undisputed that Defendants omitted Western's purchase price for the GP properties from the information disclosed to the investors. (ECF No. 4-1, 139:3–14, 177:20–178:5.) Defendants respond that this omission is immaterial for four reasons: (1) Defendants disclosed their conflict of interest to the investors, (2) Defendants' prior GP investments had been successful, (3) Defendants disclosed the speculative nature of the investments, and (4) Western's purchase price was "readily and publicly available." (ECF No. 1063, at 6–11.) First, the partnership representations do state that there is a conflict of interest between Defendants and the investors. (ECF No. 14-3 ¶ 74.) Second, while some prior GP investments may have been successful, the Court is not convinced that the evidence provided by Defendants undisputedly proves that alleged success. (*See* ECF No. 1003, at 13 (discussing the weaknesses in Defendants' evidence of alleged success).) Third, the partnership representations do state that the GP units are speculative investments. (ECF No. 14-3 ¶ 6.) Fourth, while Schooler declares that the price Defendants "paid for the land . . . [is] public information available in county records and title reports," Defendants previously stated that they "have not been able to obtain the final closing statements for all of the properties acquired before 2004." (ECF No. 1063-3 ¶ 15; ECF No. 981, at 36 n.7.) Receiver Thomas C. Hebrank, who acts as federal equity receiver in this case, has also indicated that, even after title report searches, he was unable to find Western's purchase price for

land held by approximately 26 GPs. (ECF No. 852-1, Ex. A.)

As an initial matter, the case cited by the SEC for the proposition that information relevant to fair market value can be material to a securities purchaser, *SEC v. Cochran*, 214 F.3d 1261 (10th Cir. 2000), is inapposite. (ECF No. 1015-1, at 14.) Because *Cochran* was an appeal from a grant of summary judgment in favor of the defendant, the Tenth Circuit viewed the facts in the light most favorable to the SEC in that case. 214 F.3d at 1262–63 (citation omitted). Thus, while *Cochran* stands for the proposition that information relevant to fair market value can be material in certain situations, it says nothing about whether an omission of such information is sufficiently obvious to make its materiality appropriately resolved on summary judgment. *See TSC Indus.*, 426 U.S. at 450. The SEC's reliance on *SEC v. Fehn*, 97 F.3d 1276 (9th Cir. 1996), is misplaced for similar reasons. (*See* ECF No.1015-1, at 15.) *Fehn* was an appeal of a final judgment after a bench trial. 97 F.3d at 1282. Thus, the issue of materiality was submitted to the finder of fact in *Fehn*, which the SEC argues against in this case. Just as in *Cochran*, *Fehn* does not say whether an omission is sufficiently obvious where a disclosure of the omitted fact could remedy an otherwise misleading statement. *See id.* at 1290 n.12. However, the Ninth Circuit has stated that "the materiality of information relating to financial condition, solvency and profitability is not subject to serious challenge." *Sec. and Exch. Comm'n v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980).

The Court notes that this is an extremely close call. The pertinent facts— that Western marked up the GP properties by upwards of 500% and that Western did disclose to at least some investors that it would make a "very substantial profit"—are not in dispute. Other courts have found that failures to disclose far smaller markups were material omissions even when accompanied by disclosures that there was some sort of markup. *See, e.g.*, *Sec. and Exch. Comm'n v. Alliance Leasing Corp.*, No. 3:98-cv-1810-J-CGA, 2000 WL 35612001 (S.D. Cal. Mar. 20, 2000), *aff'd* 28 F. App'x 648 (9th Cir. 2002). For example, in *Alliance Leasing*, the defendants made a general

1   disclosure that they would receive "commissions," but failed to disclose that those
2   commissions amounted to 30%. 2000 WL 35612001, *10. On summary judgment, the
3   district court found that "[r]easonable minds could not differ that a general disclosure
4   of 'commissions' is not the equivalent of a disclosure of 30% commissions." *Id.* The
5   district court thus granted summary judgment for the SEC, finding that "large
6   commissions amounting to 30 cents on every dollar invested are patently material"
7   because "large commissions impact the profitability of an investment and as such are
8   material to an investor's informed decision." *Id.* While the reasoning of *Alliance*
9   *Leasing* is quite persuasive, the Court finds that the materiality of the land value
10  omissions should be submitted to the finder of fact.

