1
2
3
4
5
6
7

8 **UNITED STATES DISTRICT COURT**

9 **SOUTHERN DISTRICT OF CALIFORNIA**

10
11

SECURITIES AND EXCHANGE
COMMISSION,

                              Plaintiff,

12
13
14
15
16
17
18

        v.

19
20
21

LOUIS V. SCHOOLER and FIRST
FINANCIAL PLANNING
CORPORATION, dba Western
Financial Planning Corporation,

22

                           Defendants.

23

CASE NO. 3:12-cv-2164-GPC-JMA

**ORDER:**

**GRANTING IN PART AND
DENYING IN PART RECEIVER'S
MOTION FOR ORDER (A)
AUTHORIZING THE RECEIVER
TO CONDUCT AN ORDERLY
SALE OF GENERAL
PARTNERSHIP PROPERTIES; (B)
APPROVING THE PLAN OF
DISTRIBUTING RECEIVERSHIP
ASSETS; AND (C) APPROVING
PROCEDURES FOR THE
ADMINISTRATION OF
INVESTOR CLAIMS**

**DENYING AGUIRRE INVESTORS'
EX PARTE MOTION FOR AN
ORDER SETTING EVIDENTIARY
HEARING AND DISCOVERY
SCHEDULE**

[ECF Nos. 1181, 1297]

24
25

     Before the Court is Receiver Thomas C. Hebrank's ("Receiver")'s motion for an

26 order (a) authorizing the Receiver to conduct an orderly sale of general partnership

27 ("GP") properties; (b) approving the plan of distributing receivership assets; and (c)

28 approving procedures for the administration of investor claims ("Rec. Mot."), ECF No.

1181. This motion has been fully briefed. *See* SEC Resp., ECF No. 1232; Dillon Resp., ECF No. 1234; Aguirre Resp., ECF No. 1235; Rec. Dillon Reply, ECF No. 1262; Rec. Aguirre Reply, ECF No. 1263; Receiver's Court-Ordered Proposal Regarding GPs ("Rec. CO Prop."), ECF No. 1264; Receiver's Supplement to Court-Ordered Proposal Regarding GPs ("Rec. CO Supp."), ECF No. 1275; Aguirre SEC Sur-reply, ECF No. 1277; Aguirre CO Resp., ECF No. 1293; Rec. CO Reply, ECF No. 1294. The Court has also received a number of letters from individual investors concerning the Receiver's motion. *See, e.g.*, ECF Nos. 1240, 1242, 1244, 1249–1257, 1282, 1283, 1288.

A hearing was held on May 20, 2016. ECF No. 1298. Having considered the parties' submissions, oral argument, and the applicable law, and for the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** the Receiver's motion.

## BACKGROUND

The facts of the case having been recited in the Court's previous orders and the Court will not reiterate all of them here. *See, e.g.*, ECF No. 583 at 3–11. However, the Court will provide salient facts relating to this order. This is an enforcement action by Plaintiff Securities and Exchanges Commission ("SEC") against Defendants Schooler and Western Financial Planning Corporation ("Western") for violations of federal securities laws in connection with Defendants' defrauding of investors in the sale of general partnership ("GP") units which were, as a matter of law, unregistered securities. *See* ECF No. 583 at 3–11, ECF No. 1081.

This case involves an investment scheme hatched by the Defendants that organized GPs into co-tenancies. At least two, but typically four, GPs would end up owning an undeveloped real estate that Defendants selected and bought. In one instance, eleven GPs owned various parcels of one large stretch of real estate. Generally, each GP held an undivided fractional interest in a parcel. Most co-tenancy agreements required that all decisions about a real property be made by unanimous consent of all co-tenant GPs. This structure and unanimity requirement made it effectively impossible for any single investor or GP to exercise any power over the

GP's main asset—land.

In addition, the GPs were financially intertwined with Western in a number of ways. First, Western borrowed roughly $14.2 million to buy certain properties that it later transferred to GPs. These loans were secured by mortgages on these properties. Thus, a default by Western could result in the foreclosure of these properties.

Second, many investors borrowed money from Western to buy GP units. Defendants structured this debt so the GPs, rather than individual investors, owed Western money. That is, Defendants would lend money to the GPs to cover individual investor shortfalls in exchange for promissory notes from the GPs. Some GPs also owed Western additional money for loans Western made to GPs to cover operational expenses. Despite the existence of these loans, Western rarely collected on them until a GP's property was sold.

Third, Western bought and retained an equity, albeit non-voting, interest in every GP. In the aggregate, these interests had a purported value of $10 million (based on the prices Defendants charged investors for their interests), but the current fair market value of these interests has been estimated to be about $1.22 million. Rec. Mot. 13.

Fourth, on several occasions, Schooler would cover shortfalls in Western's or the GPs' expenses.

**A.    Receivership**

On October 5, 2012, Judge Larry A. Burns ordered that Western and the GPs be placed under a temporary federal equity receivership because the SEC had demonstrated a probability of success on the merits of their enforcement action and the possibility that Defendants would dissipate assets. ECF No. 10 at 1. Judge Burns' Order empowered the Receiver "with full powers of an equity receiver, including, but not limited to, full power over all funds, assets, collateral, premises (whether owned, leased, occupied, or otherwise controlled), choses in action, books, records, papers and other property belonging to, being managed by or in the possession of or control of Western and its subsidiaries and affiliates, including but not limited to the [GPs] listed

on Schedule 1 . . ." *Id.* at 11–14.

On October 5, 2012, Judge Burns concluded that the SEC had made out a prima facie case that the GPs were securities, that Defendants violated the securities laws, and that there was a reasonable likelihood that their violations would be repeated. ECF No. 44 at 21–22. As a result, pursuant to Section 20(b) of the Securities Act of 1933, and Section 21(d) of the Securities Exchange Act of 1934, Judge Burns issued a preliminary injunction ordering that the receivership be made permanent. *Id.*

On October 22, 2012, the case was transferred to the Honorable Gonzalo P. Curiel. ECF No. 52. During the course of the litigation, the Court considered whether to continue to keep the GPs under receivership. *See* ECF No. 1003 at 2–4. On March 4, 2015, the Court issued an Order Keeping GPs Under Receivership. *Id.* The Court first carefully examined claims allegations from Defendants and individual investors that the Receiver was behaving unethically or irresponsibly, and found no merit in those allegations. *Id.* at 7–8. The Court then found that, given the posture of the litigation, the nature of Defendants' alleged scheme of securities fraud, the structure of the GP units, and the differences in investor opinion, the public interest in maintaining the receivership estate's assets was best served by keeping all the GPs within the receivership. *See id.* at 16–20. The Court directed the Receiver to (a) provide more information to investors by including a detailed list of expenses in any future bills sent to investors, obtaining updated appraisals of all GP properties, and sending a comprehensive informational packet to investors; and (b) file a report and recommendation regarding whether liquidation was warranted for any GPs unable to meet their payment obligations. *Id.* at 21–22.

Pursuant to that Order, on April 17, 2015, the Receiver filed a report and recommendation regarding the appropriate course of action with regards to each GP in light of the Court keeping the GPs in receivership. ECF No. 1056. The Receiver divided the GPs into three categories (A, B, and C) based on their ability to pay their expenses, including underlying mortgages as well as notes and operational loans due

to Western. Category A properties were able to pay their expenses; Category B properties needed to raise additional capital from their investors in order to pay their expenses, but the shortfall was lower than the estimated net proceeds from a sale of the property; and Category C properties needed to raise additional capital from their investors in order to pay their expenses, but the shortfall was greater than the estimated net proceeds from a sale of the property. *Id.* at 3–6.

