UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>LOUIS V. SCHOOLER and FIRST FINANCIAL PLANNING CORPORATION d/b/a WESTERN FINANCIAL PLANNING CORPORATION,<br><br>Defendants. | Case No.: 3:12-cv-02164-GPC-JMA<br><br>**ORDER APPROVING:**<br><br>**SALE OF LV KADE PROPERTY AND AUTHORITY TO PAY BROKER'S COMMISSION**<br><br>**[ECF No. 1506]**<br><br>**(REDACTED VERSION)** |

Before the Court is the Receiver's Motion for Approval of Sale of LV Kade Property ("Motion"). ECF No. 1506. No opposition was filed. Based upon a review of the moving papers and the applicable law, the Court **GRANTS** the Receiver's motion.

## BACKGROUND

### A. The SEC Enforcement Action

On January 21, 2016, the Court granted the SEC's motion for final judgment against Defendant Louis V. Schooler. ECF No. 1170. The SEC had initiated this civil action against Defendant Schooler and Western Financial Planning Corporation ("Western") four years earlier, on account of their practice of defrauding investors into

1

purchasing unregistered securities. *Id.* (citing Second Summary Judgment Order, ECF No. 1081). To carry out the scheme, Defendant Western bought undeveloped real estate, with cash or through financing, and simultaneously formed one or more General Partnerships ("GPs") to own the land. First Summary Judgment Order, ECF No. 1074 at 10. Western then sold General Partnership units to investors and sold the undeveloped real estate to the General Partnerships. *Id.* at 10. In total, Western raised approximately $153 million from almost 3,400 investors through implementing this scheme. *Id.*

### B. The Decline of the General Partnership Assets

In 2013, the Court-appointed Receiver, Thomas Hebrank, engaged licensed appraisers to value the 23 properties owned by the General Partnerships. ECF No. 203 at 2. Those professionals determined that the land was worth $16,328,000 and that the net appraised value (appraised value less outstanding balances on all mortgages) of the properties was $12,860,661. *Id.* The net appraised value represented just 8.41% of the total funds that the general partners had invested in the land. *Id.* The Receiver further estimated that, based on the then-current appraised values of the land, the average GP investor would suffer an 88.40% loss if the GP properties were sold in 2013. *Id.*

Three years later, soon after final judgment was entered, the Receiver moved for authority to conduct an Orderly Sale of the General Partnership Properties ("Orderly Sale"). Motion for Orderly Sale, ECF No. 1181-1. In the Motion, the Receiver indicated that the aggregate value in the GP accounts had been steadily decreasing while litigation was ongoing. *See id.* In September 2012, the Receivership had assets of $6.6 million. *Id.* at 1. By the end of 2015, the assets had dropped to $3.5 million, and the Receiver had reason to believe that the value of the Receivership would continue to drastically decrease through the end of 2016.[1] This decline, he noted, was due to three main factors:

---

[1] The Receiver provided the Court with projections that the Receivership would further decline to $1.8 million by the end of 2016. Indeed, the Receiver's projection has since proved to be accurate. The Eighteenth Interim Status Report submitted by the Receiver indicates that the Receivership's current cash balance is $1,546,447. ECF No. 1441 at 20.

(1) 14 of the 23 properties were not appreciating in value[2]; (2) the properties were not worth enough to cover the costs of the GPs carrying the properties; and (3) low levels of investor contributions to pay GP administrator fees, tax preparation fees, property taxes, property insurance premiums, and notes owed to Western. *See id.* at 1-2. In other words, the Receiver concluded, because the money being spent to hold the GP properties was disproportionately high in relation to the value of the GP's real estate assets, the Receivership was in a steady decline. *Id.*

In order to prevent the value of the Receivership from falling into further decline, the Receiver proposed that the GP properties be sold in accordance with Court-approved orderly sale procedures. *Id.* The Receiver's proposal explained that the best way to maximize the value of all of the GP assets for the benefit of all investors, irrespective of any given investors' direct property interest, was to initiate an orderly sale of the GP properties. *Id.* The Receiver estimated that the Receivership, after conducting sales of the GP properties, Western's properties and asset recovery, would be worth $21,804,826. *Id.* at 16.

