UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　　　　　　　　Plaintiff,<br><br>v.<br><br>LOUIS V. SCHOOLER and FIRST FINANCIAL PLANNING CORPORATION d/b/a WESTERN FINANCIAL PLANNING CORPORATION,<br><br>　　　　　　　　　　　　Defendants. | Case No.: 3:12-cv-2164-GPC-JMA<br><br>**ORDER APPROVING:**<br><br>**SALE OF REMAINING 65 ACRE PORTION OF STEAD 1 PROPERTY AND AUTHORITY TO PAY BROKER'S COMMISSION**<br><br>**[ECF No. 1707]** |

Before the Court is the Receiver's Motion for (A) Approval of Sale of Remaining 65 Acre Portion of Stead 1 Property, and (B) Authority to Pay Broker's Commission ("Motion"). ECF No. 1707. No opposition was filed. Based upon a review of the moving papers and the applicable law, the Court **GRANTS** the Receiver's motion.

## BACKGROUND

**A. The SEC Enforcement Action**

On January 21, 2016, the Court granted the SEC's motion for final judgment against Defendant Louis V. Schooler. ECF No. 1170. The SEC had initiated this civil

action against Defendant Schooler and Western Financial Planning Corporation ("Western") four years earlier, on account of their practice of defrauding investors into purchasing unregistered securities. *Id.* (citing Second Summary Judgment Order, ECF No. 1081). To carry out the scheme, Defendant Western bought undeveloped real estate, with cash or through financing, and simultaneously formed one or more General Partnerships ("GPs") to own the land. First Summary Judgment Order, ECF No. 1074 at 10. Western then sold General Partnership units to investors and sold the undeveloped real estate to the General Partnerships. *Id.* at 10. In total, Western raised approximately $153 million from almost 3,400 investors through implementing this scheme. *Id.*

### B. The Decline of the General Partnership Assets

In 2013, the Court-appointed Receiver, Thomas Hebrank, engaged licensed appraisers to value the 23 properties owned by the General Partnerships. ECF No. 203 at 2. Those professionals determined that the land was worth $16,328,000 and that the net appraised value (appraised value less outstanding balances on all mortgages) of the properties was $12,860,661. *Id.* The net appraised value represented just 8.41% of the total funds that the general partners had invested in the land. *Id.* The Receiver further estimated that, based on the then-current appraised values of the land, the average GP investor would suffer an 88.40% loss if the GP properties were sold in 2013. *Id.*

Three years later, soon after final judgment was entered, the Receiver moved for authority to conduct an Orderly Sale of the General Partnership Properties ("Orderly Sale"). Motion for Orderly Sale, ECF No. 1181-1. In the Motion, the Receiver indicated that the aggregate value in the GP accounts had been steadily decreasing while litigation was ongoing. *See id.* In September 2012, the Receivership had assets of $6.6 million. *Id.* at 1. By the end of 2015, the assets had dropped to $3.5 million, and the Receiver had reason to believe that the value of the Receivership would continue to drastically

2

3:12-cv-2164-GPC-JMA

decrease through the end of 2016.[1]  This decline, he noted, was due to three main factors: (1) 14 of the 23 properties were not appreciating in value[2]; (2) the properties were not worth enough to cover the costs of the GPs carrying the properties; and (3) low levels of investor contributions to pay GP administrator fees, tax preparation fees, property taxes, property insurance premiums, and notes owed to Western.  *See id.* at 1-2.  In other words, the Receiver concluded, because the money being spent to hold the GP properties was disproportionately high in relation to the value of the GP's real estate assets, the Receivership was in a steady decline.  *Id.*

In order to prevent the value of the Receivership from falling into further decline, the Receiver proposed that the GP properties be sold in accordance with Court-approved orderly sale procedures.  *Id.*  The Receiver's proposal explained that the best way to maximize the value of all of the GP assets for the benefit of all investors, irrespective of any given investors' direct property interest, was to initiate an orderly sale of the GP properties.  *Id.*  The Receiver estimated that the Receivership, after conducting sales of the GP properties, Western's properties and asset recovery, would be worth $21,804,826.  *Id.* at 16.

