UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                          Plaintiff,<br><br>v.<br><br>LOUIS V. SCHOOLER and FIRST FINANCIAL PLANNING CORPORATION d/b/a WESTERN FINANCIAL PLANNING CORPORATION,<br><br>                        Defendants. | Case No.: 3:12-cv-2164-GPC-JMA<br><br>**ORDER APPROVING:**<br><br>**SALE OF VISTA TECATE PROPERTY AND AUTHORITY TO PAY BROKER'S COMMISSION**<br><br>**[ECF No. 1722]** |

Before the Court is the Receiver's Motion for (A) Approval of Sale of Vista Tecate Property, and (B) Authority to Pay Broker's Commission ("Motion"). ECF No. 1722. No opposition was filed. Based upon a review of the moving papers and the applicable law, the Court **GRANTS** the Receiver's motion.

## BACKGROUND

**A. The SEC Enforcement Action**

On January 21, 2016, the Court granted the SEC's motion for final judgment against Defendant Louis V. Schooler. ECF No. 1170. The Court granted the SEC's

1

3:12-cv-2164-GPC-JMA

motion for revised final judgment on June 4, 2019. ECF No. 1724. The SEC had initiated this civil action against Defendant Schooler and Western Financial Planning Corporation ("Western") four years earlier, on account of their practice of defrauding investors into purchasing unregistered securities. *Id.* (citing Second Summary Judgment Order, ECF No. 1081). To carry out the scheme, Defendant Western bought undeveloped real estate, with cash or through financing, and simultaneously formed one or more General Partnerships ("GPs") to own the land. First Summary Judgment Order, ECF No. 1074 at 10. Western then sold General Partnership units to investors and sold the undeveloped real estate to the General Partnerships. *Id.* at 10. In total, Western raised approximately $153 million from almost 3,400 investors through implementing this scheme. *Id.*

**B. The Decline of the General Partnership Assets**

In 2013, the Court-appointed Receiver, Thomas Hebrank, engaged licensed appraisers to value the 23 properties owned by the General Partnerships. ECF No. 203 at 2. Those professionals determined that the land was worth $16,328,000 and that the net appraised value (appraised value less outstanding balances on all mortgages) of the properties was $12,860,661. *Id.* The net appraised value represented just 8.41% of the total funds that the general partners had invested in the land. *Id.* The Receiver further estimated that, based on the then-current appraised values of the land, the average GP investor would suffer an 88.40% loss if the GP properties were sold in 2013. *Id.*

Three years later, soon after final judgment was entered, the Receiver moved for authority to conduct an Orderly Sale of the General Partnership Properties ("Orderly Sale"). Motion for Orderly Sale, ECF No. 1181-1. In the Motion, the Receiver indicated that the aggregate value in the GP accounts had been steadily decreasing while litigation was ongoing. *See id.* In September 2012, the Receivership had assets of $6.6 million. *Id.* at 1. By the end of 2015, the assets had dropped to $3.5 million, and the Receiver had reason to believe that the value of the Receivership would continue to drastically

decrease through the end of 2016.[1]  This decline, he noted, was due to three main factors: (1) 14 of the 23 properties were not appreciating in value[2]; (2) the properties were not worth enough to cover the costs of the GPs carrying the properties; and (3) low levels of investor contributions to pay GP administrator fees, tax preparation fees, property taxes, property insurance premiums, and notes owed to Western.  *See id.* at 1-2.  In other words, the Receiver concluded, because the money being spent to hold the GP properties was disproportionately high in relation to the value of the GP's real estate assets, the Receivership was in a steady decline.  *Id.*

In order to prevent the value of the Receivership from falling into further decline, the Receiver proposed that the GP properties be sold in accordance with Court-approved orderly sale procedures.  *Id.*  The Receiver's proposal explained that the best way to maximize the value of all of the GP assets for the benefit of all investors, irrespective of any given investors' direct property interest, was to initiate an orderly sale of the GP properties.  *Id.*  The Receiver estimated that the Receivership, after conducting sales of the GP properties, Western's properties and asset recovery, would be worth $21,804,826.  *Id.* at 16.

