UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>LOUIS V. SCHOOLER and FIRST FINANCIAL PLANNING CORPORATION d/b/a WESTERN FINANCIAL PLANNING CORPORATION,<br><br>Defendants. | Case No.: 3:12-cv-2164-GPC-JMA<br><br>**ORDER APPROVING:**<br><br>**SALE OF YUMA PROPERTIES AND AUTHORITY TO PAY BROKER'S COMMISSION**<br><br>**[ECF No. 1735]** |

Before the Court is the Receiver's Motion for (A) Approval of Sale of Yuma Properties, and (B) Authority to Pay Broker's Commission ("Motion"). ECF No. 1735. No opposition was filed. Based upon a review of the moving papers and the applicable law, the Court **GRANTS** the Receiver's motion.

1

# BACKGROUND

## A. The SEC Enforcement Action

On January 21, 2016, the Court granted the SEC's motion for final judgment against Defendant Louis V. Schooler. ECF No. 1170. The Court granted the SEC's motion for revised final judgment on June 4, 2019. ECF No. 1724. The SEC had initiated this civil action against Defendant Schooler and Western Financial Planning Corporation ("Western") four years earlier, on account of their practice of defrauding investors into purchasing unregistered securities. *Id.* (citing Second Summary Judgment Order, ECF No. 1081). To carry out the scheme, Defendant Western bought undeveloped real estate, with cash or through financing, and simultaneously formed one or more General Partnerships ("GPs") to own the land. First Summary Judgment Order, ECF No. 1074 at 10. Western then sold General Partnership units to investors and sold the undeveloped real estate to the General Partnerships. *Id.* at 10. In total, Western raised approximately $153 million from almost 3,400 investors through implementing this scheme. *Id.*

## B. The Decline of the General Partnership Assets

In 2013, the Court-appointed Receiver, Thomas Hebrank, engaged licensed appraisers to value the 23 properties owned by the General Partnerships. ECF No. 203 at 2. Those professionals determined that the land was worth $16,328,000 and that the net appraised value (appraised value less outstanding balances on all mortgages) of the properties was $12,860,661. *Id.* The net appraised value represented just 8.41% of the total funds that the general partners had invested in the land. *Id.* The Receiver further estimated that, based on the then-current appraised values of the land, the average GP investor would suffer an 88.40% loss if the GP properties were sold in 2013. *Id.*

Three years later, soon after final judgment was entered, the Receiver moved for authority to conduct an Orderly Sale of the General Partnership Properties ("Orderly Sale"). Motion for Orderly Sale, ECF No. 1181-1. In the Motion, the Receiver indicated that the aggregate value in the GP accounts had been steadily decreasing while litigation

was ongoing. *See id.* In September 2012, the Receivership had assets of $6.6 million. *Id.* at 1. By the end of 2015, the assets had dropped to $3.5 million, and the Receiver had reason to believe that the value of the Receivership would continue to drastically decrease through the end of 2016.[1] This decline, he noted, was due to three main factors: (1) 14 of the 23 properties were not appreciating in value[2]; (2) the properties were not worth enough to cover the costs of the GPs carrying the properties; and (3) low levels of investor contributions to pay GP administrator fees, tax preparation fees, property taxes, property insurance premiums, and notes owed to Western. *See id.* at 1-2. In other words, the Receiver concluded, because the money being spent to hold the GP properties was disproportionately high in relation to the value of the GP's real estate assets, the Receivership was in a steady decline. *Id.*

In order to prevent the value of the Receivership from falling into further decline, the Receiver proposed that the GP properties be sold in accordance with Court-approved orderly sale procedures. *Id.* The Receiver's proposal explained that the best way to maximize the value of all of the GP assets for the benefit of all investors, irrespective of any given investors' direct property interest, was to initiate an orderly sale of the GP properties. *Id.* The Receiver estimated that the Receivership, after conducting sales of the GP properties, Western's properties and asset recovery, would be worth $21,804,826. *Id.* at 16.

