UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　　　　　　　Plaintiff,<br><br>v.<br><br>LOUIS V. SCHOOLER and FIRST FINANCIAL PLANNING CORPORATION d/b/a WESTERN FINANCIAL PLANNING CORPORATION,<br><br>　　　　　　　　　　　Defendants. | Case No.:  3:12-cv-2164-GPC-JMA<br><br>**ORDER APPROVING SALE OF WASHOE III PROPERTY AND AUTHORITY TO PAY BROKER'S COMMISSION AND VACATING HEARING**<br><br>[ECF No. 1765] |

Before the Court is the Receiver's Motion for (A) Approval of Sale of Washoe III Property, and (B) Authority to Pay Broker's Commission ("Motion"). ECF No. 1765. On July 16, 2020, Receiver filed a Notice of Winning Bid for Washoe III Property and Submission of Amended Proposed Order Approving Winning Bid. ECF No. 1775. No opposition was filed. Based upon a review of the moving papers and the applicable law, the Court **GRANTS** the Receiver's Motion and approves the Amended Proposed Order Approving Winning Bid.

The hearing on this matter set for July 31, 2020 is hereby **VACATED**.

## BACKGROUND

### A. The SEC Enforcement Action

On January 21, 2016, the Court granted the SEC's motion for final judgment against Defendant Louis V. Schooler. ECF No. 1170. The Court granted the SEC's motion for revised final judgment on June 4, 2019. ECF No. 1724. The SEC had initiated this civil action against Defendant Schooler and Western Financial Planning Corporation ("Western") four years earlier, on account of their practice of defrauding investors into purchasing unregistered securities. *Id.* (citing Second Summary Judgment Order, ECF No. 1081). To carry out the scheme, Defendant Western bought undeveloped real estate, with cash or through financing, and simultaneously formed one or more General Partnerships ("GPs") to own the land. First Summary Judgment Order, ECF No. 1074 at 10. Western then sold General Partnership units to investors and sold the undeveloped real estate to the General Partnerships. *Id.* at 10. In total, Western raised approximately $153 million from almost 3,400 investors through implementing this scheme. *Id.*

### B. The Decline of the General Partnership Assets

In 2013, the Court-appointed Receiver, Thomas Hebrank, engaged licensed appraisers to value the 23 properties owned by the General Partnerships. ECF No. 203 at 2. Those professionals determined that the land was worth $16,328,000 and that the net appraised value (appraised value less outstanding balances on all mortgages) of the

properties was $12,860,661. *Id.* The net appraised value represented just 8.41% of the total funds that the general partners had invested in the land. *Id.* The Receiver further estimated that, based on the then-current appraised values of the land, the average GP investor would suffer an 88.40% loss if the GP properties were sold in 2013. *Id.*

Three years later, soon after final judgment was entered, the Receiver moved for authority to conduct an Orderly Sale of the General Partnership Properties ("Orderly Sale"). Motion for Orderly Sale, ECF No. 1181-1. In the Motion, the Receiver indicated that the aggregate value in the GP accounts had been steadily decreasing while litigation was ongoing. *See id.* In September 2012, the Receivership had assets of $6.6 million. *Id.* at 1. By the end of 2015, the assets had dropped to $3.5 million, and the Receiver had reason to believe that the value of the Receivership would continue to drastically decrease through the end of 2016.[1] This decline, he noted, was due to three main factors: (1) 14 of the 23 properties were not appreciating in value[2]; (2) the properties were not worth enough to cover the costs of the GPs carrying the properties; and (3) low levels of investor contributions to pay GP administrator fees, tax preparation fees, property taxes, property insurance premiums, and notes owed to Western. *See id.* at 1-2. In other words, the Receiver concluded, because the money being spent to hold the GP properties was disproportionately high in relation to the value of the GP's real estate assets, the Receivership was in a steady decline. *Id.*

In order to prevent the value of the Receivership from falling into further decline, the Receiver proposed that the GP properties be sold in accordance with Court-approved orderly sale procedures. *Id.* The Receiver's proposal explained that the best way to maximize the value of all of the GP assets for the benefit of all investors, irrespective of

---

[1] The Receiver provided the Court with projections that the Receivership would further decline to $1.8 million by the end of 2016. Indeed, the Receiver's projection has since proved to be accurate. The Twentieth Interim Status Report submitted by the Receiver indicates that the Receivership's current cash and cash equivalent balance is $666,113. ECF No. 1505 at 17.