11          On one hand, Western's initial purchase price may have been material to an
12  investor because it affected the likelihood that the investor would realize a return on
13  his or her investment, and, if so, how much that return could be. On the other hand,
14  Defendants did represent that they would make a "very substantial profit" by selling
15  the property to the investors, (ECF No. 14-3 ¶ 74), and thus the specific amount paid
16  by Western may have been immaterial because the investors were already informed that
17  that amount was substantially less than what the investors paid for the property. That
18  said, this disclosure was buried on the tenth page of an eleven page document in the
19  middle of a series of disclaimers. (*See id.*) While it is a close call, based on the
20  disclosure of what Defendants stood to gain, the Court cannot say that Western's
21  purchase price is "so obviously important, that reasonable minds cannot differ on the
22  question of materiality." *TSC Indus.*, 426 U.S. at 450 (citation omitted); *see also Sec.*
23  *and Exch. Comm'n v. Meltzer*, 440 F. Supp. 2d 179, 194 (E.D.N.Y. 2006) ("[T]he
24  difference in compensation may or may not be material to a reasonable investor; it may
25  be that simply being alerted to the fact that some significant amount was paid is
26  significant, but that the actual amount is immaterial."). Accordingly, the Court finds
27  that the materiality of Defendants' alleged omission of the price Western paid for the
28  properties is a question to be decided by the finder of fact.

### b. Comparable Properties

The SEC cites three alleged misrepresentations regarding allegedly comparable properties ("comps"): (1) comps provided to Western's sales representatives to help market the Pyramid Highway property to investors, (ECF No. 4-24); (2) a brochure provided to investors regarding the Stead property, (ECF No. 7-1, Ex. 1); and (3) the use of land purchased by Wal-Mart as a comp for the Stead property in an email sent by Western employee John Naviaux, (ECF No. 4-25, Ex. 25; ECF No. 7 ¶ 9). (ECF No. 1015-1, at 4–5, 8–10, 19–20.)

In response, Defendants argue that: (1) the investors represented that they did not rely on Defendants' representations, (ECF No. 14-3 ¶ 19);[2] and (2) the comps "were merely puffery, and not actionable misrepresentations or omissions of material fact." (ECF No. 1063, at 12.) As an initial matter, whether the investors actually relied on the representations is irrelevant to the SEC's fraud causes of action. *See Sec. and Exch. Comm'n v. True N. Fin. Corp.*, 909 F. Supp. 2d 1073, 1097 (D. Minn. 2012) (explaining that reliance is not an element of Section 17(a), Section 10(b), or Rule10b-5 causes of action brought by the SEC); *see also Sec. and Exch. Comm'n v. Rana Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993) ("The SEC need not prove reliance in its action . . . on the basis of violations of section 10(b) and Rule 10b-5."); *Sec. and Exch. Comm'n v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 490–91 (S.D.N.Y. 2002) ("The SEC does not need to prove investor reliance, loss causation, or damages in an action under Section 10(b) of the Exchange Act, Rule 10b–5, or Section 17(a) of the Securities Act.") (citations omitted). The Court now turns to the alleged misrepresentations cited by the SEC.