The Receiver recommended monitoring Category A properties; issuing a capital call for Category B properties, and selling Category B properties if the capital call failed; and selling Category C properties. *Id.* Finally, the Receiver identified two underwater properties where the total amount owed on mortgages exceeded the estimated net proceeds from a sale, and recommended exploring foreclosure or other surrender of the properties in satisfaction of the outstanding debt. *Id.* at 6. The Receiver proposed a orderly sale process for the sale of qualifying properties, which included soliciting proposed listing agreements from multiple brokers, requesting Court approval for engagement of a particular broker, circulating credible offers to investors for input, seeking Court approval of sales to prospective purchasers, providing notice of the sale motion to all investors with an interest in the property, and marketing the property to potential overbidders. *Id.* at 7–8.

On May 12, 2015, the Court adopted in part the Receiver's report and recommendation regarding further courses of action on the GP properties. ECF No. 1003. The Court adopted the Receiver's approach to Category A and B properties, but directed the Receiver to issue capital calls for the Category C properties as well. *Id.* at 3. In addition, the Court directed the Receiver to issue capital calls for any underwater property where the majority of investors indicated a desire to retain the property, and pursuing surrender only where the capital call failed. *Id.*

In the following year, the Court has approved the Receiver's recommendations in a number of instances regarding letters of intent from prospective purchasers, the engagement of brokers, and other components of the orderly sale process. *See, e.g.,*

ECF No. 1168. However, the Court has not yet finally approved the sale of any particular GP property to a prospective purchaser. Two motions from the Receiver, to approve the sale of the Jamul Valley property and the Reno Vista and Reno View properties respectively, are currently pending before the Court. *See* ECF Nos. 1191, 1225, 1285.

### B.     Final Judgment

On May 19, 2015, the Court granted in part and denied in part the SEC's motion for summary judgment on its fourth claim for relief, finding that Defendant had engaged in the sale of unregistered securities and that the appropriate amount of disgorgement was $136,654,250, plus prejudgment interest calculated to May 19, 2015. ECF No. 1074 at 25. On June 3, 2015, the Court granted in part and denied in part the SEC's motion for summary judgments on its first and second claims for relief, granting both causes of action as to all elements with regards to the fair market value representation of the Stead property in Western's sales brochure. ECF No. 1081 at 20.

On January 21, 2016, the Court granted the SEC's motion for final judgment against Defendant Schooler, directing (1) a permanent injunction restraining the Defendant from violating federal securities laws; (2) disgorgement of $136,654,250 with prejudgment interest of $10,956,030 (for a total of $147,610,280); and (3) imposition of a civil penalty of $1,050,000. ECF No. 1170 at 8–13.

### C.     Receiver's Motion

On February 4, 2016, the Receiver filed the instant motion for an order (a) authorizing the Receiver to conduct an orderly sale of general partnership ("GP") properties; (b) approving the plan of distributing receivership assets; and (c) approving procedures for the administration of investor claims. Rec. Mot.

On April 5, 2016, the Court *sua sponte* directed the Receiver to craft an additional proposal that would enable general partnerships ("GPs") that wish to do so to exit the receivership while maintaining control of their properties instead of having their properties sold. ECF No. 1224 at 2. The Receiver filed that proposal on April 22,

2016. *See* Rec. CO Prop.; *see also* Rec. CO Supp.

On May 18, 2016, the Court granted the motions of two groups of investors who have invested in various GPs subject to the receivership, the Dillon Investors and the Aguirre Investors (collectively "Investors"),[1] to intervene for the limited purpose of opposing the Receiver's motion. ECF No. 1296; *see* Dillon Resp.; Aguirre Resp.; Aguirre SEC Sur-reply; Aguirre CO Resp. The SEC has also responded to the Receiver's proposal. *See* SEC Resp. The Receiver has replied to Investors' responses. *See* Rec. Dillon Reply; Rec. Aguirre Reply; Rec. CO Reply.

## DISCUSSION

### I.    Legal Standard

Section 1 of Article III of the Constitution of the United States vests the judicial power of the United States in "…one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." Clause 1 of Section 2 of Article III goes on to provide that, "(t)he judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . . ."

"In pursuit of their equity powers, courts often appoint receivers as neutral third parties to address issues facing the Court where . . . it does not seem reasonable to the Court that either party should address such issues." Ralph S. Janvey, *An Overview of SEC Receiverships*, 38 No. 2 Securities Regulation Law Journal ART 1 (2010). Accordingly, "the appointment of receivers in a proper case is within the scope of the extraordinary powers of a Court sitting in equity." *Id.* (quoting *Gross v. Missouri & A. RY. Co.*, 74 F. Supp. 242, 244 (W.D. Ark. 1947)) (internal quotation marks omitted).

Moreover, a Court may authorize injunctive relief under Section 20(b) of the Securities Act of 1933, and Section 21(d) of the Securities Exchange Act of 1934,

---

[1] Each investor group represents over one hundred investors. *See* Dillon Resp. 1 n.1; Aguirre Resp., Attachment 1. Collectively, the Dillon and Aguirre Investors comprise approximately 8% of the approximately 3300 investors in the case.

where "'a proper showing' has been made by the SEC that there is a reasonable likelihood that the defendant is engaged or about to engage in practices that violate the federal securities laws." Janvey, *supra*, at 7 (quoting *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316–317 (8th Cir. 1993)). As the Fifth Circuit has observed,

> The appointment of a receiver is a well-established equitable remedy available to the SEC in its civil enforcement proceedings for injunctive relief. . . . The district court's exercise of its equity power in this respect is particularly necessary in instances in which the corporate defendant, through its management, has defrauded members of the investing public; in such cases, it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to division and waste to the detriment of those who were induced to invest in the corporate scheme and for whose benefit, in some measure, the SEC injunctive action was brought.

*Id.* (citing *SEC v. First Fin. Group of Tex*, 645 F.2d 429, 434 (5th Cir. 1981), *aff'd*, 659 F.2d 660 (5th Cir. 1981).

The Receiver acts as an officer of the Court, and the Court is tasked with supervising the equity receivership and determining the appropriate action to be taken in the administration of the receivership. *Id.* Thus, "a district court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad." *S.E.C. v. Capital Consultants, LLC*, 397 F.3d 733, 738 (9th Cir. 2005) (quoting *SEC v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986)) (internal quotation marks omitted). "[T]he district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership." *Id.* (quoting *SEC v. Lincoln Thrift Ass'n*, 577 F.2d 600, 606 (9th Cir. 1978) (internal quotation marks omitted). "The basis for this broad deference to the district court's supervisory role in equity receiverships arises out of the fact that most receiverships involve multiple parties and complex transactions." *Id.* (quoting *Hardy*, 803 F.2d at 1037) (internal quotation marks omitted).

This power to administer the receivership entails the power to order a sale of property in receivership. As the Ninth Circuit has observed, the leading treatise on the

law of receiverships states:

> It is generally conceded that a court of equity having custody and control of property has power to order a sale of the same in its discretion. The power of sale necessarily follows the power to take possession and control of and to preserve property, resting in the sovereignty and exercised through courts of chancery, or courts having statutory power to make the sale.