**C. The Receiver's Motion for Orderly Sale**

On May 20, 2016, the Court held a hearing on the Receiver's Motion for Orderly Sale, at which time the Court heard from the SEC, Defendant, the Receiver, and the investor-interveners — that is, those investors who were granted permission under Rule 23 to intervene to oppose the Receiver's Motion. *See* ECF No. 1298. A short time thereafter, on May 25, 2016, the Court approved, in part, the Receiver's Orderly Sale process.[3] ECF No. 1304.

---

[2] By way of example, the Receiver notes that the value of these 14 properties in 2016, $3,732,815, was about $400,000 less than their value in 2013, $4,137,000. *Id.* at 2.

[3] The Court directed the Receiver to file a Modified Orderly Sale Process that incorporated the public sale process consistent with the requirement of 28 U.S.C. § 2001. ECF No. 1304. The Receiver filed a modified proposal on June 8, 2016 (ECF No. 1309) and the Court approved the modified proposal on August 30, 2016 (ECF No. 1359).

3

In approving the Orderly Sale, the Court addressed and evaluated the concerns expressed by the Receiver, the SEC, and myriad investors, all of whom held differing positions on whether the Orderly Sale would benefit the Receivership estate. *See generally* ECF Nos. 1181 (Motion for Orderly Sale), 1232 (SEC Response), 1234 (Dillon Investors' Response), 1235 (Graham Investors' Response); *see also, e.g.*, ECF Nos. 1240, 1242, 1244, 1249-1257 (Letters from Investors). The Court also took into consideration the recommendations of the investors' experts, as set forth in the Xpera Report. *See* ECF No. 1304 at 16. The Xpera Report, the Court noted, substantially agreed with the Receiver on how to maximize the value of the Receivership estate and, for the most part, agreed on the appraised value of the various GP properties. *Id.* As such, the Court directed the Receiver, where feasible, to incorporate the recommendations of the Xpera Report into his ultimate Orderly Sale proposal. *Id.* at 19.

On July 22, 2016, the Receiver moved for permission to engage CBRE, a real estate brokerage firm, as a consultant in order to weigh the pros and the cons of the Xpera Report. ECF No. 1341-1. The Court granted the Receiver's motion on August 30, 2016. ECF No. 1359. CBRE presented its findings on the GP properties on October 24, 2016. ECF No. 1419 (filed under seal). On November 22, 2016, the Receiver submitted a report evaluating the Xpera Report recommendations. ECF No. 1405. The Court reviewed the Receiver's report and adopted the recommendations contained therein on December 12, 2016. ECF No. 1423.

**D. LV Kade Property**

The LV Kade property is comprised of 57 acres of undeveloped land in the City of North Las Vegas, Clark County, Nevada. ECF No. 1506 at 2. Four of the general partnerships in the receivership jointly hold the property: the Hollywood Partners, the BLA Partners, the Checkered Flag Partners, and the Victory Lap Partners (collectively the "LV Kade partners"). *Id.*

With the Court's permission, the Receiver appraised the LV Kade property, along with the rest of the properties in the Receivership, in 2013. ECF No. 1405, Ex. A. At

that time, the appraised value of the LV Kade property was $4,110,000. *Id.* at 12. By 2015 and according to a broker opinion value, the property's worth had increased to $8,260,000. *Id.* One year later, in 2016, the Xpera Group valued the LV Kade property between $8,690,220 and $11,173,140. *Id.* Later on in 2016, CBRE estimated that the value of the property ranged from $7,450,000 and $9,310,000. *Id.*

While the value ranges proposed by the Xpera Group and CBRE overlapped, the two professionals differed in terms of when the property should be sold. Whereas the Xpera Group recommended that the property be held for five to ten years for appreciation, *id.*, CBRE recommended that the Receiver ███████████████. ███████████████ ECF No. 1419 at 31 (document under seal). ███████████████
███████████████
███████████████.
███████████ *Id.* (document under seal).