**C. The Receiver's Motion for Orderly Sale**

On May 20, 2016, the Court held a hearing on the Receiver's Motion for Orderly Sale, at which time the Court heard from the SEC, Defendant, the Receiver, and the investor-interveners — that is, those investors who were granted permission under Rule 23 to intervene to oppose the Receiver's Motion.  *See* ECF No. 1298.  A short time

---

[1] The Receiver provided the Court with projections that the Receivership would further decline to $1.8 million by the end of 2016.  Indeed, the Receiver's projection has since proved to be accurate.  The Twentieth Interim Status Report submitted by the Receiver indicates that the Receivership's current cash and cash equivalent balance is $666,113.  ECF No. 1505 at 17.

[2] By way of example, the Receiver notes that the value of these 14 properties in 2016, $3,732,815, was about $400,000 less than their value in 2013, $4,137,000.  *Id.* at 2.

thereafter, on May 25, 2016, the Court approved, in part, the Receiver's Orderly Sale process.[3] ECF No. 1304.

In approving the Orderly Sale, the Court addressed and evaluated the concerns expressed by the Receiver, the SEC, and myriad investors, all of whom held differing positions on whether the Orderly Sale would benefit the Receivership estate. *See generally* ECF Nos. 1181 (Motion for Orderly Sale), 1232 (SEC Response), 1234 (Dillon Investors' Response), 1235 (Graham Investors' Response); *see also, e.g.*, ECF Nos. 1240, 1242, 1244, 1249-1257 (Letters from Investors). The Court also took into consideration the recommendations of the investors' experts, as set forth in the Xpera Report. *See* ECF No. 1304 at 16. The Xpera Report, the Court noted, substantially agreed with the Receiver on how to maximize the value of the Receivership estate and, for the most part, agreed on the appraised value of the various GP properties. *Id.* As such, the Court directed the Receiver, where feasible, to incorporate the recommendations of the Xpera Report into his ultimate Orderly Sale proposal. *Id.* at 19.

On July 22, 2016, the Receiver moved for permission to engage CBRE, a real estate brokerage firm, as a consultant in order to weigh the pros and the cons of the Xpera Report. ECF No. 1341-1. The Court granted the Receiver's motion on August 30, 2016. ECF No. 1359. CBRE presented its findings on the GP properties on October 24, 2016. ECF No. 1419 (filed under seal). On November 22, 2016, the Receiver submitted a report evaluating the Xpera Report recommendations. ECF No. 1405. The Court reviewed the Receiver's report and adopted the recommendations contained therein on December 12, 2016. ECF No. 1423.

**D. Remaining 65 Acre Portion of Stead 1 Property**

---

[3] The Court directed the Receiver to file a Modified Orderly Sale Process that incorporated the public sale process consistent with the requirement of 28 U.S.C. § 2001. ECF No. 1304. The Receiver filed a modified proposal on June 8, 2016 (ECF No. 1309) and the Court approved the modified proposal on August 30, 2016 (ECF No. 1359).

Stead 1 Property includes approximately 106 acres of undeveloped land, which is located in Washoe County, Nevada. ECF No. 1707-1 at 2. The Stead I Property is made up of twelve parcels that are divided by two streets and one rail line. Prior to being transferred to the Qualified Settlement Fund Trust, 50% of the Stead I Property was held by two General Partnerships—P-39 Partners and P-40 Partners—and the other 50% was held by P51, LLC. *Id.*

In 2015, the Receiver obtained an appraisal of Stead I Property estimating the value to be $420,000. *Id.* In early 2016, Xpera Group valued Stead I Property between $1,584,000 and $3,168,000. *Id.* This valuation range was based on dividing the property into small parcels that would be sold one by one over several years. *Id.* at 3. The Receiver then had CBRE evaluate Stead I Property. CBRE recommended Stead I Property be sold "as is" with an estimated value of $860,600. *Id.*

The Receiver engaged a local property manager to coordinate the clean-up of trash and debris on Stead I Property to maximize the sale value. *Id.* While the work was ongoing, the Receiver received unsolicited interest in a 42-acre portion of Stead I Property. *Id.* Purchase and sale terms were negotiated and a sale contract was signed for $1,000,000. *Id.* Subsequently, an overbid in the amount of $1,282,600 was received, and the 42-acre portion was sold to the overbidder. *Id.* The remaining 65-acre portion of Stead 1 Property (the "Property") was then listed for sale with Bradway Properties, a licensed broker in the area.