**C. The Receiver's Motion for Orderly Sale**

On May 20, 2016, the Court held a hearing on the Receiver's Motion for Orderly Sale, at which time the Court heard from the SEC, Defendant, the Receiver, and the investor-interveners — that is, those investors who were granted permission under Rule 23 to intervene to oppose the Receiver's Motion.  *See* ECF No. 1298.  A short time

---

[1] The Receiver provided the Court with projections that the Receivership would further decline to $1.8 million by the end of 2016.  Indeed, the Receiver's projection has since proved to be accurate.  The Twentieth Interim Status Report submitted by the Receiver indicates that the Receivership's current cash and cash equivalent balance is $666,113.  ECF No. 1505 at 17.

[2] By way of example, the Receiver notes that the value of these 14 properties in 2016, $3,732,815, was about $400,000 less than their value in 2013, $4,137,000.  *Id.* at 2.

thereafter, on May 25, 2016, the Court approved, in part, the Receiver's Orderly Sale process.[3] ECF No. 1304.

In approving the Orderly Sale, the Court addressed and evaluated the concerns expressed by the Receiver, the SEC, and myriad investors, all of whom held differing positions on whether the Orderly Sale would benefit the Receivership estate. *See generally* ECF Nos. 1181 (Motion for Orderly Sale), 1232 (SEC Response), 1234 (Dillon Investors' Response), 1235 (Graham Investors' Response); *see also, e.g.*, ECF Nos. 1240, 1242, 1244, 1249-1257 (Letters from Investors). The Court also took into consideration the recommendations of the investors' experts, as set forth in the Xpera Report. *See* ECF No. 1304 at 16. The Xpera Report, the Court noted, substantially agreed with the Receiver on how to maximize the value of the Receivership estate and, for the most part, agreed on the appraised value of the various GP properties. *Id.* As such, the Court directed the Receiver, where feasible, to incorporate the recommendations of the Xpera Report into his ultimate Orderly Sale proposal. *Id.* at 19.

On July 22, 2016, the Receiver moved for permission to engage CBRE, a real estate brokerage firm, as a consultant in order to weigh the pros and the cons of the Xpera Report. ECF No. 1341-1. The Court granted the Receiver's motion on August 30, 2016. ECF No. 1359. CBRE presented its findings on the GP properties on October 24, 2016. ECF No. 1419 (filed under seal). On November 22, 2016, the Receiver submitted a report evaluating the Xpera Report recommendations. ECF No. 1405. The Court reviewed the Receiver's report and adopted the recommendations contained therein on December 12, 2016. ECF No. 1423.

**D. Vista Tecate Property**

---

[3] The Court directed the Receiver to file a Modified Orderly Sale Process that incorporated the public sale process consistent with the requirement of 28 U.S.C. § 2001. ECF No. 1304. The Receiver filed a modified proposal on June 8, 2016 (ECF No. 1309) and the Court approved the modified proposal on August 30, 2016 (ECF No. 1359).

Vista Tecate Property (the "Property") includes undeveloped land located in San Diego County, California. ECF No. 1722-1 at 2. The Property is one of the properties that collectively are known as the "Tecate" properties, all of which are located in the San Diego area. *Id.* Prior to being transferred to the Qualified Settlement Fund Trust, the Property was held outright by one General Partnership—Vista Tecate Partners. *Id.*

On March 7, 2016, the Receiver recommended that the Tecate properties be listed for sale with Real Blue Properties[4] ("Broker"), a licensed broker located in the San Diego area, with the Vista Property listed for $100,000. *Id.* On May 25, 2016, the Court approved the Receiver's recommendation. *Id.* Broker promptly listed and advertised the Tecate properties for sale and marketed them to interested parties via the Multiple Listing Service (MLS) by placing "For Sale" signs on the properties, attending Broker Caravan marketing sessions, and publicizing the Tecate property listings. *Id.* Broker has responded to over 70 phone calls and emails about the properties from interested parties and toured the properties with interested parties on over 47 separate occasions. *Id.* at 2–3.

In 2013, the Receiver obtained an appraisal of the Property estimating the value to be $96,000. *Id.* at 3. Two years later, in 2015, the Receiver obtained a broker opinion of value for the Property estimating the value to be $43,000. *Id.* In early 2016, Xpera Group valued the Property between $346,000 and $519,000—but this valuation was based on the Property being held for an indefinite period until San Diego County finalizes the development plan in the area. *Id.* The Court expressly rejected the indefinite timing proposed by Xpera. ECF No. 1304 at 18.