**C. The Receiver's Motion for Orderly Sale**

On May 20, 2016, the Court held a hearing on the Receiver's Motion for Orderly Sale, at which time the Court heard from the SEC, Defendant, the Receiver, and the investor-interveners — that is, those investors who were granted permission under Rule

---

[1] The Receiver provided the Court with projections that the Receivership would further decline to $1.8 million by the end of 2016. Indeed, the Receiver's projection has since proved to be accurate. The Twentieth Interim Status Report submitted by the Receiver indicates that the Receivership's current cash and cash equivalent balance is $666,113. ECF No. 1505 at 17.

[2] By way of example, the Receiver notes that the value of these 14 properties in 2016, $3,732,815, was about $400,000 less than their value in 2013, $4,137,000. *Id.* at 2.

23 to intervene to oppose the Receiver's Motion. *See* ECF No. 1298. A short time thereafter, on May 25, 2016, the Court approved, in part, the Receiver's Orderly Sale process.³ ECF No. 1304.

In approving the Orderly Sale, the Court addressed and evaluated the concerns expressed by the Receiver, the SEC, and myriad investors, all of whom held differing positions on whether the Orderly Sale would benefit the Receivership estate. *See generally* ECF Nos. 1181 (Motion for Orderly Sale), 1232 (SEC Response), 1234 (Dillon Investors' Response), 1235 (Graham Investors' Response); *see also, e.g.*, ECF Nos. 1240, 1242, 1244, 1249-1257 (Letters from Investors). The Court also took into consideration the recommendations of the investors' experts, as set forth in the Xpera Report. *See* ECF No. 1304 at 16. The Xpera Report, the Court noted, substantially agreed with the Receiver on how to maximize the value of the Receivership estate and, for the most part, agreed on the appraised value of the various GP properties. *Id.* As such, the Court directed the Receiver, where feasible, to incorporate the recommendations of the Xpera Report into his ultimate Orderly Sale proposal. *Id.* at 19.

On July 22, 2016, the Receiver moved for permission to engage CBRE, a real estate brokerage firm, as a consultant in order to weigh the pros and the cons of the Xpera Report. ECF No. 1341-1. The Court granted the Receiver's motion on August 30, 2016. ECF No. 1359. CBRE presented its findings on the GP properties on October 24, 2016. ECF No. 1419 (filed under seal). On November 22, 2016, the Receiver submitted a report evaluating the Xpera Report recommendations. ECF No. 1405. The Court reviewed the Receiver's report and adopted the recommendations contained therein on December 12, 2016. ECF No. 1423.

**D. Yuma Properties**

---

³ The Court directed the Receiver to file a Modified Orderly Sale Process that incorporated the public sale process consistent with the requirement of 28 U.S.C. § 2001. ECF No. 1304. The Receiver filed a modified proposal on June 8, 2016 (ECF No. 1309) and the Court approved the modified proposal on August 30, 2016 (ECF No. 1359).

The "Yuma Properties" include undeveloped land known as the Yuma I, Yuma II, and Yuma III properties, as well as undeveloped parcels adjacent to Yuma I and Yuma II that were owned by Western, all of which properties are located in Yuma County, Arizona. ECF 1735-1 at 2. Prior to being transferred to the Qualified Settlement Fund Trust (or QSF Trust) set up to hold title to the properties, the Yuma I, Yuma II, and Yuma III properties were each held by multiple General Partnerships (three GPs for Yuma I, and four GPs each for Yuma II and Yuma III) with each GP having an undivided percentage interest in its respective property. ECF No. 735-2, Declaration of Thomas C. Hebrank ("Hebrank Decl.") ¶ 2.

On October 27, 2016, the Receiver recommended that the Yuma Properties be listed for sale with CB Richard Ellis ("CBRE"), a licensed broker located in the Yuma area ("Broker"), with Yuma I, Yuma II, and Yuma III listed initially for $350,000 each, for a total of $1,050,000. ECF No. 1399; Hebrank Decl. ¶ 3. On December 6, 2016, the Court approved the Receiver's recommendation. ECF No. 1416.

Broker listed and advertised the Yuma Properties[4] for sale and marketed them to interested parties via the Costar/Loopnet listing service[5] and by preparing and emailing a marketing brochure to approximately 19,000 brokers and real estate agents every 21 days. ECF No. 1735-1 at 2-3. Broker previously responded to two offers that were considered too low to be reasonable. Hebrank Decl., ¶ 3.