[2] By way of example, the Receiver notes that the value of these 14 properties in 2016, $3,732,815, was about $400,000 less than their value in 2013, $4,137,000. *Id.* at 2.

any given investors' direct property interest, was to initiate an orderly sale of the GP properties. *Id.* The Receiver estimated that the Receivership, after conducting sales of the GP properties, Western's properties and asset recovery, would be worth $21,804,826. *Id.* at 16.

**C. The Receiver's Motion for Orderly Sale**

On May 20, 2016, the Court held a hearing on the Receiver's Motion for Orderly Sale, at which time the Court heard from the SEC, Defendant, the Receiver, and the investor-interveners—that is, those investors who were granted permission under Rule 23 to intervene to oppose the Receiver's Motion. *See* ECF No. 1298. A short time thereafter, on May 25, 2016, the Court approved, in part, the Receiver's Orderly Sale process.[3] ECF No. 1304.

In approving the Orderly Sale, the Court addressed and evaluated the concerns expressed by the Receiver, the SEC, and myriad investors, all of whom held differing positions on whether the Orderly Sale would benefit the Receivership estate. *See generally* ECF Nos. 1181 (Motion for Orderly Sale), 1232 (SEC Response), 1234 (Dillon Investors' Response), 1235 (Graham Investors' Response); *see also, e.g.*, ECF Nos. 1240, 1242, 1244, 1249-1257 (Letters from Investors). The Court also took into consideration the recommendations of the investors' experts, as set forth in the Xpera Report. *See* ECF No. 1304 at 16. The Xpera Report, the Court noted, substantially agreed with the Receiver on how to maximize the value of the Receivership estate and, for the most part, agreed on the appraised value of the various GP properties. *Id.* As such, the Court directed the Receiver, where feasible, to incorporate the recommendations of the Xpera Report into his ultimate Orderly Sale proposal. *Id.* at 19.

---

[3] The Court directed the Receiver to file a Modified Orderly Sale Process that incorporated the public sale process consistent with the requirement of 28 U.S.C. § 2001. ECF No. 1304. The Receiver filed a modified proposal on June 8, 2016 (ECF No. 1309) and the Court approved the modified proposal on August 30, 2016 (ECF No. 1359).

On July 22, 2016, the Receiver moved for permission to engage CBRE, a real estate brokerage firm, as a consultant in order to weigh the pros and the cons of the Xpera Report. ECF No. 1341-1. The Court granted the Receiver's motion on August 30, 2016. ECF No. 1359. CBRE presented its findings on the GP properties on October 24, 2016. ECF No. 1419 (filed under seal). On November 22, 2016, the Receiver submitted a report evaluating the Xpera Report recommendations. ECF No. 1405. The Court reviewed the Receiver's report and adopted the recommendations contained therein on December 12, 2016. ECF No. 1423.

**D. Washoe III Property**

The Washoe III Property includes approximately 1,670 acres of undeveloped land located in Washoe County, Nevada. ECF. No. 1765-2, Declaration of Thomas C. Hebrank ("Hebrank Decl.") ¶ 2. Prior to being transferred to the Qualified Settlement Fund Trust (or QSF Trust), set up to hold title to the properties, the property was held by Four General Partnerships: Antelope Springs, Spanish Springs View, Big Ranch, and Wild Horse.

Since the appointment of the Receiver, several valuations of the Washoe III Property have been conducted. In 2013, with the Court's authorization, the Receiver obtained an appraisal estimating the value of the property to be $600,000. ECF No. 1405, Ex. A at 13. In 2015, the Receiver obtained a second appraisal estimating the value to be $940,000. *Id.* In early 2016, Xpera Group valued the property between $1,505,889 and $5,019,630[4], depending on whether the property was sold in one transaction or divided into lots (in which case, the marketing time would be substantially increased). ECF No. 1245-1 at 61-62.

---

[4] The Receiver lists the Xpera Group valuation as ranging between "$1,000,000 - $5,000,000" in the Memorandum of Points and Authorities in Support of Receiver's Motion for (A) Approval of Sale of Washoe III Property and (B) Authority to Pay Broker's Commission. No. 1765-1 at 2.