### i. The Pyramid Highway Property

The evidence shows that the comps provided to Western's sales representatives

---

[2] At oral argument, the vast majority of Defendants' argument with regards to the comps was that the investors stated that they did not rely on Western's representations. (*See* ECF No. 1073.) As the Court notes below, reliance is not an element of the antifraud provisions in an SEC enforcement action.

regarding the Pyramid Highway property were not comparable at the time of investment. (*Compare* ECF No. 182-1, Ex. 13, at 97 (Pyramid Highway property purchased by Schooler for approximately $3,000 per acre, sold to Western for approximately $5,700 per acre, and then sold to investors for approximately $15,000 per acre) *with* ECF No. 4-24 (comps for the Pyramid Highway property valued between approximately $130,000 per acre and $700,000 per acre).) Indeed, Schooler himself has admitted as much. (ECF No. 4-1, Ex. 1, at 164:1–25; ECF No. 4-2, Ex. 2, at 311:4–315:25.) However, the SEC does not cite what representations were made to investors regarding the Pyramid Highway property. Though these "comps" were provided to Western's sales representatives, that does not show what those sales representatives actually said to investors. Even if these comps were advertised to investors, the investors may have viewed them as what the property "could become" rather than what it was currently worth. (ECF No. 4-2, Ex. 2, at 314:19.) This is consistent with an investor's declaration that Western provided both "true comps," i.e., properties that allegedly were comparable at the time of the investment, and "future comps," i.e. properties that allegedly showed what the property could be valued at in the future, (ECF No. 563-4 ¶ 5), and the SEC's evidence does not indicate whether the Pyramid Highway comps it cites as alleged misrepresentations were advertised as "true comps" or "future comps." Accordingly, the SEC has failed to carry its burden to show that a the Pyramid Highway comps were material.

### ii. The Stead Property[3]

The SEC makes two arguments with regards to the Stead property: (1) that the comps given in Western's brochure and in an email sent by Western employee John Naviaux "were not, in fact, comparable" to the Stead property, (ECF No. 1015-1, at 19); and (2) the fair market value representation of the Stead property in Western's brochure was "less than 1/25th" of the actual fair market value, (ECF No. 1015-1, at

---

[3] The Stead property is comprised of two primary parcels: (1) the North Stead property containing approximately 39.8 acres, and (2) the South Stead property contained approximately 76 acres. (*See* ECF No. 7-1, Ex. 1, at 5.)

10). The parties do not dispute that Western's brochure on the Stead property, displayed to potential investors (*see* ECF No. 1015-7, Ex. 4, at 39:9–41:7), stated that the South Stead property "would, under current market conditions, be evaluated at approximately $2.50 per sq foot" and that, "[i]n the past, similar commercial property in the Reno area has been valued between $6.00 and $15.00 per sq foot, with some small commercial pads approaching a price of $20.00 per square foot." (ECF No. 7-1, Ex. 1, at 5–6.) Similarly, the parties do not dispute that Mr. Naviaux sent an email to an investor stating that "[w]e paid $2.50 a Sq. Ft." for the Stead property and that Wal-Mart paid "$8.78 per sq. ft." "for their new site in Stead, NV." (ECF No. 4-25, Ex. 25.)[4]

First, the Court finds that the alleged comps to the Stead property—$6.00 to $15.00 per square foot in Western's brochure and $8.78 per square foot in Mr. Naviaux's email—may have been "future comps" and thus not necessarily material misrepresentations. This is consistent with the fact that Western's brochure stated that the $6.00 to $15.00 per square foot comps were from "the past" and that "[t]here is no way to predict whether higher values would return." (ECF No. 7-1, Ex. 1, at 5.) As with the Pyramid Highway comps, a hypothetical reasonable investor could arguably have viewed these comps as what the marketed property "could become," (ECF No. 4-2, Ex. 2, at 314:19), and not considered the misrepresentation to be material. Accordingly, the Court finds that the materiality of Defendants' alleged misrepresentation regarding the purportedly comparable properties is a question to be decided by the finder of fact. *See TSC Indus.*, 426 U.S. at 450.