*S.E.C. v. Am. Capital Investments, Inc.*, 98 F.3d 1133, 1144 (9th Cir. 1996), *abrogated on other grounds by Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) (quoting 2 Clark on Receivers § 482 (3d ed. 1992)).

Accordingly, the Court has the inherent power to order a sale of receivership property and fashion any distribution plan that is fair and equitable to the investors. *Id.*; *see also Capital Consultants*, 397 F.3d at 738–739.

## II.    Parties' Positions

### a.    Receiver's Position

The Receiver argues it is in the best interests of the receivership estate to conduct an orderly sale of all the GP properties. The Receiver outlines the financial position of the 23 GPs. Over the past three and a half years since the GPs were placed in receivership, 14 of the 23 GP properties have not appreciated in value. Rec. Mot. 2. At the same time, because the GPs must pay property taxes, insurance premiums, administrator fees, tax preparation fees, and in some cases notes to Western to pay underlying mortgages, and because the vast majority of investors have stopped making contributions to their GPs, the balances in GP accounts have steadily declined. Rec. Mot. 3. The aggregate balance in all GP accounts has declined from $6.6 million in September 2012 to approximately $3.5 million as of December 31, 2015, and is projected to be approximately $1.8 million by the end of this year. In the Receiver's words, "money is rapidly being spent to hold properties that are not measurably appreciating in value." *Id.* The Receiver argues that this state of affairs "runs counter to the fundamental purpose of a federal equity receivership, which is to maximize the value in the receivership estate for the benefit of investors and creditors." *Id.*

The Receiver proposes moving all GP properties to the orderly sale process approved by the Court in the May 12, 2015 for the Category B and C properties. *See id.* at 9, Orderly Sale Process, Ex. C. The Receiver also identifies three properties, Dayton IV, Santa Fe, and Yuma III, which are close to being underwater, *i.e.*, the amount owed to mortgages is equal to or greater than their market value, that he recommends surrendering to the lender in satisfaction of the applicable loans. Rec. Mot. 11.

The Receiver then recommends distributing the receivership assets according to one of two approaches, the "One Pot" approach or the "Two Tier" approach. *See id.* at 13. The Receiver favors the One Pot approach. *Id.* at 21.

### b.    SEC's Position

The SEC supports the Receiver's proposal for an orderly sale of the receivership assets and the One Pot distribution plan. SEC Resp. 2.

### c.    Dillon Investors' Position

Dillon and Aguirre Investors commissioned an expert report ("Xpera Report" or "Report") from a consulting group, Xpera Group ("Xpera"), that independently appraised the 23 GP properties. *See* Xpera Report, Dillon Resp., Ex. 1, ECF No. 1234-2. In accordance with findings of the Report, Dillon Investors argue that the Receiver should take a more flexible approach than selling all of the properties now as-is: selling some of the properties in parcels and pursuing zoning and other changes, and holding other properties for 5-10 years in order to maximize the value of the properties. *See* Dillon Resp. 2–13.

Dillon Investors also argue that, as a private sale of realty, the Receiver's orderly sale proposal does not comport with the requirements of 28 U.S.C. § 2001(b). *Id.* at 15–19.

Finally, Dillon Investors agree with the Receiver and the SEC that should an orderly sale occur, the proceeds should be distributed to investors in accordance with

the One Pot approach. Dillon Resp. 19.

### d.   Aguirre Investors' Position

First, Aguirre Investors argue that investors, as members of GPs, are "necessary parties" to the case, and that due process forbids the selling of GP properties by the Receiver. Aguirre Resp. 16; Aguirre SEC Sur-reply 3; Aguirre CO Resp. 2–4.

Second, Aguirre Investors argue that "[n]o true plan can be submitted at this time, because there is a void of critical financial information." Aguirre CO Resp. 1. However, Aguirre Investors' "*concept* of a plan" is that following an accounting of the receivership that would achieve "full disclosure" for the investors, all GPs should take a vote on whether to exit the receivership. *Id.* at 1, 4–9. Aguirre Investors proffer a poll purporting to show that, of 1,104 investors who responded, the vast majority (93.34–96.99%) of investors support removing GPs from the receivership, having investors decide when to sell GPs, and having an accounting of the receivership. Aguirre CO Resp., Ex. 1, at 2.

Aguirre Investors support the Two Tier distribution approach. *See* Transcript of May 20, 2016.

### e.   Individual Investors' Positions

The Court has received a number of letters from individual investors, some of whom support the Receiver's plan, and some of whom oppose it and wish to exit the Receivership. *Compare, e.g.*, ECF Nos. 1282, 1283, *with* ECF Nos. 1249–1257. Some investors disputed the accuracy of Aguirre Investors' poll, arguing that the communications from Aguirre Investors contained factual misrepresentations, did not disclose the full liabilities for investors exiting the receivership, did not contact all investors, and did not take into account the views of those who did not respond. *See* ECF Nos. 1282, 1288; *see also* ECF No. 1282, Appendix B (attaching list of investors opposing removing the GPs from the receivership).

*//*

### III.   Analysis

#### a.      Whether GPs are "Necessary Parties" to the Action

As a threshold matter, Aguirre Investors argue that investors, as members of GPs, are "necessary parties" to the case, and that due process forbids the selling of GP properties. Aguirre Resp. 16; Aguirre SEC Sur-reply 3; Aguirre CO Resp. 2–4. As a result, either the case ought to be stayed, Aguirre Resp. 16, or every order issued in this case since the GPs were not joined as parties is void, or all of the approximately 3,300 or more investors have to be joined as parties, Transcript of May 20, 2016 Hearing, or the Receiver must file a defendant class action and serve all investors as members of the class by mail, Aguirre SEC Sur-reply, or, as the Aguirre Investors requested in an *ex parte* motion filed on the morning of the May 20, 2016 hearing, the Court must set a jury trial and reopen discovery on "the factual issues that remain open in this case" because the Investors have the right to "plenary participation" in the case. Aguirre Ex Parte Mot. 2–4, ECF No. 1297.

Aguirre Investors' argument is without merit. As set forth *supra* in Part I, "the district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership." *Capital Consultants, LLC*, 397 F.3d at 738 (quoting *SEC v. Lincoln Thrift Ass'n*, 577 F.2d 600, 606 (9th Cir. 1978) (internal quotation marks omitted). As the Ninth Circuit has previously stated,

> Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. "The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction."

*See Reebok Int'l v. Marnatech Enter., Inc.*, 970 F.2d 552, 561–62 (9th Cir.1992) (quoting Brown v. Swann, 35 U.S. (10 Pet.) 497, 503, 9 L.Ed. 508 (1836)); *see also Am. Capital Investments, Inc.*, 98 F.3d 1133, 1144. Therefore,

> The federal courts have inherent equitable authority to issue a variety of "ancillary relief" measures in actions brought by the SEC to enforce the federal securities laws. This circuit has repeatedly approved imposition of a receivership in appropriate circumstances. The power of a district court

1
2
3

> to impose a receivership or grant other forms of ancillary relief does not in the first instance depend on a statutory grant of power from the securities laws. Rather, the authority derives from the inherent power of a court of equity to fashion effective relief.

*In re San Vicente Med. Partners Ltd.*, 962 F.2d 1402, 1406 (9th Cir. 1992). Moreover,

4
5
6
7

> It is generally conceded that a court of equity having custody and control of property has power to order a sale of the same in its discretion. The power of sale necessarily follows the power to take possession and control of and to preserve property, resting in the sovereignty and exercised through courts of chancery, or courts having statutory power to make the sale.