Meanwhile, the general partnerships who owned the LV Kade property had fallen into arrears on payments. In April 2015, the Receiver informed the Court that the LV Kade partners did not have sufficient funds to pay 2015 expenses, would not have the funds needed to pay expenses through 2016, and that the property risked default. *See* ECF No. 1056 at 5, Exhibit A. As such, the Receiver requested permission to initiate a process whereby the LV Kade investors would be given an opportunity to "raise sufficient capital to meet their payment obligations." *Id.* The Receiver's plan further proposed that "If the GPs cannot raise the required capital within a set period of time, . . . the properties should be sold." *Id.*

The Receiver explained that sale was appropriate in the event of a failed capital call because "When GPs have insufficient cash to pay their mortgages, property taxes, insurance, and other expenses, the value of their property interests quickly become impaired due to defaults, late charges, penalties, and accrued interest." *Id.* at 3. Given such consequences, the Receiver stated that "the only way to preserve the value of [the] GP property interests is to sell them and stop the accrual of these charges against the

properties." *Id.* The Court approved the Receiver's plan on May 12, 2015. ECF No. 1069.

Thereafter, the Receiver initiated capital calls to recover the remaining expenses owed on the LV Kade property through 2016. ECF No. 1166 at 2. The Receiver later informed the Court that the attempt failed. *Id.* More specifically, the Receiver stated that while the LV Kade property needed $99,279 to cover its 2016 expenses, the capital call only recovered $10,855. *Id.* Because the LV Kade partners failed to cover the necessary expenses, the Receiver moved the LV Kade property to the orderly sale process in accordance with the Court-approved plan. *Id.* Subsequently and in light of the fact that the LV Kade property expenses remained in arrears, the Receiver asked the Court for permission to list the property for sale with a licensed broker in Las Vegas, Nevada. *Id.* The Court approved the Receiver's recommendation on January 14, 2016. ECF No. 1168.

Beginning in February 2016, the Receiver's broker began to actively market the LV Kade property. ECF No. 1506 at 3. The broker listed the property on LoopNet and Property Line, two "widely used property listing services." *Id.* The broker also sent the LV Kade listing to "approximately 2,400 broker and buyer contacts in the California and Nevada commercial/industrial real estate markets[.]" *Id.* The broker sent follow-up "email blasts" reminding recipients of the LV Kade listing, and the broker additionally made a number of direct calls to "land owners, developers, and investors" that the broker knew in the Las Vegas area. *Id.*

In October 2016, the broker reached out to its broker/buyer contacts with a call for offers. *Id.* Two offers came in. *Id.* One for $8,250,000 and one for $8,500,000. *Id.* Pursuant to the modified orderly sale process, the Receiver sent notice of the offers to the investors and asked the two offerors to submit a best and final offer. *Id.* Both offerors made a final offer with the highest being for $8,750,000. *Id.* No investor submitted a substantive response to the Receiver's notice. *Id.*

6

3:12-cv-02164-GPC-JMA

After entering into negotiations, the offeror and Receiver reached an impasse over the terms of a purchase and sale agreement. *Id.* While those negotiations stalled, the Receiver received another offer from Prologis L.P ("Prologis") for $8,825,000. *Id.* Receiver and Prologis began negotiations and came close to executing a purchase and sale agreement. *Id.* Thereafter, the initial offeror increased its offer to $9,500,000. *Id.* The Receiver proceeded to give Prologis an opportunity to match the new offer and "sign the purchase and sale agreement at that amount." *Id.* at 3-4. Prologis agreed and the parties executed a purchase and sale agreement. *Id.* at 4. Prologis ("the Buyer") has since removed all contingencies. *Id.*

In accordance with the Court-approved modified Orderly Sale procedures, *see generally* ECF No. 1309, 1359, the Receiver sent notice of the offer to investors, but no substantive response addressing the offer was received. ECF No. 1506. After executing the purchase agreement, the Receiver laid out a timeline for the submission of qualified overbids pursuant to the modified Orderly Sale procedures. *Id*. On September 5, 2017, the Receiver notified the Court that no qualified overbids had been received for the LV Kade property. ECF No. 1510.