The best offer for the Property was from Blake Hoffmann in the amount of $475,000. *Id.* In accordance with the Court-approved modified Orderly Sale procedures, *see generally* ECF Nos. 1309, 1359, the Receiver sent notice of the offer to investors. ECF No. 1707-1 at 3. The Receiver and Hoffmann agreed on a purchase price of $475,000 for the Property. *Id.* After executing the purchase agreement, the Receiver also laid out a timeline for the submission of qualified overbids pursuant to the modified Orderly Sale procedures. *Id.* at 8-10.

On May 1, 2019, the Receiver filed a Notice of the Receipt of Qualified Overbids, stating that two qualified overbids had been received by the overbid deadline. ECF No. 1717 at 2. The Receiver then conducted an auction on May 2, 2019. ECF No. 1720 at 2. At the conclusion of the auction, the highest bid was from Brad Armstrong ("Buyer") in the amount of $875,000. *Id.* The Receiver and Buyer signed a Purchase and Sale Agreement. *See id.* at 6, Ex. A. The second highest bid at the auction was from SS Sierra Investments, Inc. ("Back Up Buyer") in the amount of $825,000. *Id.* at 3. The Receiver and Back Up Buyer signed a Purchase and Sale Agreement. *See id.* at 41, Ex. B.

**E. Conclusion**

The Court finds that the purchase price of $875,000 is reasonable in light of the fact that, when combined with the purchase price for the 42-acre portion of Stead I Property ($1,282,600), it exceeds the 2015 appraised value of $420,000 and the CBRE value estimate of $860,000 for Stead I Property. The purchase price is also consistent with the Xpera Group valuation range ($1,584,000–$3,168,000), especially considering the Receiver did not incur the significant expense of breaking the property up into small lots, as Xpera had recommended.

The Court is also satisfied that the Receiver's notice of the sale adhered to the modified Orderly Sale procedures—which require that notice of the sale be published "in the county, state, or judicial district of the United States *wherein the realty is situated*," 28 U.S.C. § 2002 (emphasis added)—by publishing notice in the Reno Journal-Gazette, a newspaper of general circulation in Washoe County, Nevada, and by providing notice to the investors.

Accordingly, and given that no opposition to the present Motion has been filed or raised, the Court **GRANTS** Receiver's motion for approval of sale. In the event Buyer does not close the sale for any reason, the Court authorizes the Receiver to close the sale to Back Up Buyer at the price of $825,000.

**ORDER**

The Motion for (A) Approval of Sale of Remaining 65 Acre Portion of Stead I Property, and (B) Authority to Pay Broker's Commission ("Motion") filed by Thomas C. Hebrank ("Receiver"), the Court-appointed receiver for First Financial Planning Corporation d/b/a Western Financial Planning Corporation ("Western"), its subsidiaries, and the General Partnerships listed in Schedule 1 to the Preliminary Injunction Order entered on March 13, 2013, having been reviewed and considered by this Court, the Receiver having notified the Court regarding the receipt of a qualified overbid and the results of the auction (ECF No. 1720), and for good cause appearing therefore, the Court finds as follows:

1. The Motion is **GRANTED**;

2. The sale of the Property known as the Remaining 65 Acre Portion of Stead I Property ("Property"), as described on Exhibit A to the Notice of Results of Auction of Remaining 65-Acre Portion of Stead I Property ("Auction Results Notice"), by Thomas C. Hebrank, as receiver, to Brad Armstrong ("Buyer") is confirmed and approved;

3. The purchase price of $875,000 for the Property is confirmed and approved;

4. The Receiver is immediately authorized to complete the sale transaction, including executing any and all documents as may be necessary and appropriate to do so; and

5. Because a broker is representing the buyer, and pursuant to the Court-approved listing agreement, the Receiver is authorized to pay, upon closing of the sale, a commission of 6% of the final purchase price to broker Bradway Properties.

6. In the event the sale of the Property to Buyer does not close pursuant to the terms of the Purchase and Sale Agreement and Joint Escrow Instructions attached to the Auction Results Notice as Exhibit A, the sale of the Property to SS Sierra Investments, Inc. ("Back Up Buyer") for the purchase price of $825,000, pursuant to the Purchase and Sale Agreement and Joint Escrow Instructions attached to the Auction Results Notice as Exhibit B, is approved, and the Receiver is authorized to complete the sale transaction to

Back Up Buyer, including executing any and all documents as may be necessary and appropriate to do so.

**IT IS SO ORDERED.**

Dated: June 3, 2019

Hon. Gonzalo P. Curiel
United States District Judge