The County has been working on this development plan for over 30 years and there is no current timeframe for when the development plan will be finalized. ECF No. 1722-1 at 3. Additionally, Xpera noted the very limited sales transactions in the area,

---

[4] Real Blue Properties subsequently changed its name to Resonate Real Estate.

explaining that in 2014 and 2015, only two properties sold each year and that "the sale of properties in Tecate has virtually ground to a halt." *Id.* Additionally, in their schedule detailing transactions that took place between 2012 and 2015, almost all transactions in the area were for between $25,000 and $42,000. The only exception was a property that sold for $250,000, which they noted was different from the Tecate properties in that it was a "prime property directly on the border." *Id.*

Unfortunately, no offers for the Property were received for many months after it was listed. The Receiver, in consultation with Broker, determined that gradually reducing the list price was the best course of action to generate more interest in the Property. Accordingly, the list price was gradually reduced until it reached $60,000, at which point an offer for $60,000 was received from Irma Angelica Rodriguez ("Buyer"). The Receiver gave notice of the offer to investors and entered into negotiations with Buyer. The Receiver and Buyer then executed a Vacant Land Purchase Agreement and Joint Escrow Instructions ("Agreement"), subject to overbid and Court approval, with a purchase price of $60,000. On May 6, 2019, Buyer removed all contingencies (other than Court approval). On June 20, 2019, the Receiver notified the Court that no qualified overbids had been received for the Property. ECF No. 1728.

**E. Conclusion**

The Court finds that the purchase price of $60,000 is reasonable in light of the facts that the sale of Tecate properties has virtually ground to a halt and the Court previously declined to direct the Receiver to hold the Tecate properties for an indefinite period of time. There are very limited sales transactions in the area, and of these limited transactions, almost all were for between $25,000 and $42,000. Moreover, the purchase price of $60,000 exceeds the broker opinion value of $43,000.

The Court is also satisfied that the Receiver's notice of the sale adhered to the modified Orderly Sale procedures—which require that notice of the sale be published "in the county, state, or judicial district of the United States *wherein the realty is situated*," 28 U.S.C. § 2002 (emphasis added)—by publishing notice in the San Diego Union-

6

3:12-cv-2164-GPC-JMA

1 | Tribune, a newspaper of general circulation in San Diego County, and by providing
2 | notice to the investors.
3 |       Accordingly, and given that no opposition to the present Motion has been filed or
4 | raised, and no qualified overbid was received, the Court **GRANTS** Receiver's motion for
5 | approval of sale.
6 | //
7 | //
8 | //
9 | //
10 | //
11 | //
12 | //
13 | //
14 | //
15 | //
16 | //
17 | //
18 | //
19 | //
20 | //
21 | //
22 | //
23 | //
24 | //
25 | //
26 | //
27 | //
28 | //

# ORDER

The Motion for (A) Approval of Sale of Vista Tecate Property, and (B) Authority to Pay Broker's Commission ("Motion") filed by Thomas C. Hebrank ("Receiver")—the Court-appointed receiver for First Financial Planning Corporation d/b/a Western Financial Planning Corporation ("Western"), its subsidiaries, and the General Partnerships listed in Schedule 1 to the Preliminary Injunction Order entered on March 13, 2013—having been reviewed and considered by this Court, the Receiver having notified the Court that no qualified overbid has been received, and for good cause appearing therefore, the Court finds as follows:

1. The Motion is **GRANTED**;

2. The sale of the Property known as the Vista Tecate Property ("Property"), as described on Exhibit A to the Declaration of Thomas C. Hebrank in support of the Motion, by Thomas C. Hebrank, as receiver, to Irma Angelica Rodriguez ("Buyer") is confirmed and approved;

3. The purchase price of $60,000 for the Property is confirmed and approved;

4. The Receiver is immediately authorized to complete the sale transaction, including executing any and all documents as may be necessary and appropriate to do so; and

5. The Receiver is authorized to pay, upon closing of the sale, a commission of 9% of the final purchase price to broker Resonate Real Estate.

**IT IS SO ORDERED.**

Dated: July 24, 2019

Hon. Gonzalo P. Curiel
United States District Judge