Since the Receiver was appointed, several valuations of the Yuma Properties have been done. ECF No. 1735-1 at 3. In 2013, with the Court's authorization, the Receiver obtained an appraisal of the Yuma I, Yuma II, and Yuma III properties estimating the value of each property to be $265,000, $275,000, and $141,000, respectively, with a

---

[4] The Western-owned Yuma land had previously been listed with a different broker, but the listing was changed to CBRE once the Court approved the CBRE listing of Yuma I, Yuma II, and Yuma III, and all four properties were then listed together with a combined list price of $1,400,000 (*i.e.* $350,000 each).
[5] Costar/Loopnet is a commonly used electronic listing service for commercial properties throughout the United States. ECF No. 1735 n.2.

combined value of $681,000. ECF No. 1405, Ex. A at 14. Two years later, in 2015, with the Court's authorization, the Receiver obtained a broker opinion of value for the Yuma I, Yuma II, and Yuma III properties estimating the value to be $153,000, $195,000, and $159,620, respectively, with a combined value of $507,620. *Id*.

No offers for the Yuma Properties were received for several months after they were listed. Hebrank Decl., ¶ 4. The Receiver, in consultation with Broker, determined that gradually reducing the list price was the best course of action to generate more interest in the Property. *Id.* Accordingly, the combined list price was reduced until it reached $400,000, at which point an offer for $300,000 was received from M Land Investments, LLC ("Buyer"). *Id*. The Broker recommended acceptance of the offer. *Id*. The Receiver gave notice of the offer to investors and entered into negotiations with Buyer. *Id*. The Receiver and Buyer then executed a Purchase and Sale Agreement and Joint Escrow Instructions ("Agreement"), subject to overbid and Court approval. *Id*. Buyer conducted its due diligence and removed all contingencies (other than Court approval) on July 16, 2019. *Id.* On July 24, 2019, the Receiver notified the Court that no qualified overbids had been received for the Yuma Properties. ECF No. 1741.

**E. Conclusion**

The Court finds that the purchase price of $300,000 is reasonable in light of the fact that the Yuma Properties has been marketed over the last 32 months and $300,000 is the best offer received. Hebrank Decl., ¶ 7.

The Court is also satisfied that the Receiver's notice of the sale adhered to the modified Orderly Sale procedures—which require that notice of the sale be published "in the county, state, or judicial district of the United States *wherein the realty is situated*," 28 U.S.C. § 2002 (emphasis added)—by publishing notice in the Yuma Sun, a newspaper of general circulation in Yuma County, and by providing notice to the investors.

Accordingly, and given that no opposition to the present Motion has been filed or raised, and no qualified overbid was received, the Court **GRANTS** Receiver's motion for approval of sale.

# ORDER

The Motion for (A) Approval of Sale of Yuma Properties, and (B) Authority to Pay Broker's Commission ("Motion") filed by Thomas C. Hebrank ("Receiver")—the Court-appointed receiver for First Financial Planning Corporation d/b/a Western Financial Planning Corporation ("Western"), its subsidiaries, and the General Partnerships listed in Schedule 1 to the Preliminary Injunction Order entered on March 13, 2013—having been reviewed and considered by this Court, the Receiver having notified the Court that no qualified overbid has been received, and for good cause appearing therefore, the Court finds as follows:

1. The Motion is **GRANTED**;

2. The sale of the Yuma I, Yuma II, and Yuma III properties known as the Yuma Properties ("Properties"), as described in Exhibit A to the Declaration of Thomas C. Hebrank in support of the Motion, by Thomas C. Hebrank, as receiver, to M Land Investments, LLC ("Buyer") is confirmed and approved;

3. The purchase price of $300,000 for the Property is confirmed and approved;

4. The Receiver is immediately authorized to complete the sale transaction, including executing any and all documents as may be necessary and appropriate to do so; and

5. The Receiver is authorized to pay, upon closing of the sale, a commission of 10% of the final purchase price to CB Richard Ellis ("Broker"), one third of which will be paid to the Buyer's broker.

**IT IS SO ORDERED.**

Dated: November 13, 2019

Hon. Gonzalo P. Curiel
United States District Judge