     The Washoe III Property has been listed with licensed broker NAI Alliance Carson City ("Broker") for the last four years. Hebrank Decl., ¶ 3. Although the list price began at $1,670,000, due to lack of interest, the price was periodically reduced until it reached $450,000. *Id.* At that point, two offers were received. *Id.* The Receiver negotiated terms with both prospective buyers and signed a Purchase and Sale Agreement and Joint Escrow Instructions ("Agreement") with buyers Adam Ferran and Creg Garcia ("Buyer") for a purchase price of $550,000. *Id.* Other offers received were invited to qualify as overbidders. *Id.* Shortly after the offer was received, the investors were provided notice via email. *Id.*, ¶ 5.

     On June 18, 2020, the Receiver filed his Motion for (A) Approval of Sale of Washoe III Property and (B) Authority to Pay Broker's Commission ("Motion") (ECF No. 1765), which sought approval of the Washoe III Property sale to Buyer for $550,000, pursuant to the Agreement. ECF No. 1765-3. In the Motion, the Receiver proposed a deadline for submission of qualified overbids, July 7, 2020 ("Overbid Deadline").

     The Receiver then published notice of the opportunity to overbid for the property in the *Reno Journal-Gazette* for four consecutive weeks, pursuant to 28 U.S.C. §§ 2001(a) and 2002, as provided in the Motion. ECF No. 1765-1 at 6-8. On July 8, 2020, the Receiver filed Notice of the Receipt of a Qualified Overbid, stating that one qualified overbid had been received by the Overbid Deadline. ECF No. 1771. The original buyer and overbidder agreed the resultant auction would be conducted via Zoom call on July 9, 2020. The overbidder, ARJ Properties LLC ("Winning Bidder"), had the winning bid in the amount of $710,000. ECF No. 1775 at 2. Reflecting the result of the auction, the Receiver and Winning Bidder signed a Purchase and Sale Agreement ("Winning Bidder PSA"). *Id.* The Receiver now asks the Court to approve the sale to the Winning Bidder at the price of $710,000, pursuant to the Winning Bidder PSA, and give the Receiver authorization to take the necessary steps to close the sale. *Id.*

/ / /

/ / /

### E. Conclusion

The Court finds that the purchase price of $710,000 is reasonable in light of the fact that the Washoe III Property has been marketed for four years and $710,000 is the best offer received.  Hebrank Decl. ¶ 3.

The Court is also satisfied that the Receiver's notice of the sale adhered to the modified Orderly Sale procedures—which require that notice of the sale be published "in the county, state, or judicial district of the United States *wherein the realty is situated*," 28 U.S.C. § 2002 (emphasis added)—by publishing notice in the *Reno Journal-Gazette*, a newspaper of general circulation in Washoe County, and by providing notice to the investors.  Accordingly, and given that no opposition to the present Motion has been filed or raised, the Court **GRANTS** Receiver's motion for approval of sale.

## ORDER

The Receiver's Motion for (A) Approval of Sale of Washoe III Property, and (B) Authority to Pay Broker's Commission ("Motion") of Thomas C. Hebrank ("Receiver"), the Court-appointed receiver for First Financial Planning Corporation d/b/a Western Financial Planning Corporation ("Western"), its subsidiaries and the General Partnerships listed in Schedule 1 to the Preliminary Injunction Order entered on March 13, 2013 (collectively, "Receivership Entities"), having been reviewed and considered by this Court, as well as the Receiver's Notice of Receipt of Qualified Overbids (ECF. No. 1771) and Notice of Winning Bid for Washoe III Property and Submission of Amended Proposed Order Approving Winning Bid ("Notice of Winning Bid") (ECF. No. 1775), and for good cause appearing therefore, the Court finds as follows:

1. The Court **GRANTS** Receiver's motion;

2. The sale of the property known as the Washoe III Property, as described in Exhibit A to the Notice of Winning Bid ("Property"), by Thomas C. Hebrank, as receiver,

to ARJ Properties LLC ("Winning Bidder") is confirmed and approved;

    3.    The purchase price of $710,000 for the Property is confirmed and approved;

    4.    The Receiver is authorized to pay broker NAI Alliance Carson City a commission of 6% of the gross sales price;

    5.    The Receiver is immediately authorized to complete the sale transaction, including executing any and all documents as may be necessary and appropriate to do so.

**IT IS SO ORDERED.**

Dated: July 23, 2020

Hon. Gonzalo P. Curiel
United States District Judge