Second, the Court finds that the statement by Western—that, "under current market conditions," the South Stead property would "be evaluated at approximately $2.50 per sq foot," (ECF No. 7-1, Ex. 1, at 5)—was a material misrepresentation. The appraisal obtained by the SEC which states that the fair market value of the Stead

---

[4] The Court notes that this email appears to have been sent *after* the sale of GP units in that instance because it states "[w]e *paid*" and thus would not necessarily be a representation made in connection with the offer or sale of a security. (ECF No. 4-25, Ex. 25 (emphasis added).) Though not entirely clear, "[w]e" appears to refer to the investor herself. (*See* ECF No. 1015-7, Ex. 4, at 42:3–22.)

property was $0.077 per square foot as of August 2010 and $0.053 per square foot as of July 2012. (ECF No. 5-1, Ex. 1, at 4.)[5]Citing the "Expert-Opinion Rebuttal Report of Louis V. Schooler," Defendants dispute the appraised values, arguing that the SEC's appraiser "used properties that are completely dissimilar." (ECF No. 1063-1, at 26 (quoting ECF No. 862-9, Ex. 8, at 12–14).) However, the cited report by Schooler does not attempt to rebut the Stead appraisal, but rather attempts to rebut the appraisals of the Dayton IV and Washoe 5 properties. (*See* ECF No. 862-9, Ex. 8, at 4–5.) Thus, Defendants cite no evidence that in any way disputes the Stead appraisal as nothing in Schooler's report indicates an issue with the SEC's appraisals other than for the Dayton IV and Washoe 5 properties.

However, the Court does note that Western's brochure assumed that the Stead property's surface water rights were worth "$40,000 per acre foot," (ECF No. 7-1, Ex. 1, at 5), but the SEC's appraiser does not appear to have valued the water rights in his appraisals because he stated that the water rights were either limited, potentially inadequate for development, or potentially lost due to non-use. (*See* ECF No. 5-2, Ex. 1, at 69–70). Viewing the evidence in the light most favorable to Defendants, the Court finds it appropriate to add the water rights valuation assumed by Western to appraised value obtained by the SEC.

The Stead property was purchased with approximately 104.895 acre feet of water rights, (ECF No. 5-1, Ex. 1, at 28; ECF No. 5-2, Ex. 1, at 69), which comes out to approximately $4,195,800 based on the $40,000 per acre foot assumption in Western's brochure. Divided by the approximately 4,596,407.64 square feet in the Stead property, this would increase the SEC's appraised values by $0.913 per square foot had Western's assumption been used. This results in values of $0.99 per square foot for August 2010 and $0.966 per square for July 2012.

---

[5] The Stead property is approximately 105.519 acres, which is approximately 4,596,407.64 square feet. (*See* ECF No. 5-1, Ex. 1, at 3–4.) The appraiser valued the property at $355,000 as of August 2010 and $244,500 as of July 2012. (*Id.*) This results in approximately $0.077 per square foot and $0.053 per square foot appraisals, respectively.

1    As discussed above, the undisputed evidence indicates that the fair market value

2    of the Stead property was, using Western's assumptions regarding water rights,

3    approximately one dollar per square foot in August 2010 and July 2012. By

4    representing that the fair market value of the South Stead property was $2.50 per

5    square foot, Western's representation was 150% greater than the actual market value.

6    In the mind of a hypothetical reasonable investor, this misrepresentation would have

7    significantly changed the "total mix" of information, *TSC Indus., Inc. v. Northway,*

8    *Inc.*, 426 U.S. at 449, because he or she was led to believe that the property was worth

9    more than double what the true fair market value was. *Cf. Johnston v. Bumba*, 764 F.

10   Supp. 1263 (N.D. Ill. 1991), *aff'd* 983 F.2d 1072 (7th Cir. 1992) ("We find this

11   disclosure [of 'substantial profit'] too vague to satisfy the requirements of disclosure,

12   particularly where the fair market value of the systems was misrepresented."). Due to

13   the magnitude of difference between the actual fair market value and Western's

14   statements, summary judgment on the misrepresentation of the South Stead property's

15   fair market value is appropriate because it is "so obviously important, that reasonable

16   minds cannot differ on the question of materiality." *TSC Indus.*, 426 U.S. at 450

17   (citation omitted). Accordingly, the Court finds that the fair market value

18   representation in Western's brochure on the Stead property was material.