8  *Id.* (quoting 2 Clark on Receivers § 482 (3d ed. 1992)).

9        None of the cases cited by Aguirre Investors support the proposition that the
10  Court lacks the authority to determine the appropriate relief in this federal equity
11  receivership.

12       First, with regards to the arguments that the investors, as members of GPs, are
13  "necessary parties," most of the cases Aguirre Investors cite do not concern federal
14  equity receiverships or SEC enforcement actions at all. *Mathews v. Traverse (In re*
15  *Pappas)*, 1994 U.S. App. LEXIS 8881 (9th Cir. Apr. 13, 1994) (unpublished opinion),
16  *Delta Fin. Corp. v. Paul D. Comanduras & Associates*, 973 F.2d 301 (4th Cir. 1992),
17  *Rudnick v. Delfino*, 294 P.2d 983 (Cal. App. Ct. 1956) concern actions brought by
18  members of limited partnerships seeking dissolution of the partnerships. In such cases,
19  courts hold that all members of the partnership are necessary parties. *See* 1994 U.S.
20  App. LEXIS 8881*;* 973 F.2d at 305–06; 294 P.2d 983. *Pac. Queen Fisheries v. Symes*,
21  307 F.2d 700, 721 (9th Cir. 1962), concerned a shipowner insurance dispute where
22  three appellant-plaintiffs, as partners in a fishery that owned the fishing vessel at issue
23  in the case, were held to be "necessary parties [such that their] admissions would be
24  binding on appellant[s]" as a whole for evidentiary purposes. And *Valley Nat. Bank of*
25  *Arizona v. A.E. Rouse & Co.*, 121 F.3d 1332, 1336 (9th Cir. 1997), concerned the issue
26  of whether legal judgments against a partnership can be enforced against partners who
27  were not parties to an action, and concluded that "judgment may not be entered against

28

one not a party to an action" as a matter of procedural due process. *See id.* (citing *Nisenzon v. Sadowski*, 689 A.2d 1037, 1048 (R.I. 1997) ( "To the extent the judgment purports to bind the unnamed Park City partners in their individual capacities without their having been afforded notice and an opportunity to be heard, it is void as violative of their due process rights."); *Duncan, Inc. v. Head*, 519 So.2d 1305, 1308 (Ala. 1988) ( "In an action on a judgment, one may not obtain relief broader than the judgment sued on. The partners must have due process of law."); *Foster Lumber Company, Inc. v. Glad*, 303 N.W.2d 815, 816 (S.D. 1981) ("[D]ue process requires personal service on a partner to bind his individual assets"); *see also Detrio v. United States*, 264 F.2d 658, 660 (5th Cir. 1959) ("Undoubtedly the partnership law that requires personal service on a partner to bind his individual assets is required by concepts of procedural due process."). Here, there is no question of personal judgment being entered against individual investors or binding the assets of individual investors.

Second, Aguirre Investors argue that *San Vicente*, 962 F.2d 1402 and *American Capital Investments, Inc.*, 98 F.3d 1133, demonstrate that even if the assets of limited partnerships can be sold by a receiver, the assets of general partnerships may not be so sold. However, neither case supports this proposition. In *San Vincente*, San Vincente, a limited partnership whose assets were under receivership due to an SEC enforcement action against APHI, the general partnership that administered both San Vincente and 81 other partnerships and trusts, challenged a receiver's actions in selling limited partnership assets. 962 F.2d at 1404–05. San Vincente argued that the receiver did not have the authority to sell the limited partnership assets because it was acting in the place of APHI, which did not have such authority. *Id.* at 1408. However, the Ninth Circuit found that the receiver was not acting in place of the general partner, but as a court-appointed receiver, and was thus not bound by the legal relationship between APHI and San Vincente. *Id.* at 1408–09. Similarly, in *American Capital Investments*, the Ninth Circuit found that a receiver was acting in his capacity as a receiver, not as

3:12-cv-2164-GPC-JMA

a replacement for the ousted general partner, in selling limited partnership assets. 98 F.3d at 1145.

As should be readily apparent, neither case addresses the question of whether general partnership assets may be sold by a receiver in the same way as limited partnership assets. Both cases do, however, repeatedly affirm the "well-established" powers of sale of federal equity receivers, *see id.*, and the "wide discretion" the federal courts enjoy in fashioning relief, *see* 962 F.2d at 1406. And while *American Capital Investments*, 98 F.3d at 1145 n.17, does cite 2 *Clark on Receivers* §§ 482, 491, for the proposition that equity receivers "can conduct a judicial sale of real property that is properly within their 'possession and control' and within the court's territorial jurisdiction, where all parties of interest have been brought before the court," Aguirre Investors cite no authority to support the proposition that investors should be understood to be parties of interest. *See also* Black's Law Dictionary (9th ed. 2011) (defining "party in interest" as "[a] person entitled under the substantive law to enforce the right sued upon and who generally, but not necessarily, benefits from the action's final outcome").

Third, with respect to the due process argument, it is well-established that "the traditional rule is that summary proceedings are appropriate and proper to protect equity receivership assets." *United States v. Arizona Fuels Corp.*, 739 F.2d 455, 456 (9th Cir. 1984) (citations omitted) *see also Am. Capital Investments*, 98 F.3d at 1146 ("For the claims of nonparties to property claimed by receivers, summary proceedings satisfy due process so long as there is adequate notice and opportunity to be heard.") (citing *SEC v. Wencke*, 783 F.2d 829, 836–38 (9th Cir.), *cert. denied*, 479 U.S. 818, (1986); *SEC v. Universal Fin.*, 760 F.2d 1034, 1037 (9th Cir.1985)). In both *San Vicente* and *American Capital Investments*, the Ninth Circuit found due process satisfied where the partnerships had notice of the proceedings and an opportunity to be heard. *See* 98 F.3d at 1147 (finding due process satisfied where "Appellants have

1   presented only one alternative to the district court's comprehensive scheme—their own

2   last-minute purchase proposal, which the district court found financially dubious and

3   inattentive to the needs of creditors, [and the district court] rejected the Investors'

4   proposal only after full briefing, a hearing, and post-hearing supplemental briefing.");

5   962 F.2d at 1407, which investors have been amply afforded in this case, *see, e.g.*, ECF

6   Nos. 790, 794, 1234, 1235, 1277, 1293, 1298.

7       Accordingly, Aguirre Investors' *Ex Parte* Motion for an Order Setting

8   Evidentiary Hearing and Discovery Schedule, ECF No. 1297, is **DENIED**.

9                    **b.   Orderly Sale of GP Properties**

10                         **i.   Xpera Report**

11      Comparing the Receiver's proposal and the recommendations of the Investors'

12  experts, the Court observes that there is a substantial level of agreement between the

13  two regarding how to maximize the value of the receivership estate.

14      The Xpera Report makes the following recommendations: In 12 instances, the

15  Report recommends selling the GP property now, as-is. In 2 instances, the Report

16  recommends selling the GP property now, but exploring whether to sell in bulk or in

17  individual parcels in order to maximize the selling price. In 6 instances, the Report

18  recommends taking relatively minor actions over a time frame of less than a year, such

19  as obtaining a zoning change, getting a subdivision approval, or holding a property for

20  up to 12 months pending the completion of a nearby parkway, in order to maximize the

21  selling price. In 3 instances, the Report recommends holding the GP property, either

22  indefinitely or for a period of 5-10 years, in order to maximize the selling price.