**E**. **Conclusion**

The Court finds that the purchase price of $9,500,000 is reasonable in light of the Xpera Group and CBRE evaluations. The purchase price falls within the range provided by the Xpera Group ($8,690,220 – $ 11,173,140) and is above the range provided by CBRE ($7,450,000 – $9,310,000). The Court moreover concludes that selling the LV Kade property now is fair and reasonable in light of the LV Kade partners' inability to satisfy the operating expenses of the property. The Receiver provided the partners with an opportunity to hold the property if sufficient capital could have been raised to cover necessary expenses through 2016. After the capital calls failed, the property was moved into an orderly sale process in accordance with the Court-approved procedure. Accordingly, the Court finds that the immediate sale of the property and its purchase price is reasonable and in the best interests of the Receivership estate.

1  The Court is also satisfied that the Receiver has complied with the modified
2  Orderly Sale procedures.  The Receiver's notice of the sale adhered to the modified
3  Orderly Sale procedures, which require that notice of the sale be published "in the
4  county, state, or judicial district of the United States *wherein the realty is situated*," 28
5  U.S.C. § 2002 (emphasis added), by publishing notice in the Las Vegas Review-Journal
6  and by providing notice to the investors.  Accordingly, and given that no opposition to
7  the present Motion has been filed, or raised, and that no qualified overbid was received,
8  the Court **GRANTS** Receiver's motion for approval of sale (ECF No. 1506).

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

8

3:12-cv-02164-GPC-JMA

# ORDER

The Receiver's Motion for Approval of Sale of LV Kade Property and Authority to Pay Broker's Commission ("Motion") of Thomas C. Hebrank ("Receiver"), the Court-appointed receiver for First Financial Planning Corporation d/b/a Western Financial Planning Corporation ("Western"), its subsidiaries and the General Partnerships listed in Schedule 1 to the Preliminary Injunction Order entered on March 13, 2013 (collectively, "Receivership Entities"), having been reviewed and considered by this Court, the Receiver having notified the Court that no qualified overbids were received (ECF No. 1510), and for good cause appearing therefore,

Accordingly, the Court makes the following findings and orders:

1. The Motion is granted;

2. This Court has subject matter jurisdiction over all matters related to this Motion;

3. On March 4, 2015, after due notice and an opportunity to be heard was given to the Receivership Entities, including Hollywood Partners, BLA Partners, Checkered Flag Partners, and Victory Lap, and their investors, this Court ordered that each of the Receivership Entities and their assets are to remain within the Receivership. ECF No. 1003.

4. This Court further ordered, after due notice and an opportunity to be heard was given to the Receivership Entities, including Hollywood Partners, BLA Partners, Checkered Flag Partners, and Victory Lap Partners and their investors, that the Receiver was authorized to conduct a Modified Orderly Sales Process with respect to certain properties owned by Receivership Entities, including the LV Kade property. ECF No. 1304, 1359 ("Modified Orderly Sale Process").

5. The Receiver has complied with the terms of the Modified Orderly Sales Process with respect to the LV Kade property, including the retention of a qualified licensed broker in connection with the marketing of the property. Broker made commercially reasonable efforts to market the property to potential buyers.

9

3:12-cv-02164-GPC-JMA

6. The Receiver's notice of the sale complies with 28 U.S.C. section 2002 requiring that notice of the sale be published "in the county, state, or judicial district of the United States where in the realty is situate" and adhered to the requirement in the Modified Orderly Sale Process that notice be provided to the investors of the Receivership Entities.

7. Due Notice of this Motion and an opportunity to be heard was given to each of the Receivership Entities and their investors.

8. The sale of the Property known as the LV Kade property, as described on Exhibit A to the Declaration of Thomas C. Hebrank in support of the Motion ("Property"), by Thomas C. Hebrank, as receiver for Hollywood Partners, BLA Partners, Checkered Flag Partners, and Victory Lap Partners, to Prologis, L.P. is authorized, confirmed and approved;

9. The purchase price of $9,500,000 for the LV Kade property is reasonable, confirmed and approved;

10. The Receiver is immediately authorized to complete the sale transaction, including executing any and all documents as may be necessary and appropriate to do so;

11. The Receiver is authorized to immediately pay, upon closing of the sale, a commission of 6% of the final purchase price to Broker Colliers International; and

12. Any and all interests and claims to the LV Kade property that the GPs and any of their investors may have are transferred to the proceeds of the sale of the LV Kade property.

**IT IS SO ORDERED.**

Dated: September 5, 2017

Hon. Gonzalo P. Curiel
United States District Judge