19                                    **c. Mortgages**

20       There is no evidence that Defendants directly told the investors that the GP

21   properties were encumbered by mortgages owed by Western. (*See* ECF No. 4-2, Ex.

22   2, at 289:14–15, 330:9– 25; ECF No. 4-5, Ex. 5, at 53:13–54:18.) Defendants respond

23   that the investors had notice of the mortgages because: (1) the partnership

24   representations specifically authorized the execution of deeds of trust, (ECF No. 14-3

25   ¶ 23); (2) the all inclusive trust deeds ("AITDs") executed by the GPs in relation to

26   each property specifically mentioned the mortgages (*see, e.g.*, ECF No. 1063-2, Exs.

27   6–8); and (3) the underlying mortgages were publicly "available in county records and

28   title reports," (ECF No. 1063-3 ¶ 15). (ECF No. 1063, at 12–14.)

As an initial matter, the AITDs appear to have been executed *after* the investors made the decision to hand over their money to Western and thus, at the time the investors purchased the security, the AITDs would not have informed the investors of the underlying mortgages. (*Compare* ECF No. 182-1, Ex. 13, at 102 (escrow close date for Pyramid Highway 177 Partners was May 6, 2010) *with* ECF No. 1063-2, Ex. 6 (AITD for Pyramid Highway 177, LLC executed on May 6, 2010).) However, as Western, not the GPs or the investors, owed the mortgages, the mortgages were essentially a "contingent liability" that Western might fail to pay the mortgages, causing either the GP to pay the mortgage or the property to be foreclosed upon. *Fehn*, 97 F.3d at 1291. The materiality of a contingent liability depends "upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) (quoting *Sec. and Exch. Comm'n v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968)). While the magnitude of the event is significant—either foreclosure and loss of the investment property or the payment of potentially over a million dollars, (*see, e.g.*, ECF No. 182, at 5 (Dayton Valley II property secured by $1.5 million mortgage))—there is no evidence of the probability that Western would fail to pay the mortgages. The SEC merely argues that "the magnitude of the event . . . represents such a significant financial loss, that the mortgage information was clearly material." (ECF No. 1015-1, at 21.)

While the possibility of such an event could be material to a hypothetical reasonable investor, if the event's likelihood was low then the mortgage information may not have been material. Because the SEC has not presented evidence that Western ever failed to meet its obligations on these mortgages, let alone that such an event had a more than marginal chance of occurring, the Court cannot say that the disclosure of underlying mortgages is "so obviously important, that reasonable minds cannot differ on the question of materiality." *TSC Indus.*, 426 U.S. at 450 (citation omitted). Accordingly, the Court finds that the materiality of Defendants' alleged omission of the

1  underlying mortgages is a question to be decided by the finder of fact.

2      As the Court has found that only one of the SEC's alleged bases for materiality

3  is properly decided on summary judgment, the Court GRANTS IN PART AND

4  DENIES N PART the SEC's motion for summary judgment as to materiality. The SEC

5  requests "that the Court grant summary judgment as to the elements of its claims that

6  [the Court] deems have been established." (ECF No. 1015-1, at 25.) Accordingly, the

7  Court turns to whether Defendants acted with scienter or negligence.

8      **2. Intent**

9      Generally, intent in securities fraud cases "should *not* be resolved by summary

10  judgment." *Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996) (emphasis in

11  original). Because of this, "the moving party bears a heavier burden of showing that

12  there exists no genuine issue of material fact." *Sec. and Exch. Comm'n v. Seaboard

13  Corp.*, 677 F.2d 1289, 1295 (9th Cir. 1982). Section 17(a)(1), Section 10(b), and Rule

14  10b-5 require a showing of recklessness; Sections 17(a)(2) and (a)(3) require a showing

15  of negligence. *Dain Rauscher*, 254 F.3d at 856. Reckless conduct is "defined as a

16  highly unreasonable omission, involving not merely simple, or even inexcusable

17  negligence, but an extreme departure from the standards of ordinary care, and which

18  presents a danger of misleading buyers or sellers that is either known to the defendant

19  or is so obvious that the actor must have been aware of it." *See Hollinger v. Titan Cap.