23  *See generally* Xpera Report.

24      In sum, in 20 out of 23 instances, the Xpera report accords with the Receiver's

25  proposal in recommending either selling the property immediately (14 instances), or

26  taking relatively minor actions that would take less than a year in order to improve the

27  value of the property before selling the property (6 instances). As the Receiver points

28

out, the Receiver's orderly sale plan contemplates a sale process that takes a significant period of time, and could incorporate Xpera's suggestions for how to maximize the value of the identified properties. Rec. Dillon Reply 2.

Similarly, the vast majority of Xpera's 2016 appraisal values are in line with the Receiver's 2015 appraisal values. *See id.*, Ex. A. In 14 instances, Xpera's 2016 appraisal values are similar to or only slightly higher than the Receiver's 2015 appraisal values, a difference largely attributable to the year-long gap between the two appraisals. In 6 instances, the difference in appraisal values is due to the increased value Xpera assigns to the recommended zoning and other changes. Only in 3 instances, Las Vegas 1, Washoe IV, and Washoe County 5, is there a significant unexplained difference in appraisal values.

Significantly, the Xpera Report endorses the Receiver's recommended sale of the Jamul Valley property, which has been strongly opposed by both Dillon and Aguirre Investors, *compare* Xpera Report 121, *with* ECF Nos. 1227, 1230, as well as the Receiver's proposed broker and marketing time for the Sante Fe property, Xpera Report 143.

Only in 3 instances does Xpera differ from the Receiver in recommending holding a GP property for a significant length of time. The Court will examine each instance in turn. First, with regards to the Tecate property, Xpera recommends holding the property for an indefinite amount of time until the City of San Diego Planning Department develops an overall plan for the Tecate area including water sources. Xpera Report 128. However, Xpera evinces no optimism that the County will develop such a plan in the foreseeable future, stating that "that process is moving very slowly," and "[a]s a result, the sale of properties in Tecate has virtually ground to a halt." *Id.* at 128.

Second, with regards to the Las Vegas 1 and LV Kade properties, Xpera projects that holding the properties for 5-10 years will result in a two-to-three fold increase in the values of the properties due to their valuable locations. *See* Xpera Report 29–32.

As these two properties are by far the most valuable properties held by investors,[2] Dillon Investors argue that holding these two properties for 5-10 years would significantly increase the value of the receivership estate. Dillon Resp. 2, 6.

Xpera notes, however, that the "Las Vegas economy tends to be cyclical and therefore, prices do not move upward (or downward) in a smooth pattern. It will be necessary to closely track the economy to "catch" an upward wave to optimize the value of the properties." Xpera Report 33. The Receiver also points out that the Xpera recommendations do not take into account that many of the GPs have unpaid expenses. Rec. Dillon Resp. 4. While the Las Vegas 1 and LV Kade properties are appraised at a significant value, they are also among the properties that have unpaid property taxes and cannot pay their operating expenses for 2016. *Id.* The previous capital call directed by the Court last year for Las Vegas 1 only raised $11,776 of the needed $86,850, or 13.56% of the necessary funds, *see* ECF No. 1203 at 1, and the capital call for LV Kade only raised $10,855 of the needed $99,279, or 10.93% of the necessary funds, ECF No. 1166 at 1.

Having reviewed these three instances, the Court declines to direct the Receiver to hold the Tecate period for an indefinite period, and the Las Vegas 1 and LV Kade properties for 5-10 years, in the hope of increasing their selling prices. First, with respect to the Tecate property, the Xpera Report offers no time frame and expresses no optimism that San Diego County will decide on a development plan for the area such that property prices in Tecate will increase in the near future. Second, with respect to the Las Vegas 1 and LV Kade properties, while there is an evident potential for the properties to substantially increase in value, the Xpera report also acknowledges that there is significant risk in continuing to hold the properties due to the cyclical nature

---

[2] Las Vegas 1 was valued by the Receiver as worth $5,275,00 in 2015, and by Xpera as worth between $7,423,976,410 and $9,764,410 in 2016. LV Kade was valued by the Receiver as worth $8,260,000 in 2015, and by Xpera as worth between $8,690,220 and $11,173,140 in 2016. *See* Rec. Dillon Resp., Ex. A.

of the Las Vegas economy, the properties have run out of money to pay their operating expenses this year, and the recent capital calls failed by a very large margin.

That said, the Receiver has expressed willingness to evaluate the recommendations of the Xpera Report and incorporate them where feasible. Rec. Dillon Reply 2. The Receiver has also pointed out that if the One Pot approach is adopted, money from the overall pool could be used to pursue such measures as subdivisions, zoning changes, etc. for the properties that cannot currently pay their operating expenses. *Id.* at 5. Thus, the Court **DIRECTS** the Receiver to file a report and recommendation evaluating the pros and cons of the Xpera Report recommendations, and identifying those recommendations that would feasibly maximize the value of the receivership estate.

### ii.    28 U.S.C. § 2001

Dillon Investors argue that the Receiver's proposed Orderly Sale Process, Rec. Mot., Ex. C, contemplates a private sale of realty but does not comport with the requirements of 28 U.S.C. § 2001(b). Dillon Resp. 15–19. § 2001 provides in relevant part,

> (a) Any realty or interest therein sold under any order or decree of any court of the United States shall be sold as a whole or in separate parcels at public sale at the courthouse of the county, parish, or city in which the greater part of the property is located, or upon the premises or some parcel thereof located therein, as the court directs. Such sale shall be upon such terms and conditions as the court directs. Property in the possession of a receiver or receivers appointed by one or more district courts shall be sold at public sale in the district wherein any such receiver was first appointed, at the courthouse of the county, parish, or city situated therein in which the greater part of the property in such district is located, or on the premises or some parcel thereof located in such county, parish, or city, as such court directs, unless the court orders the sale of the property or one or more parcels thereof in one or more ancillary districts.

> (b) After a hearing, of which notice to all interested parties shall be given by publication or otherwise as the court directs, the court may order the sale of such realty or interest or any part thereof at private sale for cash or other consideration and upon such terms and conditions as the court approves, if it finds that the best interests of the estate will be conserved thereby. Before confirmation of any private sale, the court shall appoint three disinterested persons to appraise such property or different groups of three appraisers each to appraise properties of different classes or

situated in different localities. No private sale shall be confirmed at a price less than two-thirds of the appraised value. Before confirmation of any private sale, the terms thereof shall be published in such newspaper or newspapers of general circulation as the court directs at least ten days before confirmation. The private sale shall not be confirmed if a bona fide offer is made, under conditions prescribed by the court, which guarantees at least a 10 per centum increase over the price offered in the private sale.

The Receiver argues that the requirements for private sales under § 2001(b) are "completely outdated and out of touch with the way real estate is sold in today's market," and will result in significant costs and delay. Rec. Dillon Reply 7. Instead, the Receiver proposes a modified Orderly Sale Process where, once terms of a sale have been agreed on with a prospective purchaser, a public sale is conducted pursuant to the terms of § 2001(a). *Id.* at 6. The Receiver has offered ECF No. 1225 at 13–14 and ECF No. 1285 at 9–10 as examples of how this public sale procedure could operate in conjunction with the proposed Orderly Sale Process.

Upon review of the Receiver's examples, the Court finds that the Receiver's proposed public sale process would comport with the requirements of 28 U.S.C. § 2001. The Court **DIRECTS** the Receiver to file a Modified Orderly Sale Process proposal, based on that provided in Exhibit C of the Receiver's motion, that incorporates the public sale process discussed above.