20  Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (quoting *Sundstrand Corp. v. Sun Chem.

21  Corp.*, 553 F.2d 1033, 1045 (7th Cir.) *cert. denied*, 434 U.S. 875 (1977)). Negligent

22  conduct is defined as a "fail[ure] to use the degree of care and skill that a reasonable

23  person of ordinary prudence and intelligence would be expected to exercise in the

24  situation." *True N. Fin.*, 909 F. Supp. 2d at 1122 (citations omitted). Defendants

25  respond to the SEC's allegations by arguing that: (1) they relied on the advice of

26  counsel, and (2) intent should be decided by the finder of fact. (ECF No. 1063, at

27  14–16.)

28  / /

### a. Reliance on Counsel

There are four elements that Defendants must prove to show reliance on the advice of counsel: they "(1) made a complete disclosure to counsel; (2) requested counsel's advice as to the legality of the contemplated action; (3) received advice that it was legal; and (4) relied in good faith on that advice." *Sec. and Exch. Comm'n v. Goldfield Deep Mines Co. of Nev.*, 785 F.2d 459, 467 (9th Cir. 1985) (citing *Sec. and Exch. Comm'n v. Savoy Indus., Inc.*, 665 F.2d 1310, 1314 n.28 (D.C. Cir. 1981). However, "such reliance does not operate as an automatic defense, but is only one factor to be considered." *Id.* (citation omitted). Though the SEC argues that "Schooler never sought legal advice regarding his disclosures" prior to 2010, (ECF No. 1067, at 9), the Court is not so convinced. Schooler specifically asked his counsel whether the GP units were securities, to which the response was, essentially, "probably not." (*See* ECF No. 1063-3, Exs. 1–4.) Because the antifraud provisions operate only in connection with the offer or sale of a security, *Phan*, 500 F.3d 895 at 907–08, by asking whether the GP units were securities and being advised that they were not, Schooler was also asking whether he was in compliance with the antifraud provisions.

However, with regards to the Stead property brochure, the Court finds that Defendants have not shown that they "made a complete disclosure to counsel" and thus have failed to carry their burden. *Goldfield*, 785 F.2d at 467. Specifically, Defendants never told counsel that they represented a property's alleged fair market value to investors, instead merely disclosing that they would use "sales videos, aerial photographs, and the basic property description to sell the partnership interest." (ECF No. 1063-3, Ex. 2.) With regards to all other alleged misrepresentations and omissions, the Court does not reach Defendants' reliance on counsel argument because, as discussed below, the Court finds that the SEC has failed to carry its burden on the element of intent.

### b. Stead Property Brochure

With regards to the material misrepresentation regarding the fair market value

of the South Stead property in Western's brochure noted above, the Court finds that Defendants acted with scienter. It is undisputed that Defendants purchased the Stead property for approximately $1.85 million, or approximately $0.40 per square foot, on April 1, 2010. (ECF No. 5-1, Ex. 1, at 28–29; ECF No. 1063-1, at 26.) Because Defendants' purchase of the Stead property was an arm's length transaction, Defendants must have been aware that their purchase price represented, at most, approximately the fair market value of the land. (*See* ECF No. 5-1, Ex. 1, at 28–29.) Yet in spite of the knowledge of their own purchase price, Defendants represented to investors that the fair market value of the South Stead property was $2.50 per square foot, (ECF No. 7-1, Ex. 1, at 5), which was over six times greater than what they paid for it. This affirmative misrepresentation was an "extreme departure from the standards of ordinary care" that Defendants knew, or should have known, presented a danger of misleading investors. *Hollinger*, 914 F.2d at 1569 (citation omitted). On this specific misrepresentation, the Court finds the SEC has carried its burden with regard to intent, and thus with regards to all elements. Accordingly, the Court GRANTS the SEC's motion for summary judgment with regards to this misrepresentation.