### iii.   Whether to Allow GPs to Exit the Receivership

On April 5, 2016, the Court *sua sponte* directed the Receiver to craft an additional proposal that would enable general partnerships ("GPs") that wish to do so to exit the receivership while maintaining control of their properties instead of having their properties sold. ECF No. 1224 at 2. The Court specified that "the proposal should include: (1) a procedure by which each GP could elect whether or not to sell; (2) conditions that must be met by each GP that wishes not to sell showing that the GP could maintain fiscal viability going forward; (3) conditions that must be met by each GP to insure fairness to those investors within GPs which wish not to sell but who individually wish to exit their investment; (4) conditions that must be met by each GP

1   to demonstrate their ability for self-governance; (5) alternatives for the disposal of

2   Western's interest in such GPs; and (6) an assessment by the Receiver of the

3   advantages and disadvantages of the proposal." *Id.*

4        The Receiver filed that proposal on April 22, 2016. *See* Rec. CO Prop.; *see also*

5   Rec. CO Supp. The Receiver points out a number of equitable and logistical problems

6   with allowing GPs to exit the receivership, but nonetheless proposes a mechanism

7   whereby the 5 GPs with sufficient cash on hand to pay their operating expenses

8   through 2016 and buy out Western's interest in the GP could vote to exit the

9   receivership. *See id.*

10        Upon review of the Receiver's proposal, the Court determines that it would be

11   both unequitable and impracticable to allow the GPs to exit the receivership at the

12   present time. In his proposal, the Receiver identifies a number of equitable and

13   logistical hurdles complicating any attempt to allow the GPs to exit the receivership.

14   First, as the Court has previously recognized, all investors have a potential interest in

15   the value of all GP properties because Western has a financial stake in each GP, and

16   all investors have potential claims against Western. ECF No. 1003 at 18–20. Moreover,

17   it would be unfair for the fees and costs of the receivership to solely be borne by the

18   non-exiting investors. Rec. CO Prop. 11. This means that it would be unfair to the non-

19   exiting investors for the exiting investors to exit the receivership without repaying

20   amounts owed to Western, buying out Western's interests in the GP, and releasing all

21   claims against Western, including claims held by investors. Rec. CO Prop. 5. It would

22   also be adminstratively unworkable to have exiting investors continue to hold claims

23   against Western, because the amount of investor claims in equity receiverships is

24   determined by the amount of investor losses, which cannot be determined until the GP

25   properties are sold. *Id.* at 6. Under the Receiver's estimate, only 5 GPs have the ability

26   to pay the amount necessary to exit the receivership and have cash remaining after

27   paying their 2016 Expenses.

28

In addition, it would be unfair for investors who did *not* want to leave the receivership to not be cashed out upon a GP exiting the receivership. Otherwise, those investors would be subject to investments they do not want and potentially subject to personal liability for debts of their GPs, a concern several investors have previously expressed. *See* ECF No. 1003 at 18. Only 5 GPs could potentially cash out non-exiting investors with their existing cash on hand. The Receiver points out that any alternative scheme where the exiting investors individually buy out non-exiting investors would be "complicated, time consuming, require a lot of oversight, and, based on the low response rates to investor votes and capital calls,[3] unlikely to work." Rec. CO Prop. 9.

The Receiver also points out that it would be difficult to develop a mechanism for insuring that an exiting GP could govern itself. As the Court has previously recognized, the GPs were structured by Defendants in such a way as to make them essentially ungovernable and dependent on Defendants to make decisions regarding the properties. *See* ECF No. 583 at 6–10. Changing the management structure of the GPs at this stage would require the Receiver to resolve difficult questions regarding "the scope of [a] manager's duties and responsibilities, reporting to investors, payment of manager fees and expenses, liability for errors made, insurance, and other issues." *Id.* at 10. Moreover, it would be unfair not to obtain the consent of all exiting investors as to the new management structure, and any failure to institute a successful management structure could, as noted above, subject exiting investors to personal liability due to the general partnership structure of the GPs. *Id.*

Moreover, to the extent that schemes to monitor investor buy-out and the establishment of GP self-governance become administratively complex, it would be unfair to non-exiting investors, because those administrative costs would be borne by the entire receivership estate.

---

[3] The Receiver points out that the capital calls ordered by the Court last year have raised only 18% of the funds needed. Rec. CO Reply 3.

Finally, the Receiver points out that the 5 GP properties that have sufficient cash on hand to exit the receivership are projected to receive *less* value if they exit the receivership than if they stay in the receivership and receive *pro rata* distributions under the One Pot approach, even using the Xpera Report's 2016 appraised property values. *See* Rec. CO Supp. 2; *id.*, Ex. A. This is because there is no correlation between whether a GP property can pay its operational expenses and whether it has appreciated in value. Rec. CO Prop. 8.

Aguirre Investors' arguments to the contrary are unpersuasive. The Aguirre Investors argue that, following an accounting of the receivership, all GPs should be allowed to take a vote on whether to exit the receivership. Aguirre CO Resp. 1, 4–9. Aguirre Investors argue that until there has been "full disclosure," investors cannot make a well-informed decision about whether to remain in the receivership.

However, the Court has already previously examined numerous allegations from Defendants and individual investors that the Receiver was behaving unethically or irresponsibly, and found no merit in those allegations. *See, e.g.*, ECF No. 1003 at 7–8.[4] The Receiver has been open with investors regarding the troubled financial status of many of the GP properties.

Moreover, on March 4, 2015, the Court directed the Receiver to (1) begin to include a detailed list of expenses in bills sent to investors; (2) obtain updated property appraisals for all GP properties; and (3) provide detailed information packets to all

---

[4] Indeed, at the May 20, 2016 hearing, counsel for Aguirre Investors accused the Receiver of knowingly providing inaccurate financial statements to the Court and investors. *See* Transcript of May 20, 2016 Hearing. Further questioning regarding these accusations revealed that in the second quarter of 2014, the Receiver changed the way Western's receipts and disbursements were calculated so as not to include "flow-through" funds that were technically received from the GPs and then disbursed by Western to creditors, but did not reflect more active financial actions on Western's part. While the Receiver could have included a sentence in an interim report explaining this accounting change to the Court and investors, the Receiver evidently acted in good faith in changing the method for presenting an aspect of Western's financial status so as to render Western's true level of financial activity in a clearer fashion. Aguirre Investors provided no evidence supporting their assertion the Receiver knowingly or intentionally misled the Court.

investors last year describing (a) the SEC's allegations; (b) the Receiver's findings to date, including the original purchase prices of the GP properties, the funds raised by Western from the GPs, how the difference between the purchase prices and the money raised was spent by Western, and the results of the appraisals on the GP properties; (c) the current and projected financial status of the GPs and their properties; and (d) the amount and purpose of the expenses being billed to investors, the amount of billed expenses that are actually paid, and what may occur if insufficient funds are raised from investors to pay operational expenses. *See* ECF No. 1003 at 22; ECF No. 1023, ECF No. 1069. The Court thus rejects Aguirre Investors' argument that investors have not been appropriately informed as to the status of the GP properties.