### c. Other Alleged Misrepresentations and Omissions

With regards to the other misrepresentations and omissions, the SEC argues that three things show scienter: (1) Defendants' "fail[ure] to disclose Western's purchase price or an appraisal to investors," (2) Defendants "provid[ing] 'comps' to the sales force that were not truly comparable to the properties Western was offering," and (3) Defendants' "fail[ure] to disclose that significant third-party mortgages encumbered the properties being offered to investors." (ECF No. 1015-1, at 22–23.)

Summary judgment on intent is "inappropriate . . . unless all reasonable inferences that could be drawn from the evidence defeat the plaintiff's claims." *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1220 (9th Cir. 1980) (citation omitted); *Provenz*, 102 F.3d at 1489–90 ("Thus, summary judgment on the scienter issue is appropriate *only* where 'there is no rational basis in the record for concluding that any of the challenged

statements was made with requisite scienter.'") (emphasis in original) (quoting *In re Software Toolworks*, 38 F.3d 1078, 1088 (9th Cir. 1994)). A reasonable inference that Defendants' actions were consistent with the ordinary standard of care can be drawn with regards to all three of the alleged misrepresentations and omissions cited by the SEC above. First, a reasonable person in Defendants' position may have omitted Western's purchase because Defendants did disclose that they stood to make a "very substantial profit." (ECF No. 14-3 ¶ 74.) Second, a reasonable person in Defendants' position may have represented the purportedly comparable properties as comparable because Defendants could have believed that investors would view these comps as what the property "could become" and not what it was worth at the time of investment. (ECF No. 4-2, Ex. 2, at 314:19.) Third, a reasonable person in Defendants' position may have omitted the existence of the underlying mortgages because Defendants could have believed that there was an extremely high likelihood that Western would meet its payment obligations under the mortgage. *See Basic*, 485 U.S. at 238. Accordingly, the Court finds that the SEC has not carried its burden with regards to the intent element of the antifraud provisions and thus DENIES the SEC's motion for summary judgment with regards to intent on all other alleged misrepresentations and omissions.[6]

## V. CONCLUSION AND ORDER

For the reasons stated above, **IT IS HEREBY ORDERED** that the SEC's Motion for Partial Summary Judgment on its First and Second Claims for Relief, (ECF No. 1015), is **GRANTED IN PART AND DENIED IN PART**:

---

[6] At oral argument, the SEC argued that "one misrepresentation to one investor is sufficient to find a violation." (ECF No. 1079.) While the SEC is technically correct, the Court does note that, in determining the appropriate civil penalties in SEC enforcement actions, each separate violation is relevant. *See Sec. and Exch. Comm'n v. Tourre*, 4 F. Supp. 3d 579, 583 (S.D.N.Y. 2014) ("Courts assess civil penalties on a per-violation basis."). As the SEC has indicated that it may seek civil penalties in this case, (ECF No. 685-1, at 14–15), the Court believes it appropriate to submit the materiality and intent of the other alleged misrepresentations and omissions to the finder of fact to determine whether Defendants did, in fact, commit any other violations. Were the SEC to abandon its first and second causes of action based on the other alleged misrepresentations and omissions and decide not to seek penalties based on those alleged misrepresentations and omissions, the issue would not need to be resolved by the finder of fact.

1.   With regards to the Stead property fair market value representation in Western's brochure, the SEC's first and second causes of action are **GRANTED** as to all elements; and

2.   With regards to all other alleged misrepresentations and omissions, the SEC's first and second causes of action are **GRANTED** as to an offer or sale of a security, **GRANTED** as to interstate commerce, **DENIED** as to materiality, and **DENIED** as to intent.

DATED:  June 3, 2015

HON. GONZALO P. CURIEL
United States District Judge