That said, the Court also recognizes that the Receiver's previous fee reports to the Court have not fully complied with the SEC's recommended format for fee reports. *Compare, e.g.*, Receiver's Fourteenth Interim Report, ECF No. 1189, *with* SEC Standardized Fund Accounting Report: Civil – Receivership Fund ("SFAR"), *available at* Billing Instructions for Receivers in Civil Actions Commended by the U.S. Securities and Exchanges Commission ("SEC Billing Instructions"), https://www.sec.gov/oiea/Article/billinginstructions.pdf. The Court thus **DIRECTS** the Receiver to withdraw and resubmit Receiver's Fourteenth Interim Report, ECF No. 1189, and submit all future fee reports, consistent with SFAR. The Court also **DIRECTS** the Receiver to submit a final fee application "describing in detail the costs and benefits associated with all litigation and other actions pursued by the receiver during the course of the receivership," as recommended by the SEC. *Id.*

The Court also observes that Aguirre Investors have no concrete proposals to resolve the equitable and logistical problems identified by the receiver. At the May 20, 2016 hearing, counsel for Aguirre Investors proffered the Las Vegas 1 property as an example of the simplicity of allowing some GPs to exit the receivership, and stated that the "only thing" keeping Las Vegas 1 in the receivership was $100,000 in unpaid

liability. Transcript of May 20, 2016 Hearing. Aguirre Investors suggested that requiring investors in Las Vegas 1 to pay a mere $212/mo for 6 months would pay this liability and allow Las Vegas 1 to exit the receivership. However, this proposal accounts for none of the concerns articulated by the Court in its April 5, 2016 Order and also identified by the Receiver, including how the minority of investors within exiting GPs who do not wish to exit the GPs would be bought out, the risk that exiting investors would be exposed to personal liability to any debts incurred by the GP due to the structure of the general partnership agreements, the lack of a functioning self-governance mechanism for the exiting GPs, how Western's share in Las Vegas 1 would be bought out, and the fairness to non-exiting GPs of bearing all the fees and costs of the receivership estate.

Aguirre Investors argue largely that solutions to most of these problems cannot be identified until there has been "full disclosure." *See* Aguirre CO Resp. at 6–8; Transcript of May 20, 2016 Hearing.[5] This is an unrealistic response to the considerable risks discussed above that any administratively complex scheme would both unfairly burden the receivership estate and the non-exiting investors, and risk exposing the exiting investors to personal liability on behalf of their GPs. The Court recognizes that in any situation where the assets of the receivership estate are insufficient to pay its claims in full, a certain number of claimants will not receive their desired outcome. However, for the reasons stated above, the Court finds the disadvantages of allowing GPs to exit the receivership at the present time outweigh the

---

[5]Aguirre Investors also argue that the GP agreements contain a number of terms allowing for self-governance, such as appointment of a signatory partner to make various decisions and the appointment of a secretary. *Id.* at 9. However, as discussed above, the existence of these terms does not mitigate the Court's earlier observation that implementing a workable managerial scheme would be an extremely complex task that, if executed incorrectly, could expose exiting investors to personal liability on behalf of their GPs. Similarly, Aguirre Investors' argument that Western's interest in the GPs could be sold as "personalty" seems to contemplate additional work required by the Receiver in order to market and sell Western's interest in each GP. It is also unclear how Western's interest could be sold to non-existing investors, given the nature of the general partnership agreements.

advantages from the perspective of maximizing the value of the receivership estate for all investors.

As an alternative proposal, the Receiver suggests that investors who want to retain GP properties can join together, form new entities, and purchase GP properties from the receivership estate. Rec. CO Prop. 12. In order to avoid forcing investors to essentially "repurchase" properties, the Receiver proposes that any new investor entity be permitted to include as a component of their bid the projected amount its investors will receive in distributions. *Id.* at 13.

The Court finds that this proposal has considerable advantages when compared with allowing GPs to exit the receivership in their current form. As the Receiver points out, "[i]t is not at all unusual for a subset of investors in a distressed investment . . . to form a new entity and purchase assets from the distressed entity." *Id.* The new investor entities could decide their management structure from scratch, and investors who wish to exit their investments could simply decide not to participate in the new investor entity. To the extent that the GP property is being sold below market value, the investor entity would be acquiring a bargain. The receivership estate would bear no administrative expenses in connection with the formation of the new receivership entities. Moreover, the Receiver's proposal that any new investor entity be permitted to include as a component of their bid the projected amount its investors will receive in distributions reduces the cash amount the new investor entity would have to pay to purchase a GP property.

Accordingly, the Court **DIRECTS** the Receiver to allow any new investor entities who seek to purchase GP properties through the Modified Orderly Sale Process to allow the new investor entity to include as a component of its bid for a GP property the projected amount its investors will receive in distributions.

### c.    Distribution of Receivership Assets

Once GP properties have gone through the sale process, sales have closed,

mortgages, taxes, broker commissions, and other costs of sale have been paid, and the net sale proceeds have been recovered, the Receiver proposes two possible approaches for distributing the receivership assets: the "One Pot" approach and the "Two Tier" approach. Under the One Pot approach,

> [A]ll net sale proceeds from all GP properties are pooled and distributed *pro rata* to all investors based on the total funds they invested in all GPs.

*Id.* at 13. Under the Two Tier approach,

> [T]he net sale proceeds from the sale of each GP property go to the GPs that own that property in accordance with their cotenant ownership interests. The debts of each GP are then paid and the remaining net proceeds are distributed directly to investors in accordance with their GP units. The debts paid by the GPs include amounts owed to Western and Western also receives its share of the net proceeds in accordance with the GP units it owns. All investors then share *pro rata* in assets of Western based on the total funds they invested in all GPs.

*Id.*

The Receiver estimates that under the One Pot approach, after outstanding fees and taxes are paid, the total cash available to distribute from the sale of GP properties, cash on hand in GP accounts, the sale of Western's properties, and the recovery of Western's remaining assets, will be approximately $21,804,826. If this amount is distributed *pro rata* under the one pot approach, investors are projected to recover 13.40% of the amount they invested in their GPs. *Id.*

Under the Two Tier approach, approximately $20,582,303 would be distributed directly from GPs to their investors according to their GP units, and approximately $1,222,523 would be distributed to all investors *pro rata* from the remaining assets of Western. Under this approach, the projected recoveries of investors would vary greatly, from as little as 0.75% to as much as 194.07% of their investment. *See id.* at Ex. D.

The Receiver, the SEC, and Dillon Investors all favor the One Pot approach, while Aguirre Investors favor the Two Tier approach. *See* Rec. Mot. 21; SEC Resp. 2; Dillon Resp. 19–20; Aguirre Resp. 18–22; Transcript of May 20, 2016 Hearing.

The Receiver, the SEC, and Dillon Investors make several arguments in favor

of the One Pot approach. First, they argue that in the majority of federal equity receivership cases, receivership assets are pooled and distributed to investors on a *pro rata* basis, because in most circumstances, the similarities in the way investors were harmed outweigh the differences in the way they invested. *See* Rec. Mot. 14 (citing *Capital Consultants*, 397 F.3d at 750; *CFTC v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1116 (9th Cir. 1999); *United States v. Real Property Located at 13328 and 13324 State Highway 75 N.*, 89 F.3d 551, 553–54 (9th Cir. 1996); *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80 (2d Cir. 2002); *SEC v. Forex Asset Mgmt., LLC*, 242 F.3d 325 (5th Cir. 2001); *SEC v. Basic Energy & Affiliated Res.*, 273 F.3d 657 (6th Cir. 2001); *SEC v. Elliott*, 953 F.2d 1560 (11th Cir. 1992), *rev'd in part on other grounds*, 998 F.2d 922 (11th Cir. 1993)). The Court has already previously found that the general partnership agreements and co-tenancy agreements did not convey any powers to investors at the time of investment, and therefore the GP units sold to investors were securities. ECF No. 583 at 14–17. Since all investors were victims of the same scheme, they should be entitled to the same relief. *See* Dillon Resp. 20.

Second, they argue that even in the absence of fraud, pooling of assets for distribution has been approved where distinctions between similarly situated claimants are based primarily on timing or luck. *See, e.g.*, SEC Resp. 4 (citing *S.E.C. v. Sunwest Mgmt., Inc.*, No. CIV. 09-6056-HO, 2009 WL 3245879, at *9 (D. Or. Oct. 2, 2009)). Here, they argue that while some investors evidently conducted research into their investments, the material misrepresentations made by Defendants, and the concealment of information such as (a) the difference between the purchase prices paid by Western for the property, and the marked-up purchase prices paid by the GPs for the property (which ranged from 109% to 1800%); (b) how much each cotenant GP paid for its interest in the property, which increased as time went on; (c) the fact that, on average, 93% of the funds raised from investors went not towards the GP property directly, but to Western where the funds were used in a variety of ways, including to pay Schooler

and pay general Western expenses; (d) the undisclosed mortgages on some of the GP properties; (e) the GP notes owed to Western as a result of some investors financing their purchase of GP units and how much was owed on such notes; (f) the operational/shortfall loans owed to Western because certain GPs were unable to pay their operating expenses; and (g) the fact that Western stopped collecting note payments from certain GPs in the total amount of approximately $3.3 million so GP shortfalls would not be detected. Rec. Mot. 17–18.

The Court recognizes that where the assets of the receivership estate are insufficient to pay its claims in full, no distribution scheme will fully satisfy all investors. That said, the Court agrees with the Receiver, the SEC, and Dillon Investors that the One Pot approach is the more equitable approach. While some investors did conduct research into their investments, and investors signed general partnership agreements tied to specific GPs, the incomplete information available to investors and the essentially fraudulent nature of Defendants' scheme means that even investors who researched the same property could have wildly disparate results under the Two Tier approach depending upon which co-tentant GP they are part of.[6] Under the Two Tier approach, estimated investor recoveries would vary dramatically, between as little as 0.75% to as much as 194.07% of their investment, while under the One Pot approach, investors would uniformly receive an estimated 13.40% recovery. *Id.* at 20–21. Investors in 69 of 86 GPs are projected to receive a greater recovery under the One Pot approach than under the Two Tier approach. *Id.* at 21.

Administrative considerations also support the One Pot approach over the Two Tier approach. The Receiver has noted that pooling receivership assets would ease

---

[6] For instance, the Receiver offers the example of the Jamul Valley property: Under the Two Tier approach, the three GPs that co-own the property, Jamul Meadows, Hidden Hills, and Lyons Valley, would receive one-third of the net sale proceeds from the property. However, because Hidden Hills and Lyons Valley owe GP notes and operation loans to Western, while Jamul Valley does not, investors in Jamul Valley would receive an estimated $133,023, while investors in Hidden Hills and Lyons Valley would receive only $7,549 and $7,339 respectively. *See* Rec. Mot. 18–19.

administration of GPs in arrears with regards to their operating expenses, Rec. Mot. 22, make available resources to consider the Xpera Report recommendations, Rec. Dillon Reply 5, and allow the GP administrator, Lincoln Property Group, and the tax accounting firm that prepares GP tax returns, Duffy Kruspodin & Company, LLP, to be paid and remain as GP service providers, Rec. CO Prop. 4. All investors benefit where the value of the receivership estate is increased by lower administrative costs and higher selling prices for GP properties.

Finally, Aguirre Investors' argument that the One Pot approach is legally impermissible is unconvincing. Essentially, Aguirre Investors argue that courts have only pooled  assets and distributed them *pro rata* where courts have found fraud or commingling. *See* Aguirre Resp. 18–22. Even were that the case, the Court has already previously found that Defendants employed a common scheme, material misrepresentations were made by Defendants in connection with the marketing of the Stead property, ECF No. 1081, and that the GPs were "financially intertwined" with Western, e.g., 93% of the funds raised from investors went not towards the GP property directly, but to Western where the funds were used in a variety of ways. ECF No. 583 at 10. But more importantly, Aguirre Investors have offered no authority denying the broad authority of the Court to fashion an equitable distribution plan.

For the reasons stated above, the Court finds that the One Pot approach would produce a more equitable result for the investors than the Two Tier approach. Ultimately, investors were victims of the same investment scheme, and should receive the same relief. Accordingly, the Court **APPROVES** the Receiver's recommendation for a "One Pot" distribution plan of receivership assets, as well as the recommended Distribution Plan attached as Exhibit E to the Receiver's motion, and the accompanying proposed procedures for the administration of investor claims, set forth in pages 23 to 24 of the Receiver's motion.

## CONCLUSION

Based on the foregoing, **IT IS HEREBY ORDERED** that:

1.   The Receiver's motion for an order (a) authorizing the Receiver to conduct an orderly sale of general partnership ("GP") properties; (b) approving the plan of distributing receivership assets; and (c) approving procedures for the administration of investor claims, ECF No. 1181, is **GRANTED IN PART** and **DENIED IN PART**;

2.   The Court hereby **DIRECTS** the following orderly sale procedures:

   a.   Within fourteen (14) days of the issuance of this Order, the Court **DIRECTS** the Receiver to file a Modified Orderly Sale Process proposal for the Court's approval, incorporating a public sale process consistent with the requirements of 28 U.S.C. § 2001;

   b.   Within 180 days of the issuance of this Order, the Court **DIRECTS** the Receiver to file a report and recommendation evaluating the pros and cons of the Xpera Report recommendations, and identifying those recommendations that would feasibly maximize the value of the receivership estate;

   c.   The Court **DIRECTS** the Receiver to allow any new investor entities who seek to purchase GP properties through the Modified Orderly Sale Process to allow the new investor entity to include as a component of its bid for a GP property the projected amount its investors will receive in distributions;

   d.   The Court **APPROVES** the use of the One Pot approach to distribute receivership assets;

   e.   The Court **APPROVES** the Distribution Plan attached as Rec. Mot., Ex. E, ECF No. 1181; and

   f.   The Court **APPROVES** the proposed procedures for the administration of investor claims, as set forth in Rec. Mot. 23–24, ECF No. 1181.

3.  The Court **DIRECTS** the Receiver to withdraw and resubmit Receiver's Fourteenth Interim Report, ECF No. 1189, and submit all future fee reports, consistent with the SEC Standardized Fund Accounting Report ("SFAR"), *available at* Billing Instructions for Receivers in Civil Actions Commended by the U.S. Securities and Exchanges Commission ("SEC Billing Instructions"), https://www.sec.gov/oiea/Article/billinginstructions.pdf.   The Court also **DIRECTS** the Receiver to submit a final fee application "describing in detail the costs and benefits associated with all litigation and other actions pursued by the receiver during the course of the receivership," as recommended by the SEC's Billing Instructions.

4.  Aguirre Investors' *Ex Parte* Motion for an Order Setting Evidentiary Hearing and Discovery Schedule, ECF No. 1297, is **DENIED**.

**IT IS SO ORDERED.**

DATED:  June 13, 2016

HON. GONZALO P. CURIEL
United States District Judge